**UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| IN RE: | CASE NO:  25-55072-SMS |
| JDI CUMBERLAND INLET, LLC | |
| Debtor. | CHAPTER 11 |

**MOTION OF CAMDEN COUNTY JOINT DEVELOPMENT AUTHORITY TO (I)
DISMISS CASE; OR (II) ALTERNATIVELY, GRANT RELIEF FROM THE
AUTOMATIC STAY**

Camden County Joint Development Authority (the "**Development Authority**"), moves

on the following grounds for entry of an order (i) dismissing this chapter 11 case (the

"**Bankruptcy Case**") filed by JDI Cumberland Inlet, LLC (the "**Debtor**") for cause pursuant to

11 U.S.C. § 1112(b) and Rules 1017(a) and 9014 of the Federal Rules of Bankruptcy Procedure

(the "**Bankruptcy Rules**"), or alternatively (ii) granting the Development Authority relief from

the automatic stay for cause pursuant to 11 U.S.C. § 362(d)(1) and Bankruptcy Rule 4001(a).

## I.      JURISDICTION AND VENUE

1.      This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157

and 1334. Consideration of this Motion is a core proceeding pursuant to 28 U.S.C. § 157(b).

## II.      PROCEDURAL BACKGROUND

2.      On May 5, 2025, the Debtor filed its voluntary bankruptcy petition under chapter

11 of the Bankruptcy Code (the "**Petition**"). (Doc. 1).

3.      The Debtor continues to manage its affairs as a debtor-in-possession, pursuant to

Sections 1107 and 1108 of the Bankruptcy Code.

4.      No creditors' committee or trustee has been appointed in this case.

5.      On May 22, 2025, the Debtor filed its bankruptcy schedules and statement of financial affairs (the "**Schedules**"). (Doc. 11).

6.      On June 30, 2025, the Office of the United States Trustee conducted the section 341 meeting of creditors at which the Debtor's representative James F. Jacoby testified on behalf of the Debtor under oath. A true and correct copy of the transcript from the 341 meeting of creditors (the "**341 Transcript**") is attached hereto as Exhibit "A. "

7.      On July 24, 2025, the Development Authority began conducting its examination of the Debtor pursuant to Bankruptcy Rule 2004. A true and correct copy of the transcript from the Rule 2004 examination (the "**2004 Transcript**") is attached as Exhibit "B."

8.      On July 29, 2025, the Court entered its Consent Order Granting Motion to Designate Nature of Debtor's Business as Single Asset Real Estate Under 11 U.S.C. 101(51B) and Setting Related Deadlines (the "**SARE Order**") pursuant to which the Court, among other things, determined that the Debtor's business is single asset real estate as defined by section 101(51B) of the Bankruptcy Code. (Doc. 35.).

### III.    FACTS[1]

**A. The Debtor's Assets and Operations.**

9.      The Debtor's only asset (except for $11,784.84 of cash held in a checking account and a $1,145.00 security deposit) is an undeveloped contiguous tract of land in Camden County, Georgia (the "**Real Property**").[2] (Doc. 11, at 1–2, 6; 2004 Transcript 8:21–9:7, 16:13–17; The Debtor has no business operations other than its ownership of the undeveloped Real

---

[1] Contemporaneously with the filing of this Motion, the Development Authority filed the Affidavit of James M. Coughlin in support of Motion (the "Coughlin Aff.").

[2] Remarkably, the Debtor values the Real Property at $172,000,000.00. (Doc. 11, at 6; 2004 Transcript 15:6–22.) This figure is nearly 16 times the amount of undisputed, non-contingent, liquidated secured, priority and general unsecured claims listed in the Schedules. Although the Development Authority agrees that its claim is over secured, it does not believe the value of the Real Property is anywhere near the Debtor's purported value.

Property. The Debtor has no employees and also generates no income from operations or otherwise. (Doc. 11, at 20; 341 Transcript 20:10–12; 2004 Transcript 48:4–14).

**B.  The Loan.**

10.    The Camden County Joint Development Authority (the "**Development Authority"**) is a joint development authority duly organized and validly existing under the Constitution and laws of the State of Georgia, including the Development Authorities Law (O.C.G.A. § 36-62-1, et seq.), as amended (the "**Act**"). The Development Authority was created and enacted pursuant to the Act for the purpose of promoting trade, commerce, industry, and employment opportunities for the public good and general welfare and for the purpose of promoting the general welfare of the State of Georgia, specifically in Camden County, Georgia. Pursuant to the Act, the Development Authority has the power, to among other things, borrow money in furtherance of its public purposes and to use the proceeds thereof for a project for any industrial, commercial, business, office, parking, public, or other use.

11.    Pursuant to this authority, the Development Authority entered into a Development Agreement (the "**Development Agreement**") dated September 16, 2020, with the City of St. Marys, Georgia and Jacoby Development Inc. ("**Jacoby Development**")[3] which sets forth the parties' agreement regarding the development of the developable portion of the Real Property (the "**Development Property**") into a "Master Project."[4]  (Coughlin Aff.¶ 4).

12.    Jacoby Development thereafter assigned the Development Agreement to the Debtor pursuant to an Assignment and Assumption of Development Agreement dated June 1,

---

[3] Jacoby Development owns 100% of the equity interest in the Debtor. (Doc. 11, at 18; 2004 Transcript 41:1–3). James F. Jacoby owns 100% of the equity interest in Jacoby Development. (2004 Transcript 43:21–44:2).
[4] The Development Property consists of approximately 560 acres. That portion of the Real Property that is not the Development Property is undevelopable salt marsh along the North River in Camden County consisting of approximately 740 acres (the "**Salt Marsh**"). The Development Authority does not believe that the Salt Marsh has meaningful economic value to the Debtor.

2021, (the "**Assignment**") but was not released of its obligations thereunder.  (Coughlin Aff. ¶ 5).

16. 13.        Consistent with the Development Agreement, the Development Authority adopted a bond resolution on August 25, 2020, and a supplemental resolution on June 10, 2021, (the "**Bond Resolutions**") authorizing it to issue Taxable Industrial Development Revenue Bonds, Series 2020, in the original principal amount of $10,848,500 (the "**Series 2020 Bond**") to, among other things, finance the Debtor's acquisition of the Development Property for development as provided in the Development Agreement.  (Coughlin Aff. ¶ 6).

14.        Pursuant to the Bond Resolutions, the Development Authority issued its Series 2020 Bond, the proceeds of which were used, in part, to make a loan (the "**Loan**") to the Debtor for the acquisition of Development Property. Contractual principal and interest payments on the Loan are to be used to fund the payments due on the Series 2020 Bond.  (Coughlin Aff. ¶ 7).

15.        In connection with the Loan, the Debtor and Development Authority entered into a Loan Agreement dated as June 1, 2021 (the "**Loan Agreement**").  (Coughlin Aff. ¶ 8).

16.        The Loan is further evidenced by, among other things, a Promissory Note executed by the Debtor in favor of the Development Authority, dated June 1, 2021 (the "**Promissory Note**").  (Coughlin Aff. ¶ 9).

17.        The Debtor also executed a Guaranty dated June 1, 2021 (the "**JDI Guaranty**") in favor of the Development Authority pursuant to which it, among other things, "absolutely and unconditionally" guaranteed repayment of the Series 2020 Bond as described therein. (Coughlin Aff. ¶ 10).

18.        On June 1, 2021, Jacoby Development executed a Guaranty (the "**Jacoby Guaranty**") pursuant to which it absolutely and unconditionally guaranteed, among other

things, the Debtors obligations under the Loan Documents, which includes repayment of the Loan and the Series 2020 Bond. (Coughlin Aff. ¶ 11).

19.    The Loan and all other obligations of the Debtor under the Loan Documents (as defined below) are secured pursuant to a Fee and Leasehold Deed to Secure Debt and Security Agreement (First Priority) dated June 1, 2021, (the "**First Priority Instrument**") executed by the Debtor in favor of the Development Authority and recorded with the Clerk of Court for Camden County, Georgia in Book 2128, beginning on Page 796. (Coughlin Aff. ¶ 12).

20.    The Loan and all other obligations of the Debtor under the Loan Documents are further secured pursuant to a Fee and Leasehold Deed to Secure Debt and Security Agreement (Second Priority) dated June 1, 2021, (the "**Second Priority Instrument**") executed by the Debtor in favor of the Development Authority and recorded with the Clerk of Court for Camden County, Georgia in Book 2128, beginning on Page 837. The First Priority Instrument and the Second Priority Instrument are collectively referred to as the "**Instruments**." (Coughlin Aff. ¶ 13).

21.    The Loan and all other obligations of the Debtor under the Loan Documents are further secured pursuant to an Assignment of Leases and Rents (First Priority) executed by the Debtor in favor of the Development Authority dated June 1, 2021 (the "**First Priority Assignment of Leases and Rents**") and recorded with the Clerk of Court for Camden County, Georgia in Book 2128, beginning on Page 819. (Coughlin Aff. ¶ 14).

22.    The Loan and all other obligations of the Debtor under the Loan Documents are further secured pursuant to an Assignment of Leases and Rents (Second Priority) executed by the Debtor in favor of the Development Authority dated June 1, 2021, (the "**Second Priority Assignment of Leases and Rents**") and recorded with the Clerk of Court for Camden County,

Georgia in Book 2128, beginning on Page 859.  The First Priority Assignment of Leases and Rents and the Second Priority Assignment of Leases and Rents are collectively referred to as the "Assignments."  (Coughlin Aff. ¶ 15).

23.     The liens and security interests granted pursuant to the Instruments and Assignments cover all or substantially all the Development Property.  (Coughlin Aff. ¶ 16).

24.     The Debtor's obligations under the Loan Documents are further secured pursuant to a Collateral Assignment of Government Authorizations (the "**Collateral Assignment**") executed by the Debtor in favor of the Development Authority dated June 1, 2021.  (Coughlin Aff. ¶ 17).

25.     The term "Loan Documents" includes the Development Agreement, the Loan Agreement, the Promissory Note, the JDI Guaranty, the Jacoby Guaranty, the Instruments, the Assignments, the Collateral Assignment, and any other written agreements executed in connection with the Loan.  (Coughlin Aff. ¶ 18).

26.     Pursuant to an Intergovernmental Contract dated June 1, 2021, between Camden County and the Development Authority that was executed in connection with the Loan and the issuance of the Series 2020 Bond, Camden County, subject to certain conditions and limitations, is responsible to pay the Series 2020 Bond if the Debtor and Jacoby Development fail to pay the Loan or meet their obligations under JDI Guaranty and the Jacoby Guaranty to pay the Series 2020 Bond.  (Coughlin Aff. ¶ 19).

**C.  Loan Defaults and Non-Judicial Foreclosure.**

27.     The Debtor defaulted on its obligations under the Loan Documents by, among other things, failing to make payments to the Development Authority when required under the Loan Documents. The Debtor's first payment default occurred when it failed to timely pay the

6

principal and interest payment due on the Loan on August 15, 2024, in the amount of $763,648.75 ($192,675 interest and $570,973.68 principal). Consequently, the Development Authority was forced to make the corresponding payment on the Series 2020 Bond due September 1, 2024, in the amount of $763,648.75. The Debtor ultimately paid the August 15th payment late on October 21, 2024.[5]  (Coughlin Aff. ¶ 21).

28.    The Debtor thereafter defaulted on the next payment due under the Loan on February 15, 2025, in the amount of $181,341.24. As a result, the Development Authority was forced again to make the corresponding payment on the Series 2020 Bond due March 1, 2025, in the amount of $181,341.24.  (Coughlin Aff. ¶ 22).

29.    On or about February 21, 2025, the Development Authority provided the Debtor with Notice of Default and accelerated the amounts due under the Loan Documents (the **"Default Letter"**) because of the Debtor's failure to make the February 15th payment. (Coughlin Aff. ¶ 23).

30.    The Development Authority received no response to the Default Letter and on March 28, 2025, sent the Debtor and others Notices of Foreclosure Sale (the "**Foreclosure Sale Notices**") that scheduled non-judicial foreclosure sales regarding the Security Instruments and the Development Property for the first Tuesday in May 2025 (May 6, 2025).  (Coughlin Aff. ¶ 24).  Importantly, the Debtor filed its Bankruptcy Case the day before the scheduled non-judicial foreclosure on May 5th with the specific intent to delay the foreclosure sales. (341 Transcript 19:6–11; 2004 Transcript 17:17–24).

**D. Amounts Due on the Loan.**

31.    As of August 15, 2025, the Debtor owes the Development Authority

---

[5] Loan payments are due on February 15th and August 15th.  The corresponding payments on the Series 2020 Bond are due on March 1st and September 1st.  (Coughlin Aff. ¶ 20).

$9,466,299.69 under the Loan Documents, including the JDI Guaranty.  (Coughlin Aff. ¶ 25).

Other amounts, including reimbursable attorney fees and cost, are also due under the Loan

Documents.  (Coughlin Aff. ¶ 25).[6]

## IV.    RELIEF REQUESTED

32.    The Development Authority seeks entry of an order (i) dismissing the

Bankruptcy Case for cause pursuant to 11 U.S.C. § 1112(b) and Bankruptcy Rules 1017(a) and

9014, or alternatively: (ii) granting the Development Authority *in rem* relief from the automatic

stay pursuant to 11 U.S.C. § 362(d)(1) and Bankruptcy Rule 4001(a) to pursue its rights in the

collateral securing the Loan, including the Development Property.

## V.    ARGUMENT

**A.    Cause Exists to Dismiss the Bankruptcy Case Pursuant to 11 U.S.C. § 1112(b)(1).**

33.    The Bankruptcy Code provides a court "shall convert . . . or dismiss a case under

[Chapter 11], whichever is in the best interests of creditors and the estate, for cause." 11 U.S.C.

§ 1112(b)(1).

34.    A debtor's lack of good faith in filing a bankruptcy petition constitutes "cause"

for dismissal. *See, e.g., In re Albany Partners, Ltd.*, 749 F.2d 670, 674 (11th Cir. 1984); *In re

Phoenix Piccadilly, Ltd.*, 849 F.2d 1393, 1394 (11th Cir. 1988); *In re State St. Houses, Inc.*, 356

F. 3d 1345, 1347 (11th Cir. 2004); *In re Pegasus Wireless Corp.*, 391 F. App'x 802, 803 (11th

Cir. 2010) ("We have held cause for dismissal exists when a bankruptcy petition was not filed

in good faith."); *In re Clinton Fields, Inc.*, 168 B.R. 265, 268 (Bankr. M.D. Ga. 1994).

Determining bad faith with respect to the filing of a petition for relief "is a question of fact and

---

[6] The Schedules reflect that the Development Authority holds a secured claim that is not contingent, unliquidated or disputed in the amount of $9,386,336.58 that is secured by the Real Property. (Doc. 11, at 9).

must be made on a case-by-case basis." *In re Causey*, No. 06-61237-JB, 2006 Bankr. LEXIS

1137, at *9 (N.D. Ga. Aug. 31, 2006), *aff'd sub nom.*, No. 1:06 CV 1182 TWT, 2006 U.S. Dist.

LEXIS 66552 (N.D. Ga. Aug. 31, 2006).

35.     "There is no particular test for determining whether a debtor has filed a petition

in bad faith." *In re Phoenix Piccadilly, Ltd.*, 849 F.2d 1393, 1394 (11th Cir. 1988).  Courts may

consider any factors which evidence "an intent to abuse the judicial process and the purposes of

the reorganization provisions" or more particularly, "factors which evidence that the petition was

filed 'to delay or frustrate the legitimate efforts of secured creditors to enforce their rights.'"  *Id.*

(quoting *In re Albany Partners, Ltd.*, 749 F.2d 670, 674 (11th Cir. 1984)).

36.     The Eleventh Circuit has endorsed applying the factors set forth for a bad faith

filing in *In re Phoenix Piccadilly* for single asset real estate cases.  *In re State St. Houses, Inc.*,

356 F.3d 1345, 1347 (11th Cir. 2004).

37.     The *Phoenix Piccadilly* factors for a bad faith filing are: (1) the debtor has only

one asset, the property at issue; (2) the debtor has few unsecured creditors whose claims are

relatively small compared to the claims of the secured creditors; (3) the debtor has few employees;

(4) the property is subject to a foreclosure action as a result of arrearages on the debt; (5) the

debtor's financial problems essentially are a dispute between the debtor and the secured creditors

which can be resolved in the pending state court action; and (6) the timing of the debtor's filing

evidences an intent to delay or frustrate the legitimate efforts of the debtor's secured creditors to

enforce their rights.  849 F.2d at 1394–95.

38.     Bankruptcy courts refer to the *Phoenix Piccadilly* factors in determining whether

"bad faith" is present, but they are "non-exhaustive and not to be rigidly applied . . . ." *In re State

St. Houses, Inc.*, 356 F.3d at 1347.  Regardless, when all the *Phoenix Piccadilly* factors are

present, there is cause to dismiss a chapter 11 case. *See, e.g.*, *Phoenix Piccadilly*, 849 F.2d at

1394–95; *In re State St. Houses, Inc.*, 356 F.3d at 1347; *In re Joyce, Don & Assocs. Inc.*, No.

6:07-BK-04878-ABB, 2008 WL 343265, at *2 (Bankr. M.D. Fla. Jan. 30, 2008).

39.      "Particularly when there is no realistic possibility of an effective reorganization

and it is evident that the debtor seeks merely to delay or frustrate the legitimate efforts of secured

creditors to enforce their rights, dismissal of the petition for lack of good faith is appropriate." *In*

*re Albany Partners, Ltd.*, 749 F.2d at 674.

40.      In this Bankruptcy Case all the factors generally identified by the courts showing

bad faith are present.

### The Debtor has Only One Asset

41.      Except for a modest amount of money in the Debtor's bank account ($11,784.84)

and a modest utility security deposit ($1,145.00), the Debtor's only asset is the Real Property.

The Development Property is the only portion the Real Property that has any meaningful value

and it is subject to Development Authority's Instruments and Assignments which secure the

obligations under the Loan Documents.[7]

### The Debtor has few Unsecured Creditors whose Claims are Small in relation to the Claims of Secured Creditors

42.      The Schedules reflect non-contingent, liquidated, and undisputed secured claims

of the Development Authority and Matsco totaling $10,428,254.62. (Doc. 11, at 9). The Debtor's

Schedules also reflect that the Camden County Tax Commissioner and the City of St Mary's hold

priority claims in the amount of $125,000 and $25,000 respectively, and general unsecured claims

---

[7] Matsco Incorporated ("Matsco") holds a first lien on approximately 21 acres of the Development Property to secure its Loan (the "Matsco Collateral"). The Development Authority's holds a second lien on the Mastco Collateral pursuant to the Second Priority Instrument, the Second Priority Assignment of Leases and Rents, and subordination attached to Matsco's security deed recorded with the Clerk of Court for Camden County, Georgia in Book 2330, beginning on Page 159.

that are not contingent, unliquidated, or disputed in the total amount of $294,573.74. (Doc. 11, at 11–13).[8]  Accordingly, undisputed general unsecured creditors hold only approximately 2.7% of the total undisputed claims in the Bankruptcy Case.

**No Employees, No Revenues, and No Business Operations.**

43.      The Debtor has no employees and never has. (2004 Transcript 48:10-14). Moreover, the Debtor generates no revenues and never has. (2004 Transcript 48:4-9).  Indeed, the Debtor has no business operations. It merely owns real estate.  In short, the Debtor has no business to reorganize or rehabilitate under Chapter 11 of the Bankruptcy Code. Even if it did, it generates no income from which to pay creditors.

**The Debtor's Property is Subject to Foreclosure as a Result of Arrearage on the Debt.**

44.      As set forth above, the Debtor failed to make its February 15, 2025, payment on the Loan.  Thereafter the Loan was accelerated, and non-judicial foreclosure sales were scheduled for May 6, 2025. The Bankruptcy Case was commenced the day before the scheduled foreclosure date.

**The Debtor's Financial Problem Involves a Dispute Between the Debtor and its Secured Creditors that can be Resolved Through Non-Judicial Foreclosure Sale under Georgia Law.**

45.      The Debtor's breached the Loan Documents by failing to make payment on the Loan when due. This breach can readily be resolved through state law remedies such as a non-judicial foreclosure sale under Georgia law.  Indeed, the Development Authority scheduled non-judicial foreclosure sales under Georgia law which were to be conducted on May 6, 2025.

---

[8] The Schedules also reflect a disputed unsecured claim of Safe and Green Development Corp. in the amount of $4,500,000.00. (Doc. 11, at 13).  Importantly, shortly before the Bankruptcy Case was filed, Safe and Green Development Corp. owned a 10% equity interest in the Debtor; however, its equity interest (which it paid $3,000,000 for) was converted into debt in in the amount of $4,500,000. (2004 Transcript 33:16–39:21). According to the Debtor, this disputed debt is intended to be dealt with after the Bankruptcy Case. (2004 Excerpt 39:18–21) This claim is undoubtedly subject to reclassification as equity.

However, the Debtor filed its Bankruptcy Case the day before on May 5, 2025, which stayed the foreclosure sales.

### The Timing of the Filing Evidences an Intent to Delay and Frustrate the Legitimate Efforts of Secured Creditors.

46.    The Debtor, who has no employees, no business operations, and no income or source of revenue to pay creditors, filed its Bankruptcy Case on May 5, 2025, to stay the foreclosure sales scheduled the next day on May 6th. (341 Transcript 19:6–11; 2004 Transcript 17:17–23). This is particularly troubling because since at least June 1, 2021, (when the Debtor executed the Loan Documents) it has known that it must obtain additional financing or sell portions of the Development Property to service the Loan.[9] (2004 Transcript 48:15–21).

### No Realistic Prospect of Reorganization.

47.    The Debtor does not have a realistic prospect of an effective reorganization (rehabilitation) under chapter 11 of the Bankruptcy Code.  Simply put, the Debtor has no source of revenue to pay creditors and fund a plan of reorganization.  Although a chapter 11 plan of reorganization may adjust the debtor creditor relationship to preserve a going concern, it cannot create an operating business or revenues where none existed before.

48.    At the 2004 Exam, Mr. Jacoby, the ultimate owner of the Debtor, testified that his "plan" is to obtain a new equity investor whose investment would be used to pay off the Debtor's creditors. (2004 Transcript 73:24–76:3).  This, however, is not a legitimate chapter 11 plan of reorganization but rather a plan of delay in hopes of finding an investor to bail out the existing equity security holder.

49.    The Debtor has had approximately 7 months since its February 15th default on

---

[9] In the 2004 Exam, the Debtor clearly acknowledged that Development Agreement contemplates that the Debtor will have to obtain financing or sell some of the Development Property to service the Loan. (2004 Transcript 48:15–21).

the Loan to find an investor or otherwise refinance or sell the Development Property. It has had

a year since its first payment default in September 2024 to accomplish these results, and it has

known since the outset of the Loan in June of 2021 that it would need to obtain additional

financing or sell portions of the Development Property to service the Loan.  Indeed, Debtor's

principal, Mr. Jacoby has so testified. (2004 Transcript 48:15–19).  Yet Debtor failed to do so.

(2004 Transcript 48:20–21).

50.    As addressed above, the Loan is part of a larger pass-through financing via

issuance of the Series 2020 Bond. The Development Authority is not a traditional for-profit

lender, but rather a quasigovernmental entity charged with fostering economic opportunity and

development for the local Camden County community. Given the pass-through nature of the

financing, the Development Authority and Camden County are at significant prejudice arising

from the delay caused by the filing of the Bankruptcy Case because they are being called on to

fund payments on the Series 2020 Bond while the Debtor's ultimate equity security delays in

hopes of finding an investor to solve his problem.[10]

**B.    In the Alternative, Cause Exists to Grant Lender Stay Relief Pursuant to 11 U.S.C. § 361(d)(1).**

51.    The Development Authority respectfully submits that the circumstances addressed

above - although compelling to warrant dismissal - at a minimum require the lifting of the

automatic stay pursuant to 11 U.S.C. § 362(d)(1) "for cause." The Debtor has no viable path to

reorganization, only continued delay at the expense and risk to the Development Authority. The

Debtor is maintaining the Bankruptcy Case for the benefit of equity in hopes an investor presents

itself. Continuation of the automatic stay serves no rehabilitative purpose and unfairly prejudices

---

[10] The delay is even more troubling given that Mr. Jacoby apparently has the means to fund payment on the Loan
but has seemingly chosen not to do so. (2004 Transcript 46:14–22, 47:22–48-1.)

the Development Authority who, along with Camden County, will need to service the Series 2020 Bond while the Debtor delays.

52.      "An automatic stay may be terminated for "cause" pursuant to section 362(d)(1) of the Bankruptcy Code if a petition was filed in bad faith." *Phoenix Piccadilly, Ltd.*, 849 F.2d at 1394; s*ee also In re Danley*, 540 B.R. 468, 475 (Bankr. M.D. Ala. 2015).

53.      As set forth above, the circumstances surrounding the Bankruptcy Case strongly support a finding that cause exists for relief from the automatic stay because the Bankruptcy Case was filed in bad faith.  Because "what amounts to bad faith is the same" for both Sections 1112(b) and 362(d)(1), *Phoenix Piccadilly, Ltd*, 849 F.2d at 1394, the Development Authority incorporates by reference its previous arguments and respectfully submits that cause exists to terminate the automatic stay because the Bankruptcy Case was filed in bad faith solely to delay the Development Authority's proper remedial efforts, and not for any reorganization purposes. *See In re Sterling Bluff Invs., LLC*, 515 B.R. 902, 921 (Bankr. S.D. Ga. 2014) (finding cause for relief from stay necessarily exists when dismissal was warranted for bad faith filing under Section 1112(b)(1)). Accordingly, the automatic stay should be terminated pursuant to Section 362(d)(1) so that the Development Authority may continue with collateral enforcement efforts, including foreclosure of its interests in the Development Property.

**C.      The 14-Day Stay Pursuant to Bankruptcy Rule 4001(a)(3) Should be Waived.**

54.      The Development Authority further requests a waiver of the 14-day stay under Bankruptcy Rule 4001(a)(3). Pursuant to Bankruptcy Rule 4001(a)(4), "[a]n order granting a motion for relief from an automatic stay . . . is stayed for 14 days after it is entered." Bankruptcy Rule 4001 does not provide the grounds for a waiver of stay; thus, granting a waiver is within the Court's discretion. *See, e.g.*, *In re Taub*, 438 B.R. 39, 51 (Bankr. E.D.N.Y. 2010) (waiving the

14-day stay and noting, "[d]elay and expense, and the prospect of irreparable damage, are far more likely to result if the effective date of this Court's Order is stayed than if it is immediately effective."). Each passing day in which the Development Authority is prohibited from exercising its remedial rights increases its risks and leaves it uncompensated. Thus, the Development Authority respectfully submits that a waiver of the 14-day stay (if applicable) is warranted under the circumstances.

## V. CONCLUSION

For all of the reasons set forth above, the Development Authority respectfully requests that the Court (i) dismiss the Bankruptcy Case for "cause" pursuant to 11 U.S.C. § 1112(b), or alternatively: (ii) grant the Development Authority relief from the automatic stay pursuant to 11 U.S.C. § 362(d)(1) and Bankruptcy Rule 4001(a); and (iii) grant such other and further relief as is just and proper.

Dated:  August 20, 2025.

BRADLEY ARANT BOULT CUMMINGS LLP

/s/ *Doroteya N. Wozniak*
Georgia Bar No. 627491
1230 Peachtree St., NE, Suite 2100
Atlanta, GA 30309
Phone: (404) 868-2794
Facsimile: (404) 868-2100
Email:  dwozniak@bradley.com

and

/s/ *Edwin G. Rice*
Edwin G. Rice
Florida Bar No. 855944
1001 Water Street, Suite 1000
Tampa, FL  33602
Phone: (813) 559-5500
Facsimile: (813) 229-5946

Primary email: erice@bradley.com
Secondary email: ajecevicus@bradley.com
***Admitted Pro Hac Vice***

*Attorneys for Camden County Joint Development*
*Authority*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on August 20, 2025, a true and correct copy of Motion of Camden County Joint Development Authority to (I) Dismiss Case; or (II) Alternatively, Grant Relief from the Automatic Stay has been filed electronically with the Court's Pacer CM/ECF electronic filing system which will provide a copy to all counsel of record registered with the Court's Pacer CM/ECF electronic filing system.  Additionally, a copy has been sent U.S. Mail to all interested parties on the Mailing Matrix attached hereto on August 20, 2025.

*/s/ Edwin G. Rice*
Attorney

4929-3425-3914.4