James F. Jacoby                                    July 24, 2025
JDI Cumberland Inlet, LLC/In Re:

                                                        Page 1

1                UNITED STATES BANKRUPTCY COURT
                 NORTHERN DISTRICT OF GEORGIA
2                      ATLANTA DIVISION
3     IN RE:                        :
                                    :   CASE NO.: 25-55072-SMS
4     JDI CUMBERLAND INLET, LLC     :
                                    :
5            Debtor.                :   CHAPTER 11
                                    :
6                                   :
                                    :
7     _____
8
                     RULE 2004 EXAMINATION OF
9
                        JAMES F. JACOBY
10
           ON BEHALF OF JDI CUMBERLAND INLET, LLC
11
12
                        July 24, 2025
13
                        10:17 a.m.
14
15
16
              Rountree Leitman Klein & Geer LLC
17
                     2987 Clairmont Road
18
                         Suite 350
19
                  Atlanta, Georgia 30329
20
21
22
              Mia L. Smith CCR, No. B-2458
23
24
25

James F. Jacoby                                            July 24, 2025
JDI Cumberland Inlet, LLC/In Re:

Page 2

1                    APPEARANCES OF COUNSEL

2

3    On behalf of Camden County Joint Development Authority:

4            EDWIN G. RICE, ESQ. (Admitted Pro Hac Vice)

5            Bradley Arant Boult Cummings LLP

6            1001 Water Street

7            Suite 1000

8            Tampa, Florida 33602

9

10   On behalf of JDI Cumberland Inlet, LLC (Debtor):

11           CECI CHRISTY, ESQ.

12           Rountree Leitman Klein Geer, LLC

13           Century Plaza I

14           2987 Clairmont Road

15           Suite 350

16           Atlanta, Georgia 30329

17

18   Also Present:

19           MR. JAMES COUGHLIN, CCJDA

20           MR. JOHN LOUDON, JDI Cumberland Inlet, LLC

21           (Via Videoconference)

22

23       (Reporter disclosure made pursuant to Article 10.B of

24   the Rules and Regulations of the Board of Court Reporting

25   of the Judicial Council of Georgia).

James F. Jacoby                                    July 24, 2025
JDI Cumberland Inlet, LLC/In Re:

                                                      Page 3

1                        INDEX OF EXHIBITS

2

3    CCJDA'S EXHIBIT DESCRIPTION                            PAGE

4    Exhibit 1   Amended Notice of Bankruptcy Rule 2004      6

5                Examination Duces Tecum of JDI Cumberland

6                Inlet, LLC

7    Exhibit 2   Schedules and Statement of Financial        8

8                Affairs of JDI Cumberland Inlet, LLC

9                Filed May 22, 2025

10   Exhibit 3   Development Agreement By and Among Camden   40

11               County Joint Development Authority, The

12               City of St. Mary's, Georgia and Jacoby

13               Development, Inc.

14   Exhibit 4   Permit Issued to Camden County Joint       66

15               Development Authority For Constuction

16               and Maintenace of a Full-Service Marina

17               Facility Dated September 14, 2018

18   Exhibit 5   Permit Issued for Modification to Original  67

19               Camden County Joint Development Authority

20               Permit Dated February 14, 2023

21   Exhibit 6   Survey of Parcels of Land of The Property   73

22               Conducted June 30, 2021 By Survey Company

23               AKM Surveying, Inc.

24

25

James F. Jacoby                    July 24, 2025
JDI Cumberland Inlet, LLC/In Re:

Page 4

1                           INDEX OF EXAMINATIONS

2                                                            PAGE

3    Examination by Mr. Rice                              5

4    Examination by Ms. Christy                          76

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20                       Transcript Codes

21          --          interruption/change in thought

22          ...         incomplete thought

23          (ph)        phonetically spelled

24          (sic)       denotes word or phrase that may appear

25                      incorrect but has been typed verbatim

James F. Jacoby                                            July 24, 2025
JDI Cumberland Inlet, LLC/In Re:

Page 5

1                        JAMES F. JACOBY

2      having been first duly sworn, was examined and testified

3      as follows:

4                             EXAMINATION

5      BY MR. RICE:

6          Q.  Can you please state your full name for the

7      record?

8          A.  James Frederick Jacoby.

9          Q.  Mr. Jacoby, I'm Ed Rice.  We met earlier.

10         A.  Okay.

11         Q.  And I understand you're the representative of JDI

12     Cumberland Inlet LLC, the Debtor in this Chapter 11 case,

13     correct?

14         A.  That's correct.

15         Q.  Have you ever had your deposition taken before?

16         A.  Yes.

17         Q.  Okay.  You may know these kind of general rules

18     of the road on depositions, but if you don't mind, I'll go

19     over them.  One is, only one person can talk at a time.

20     During normal conversation, a lot of times people talk at

21     the same time and there's not a problem communicating, but

22     we have a court reporter, so we have to be careful, both

23     me and you, to make sure only one person talks at the same

24     time, okay?

25         A.  Okay.

James F. Jacoby                              July 24, 2025
JDI Cumberland Inlet, LLC/In Re:

Page 6

1      Q.  The other thing is, if I ask you a question and

2   you don't understand it, it's confusing to you, let me

3   know.  I'm not trying to trick you, I'm not trying to put

4   words in your mouth, I just want answers to questions.

5   And if you don't understand the question, it's going to be

6   incumbent on you to let me know and I'll try to

7   reformulate it in a way that we both can understand it,

8   okay?

9      A.  Yes.

10      Q.  And the third thing is, when you respond, you

11   have to do so orally.

12      A.  Okay.

13      Q.  I'm going to hand you what our court reporter is

14   going to mark Exhibit Number 1.  And this is a notice that

15   relates to today's examination, and in connection with the

16   notice, there is an Exhibit A.  Do you see Exhibit A?

17      (Exhibit 1 was identified for the record).

18      A.  Yes, I see it.

19      Q.  These are the documents that have been requested

20   from the Debtor, JDI Cumberland Inlet LLC.  So when I

21   refer to the Debtor today, that's who I'm referring to,

22   okay?

23      A.  Yes.

24      Q.  And I just want to confirm that you have compiled

25   these documents and at least provided them to your

James F. Jacoby                              July 24, 2025
JDI Cumberland Inlet, LLC/In Re:

                                                    Page 7

1    counsel.

2         A.   Yes.

3         Q.   So with respect to the first four items on the

4    list, if you'll just look at those.  They relate generally

5    to letters of intent, commitment letters, financings and

6    so forth.  Have you pulled all the documents responsive to

7    those four requests?

8         A.   Yes.

9         Q.   And you've provided those to your counsel?

10        A.   Yes.

11        Q.   What about the next item on the list, All

12   documents related to or otherwise supporting the Debtor's

13   valuation?  Have you pulled all documents responsive to

14   that request?

15        A.   I believe so.

16        Q.   And all appraisals?

17        A.   Yes.

18        Q.   The next item on the list, All documents that

19   show any attempts or efforts by the Debtor to sell or

20   lease its real property.  Have you pulled all those?

21        A.   Yes.

22        Q.   And then the second to last item, Any drafts of

23   the Master Plan, the Implementation Plan, the Plan of

24   Finance as described in the Development Agreement.  Have

25   you pulled those?

James F. Jacoby                              July 24, 2025
JDI Cumberland Inlet, LLC/In Re:

                                                        Page 8

1         A.   Yes.

2         Q.   And then finally, all plans, drawings,

3    specifications, contracts and subcontracts regarding

4    development of the Debtor's real property.   You pulled all

5    those documents?

6         A.   Yes.

7         Q.   Have you withheld any documents from your

8    counsel?

9         A.   No.

10        Q.   Mr. Jacoby, I'm going to hand you what's been

11   marked as Exhibit Number 2.   These are the Schedules and

12   Statement of Financial Affairs that you filed in this

13   Chapter 11 bankruptcy case, correct?   And take your time

14   to look at it.   I don't mean to rush you.

15        (Exhibit 2 was identified for the record).

16        A.   Okay.

17        Q.   Does that look like it?

18        A.   Looks like it, yes.

19        Q.   You agree that's it?

20        A.   Yes.

21        Q.   And as I understand it, according to these

22   Schedules, the Debtor only has three assets, correct?

23        A.   Three assets.

24        Q.   Cash?

25        A.   Yes.

James F. Jacoby                                    July 24, 2025
JDI Cumberland Inlet, LLC/In Re:

Page 9

1       Q.  A security deposit and a utility?

2       A.  Right.

3       Q.  And then its real property?

4       A.  Yes.

5       Q.  The Debtor has no other assets other than those

6  three items?

7       A.  Yes.

8       Q.  If you can turn to page --

9          MS. CHRISTY:  If we look at the top, it's

10      probably easier to view the numbers.

11          MR. RICE:  Yeah, that's what I'm going to do.

12      Q.  (By Mr. Rice) Do you see at the top, Mr. Jacoby,

13  where it says page 6 of 36?

14      A.  Yes.

15      Q.  And you list a piece of property there at 1000

16  Meeting Street, St. Marys, Georgia 31558.  Do you see

17  that?

18      A.  Yes.

19      Q.  And that's the address for the Property?

20      A.  Yes.

21      Q.  And when I say the Property today, we can have an

22  understanding I'm referring to this property reflected in

23  number 55 of the Schedules, okay?

24      A.  Yes.

25      Q.  And you list the current value of the Debtor's

James F. Jacoby                                   July 24, 2025
JDI Cumberland Inlet, LLC/In Re:

Page 10

```
 1    interest at 172 million dollars, correct?

 2         A.   Yes.

 3         Q.   And how is that valuation derived?

 4         A.   By appraisal.

 5         Q.   And it lists a net book value of 30 million

 6    dollars.  How was that value -- how was that number

 7    derived?

 8         A.   I don't recall how that number came up

 9    originally.  I think it was between our original

10    Partnership Agreement that we valued the property at that

11    time.  We did not have it appraised at that time.

12         Q.   What Partnership Agreement are you referring to?

13         A.   The partnership that we were dealing with, Safe

14    and Green.

15         Q.   Is the document --

16         A.   S&G.

17         Q.   S&G?

18         A.   Right.

19         Q.   Were you -- was the Debtor a partner with S&G?

20         A.   We formed a partnership with S&G, yes.

21         Q.   And there was a Partnership Agreement that

22    detailed the parties' understanding, am I correct?

23         A.   Yes.

24         Q.   Is it called the Partnership Agreement?

25         A.   I believe so.
```

James F. Jacoby                                July 24, 2025
JDI Cumberland Inlet, LLC/In Re:

                                                    Page 11

 1        Q.  Do you have a copy of that?  Not with you, but
 2    you --
 3        A.  Not with me, no.
 4        Q.  But you have a copy of that Agreement?
 5        A.  Yes.
 6        Q.  Perhaps we'll come back to that Agreement later.
 7    The Property, how much did the Debtor pay for the
 8    Property?
 9        A.  The Debtor paid -- I can't put in my head what
10    exactly what it was.  I'd have to come back to --
11        Q.  Mr. Jacoby, if you can't remember the exact
12    amount, if you could have a ballpark, with the
13    understanding it's just a ballpark, if you could provide
14    that.
15        A.  Yeah, I mean, it's somewhat less than 10 million
16    dollars.
17        Q.  And when was the Property acquired by the Debtor?
18        A.  I believe it was either June 30th, 2021 -- yeah,
19    I believe it was June 30th, 2021.
20        Q.  The appraisal that you referred to, is that an
21    appraisal that was performed by Cushman & Wakefield?
22        A.  That's correct.
23        Q.  Dated November 2nd, 2024?
24        A.  That's correct.
25        Q.  And who commissioned that appraisal?

James F. Jacoby                                July 24, 2025
JDI Cumberland Inlet, LLC/In Re:

                                                      Page 12

1          A.   Cumberland Inlet LLC.

2          Q.   The Debtor?

3          A.   Yes.

4          Q.   And if you look on your Schedules, Item Number

5     58.  Do you see that?

6          A.   Where is that?

7          Q.   It's in the middle of page 6 of 36.

8          A.   Oh, okay.

9          Q.   You see the question, "Has any of the property

10    listed in Part 9 been appraised by a professional within

11    the last year," and the box yes is checked?

12         A.   Yes.

13         Q.   And the Cushman & Wakefield appraisal, the

14    November 2nd, 2024 appraisal, is that the appraisal that

15    you're referring to?

16         A.   Yes.

17         Q.   Are there any other appraisals that were

18    commissioned by the Debtor for the Property?

19         A.   Ever?

20         Q.   Ever.

21         A.   We had appraisals done for an RV, so there were

22    others.  I don't recall what -- I know we had the RV

23    appraisal, so that's one that I'm aware of.

24         Q.   When you say the RV appraisal, what -- I don't

25    understand what that means.  Can you explain that to me?

Veritext Legal Solutions
800.808.4958                                          770.343.9696

James F. Jacoby                        July 24, 2025
JDI Cumberland Inlet, LLC/In Re:

Page 13

1      A.  We were looking at developing an RV park on part

2   of the Property.

3      Q.  There is no RV park on the Property now?

4      A.  No.

5      Q.  So it was like a pro forma appraisal that if this

6   is built, this is what it might be worth?

7      A.  Yes, that's correct.

8      Q.  How much equity by your calculation does the

9   Debtor have in the Property?

10      A.  How much total equity does the Debtor have?  Do I

11   have that on a form here?  I don't recall exactly what

12   that number is.

13      Q.  I don't know.  I'm looking for something.  But

14   let me ask you this way.  After the Debtor pays off all

15   its creditors, how much money will be left for equity if

16   the property is worth $172 million?

17      A.  Well, I guess do the math.  172 minus whatever is

18   outstanding on the debt here, which is, what, eleven-five?

19   So that's probably in the 16 million dollar range from the

20   172.  So whatever that number is, 172 minus approximately

21   16 million.

22      Q.  So about 155, 160 million?  In that range?

23      A.  In that range.

24         MS. CHRISTY:  Ceci Christy here.  Mr. Price, if

25      you could just -- I want to clarify this since this is

James F. Jacoby                                July 24, 2025
JDI Cumberland Inlet, LLC/In Re:

Page 14

1        a 2004 Exam and not a true deposition, about

2        Mr. Jacoby's answer.  So could you ask him what the

3        appraisal is conditioned on?

4            So the appraisal is not for the raw land, the

5        appraisal is as developed, So Mr. Jacoby may not be

6        understanding that your question is how much is the

7        equity currently as the property stands, or how much

8        would the equity be post-developed.  Two different

9        answers for that.

10       Q.  (By Mr. Rice) Well, let me just ask this.  You

11  list $172 million dollars as the value of the Property.

12       A.  That's what it was appraised at, yes.

13       Q.  Is that the value of the Property as it is now or

14  is that the value of the Property in some other condition?

15       A.  I believe it was based upon the value now with it

16  discounted back to -- well, what numbers they originally

17  took and then they discounted it back.  I believe it was

18  whatever percent.  Twenty percent?  I'm not exactly sure

19  of the formula on that.

20       Q.  So what I'm trying to understand is, is the

21  Property as it sits now worth 172 million dollars

22  according to you in its as-is condition?

23       A.  The information that -- it's the appraiser is the

24  one who came up with that number.  I didn't come up with

25  it.

James F. Jacoby                                    July 24, 2025
JDI Cumberland Inlet, LLC/In Re:

Page 15

1          Q.   But you put it in the Schedule, correct?

2          A.   Yes.

3          Q.   And so I'm trying to find out, is your

4    understanding -- you're the Debtor.

5          A.   Right.

6          Q.   Is it your understanding that the Property as it

7    sits now in its current undeveloped condition, is it worth

8    172 million dollars?

9          A.   Yes.

10         Q.   That's your belief?

11         A.   That's what the appraisal said and I'm saying the

12   appraiser took it upon himself to come up with this

13   number.

14         Q.   Do you disagree with the appraisal?

15         A.   No.

16         Q.   Do you agree with the appraisal?

17         A.   Well, if I don't disagree, then I must agree,

18   yes.

19         Q.   So you do agree with the appraisal?

20         A.   Yes.

21         Q.   So you believe it's worth 172 million dollars?

22         A.   Yes.

23         Q.   Is the RV appraisal one of the appraisals that

24   you provided to your counsel?

25         A.   This asked within the last year.  The RV was done

James F. Jacoby                    July 24, 2025
JDI Cumberland Inlet, LLC/In Re:

                                                    Page 16

1   I believe in 2022.

2        Q.  The document requests that we talked about

3   earlier, I don't think it was one of the --

4        A.  I don't recall if that was there.

5            MS. CHRISTY:  I'll have to look it through.  I

6        don't recall, but I'll get that for you if I don't

7        have it.  I may have overlooked it, not intentionally.

8            MR. RICE:  Sure.

9        Q.  (By Mr. Rice) Any other appraisals other than the

10  Cushman & Wakefield appraisal and the RV appraisal for any

11  of the Debtor's real property?

12       A.  No.

13       Q.  And the real property is undeveloped, correct?

14       A.  Correct.

15       Q.  And you would agree that it's -- the real

16  property is undeveloped land, correct?

17       A.  Yes.

18       Q.  Why did the Debtor purchase the Property?

19       A.  With intentions of developing the Property.

20       Q.  Did you ever abandon those intentions?

21       A.  No.

22       Q.  Is that your current intention?

23       A.  Yes.

24       Q.  As I understand it, and correct me if I'm wrong,

25  the Property generates no income, correct?

James F. Jacoby                         July 24, 2025
JDI Cumberland Inlet, LLC/In Re:

                                              Page 17

1          A.   Correct.

2          Q.   And it has never generated any income while the

3     Debtor has owned it, has it?

4          A.   No.

5          Q.   There was some discussion about the Property at

6     the 341 meeting of creditors.  Do you recall that?

7          A.   There was some discussion, yes.

8          Q.   You were asked some questions about the Property.

9          A.   Right.

10         Q.   And at that time you testified -- and we can pull

11    up the transcript if you want to look at it -- that you

12    believe that the Property was a contiguous tract of land;

13    is that correct?

14         A.   I believe so, yes.

15         Q.   Do you still believe that today?

16         A.   I believe so, yes.

17         Q.   You also testified that the reason you filed the

18    bankruptcy case was to stop the Authority, and when I

19    refer to the Authority I'm referring to my client, the

20    Camden County Joint Development Authority, from

21    foreclosing.  Do you recall that testimony?

22         A.   Yes.

23         Q.   And is that testimony true?

24         A.   Yes.

25         Q.   And there was a payment that came due under the

James F. Jacoby                                July 24, 2025
JDI Cumberland Inlet, LLC/In Re:

                                                      Page 18

1     Debtor's loan with the Authority in February, correct?

2          A.   Yes.

3          Q.   And the Debtor didn't make that payment, did it?

4          A.   No.

5          Q.   If you could turn to page 9 of 36.  This is

6     Schedule D from your bankruptcy schedules.

7          A.   Okay.

8          Q.   And you list two secured creditors, the Joint

9     Development Authority of Camden County and an entity

10    called Matsco Incorporated, correct?

11         A.   Yes.

12         Q.   And as I understand it, the Debtor does not

13    dispute the loan that the Authority gave to the Debtor,

14    correct?

15         A.   Correct.

16         Q.   And you list a claim amount of $9,386,336.58,

17    correct?

18         A.   Correct.

19         Q.   Is that principal?  Is that principal and

20    interest?  What's that made up of?

21         A.   I believe it's principal and interest.

22         Q.   You wouldn't include any other fees or costs or

23    reimbursable items that may be due under the Agreement?

24         A.   I'm not aware of them.

25         Q.   In your Schedules, it says describe the lien.

James F. Jacoby                                July 24, 2025
JDI Cumberland Inlet, LLC/In Re:

Page 19

1    It's basically in the middle of the page.  Do you see

2    that?

3         A.  Yes.

4         Q.  It says "Agreement you made."  What are you

5    referring to there?

6         A.  I see it, but I don't recall what this is under

7    Describe the lien.  I guess I was looking at the lien from

8    the JDA.

9         Q.  But it says "Agreement you made."  I just

10   don't -- it's not apparent to me how that relates to

11   Describe the lien.  I'm just trying to see if there's --

12   what that means.

13        MS. CHRISTY:  Ceci Christy on behalf of the

14        Debtor.  When you complete Schedules, you're only

15        given a few choices.  One of them is an agreement you

16        made.  So if you signed a loan document, that's the

17        choice you choose on the Schedules.

18        Q.  (By Mr. Rice) So when it says "Agreement you

19   made," You refers to the Debtor?

20        A.  Yes.

21        Q.  Does the Debtor have any claims against the

22   Authority?

23        A.  No.

24        Q.  Does the Debtor have any setoff rights against

25   the Authority?

James F. Jacoby                                        July 24, 2025
JDI Cumberland Inlet, LLC/In Re:

Page 20

1          A.   No.

2          Q.   Counterclaims against the Authority?

3          A.   No.

4          Q.   The other creditor listed in your Schedule of

5     Secured Creditors is Matsco Incorporated.  Do you see

6     that?

7          A.   Yes.

8          Q.   And it lists a loan amount of $1,041,918.04.  Do

9     you see that?

10         A.   Yes.

11         Q.   What was that loan for?

12         A.   That was a loan to bring the previous loan

13    current.  So that was a loan to make -- to bring the

14    principal and interest current on the JDA loan.

15         Q.   Was the funds used for anything else?

16         A.   No.  Well, for attorney's fees and typical loan

17    closings.

18         Q.   Would it be fair to say the primary purpose of

19    the loan was to cover an obligation owed to the Authority?

20         A.   Right.  That's correct.

21         Q.   When is the Matsco loan due?

22         A.   It was a 12-month loan with a six-month option.

23    So I believe it was made in October, so I believe it would

24    be due in October.

25         Q.   Was the Debtor late in its September 2024

James F. Jacoby                                    July 24, 2025
JDI Cumberland Inlet, LLC/In Re:

                                                        Page 21

1    payment?

2         A.   Was the Debtor late on their 2024 payment?

3         Q.   Payment on the loan.

4         A.   Yes.

5         Q.   The loan with Matsco, does it call for monthly

6    payment?

7         A.   No.

8         Q.   It's just a term --

9         A.   It's one year with a six-month option.

10        Q.   No intervening payments, just due in a year?

11        A.   Right.

12        Q.   What's the option?

13        A.   What is the option?  It was an option to extend

14   for -- I forget what fee -- for another six months.

15        Q.   The Debtor had the option to extend if it paid a

16   certain amount of money --

17        A.   Right.

18        Q.   --  the maturity date of the loan for six months?

19        A.   Right.

20        Q.   So that loan is technically not due?

21        A.   As far as?

22        Q.   Under the terms of the loan.

23        A.   Under the terms of the loan it's not due.

24        Q.   Does the Debtor have any defenses to that loan?

25        A.   Do we have any defenses?

James F. Jacoby                           July 24, 2025
JDI Cumberland Inlet, LLC/In Re:

                                                    Page 22

1        Q.  Any reason it thinks it shouldn't have to pay it
2   back?
3        A.  No.
4            MS. CHRISTY:  And Mr. Rice, going back to that
5        same question as it relates to the JDA, the Debtor,
6        Mr. Jacoby, testified no to counterclaims/claims
7        against the JDA, but there may be some defenses that
8        the Debtor may raise to the amount of the JDA claim
9        based on interactions the JDA has had with potential
10       buyers and developers of the Property.  So the Debtor
11       is looking into that.  Just wanted to make sure that
12       was on the record.
13       Q.  (By Mr. Rice) What understanding, if any, do you
14   have with respect to conversations the Authority has had
15   with perspective purchasers of the Property?
16       A.  Would you repeat the question?
17       Q.  What understanding do you have with respect to
18   what communications the Authority has had with respect to
19   purchasers of the Property?
20       A.  I'm not exactly sure of all of them, but I know
21   there was one situation I guess where there was a video
22   about some -- on YouTube -- that there was some
23   conversations about having other developers in the back,
24   you know, behind us.  So I think that's one.  I'm not sure
25   of the rest of them or any other situations at this point.

James F. Jacoby                              July 24, 2025
JDI Cumberland Inlet, LLC/In Re:

Page 23

1      Q.  Video?  Who published the video?

2      A.  I believe it was on YouTube.

3      Q.  But who published it?

4      A.  I believe it was at a County Commission meeting.

5      Q.  And who said what?

6      A.  I don't have it in front of me right now, so I

7   don't want to -- it'd be hearsay.  If you can get a copy

8   of the YouTube, we can try to find out.

9      Q.  Do you have a copy of the YouTube?

10      A.  I don't have it right now, no.

11      Q.  Is the Debtor --

12      A.  If it's on YouTube it's on YouTube.  You can pull

13   it up.

14      Q.  If the Authority has had -- and I don't know if

15   they have had discussions with respect to their ability to

16   sell the Property to some third party -- why do you think

17   that would give rise to a claim?

18      A.  Well, some people that we might have been dealing

19   with had been -- whether it's waiting us out or

20   whatever -- but there's probably a lot of people who've

21   been looking at this property for a number of months or

22   whatever.  And I'm not saying there is, I'm just saying

23   we're just, as our counsel said, we're just looking at.

24      Q.  Who are the people?

25      A.  I'm not exactly sure who the people were.  I

James F. Jacoby                                      July 24, 2025
JDI Cumberland Inlet, LLC/In Re:

Page 24

1    mean, there have been some people.  I can't specifically

2    say right now who, but there's been a lot of chatter.

3        Q.   There's been a lot of interest in acquiring the

4    Property by several perspective buyers, correct?

5        A.   There has been interest, of course.  And we've

6    provided that whole list of people that we've been dealing

7    with.

8        Q.   So what is it that you think that the Authority

9    did that's inappropriate?

10       A.   I don't know.

11       Q.   But you think they did something inappropriate?

12       A.   I'm not saying that.  The point was brought up.

13   We don't know at this point, but there was some people

14   that were having dialogues prior to the bankruptcy that --

15   and I don't have a list of the people that it could be,

16   but we presented it to a lot of people.

17       Q.   Mr. Coughlin is here today.  You know

18   Mr. Coughlin, correct?

19       A.   Of course.

20       Q.   You've asked Mr. Coughlin to show the property to

21   people, haven't you?

22       A.   Yes, I have.

23       Q.   Don't you think it'd be natural during the course

24   of him showing the property to people that he has a

25   discussion with the people?

James F. Jacoby                                    July 24, 2025
JDI Cumberland Inlet, LLC/In Re:

Page 25

1      A.  Of course.

2      Q.  But you don't know what the discussions were?

3      A.  No.

4      Q.  You don't know who they were with?

5      A.  No, I don't.

6      Q.  You don't know whether they were inappropriate or

7  not?

8      A.  No, I don't.

9      Q.  And you can't know because you weren't there and

10  you didn't hear what was said?

11      A.  Yes.

12      Q.  And you don't even know if anything was said

13  because you weren't there, correct?

14      A.  There were certain times, but you're asking me

15  when James was out there showing the Property.  No, I was

16  not there and I don't know what was said.

17      Q.  And he was showing it at your request?

18      A.  Yes.

19      Q.  Well, what is it that you speculate that might

20  have been inappropriate?

21      A.  I don't have that answer right now.  As we said,

22  we know that there was conversations with parties prior to

23  the bankruptcy that were reaching out to the -- I'm not

24  saying that JDA was reaching out, but people had reached

25  out to JDA for information.

James F. Jacoby                              July 24, 2025
JDI Cumberland Inlet, LLC/In Re:

Page 26

1        Q.   There's something wrong with that?

2        A.   Well, I think they probably should have come

3    through us and then gotten our blessing to have the

4    conversation with the JDA.

5        Q.   You would agree with me, would you not, that the

6    JDA, the Joint Development -- the Camden County Joint

7    Development Authority has an interest in getting this loan

8    paid, correct?

9        A.   Yes.

10        Q.   They have an interest in having the Property

11   developed, correct?

12        A.   Yes.

13        Q.   Have you received any offers to purchase the

14   Property for more than the current outstanding obligations

15   the debtor owes to its creditors?

16        A.   No.

17        Q.   No offers?

18        A.   No concrete offers.  There might have been some

19   talk, but there's no -- I've never had an offer in

20   writing.

21        Q.   Let me ask you this.  Have you ever had any

22   expressions of interest where a perspective purchaser has

23   said we're prepared to pay X or in the neighborhood of X?

24        A.   I've had people come when we've told them this is

25   what we're looking for and they've made trips from

James F. Jacoby                              July 24, 2025
JDI Cumberland Inlet, LLC/In Re:

Page 27

1    overseas to come look at the Property.

2         Q.  What'd you tell them you were looking for?

3         A.  We told them we wanted them to come and look at

4    the Property and then we'd sit down and talk.

5         Q.  You haven't had any discussions with any

6    perspective purchasers about possible purchase prices?

7         A.  I mean, we've shown the appraisals.

8         Q.  What's that mean you've shown the appraisals?

9    Does that mean that that's what you're prepared to sell it

10   for?

11        A.  It's a starting point.

12        Q.  What did they show you?  Or tell you?

13        A.  I haven't gotten a concrete proposal.

14        Q.  You haven't gotten a formal written offer to

15   purchase the Property, correct?

16        A.  That's correct.

17        Q.  But you've received multiple expressions of

18   interest to purchase the Property, correct?

19        A.  Not multiple interests, no, I have not.  If I had

20   that interest, we probably wouldn't be having this

21   conversation today.

22        Q.  Turn to page 11 of 36.  Actually, turn to page 12

23   of 36.

24        A.  Okay.

25        Q.  Were part of the loan proceeds utilized to pay

James F. Jacoby                                July 24, 2025
JDI Cumberland Inlet, LLC/In Re:

                                                      Page 28

1    certain predevelopment costs associated with the Property?

2         A.  Yes.

3         Q.  Explain to me how that process work?  For

4    instance, would the Debtor make a request for funds and

5    then the Authority transfer the funds to pay the

6    predevelopment cost?  How did that process work.

7         A.  I don't recall how that worked.  I think we

8    basically handled it internally, but in the beginning

9    there might have been some requests to go ahead and pay

10   these predevelopment dollars.

11        Q.  You don't recall if there were?

12        A.  I'm saying I think there was in the beginning.  I

13   believe.  That's been four years ago.

14        Q.  So the requests that were made, was it just for a

15   dollar amount or was it itemized in the sense we need X

16   dollars for this vendor, Y dollars for this vendor?  Do

17   you recall?

18        A.  I believe that was the case.

19        Q.  The former case where there was a specific vendor

20   that needs to be paid X dollars.

21        A.  I believe there was a combination of paying it

22   out of closing costs in the request I believe.

23        Q.  This claim of AKM Surveying, Inc., what's that

24   for?  What's the nature of that claim?

25        A.  That was for the latest surveying.  I'm not

James F. Jacoby                              July 24, 2025
JDI Cumberland Inlet, LLC/In Re:

Page 29

1    exactly sure which one that is.  I see it's for $1,080.

2    But I'm not sure.

3          Q.  How old is that debt?

4          A.  I don't think it's old because I think -- I don't

5    have that information in front of me.

6          Q.  You don't know when you --

7          A.  We've used AKM on a number of occasions and we

8    paid them off.  This was probably the last payment.  The

9    last one due.  We've paid them several thousand dollars

10   for the surveying.

11         Q.  But you don't recall when that survey was done?

12         A.  Not this specific one.

13         Q.  Brasfield & Gorrie, LLC.  What's the basis of

14   that claim?

15         A.  They have been overseeing construction

16   evaluations and so forth from pretty much the beginning

17   for the last four years.  And part of it was paid at one

18   time and I guess this is the balance owed.

19         Q.  There hasn't been any construction, has there?

20         A.  Not for construction, for construction

21   evaluations and costing and so forth.  Utility costs and

22   so forth.

23         Q.  When did that debt become due?

24         A.  I don't recall.

25         Q.  Dentons US LLP.  What's the basis of that claim?

James F. Jacoby                              July 24, 2025
JDI Cumberland Inlet, LLC/In Re:

Page 30

1        A.  They did some work for us regarding evaluations

2    of the Kings Grant Salt Marsh and so forth.  We agreed to

3    pay a retainer and they went over, so there's a dispute

4    about that.

5        Q.  It doesn't list disputed on here though, does it?

6        A.  No.

7        Q.  You're going to amend the Schedules to check

8    disputed?

9        A.  We probably should do that.

10       Q.  When was that debt incurred?

11       A.  It was done in -- I believe it was two years ago.

12       Q.  Dougherty Architecture and Design PA.  What's the

13   basis of that claim?

14       A.  This was done by a marina architect who did some

15   work for Peter Voss.

16       Q.  When did they do the work?

17       A.  I don't recall.  That was probably, again, a

18   couple of years ago.

19       Q.  You don't seem to recall much in terms of timing.

20   Is that because it was such a long time ago?

21       A.  It's a combination of timing, yes, because it was

22   a long time ago, and then I'm getting up in age.  It's a

23   combination of both.

24       Q.  Ecological Solutions, Inc.  What's the basis of

25   that claim?

James F. Jacoby                               July 24, 2025
JDI Cumberland Inlet, LLC/In Re:

                                                       Page 31

1        A.   So that is working to put together a pre

2   prospectus for Salt Marsh evaluation.

3        Q.   Evaluation for the salt marsh?

4        A.   A pre prospectus to present -- to make a

5   presentation to the Corps of Engineers for valuation for

6   credits.

7        Q.   And when were those services performed?

8        A.   Those are still taking place.  That I think was

9   still being performed.  That was probably six or eight

10  months ago.

11       Q.   How do you pay for them if they're still

12  performing them?

13       A.   Well, they're working with us.

14       Q.   Marketing Eye LLC.  What's the basis of that

15  claim?

16       A.   Marketing from I guess a couple years ago when we

17  first engaged them to do some marketing.  There again, it

18  was probably three years ago.

19       Q.   Terracon.  What's the nature of that

20  indebtedness?

21       A.   That was for -- I'm not exactly sure if this was

22  exactly for the marina, or they could have been for the

23  landfill monitoring, I'm not sure.

24       Q.   What do they do?  What does Terracon do?

25       A.   Engineering firm.

James F. Jacoby                              July 24, 2025
JDI Cumberland Inlet, LLC/In Re:

Page 32

1      Q.  When would this indebtedness been incurred?

2      A.  Well, the bill came in I guess early part of the

3  year, end of last year.

4      Q.  The early part of the year, end of last year.  So

5  in December 2024?

6      A.  Probably sometime in November, December of 2024,

7  yes.

8      Q.  The Abrams Law Group LLC.  What's the nature of

9  that claim?

10     A.  That was a law firm that did some evaluations on

11  a perspective -- I believe it was on a perspective

12  proposal that we had.  And I don't remember which one.

13     Q.  A perspective proposal for what?

14     A.  Well, if somebody was -- I don't recall exactly

15  what this was.  I'd have to go back through the files and

16  do a recollection on that.

17     Q.  When was that indebtedness incurred?

18     A.  I don't recall.

19     Q.  Within the last six months?

20     A.  No.

21     Q.  Later than that?

22     A.  Yes.

23     Q.  The Ligon Firm.  What's the basis of that claim?

24     A.  Doing some, again, evaluations of the salt marsh.

25  Kings Grant, State Grant issues.

James F. Jacoby                                      July 24, 2025
JDI Cumberland Inlet, LLC/In Re:

                                                        Page 33

1        Q.  And when was that indebtedness incurred?

2        A.  I don't recall the exact date.  It was probably a

3   couple of years ago.

4        Q.  The Ligon Firm.  Is that a law firm?  Is that an

5   engineering firm?

6        A.  Law firm.

7            MS. CHRISTY:  Excuse me, I'm going to grab some

8        water.

9            MR. COUGHLIN:  Would this an okay time for me to

10       hit the restroom?

11           MR. RICE:  Absolutely.  Why don't we just go off

12       the record for just a minute.  Everybody can take a

13       little break.

14           (Proceedings off the record at 11:11 a.m.)

15           (Proceedings back on the record at 11:20 a.m.)

16       Q.  (By Mr. Rice) Mr. Jacoby, I'd like to focus now

17   on the claim of Safe and Green Development Corp.  It's

18   listed there in the amount of $4.5 million dollars.  Do

19   you see that?

20       A.  Yes.

21       Q.  And it's checked off as disputed.

22       A.  Right.

23       Q.  As I understand it, and correct me if I'm wrong,

24   the Safe and Green Development Corporation was your former

25   partner; is that right?

James F. Jacoby                              July 24, 2025
JDI Cumberland Inlet, LLC/In Re:

Page 34

1      A.   That's correct.

2      Q.   They're the counterparty to the Partnership

3  Agreement you were referring to earlier, correct?

4      A.   Yes.

5      Q.   What is the basis of this $4.5 million dollar

6  claim?

7      A.   So it was originally a $3 million investment as a

8  partnership that they wanted to convert into -- to take it

9  from equity into a loan, and that was an agreed-upon if

10  they were going to go ahead and make the bond payments and

11  so forth.  So that's why it's being disputed.

12      Q.   So the Partnership Agreement, does it provide for

13  obligations for Safe and Green to make payments on account

14  of the bond?

15      A.   No, it did not.

16      Q.   But they had -- Safe and Green had obligations to

17  make the loan payments to the Authority.  Am I correct in

18  that?

19      A.   Safe and Green, they had an obligation to us to

20  make the payment for us to go along with the modification.

21      Q.   So I'm trying to understand.  The Debtor entered

22  into an agreement with Safe and Green that they would

23  convert their equity interest in the Debtor to debt if

24  they would make the payment or contribute enough money to

25  the Debtor to make the payment on account of the loan.

James F. Jacoby                              July 24, 2025
JDI Cumberland Inlet, LLC/In Re:

Page 35

1    Did I get that right?

2         A.   Yes.

3         Q.   When was that agreement reached?

4         A.   That agreement was reached in I believe February.

5    Early February.

6         Q.   February of 2025?

7         A.   Yes.

8         Q.   So in February of 2025, Safe and Green was an

9    equity security holder in the Debtor, correct?

10        A.   Yes.

11        Q.   How much did they pay for their equity in the

12   Debtor?

13        A.   Three million dollars.

14        Q.   And when did they pay it back?

15        A.   When we closed the original purchase.

16        Q.   Back in 2021?

17        A.   That's correct.

18        Q.   The purchase of the Property?

19        A.   Yes.

20        Q.   Do you remember the book value, 30 million

21   dollars in the Schedules?

22        A.   Yes.

23        Q.   It occurs to me that three million dollars, 10

24   percent, a hundred percent would be 30 million dollars.

25   Is perhaps that's where the 30 million dollar figure came

James F. Jacoby                                    July 24, 2025
JDI Cumberland Inlet, LLC/In Re:

                                                        Page 36

1    from?

2         A.  Yes.

3         Q.  Am I correct that at the time back in 2021 when

4    Safe and Green contributed three million dollars for 10

5    percent, the parties, meaning the Debtor and Safe and

6    Green, valued the Property at 30 million dollars?

7         A.  Correct.

8         Q.  When was the agreement entered into to convert

9    their equity to debt?

10        A.  I believe that was, as I said, in February.

11        Q.  And is that agreement in writing?

12        A.  It was negotiated back and forth and it was --

13   yes, it is in writing.

14        Q.  Is it in a definitive single integrated document

15   or is it a series of email exchanges or other

16   communications?

17        A.  I think it's more in the emails back and forth.

18   I don't know if we've provided those or not.

19        MS. CHRISTY:  I'll have to check.  I don't

20        think -- I'll look and see what we have on Safe and

21        Green.

22        Q.  (By Mr. Rice) Correct me if I'm wrong, but my

23   understanding of the February agreement with Safe and

24   Green and the Debtor is that if Safe and Green made the

25   February loan payment to the Authority, its three million

James F. Jacoby                                July 24, 2025
JDI Cumberland Inlet, LLC/In Re:

Page 37

1   dollar equity contribution would be converted to a $4.5

2   million dollar loan obligation.

3       A.  That's correct.

4       Q.  And Safe and Green did not make the contribution

5   to pay the Authority's February loan payment; is that

6   correct?

7       A.  That's correct.

8       Q.  What reason did they give for not making the

9   contribution to make the February 2025 payment?

10      A.  Their funding source did not follow through.

11  They had an agreement.  They're a public company, NASDAQ-

12  based company, and they had a funding source that was

13  coming through them that did not materialize.

14      Q.  Do they contend that they're owed $4.5 million

15  dollars?

16      A.  I think they did not go through with the

17  agreement, so I think that's our dispute right now, that

18  you did not come through with the agreement, so this

19  modification was not fulfilled.

20      Q.  So if they didn't come through with the

21  agreement, do they have a claim for $4.5 million or do

22  they go back to having 10 percent equity interest?

23      A.  I think that's to be determined.  Their position

24  right now is they did not fulfill their obligations.

25      Q.  Have they made a demand for the $4.5 million?

James F. Jacoby                          July 24, 2025
JDI Cumberland Inlet, LLC/In Re:

Page 38

1        A.  No.

2        Q.  Have they made a demand for return of their 10

3    percent equity interest?

4        A.  No.

5        Q.  What is the current status of this $4.5 million

6    dollar claim?

7        A.  I think it's in dispute right now that they did

8    not come through as advertised and put us in this

9    position.

10        Q.  So you don't believe the Debtor has the

11    obligation to pay them the $4.5 million?

12        A.  I think there's some negotiations that they

13    agreed to take their money over a long period of time and

14    work together.  So I think there's -- right now there's

15    continuing dialogue with S&G how this all plays out.

16        Q.  How was their 10 percent interest in the Debtor

17    initially evidenced?

18        A.  It was a partnership interest.

19        Q.  Was there like a certificate that said you have a

20    10 percent interest?  Was there a partnership agreement

21    that said they have --

22        A.  It was a partnership agreement.

23            MS. CHRISTY:  I just emailed you the Operating

24        Agreement, which we've already produced, but in case

25        you want it right now, I just emailed that.

James F. Jacoby                               July 24, 2025
JDI Cumberland Inlet, LLC/In Re:

Page 39

1        Q.   (By Mr. Rice) Was there a written amendment to

2   the Operating Agreement to reflect the relinquishment of

3   their 10 percent interest?

4        A.   There was a written agreement to agree, but they

5   never funded, so our position is that we need to have

6   some -- it's been disputed on what the outcome is going to

7   be, whether they're willing to -- because they did not

8   fulfill their obligation and put us in this position -- to

9   either do a reduction in the amount or to spread it out

10  over a longer period of time.  So we're in dialogue with

11  them now on how this ends up.

12       Q.   Have you given any thought to whether it's

13  appropriate to convert their equity to debt when you're in

14  an insolvency proceeding?

15       A.   We're not doing anything right now with them.  We

16  can't do anything while we're in this position.  So that's

17  why nothing has happened.

18       Q.   Is it the parties' intent -- and when I refer to

19  the parties I mean Safe and Green and the Debtor's --

20  intent to resolve this dispute after the case is finished?

21       A.   Yes.

22       Q.   Who are your counterparts at Safe and Green?

23  Their names.

24       A.   We've gone through several of them.  Dave Grulene

25  (phonetic spelling) was the first one; Paul Galvin was the

James F. Jacoby                          July 24, 2025
JDI Cumberland Inlet, LLC/In Re:

Page 40

1    president; and presently, I forget his last name, but

2    Nicolai, because they have done some restructuring and

3    they split the company from Safe and Green to Safe and

4    Green Holdings.  So there's two different companies.

5         Q.   And Safe and Green Development Corporation, how

6    do they relate to the two companies now, do you know?

7         A.   I'm not exactly sure.  One is the real estate and

8    the other one has their businesses.

9         Q.   Mr. Jacoby, I'm going to hand you what's been

10   marked as Exhibit Number 3.  Can you identify this

11   document, please?  And take your time.  I know it's a few

12   pages if you want to make sure everything's in order.

13        (Exhibit 3 was identified for the record).

14        A.   Okay.

15        Q.   Are you familiar with this document?

16        A.   Yes.

17        Q.   And I see a signature for the developer, Jacoby

18   Development, Inc. by James F. Jacoby, Chairman.  I don't

19   see the page number, but that's what it looks like right

20   there when you find it.  Do you see that?

21        A.   Yes.

22        Q.   And that's your signature?

23        A.   Yes.

24        Q.   You signed this document?

25        A.   Yes.

James F. Jacoby                                    July 24, 2025
JDI Cumberland Inlet, LLC/In Re:

Page 41

1        Q.   And Jacoby Development, Inc. is the 100 percent

2    owner of the Debtor, correct?

3        A.   Yes.

4        Q.   It was the 90 percent owner, but now it's the 100

5    percent owner because of our discussion we just had about

6    your former partner.

7        A.   Yes.

8        Q.   And this was executed before the loan transaction

9    was done, correct?

10        A.   Yes.  This was in 2020.  Yes.

11        Q.   September 2020, somewhere around there?

12        A.   Correct.

13        Q.   I say that just to help you out.  It said

14    effective date September 16th, 2020.

15        A.   Okay.

16        Q.   That's about when it was signed, correct?

17        A.   Yes.

18        Q.   And this is the agreement that governs the

19    development of the Property, the relationship between the

20    City of St. Marys, the Authority, and the developer,

21    correct?

22        A.   Right.

23        Q.   And it details generally what the Property is

24    going to be developed into, correct?

25        A.   Yes.

James F. Jacoby                                      July 24, 2025
JDI Cumberland Inlet, LLC/In Re:

Page 42

1          Q.   And the various parties' obligations with respect

2     to that development, correct?

3          A.   Yes.

4          Q.   If you could turn to page 15 of 36 in your

5     Schedules.

6          A.   What page?

7          Q.   I'm sorry, Mr. Jacoby.  It's Exhibit Number 2.

8          A.   Oh, okay.

9          Q.   So Mr. Jacoby, Schedule G on page 15 of 36, and

10    this is where the Debtor is supposed to list any executory

11    contracts that it has, and you've checked the box no.  Do

12    you see that?

13         A.   Yes.

14         Q.   Has any thought been given to whether the

15    Development Agreement, this Exhibit 3 we just discussed,

16    should be included on that list of executory contracts,

17    the Schedule G?

18         A.   I don't understand the question.

19              MR. RICE:  Can you repeat my question?

20              THE COURT REPORTER:  Sure.  "Has any thought been

21         given to whether the Development Agreement, this

22         Exhibit 3 we just discussed, should be included on

23         that list of executory contracts, the Schedule G?"

24         Q.   (By Mr. Rice) So I'm just asking if you've

25    thought about it.  If you haven't thought about it, that's

James F. Jacoby                              July 24, 2025
JDI Cumberland Inlet, LLC/In Re:

Page 43

1    fine.

2          A.   I haven't thought about it.

3          Q.   Fair enough.   So you don't know if it should be

4    listed or not?

5          A.   I don't know.

6          Q.   I'd like to focus now on Jacoby Development, Inc.

7    I got a nod of approval from your counsel that I'm keeping

8    these entities straight.

9          A.   Okay.

10         Q.   A little positive affirmation helps every now and

11   then.

12         A.   Right.

13         Q.   If you'll turn to page 18 of 36 of your

14   Schedules?

15         A.   Which one is that?

16         Q.   It's Exhibit 2.

17         A.   And what page?

18         Q.   This is what it looks like.   I know it's kind of

19   tedious to find these pages.   It's tedious for me, too.

20         A.   Okay.

21         Q.   And you list Jacoby Development, Inc. there as

22   100 percent owner of the Debtor, correct?

23         A.   Yes.

24         Q.   Who owns Jacoby Development, Inc.?

25         A.   Who owns it?

James F. Jacoby                                July 24, 2025
JDI Cumberland Inlet, LLC/In Re:

                                                    Page 44

 1      Q.  Yes.

 2      A.  I am the sole owner.

 3      Q.  Would it be fair to say that you, Mr. Jacoby,

 4  personally are the ultimate owner of the Debtor?

 5          MS. CHRISTY:  That's a legal question so I'm not

 6      going to let him answer that.

 7      Q.  (By Mr. Rice) Let me just back up and make sure I

 8  I got this.  You are the 100 percent owner of Jacoby

 9  Development, Inc.  Is that not right?

10      A.  I believe I am 100 percent, yes.  I'm not sure if

11  my brother or anybody else is in there with me.

12      Q.  Your current understanding is you're the 100

13  percent owner of Jacoby Development, Inc.

14      A.  Right.

15      Q.  And Jacoby Development, Inc. is the 100 percent

16  owner of the Debtor, correct?

17      A.  Yes.

18      Q.  And Jacoby Development, Inc., if I understand

19  correctly, and correct me if I'm wrong, guaranteed the

20  loan obligation the Debtor owes to the Authority, correct?

21      A.  Yes.

22      Q.  And it has not paid the loan due to the

23  Authority, correct?

24      A.  Yes.

25      Q.  That's correct?

James F. Jacoby                          July 24, 2025
JDI Cumberland Inlet, LLC/In Re:

                                                    Page 45

1        A.  That's correct.

2        Q.  They have not paid it?

3        A.  Correct.

4        Q.  JDI, Jacoby Development, Inc., has not paid on

5    account of the loan, correct?

6            MS. CHRISTY:  Could you ask the first question

7        again?  Did you ask if the Debtor hasn't paid the

8        loan?

9            MR. RICE:  No, I'm asking if -- let me just back

10       up so we don't have a confusing record.  Perhaps I'm

11       making it unduly complicated.

12       Q.  (By Mr. Rice) Jacoby Development, Inc., it is

13   true is it not, guaranteed the loan?

14       A.  Yes.

15       Q.  That's the loan to the Authority?

16       A.  Yes.

17       Q.  And Jacoby Development, Inc. has not made any

18   payments on account of the loan, is that true?

19       A.  Yes.

20       Q.  Why hasn't it?

21       A.  I don't understand the question why hasn't it.

22       Q.  It's obligated to pay the loan if the Debtor

23   doesn't, correct?

24           THE WITNESS:  There again, I need legal counsel

25       on that question.

James F. Jacoby                    July 24, 2025
JDI Cumberland Inlet, LLC/In Re:

Page 46

1          MS. CHRISTY:  He's asking why hasn't the member

2      of the Debtor, Jacoby Development, not paid any of the

3      Debtor's obligations under the loan to the JDA.

4      A.  Well, because Jacoby Development, Inc. does not

5  have the capital to make these loans, and that I guess is

6  one of the reasons why we filed what we did, our motions.

7      Q.  Do you have the capital to fund Jacoby

8  Development, Inc. so we can make the loan payment?

9      A.  The payment?  Which payment are we talking about,

10  the full bond payment or the monthly payment?

11      Q.  Good question.  The payment that --

12      A.  Yes, I can make monthly payments.  Or the

13  six-month payment, whatever it is.

14      Q.  You could, if you chose, make the payment due in

15  September on the loan?

16      A.  Yes.

17      Q.  Do you intend to?

18      A.  That's my intent.

19      Q.  And approximately how much is that payment, do

20  you know?

21      A.  The interest payment should probably be $180,000

22  and the bond payment should probably be $500,000.

23      Q.  What's your position with Jacoby Development,

24  Inc.?  Are you the president?

25      A.  Chairman.

Veritext Legal Solutions
800.808.4958                                    770.343.9696

James F. Jacoby                                    July 24, 2025
JDI Cumberland Inlet, LLC/In Re:

                                                        Page 47

1          Q.   You're the Chairman?

2          A.   Chairman and CEO.

3          Q.   Is there a president?

4          A.   No, just Chairman and CEO.

5          Q.   You control that entity?

6          A.   Yes.

7          Q.   Does it have any employees?

8          A.   Clerical.  Not development employees, no.

9          Q.   Are there any directors of that company besides

10    you?

11         A.   Yes.  My brother and I believe my wife is also an

12    officer.

13         Q.   Is your brother active in the company?

14         A.   Not really.  He's had a stroke and it's been -- I

15    mean, if I need him for something he's available, and he's

16    been to St. Marys.

17         Q.   Is your wife active in the company?

18         A.   Not really.

19         Q.   Would it be fair to say that you're running the

20    company, you're the active person in the company?

21         A.   Yes.

22         Q.   Is there a reason why you didn't -- you

23    personally -- didn't fund the February 2025 loan payment?

24         A.   Well, we were under the impression -- I mean, the

25    dollars were there to go ahead and make the payment, which

James F. Jacoby                              July 24, 2025
JDI Cumberland Inlet, LLC/In Re:

                                                    Page 48

1    did not materialize.

2         Q.  Mr. Jacoby, if you could turn to page 20 of 36 in

3    the Schedules, the Statement of Financial Affairs.  I just

4    want to confirm a few things.  I don't think it's

5    controversial, but it's true, is it not, that the Debtor

6    has no current revenues?

7         A.  That's correct.

8         Q.  And it has never had any revenues, has it?

9         A.  That's correct.

10        Q.  And it has no employees?  It meaning the Debtor

11   has no employees?

12        A.  That's correct.

13        Q.  And it's never had any employees?

14        A.  That's correct.

15        Q.  It was contemplated in the Development Agreement,

16   was it not, that for the loan to be repaid, the developer

17   was going to have to obtain financing or dispose of some

18   or all of the Property, correct?

19        A.  Correct.

20        Q.  And that has not occurred?

21        A.  It has not.

22        Q.  Why not?

23        A.  Well, a number of reasons.  I mean, just market

24   conditions, COVID conditions, interest rate conditions.  A

25   number of various reasons that sort of add up to the

James F. Jacoby                                        July 24, 2025
JDI Cumberland Inlet, LLC/In Re:

                                                        Page 49

1    market.

2         Q.   The Property was purchased during the middle of

3    COVID, correct?

4         A.   Yeah.

5         Q.   So that was a known when the parties executed the

6    Development Agreement in September 2020, correct?

7         A.   Well, we didn't know what COVID was, but yes.

8         Q.   I mean, in September 2020 the world had pretty

9    much shut down, correct?

10        A.   September 2020?  So it started March.  Yeah, I

11   guess.

12        Q.   It was still shut down in September 2020.

13        A.   Right.

14        Q.   So what challenges has the Debtor faced in

15   obtaining financing for the project?

16        A.   Well, we've had a number of joint venture

17   partners come into the table that, for whatever reasons --

18   challenges of a brownfield development, a marina

19   development, interest rate changes, increases, political,

20   all of the above.  I mean, we had one group that was

21   backed by Bill Gates that whoever would have ever thought

22   that they would not follow through on their commitments.

23        Q.   And when you say JV, I take it you mean a party

24   that's going to come in and be a co-owner of the Debtor,

25   correct?

James F. Jacoby                               July 24, 2025
JDI Cumberland Inlet, LLC/In Re:

Page 50

1          A.   Various different scenarios, yeah, but joint

2     venture partners, investors, all of the above.

3          Q.   So that's one scenario to raise capital is to

4     sell an equity investment in the Debtor, correct?

5          A.   Right.

6          Q.   Another way is to find a third-party financier,

7     correct?

8          A.   Yes.

9          Q.   Have you tried that?

10         A.   Yes.

11         Q.   How come you haven't been successful with that?

12         A.   It's a complicated project and -- it's a

13    complicated project, that's why.  I mean, we've supplied

14    you so many different people and groups that we've reached

15    out to, and we're still in the process of talking to some

16    of them right now.

17         Q.   And the third way to raise some capital is to

18    sell some or all of the Property, correct?

19         A.   Right.

20         Q.   What have the challenges there been?

21         A.   Getting somebody to come to the table.  And we've

22    reached out to a number of people even under that

23    scenario, too.  Either sale of the Property, joint venture

24    of the Property, or financing.  All three.

25         Q.   And is it that they're not prepared to do it on

James F. Jacoby                                    July 24, 2025
JDI Cumberland Inlet, LLC/In Re:

Page 51

1    your terms or you're not prepared to do it on their terms?

2         A.  No one has given me a concrete proposal.  And if

3    they did, as I said, we wouldn't be having this meeting

4    today.  So it's just been a challenging project.  Even

5    when we stepped in, the previous guy had similar

6    situations where trying to get a brownfield finance was

7    always a challenge.

8         Q.  But these challenges you knew about at the outset

9    of the transaction, right?

10        A.  Well, I did the largest brownfield in the country

11   at one time.  So we knew there were but there's --

12        Q.  The environmental issues, you knew about them

13   when the Debtor acquired the Property, correct?

14        A.  Yes.

15        Q.  The COVID issue you knew about when the Debtor

16   acquired the Property, correct?

17        A.  Didn't know the extent, but yes.

18        Q.  And interest rates were even then recognized as

19   historically low, correct?

20        A.  When we purchased it, yes.

21        Q.  So all these things were known.  I'm just trying

22   to -- I mean, what surprises did you encounter?  All those

23   things seem to be situations that were, as Donald Rumsfeld

24   would say, they're known knowns.

25        A.  Well, we came into the project with the potential

James F. Jacoby                          July 24, 2025
JDI Cumberland Inlet, LLC/In Re:

Page 52

1   marina developer partner that we were already doing a deal

2   with in California who we were working together with, and

3   that was what leads off this project.

4        And we've had numerous -- when they came in the deal,

5   they were one of the largest marina operators in the

6   country, and that's what intrigued us.  And they went

7   through a lot of recapitalizations.  They decided that

8   even though they had the bankers contacting the JDA and so

9   forth and saying, hey, we want to do the deal -- because

10  we had a marina partner and the marina leads this project.

11  So if there's no marina partner, the project is stalled.

12       And that's been our case, is trying to get the right

13  marina partner or lender to come in and that it's not on

14  the marina alone has been the challenge, because

15  everything else follows.

16       Q.  Explain to me why everything follows the marina.

17       A.  Well, a number of reasons.  The marina needs to

18  be dug out and the fill from there needs to be spread out

19  to the rest of the property.  There's also environmental

20  issues with the area to be dredged that need to be taken

21  off the property.  And then thirdly, the potential

22  subdevelopers.  Be it residential or multifamily, all the

23  other people want to see the marina started.  So that's

24  the linchpin.  We've not had somebody come to the table

25  and say we're willing to just go it alone if there's no

James F. Jacoby                                July 24, 2025
JDI Cumberland Inlet, LLC/In Re:

Page 53

1    marina there.

2        Q.  So the marina is the traction for somebody to

3    come in and develop retail?  Am I understanding that

4    correctly?

5        A.  That too, yes.

6        Q.  And is the marina like an amenity for people that

7    are going to build a home or buy a condo?

8        A.  Yes.  And in fact, one of the residential

9    builders has said we'd like to have a marina slip that we

10   could pay for with our HOA.  So that's an attractive

11   enticement to give the residential builders.

12       Q.  So if I understand it, and correct me if I'm

13   wrong, it's the marina that potential developers of

14   retail, potential developers of residential --

15       A.  Hotel, all of the above.

16       Q.  -- hotel are looking for, and without the marina,

17   those things are not realistic?

18       A.  To this point we have not found people that

19   are -- we're in dialogue with one right now, but that has

20   not happened yet.

21       Q.  Was it always contemplated that the marina would

22   be built first?

23       A.  Yes.

24       Q.  And why was that?

25       A.  Well, as I mentioned, there's environmental

James F. Jacoby                                    July 24, 2025
JDI Cumberland Inlet, LLC/In Re:

Page 54

1    issues that need to be addressed.  There's the marina base

2    that needs to be taken care of, plus the fill that comes

3    out of there needs to be spread out over the rest of the

4    property.  So there's probably 400,000 cubic yards of fill

5    that needs to be spread out in raising the site for sea

6    level rise issues.

7         Q.  Okay.  If you'll turn to page 21 of 36 of the

8    Schedules, the Statement of Financial Affairs.  There was

9    some discussion at this 341 meeting you will recall

10   regarding Item Number 4.  Do you recall that?

11             THE WITNESS:  Am I looking at the right page?

12             MS. CHRISTY:  Yeah.  Right here (indicating).

13             THE WITNESS:  Oh, okay.

14             MS. CHRISTY:  The reimbursement of expenses.

15        A.  Okay.

16        Q.  Do you recall that testimony at the 341 Meeting

17   of Creditors?

18        A.  Yes.

19        Q.  These reimbursements, what were they for?

20        A.  I'd have to look.  I mean, we've got the dates,

21   so we'd have to look at these.  We did not take any

22   development fees on four years on this project.  We did

23   not take any reimbursement of expenses.  It's probably

24   something that I wrote personal checks out of to pay a

25   couple of these, but I don't recall exactly what they were

James F. Jacoby                                July 24, 2025
JDI Cumberland Inlet, LLC/In Re:

                                                    Page 55

1   for.

2        Q.  And I guess you wouldn't recall the exact amount

3   for each reimbursement that correlates to the dates that

4   are reflected?

5        A.  I don't recall.

6        Q.  And what person with the Debtor would have made

7   the decision to make this reimbursement?  Would it have

8   been you?

9        A.  Yes.

10       Q.  So the bankruptcy case is filed on I believe May

11  5th of 2025, and at least a couple of these

12  reimbursements, one is dated April 10th, 2025, another one

13  is dated May 1st, 2025.

14            MS. CHRISTY:  I can check, but I believe it was

15       for --

16            THE WITNESS:  Is that attorney's fees?

17            MS. CHRISTY:  Yes.  Our attorney's fees.

18            THE WITNESS:  Right.

19            MS. CHRISTY:  I can get that and tell you what

20       that number was.

21            THE WITNESS:  I think the last two were

22       attorney's fees.

23            MS. CHRISTY:  Yes.

24       Q.  (By Mr. Rice) So let me see if I can understand

25  this.  Mr. Jacoby, Jacoby Development, Inc., paid the

James F. Jacoby                                    July 24, 2025
JDI Cumberland Inlet, LLC/In Re:

Page 56

1    retainer to Debtor's counsel; is that correct?

2        A.  Yes.

3        Q.  And then the Debtor reimbursed Jacoby

4    Development, Inc. for the retainer; is that correct?

5        A.  I don't recall the mechanism.

6            THE WITNESS:  (To Ms. Christy) Did we do that?  I

7        don't remember if it came through from --

8        MS. CHRISTY:  No, it would've come from -- Jacoby

9        Development paid the Debtor and the Debtor paid us the

10       retainer, and that retainer was on 5/5 is when we

11       received it from the Debtor, and that was $33,262

12       along with the filing fee.

13           MR. RICE:  Is that the 5/1 payment or the 4/10

14       payment?

15           MS. CHRISTY:  It would've been the 5/1 I would

16       imagine because we received it on May 5th.

17           MR. RICE:  So if I understand it, and I'm not

18       sure I do, Jacoby Development, Inc. advanced funds to

19       the Debtor to pay the retainer, and then the Debtor

20       reimbursed Jacoby Development, Inc. for the funds that

21       were advanced?  Did I say that right?

22           MS. CHRISTY:  No.  The Debtor hasn't reimbursed

23       Jacoby Development for anything, so I don't know why

24       this is -- Jacoby Development paid the Debtor $33,000

25       that the Debtor then paid to us on May 5th as our

James F. Jacoby                          July 24, 2025
JDI Cumberland Inlet, LLC/In Re:

Page 57

1       retainer for the case.

2           Jacoby Development has not been repaid the

3       $33,000.  If it had been, there wouldn't have been a

4       need for Jacoby Development to pay the money to the

5       Debtor in the first place.  So there was no

6       reimbursement on 5/1, so that is incorrect.

7           What was paid was a payment to the Debtor from

8       Jacoby Development at some point in early May, which

9       was then paid to us.  So I'll check on this.  This

10      isn't correct.

11          MR. RICE:  So maybe the Schedules should be

12      amended maybe?

13          MS. CHRISTY:  Yeah, because the way this reads, I

14      mean, it says Payments or other transfers of property

15      made within one year that benefited any insider.

16          So it looks like the reason this was put on there

17      is because -- and the additional payment dates is just

18      worded poorly -- is that Jacoby Development made a

19      payment on behalf of the Debtor for our fees, gave it

20      to the Debtor, which then benefited JDI, Jacoby

21      Development.  But we'll amend this to reflect the

22      correct transactions.

23          Q.  (By Mr. Rice) Mr. Jacoby, you're aware of the

24      motion that was filed by the Authority to have the court

25      determine that this is a single asset real estate case,

James F. Jacoby                                July 24, 2025
JDI Cumberland Inlet, LLC/In Re:

Page 58

1    correct?

2          A.   Is that in the original filing or is that in a

3    different one?

4               MS. CHRISTY:   It was the motion that the JDA

5          filed asking the court to find that the Debtor is a

6          single asset real estate Debtor.

7               THE WITNESS:   Okay.

8          A.   Yes.

9          Q.   You're aware of it?

10         A.   I'm aware of it, yes.

11         Q.   And you gave some testimony about that at the 341

12   Meeting of Creditors, correct?

13         A.   Right.

14         Q.   And if I understand your testimony correctly,

15   there were -- one reason why the Debtor contends it's not

16   a single real estate case is because there were multiple

17   projects and multiple lenders; is that correct?

18         A.   That's correct.

19         Q.   Are there any other reasons why the Debtor

20   contends that this is not a single asset real estate case?

21         A.   Well, the fact that these are different

22   businesses, you know, a studio is different than just real

23   estate, the marina is a business as opposed to just real

24   estate.  It just seems like there were different

25   subdevelopers coming in to do different projects, also.

James F. Jacoby                    July 24, 2025
JDI Cumberland Inlet, LLC/In Re:

Page 59

1       Q.  So your contention -- the Debtor's contention is
2   there were multiple projects?
3       A.  Yes.
4       Q.  I mean, right now there are no businesses on the
5   property.
6       A.  That's right.
7       Q.  I don't understand, and maybe you can help me
8   understand, what is the multiple lenders?
9       A.  Well, for somebody to do the marina, because it's
10  a marine lender more or less, there's not a whole lot of
11  them.  So, you know, it's a specific lender.  A lender for
12  a studio is also more of a specific type lender that would
13  loan on a movie studio.  So there's a lender for hotels,
14  lender for apartments, lender built for rents.
15      Q.  I just want to confirm as we sit here today.  So
16  there's nothing else other than the contention that
17  there's multiple projects and multiple potential lenders
18  why the case is not a single asset real estate case?
19      A.  I guess that's my contention, yes.
20      Q.  There's a hearing on August 4th this year for the
21  court to determine whether the case is a single asset real
22  estate case or not.  Are you aware of that?
23      A.  Yes.
24      Q.  And the Debtor has requested an evidentiary
25  hearing.  Are you aware of that?

James F. Jacoby                                    July 24, 2025
JDI Cumberland Inlet, LLC/In Re:

Page 60

1       A.   What does that mean?

2            MS. CHRISTY:  That we'll have a hearing for the

3       court to determine --

4            THE WITNESS:  Is that on the 4th?

5            MS. CHRISTY:  Yes.

6       A.   Okay.

7       Q.   It'll be a trial with witnesses.  Are you aware

8   of that?

9            MS. CHRISTY:  It's a hearing, so you'll testify,

10      as we've discussed.

11           THE WITNESS:  Is that in person or is that on

12      Zoom?

13           MS. CHRISTY:  I don't know.  It likely is in

14      person since we're presenting evidence.

15      Q.   (By Mr. Rice) So I take it you'll testify at the

16  hearing?

17      A.   Yes.

18      Q.   Who else will testify for the Debtor?

19      A.   I don't know.

20      Q.   Have you given it any thought?

21      A.   I don't know.

22      Q.   Have you retained any experts to testify?

23      A.   No.

24      Q.   Do you anticipate any experts will testify?

25      A.   I don't know.  It's something that I've never

James F. Jacoby                              July 24, 2025
JDI Cumberland Inlet, LLC/In Re:

                                                        Page 61

1    been involved with, so it's something I need to fully vet.

2         Q.  Well, it's just over --

3              MS. CHRISTY:  Can I interject here.  That's a

4         fact question.  We don't need any experts to testify.

5              MR. RICE:  Are there any other witnesses other

6         than Mr. Jacoby?

7              MS. CHRISTY:  Maybe Mr. Loudon, but we haven't

8         decided yet.

9         Q.  (By Mr. Rice) Who's Mr. Loudon?

10        A.  John Loudon is a long-time friend who's been

11   helping me on the project since its inception.

12        Q.  Is he paid?

13        A.  He's worked with us in previous projects, but

14   this one he's been working on, helping us out with.

15        Q.  What's his background?

16        A.  He's a CPA, financial background, real estate

17   development.

18        Q.  So what does he do to help you with the project?

19        A.  He does just about everything.  Financial,

20   pro formas, whatever, really.  We all sort of roll up our

21   sleeves.  We wear multiple hats.

22        Q.  Does he represent you in connection with the

23   project?

24        A.  Does he represent me?

25        Q.  Yes.

James F. Jacoby                                July 24, 2025
JDI Cumberland Inlet, LLC/In Re:

Page 62

1          A.   That means he would be -- yes, he's out there.

2          Q.   That's what I'm trying to understand.  Is he out

3     there in the community and does he speak for the Debtor?

4     People understand him as speaking for the Debtor if he's

5     out there dealing with the public on the project?

6          A.   I mean, it's understood that he's involved with

7     Cumberland Inlet and other projects as well.

8          Q.   He's involved for the Debtor?

9          A.   Yes.

10         Q.   Does he show the Property?

11         A.   He has.

12         Q.   And is he listening in to this exam?

13         A.   I believe he is, yes.

14         Q.   Okay.  So what do you contend are the separate

15    projects?

16         A.   The different components.

17         Q.   The different components?

18         A.   The marina being one, movie studio; the second

19    one, Ecotourism; the third one, build for rent; the fourth

20    one, multifamily independent living; the fifth one, a

21    hotel; the sixth one, a town center.

22         Q.   What's a town center?

23         A.   Retail that is around the marina and it could be

24    called Town Centers.

25         Q.   So what is your vision for the project?  Just

James F. Jacoby                        July 24, 2025
JDI Cumberland Inlet, LLC/In Re:

Page 63

1    kind of this is my vision?  Tell it to me.

2         A.  It's a community about ecotourism.  It's a

3    boating community, it's a town center for the town of

4    St. Marys, for tourism.  I mentioned the filming for

5    checkout dives for first responders, it's a large birding

6    community.  We have the largest rookery for wood storks in

7    the state, maybe in the country.

8         So I think it's the ecotourism.  It's about creating a

9    destination for tourists, and for the people living there,

10   they can work there and play there and so forth.

11        Q.  So all of it is supposed to work together as part

12   of a community?

13        A.  Yes.  And the example was Atlantic Station here

14   where we built eight million square feet.  It was three

15   thousand residential units, almost 3 million square feet

16   of office, and a couple million square feet of retail and

17   entertainment.  So taking that as a model of live, work

18   and play, Atlantic Station By-The-Sea, showcasing sea

19   level rise, resilience, and so forth.

20        Q.  You said work and play.  And I guess that's a

21   sense of there's retail, work, play, the ecotourism and

22   boating, and the marina.  All this is supposed to create a

23   community that people would want to visit and live in?

24        A.  Yes.

25        Q.  And it's all meant to work together as a cohesive

James F. Jacoby                    July 24, 2025
JDI Cumberland Inlet, LLC/In Re:

Page 64

1    unit I take it?

2         A.  Well, it's a cohesive unit, but each one of them

3    is probably going to have separate ownership but work

4    together.  But it's not going to happen without the marina

5    unless we restart it, and that's been more of a challenge.

6    Even to downsize the marina is more of a challenge.

7         Q.  But without the marina, you don't have the

8    ecotourism, correct?

9         A.  Yes.  Without a marina, we don't have the

10   ecotourism.  We had the birding, and that could happen,

11   but it's not going to be what the community needs and

12   wants.

13        Q.  And what is it that the community needs and

14   wants?  Is that what the Development Authority's job is,

15   to help provide what the community's needs and wants are?

16   What do you understand their job is?

17        A.  Yeah, of course.  And this is what we've taken on

18   where they started.  There's been multiple developers

19   looking at this property for different things, from a

20   barge port to golf course development.  Just different

21   types of things.

22        But it seems like what they've started on with their

23   marina permit, which they got and we have collectively

24   modified to more of a resort-type, and so I think this is

25   what the community wants.  The community wants ecotourism.

James F. Jacoby                                    July 24, 2025
JDI Cumberland Inlet, LLC/In Re:

                                                    Page 65

1    They want an industrial project.

2          MR. RICE:  Can we maybe take like a 30-minute

3       lunchbreak?

4          MS. CHRISTY:  Sure.

5          (Proceedings off the record at 12:20 p.m.)

6          (Proceedings back on the record at 12:25 p.m.)

7       Q.  (By Mr. Rice) So as I understand it, the

8    sequencing, sort of the gating issue, is the marina.  You

9    have to start with the marina first.

10      A.  I think that's the case, yes.

11      Q.  And when I say you have to start with the marina

12   first, you have to start the development work on the

13   marina first.

14      A.  Right.  Well, actually it's the environmental

15   work.  We need to get rid of the hot spots first and then

16   dredge the marina.

17      Q.  Are the hot spots at the marina site?

18      A.  Some of them are, yes.

19      Q.  So in my mind, that's all part of the same

20   development, right?  You got to clean out the bad stuff,

21   right?  Am I not looking at that correctly?

22      A.  Right.

23      Q.  And you got to do the marina first because the

24   dredge is going to fill in some low ends and because the

25   marina is the primary amenity from which everything else

James F. Jacoby                              July 24, 2025
JDI Cumberland Inlet, LLC/In Re:

Page 66

1    kind of gravitates, correct?

2        A.  Right.  And you need a place to put the fill,

3    too.  It's a combination of you need to fill and you need

4    a place to put it.

5        Q.  I think I understand.  So in your 341 meeting,

6    you testified about some permits for the marina.

7        A.  Right.

8        Q.  And so I think I have the permits.  I just want

9    you to identify them.

10            MR. RICE:  Exhibit 4?  Am I on the right number?

11            THE COURT REPORTER:  Yes.

12       Q.  (By Mr. Rice) Mr. Jacoby, I'm going to hand you

13   what's been marked as Exhibit Number 4.  Are you familiar

14   with that document?

15       (Exhibit 4 was identified for the record).

16       A.  Yes.

17       Q.  And what is this document?

18       A.  This was the original marina permit that went to

19   the Joint Development Authority and that we have modified

20   collectively.

21       Q.  So as I understand it, and as always correct me

22   if I'm wrong, when you acquired the Property there was a

23   permit to build a marina, but you wanted to modify that

24   permit because I take it there was some aspect of the

25   initial permit that you wanted to improve upon; is that

James F. Jacoby                                   July 24, 2025
JDI Cumberland Inlet, LLC/In Re:

Page 67

1    right?

2         A.   That's correct.

3         Q.   So what improvement did you want to make?

4         A.   We wanted to do away with the marina repair and

5    make it more of an upscale marina.  We also wanted it for

6    a Phase 2 on the dry stacks.  We wanted to go ahead and

7    get that permit done the second time.  I think those were

8    the two main things.  There might have been some others.

9         Q.   So if you wanted to make it more upscale and get

10   rid of the repair, I take it there was going to be some

11   sort of mechanic there?

12        A.   Originally, yes.  The Joint Development Authority

13   and the previous developer, they were going to have -- I

14   think maybe that was one way they could sell it to the

15   community is they were going to have a marina repair

16   there, but we decided that we didn't want that as part of

17   the basin and that we'd do that offsite.

18        Q.   Okay.  Mr. Jacoby, I'm handing you what's been

19   marked as Exhibit Number 5.  Are you familiar with that

20   document?

21        (Exhibit 5 was identified for the record).

22        A.   Right.

23        Q.   And what is this?

24        A.   Excuse me?

25        Q.   What is this Document Number 5?

James F. Jacoby                                July 24, 2025
JDI Cumberland Inlet, LLC/In Re:

Page 68

```
 1        A.  This was the modified -- this is the marina

 2   permit that modified the previous one.

 3        Q.  And this is what gave you the ability to build

 4   the marina you wanted to build?

 5        A.  Yes, except for one point that drug it on for

 6   another year is they had issues with -- historical issues

 7   that I think never really got finally resolved until April

 8   of '24.

 9        Q.  So this permit didn't give you the ability to

10   build the marina you wanted?

11        A.  I'm saying the D&R came up with another -- even

12   though we had this, they said we need to do archaeological

13   and historical on the property.  So as I said, that took

14   us another year to get that resolved.

15        Q.  Is that resolved now?

16        A.  Yes.

17        Q.  So I take it then, looking at the date of this

18   permit in February of 2024, you would have been in a

19   position to start --

20        A.  April.

21        Q.  -- April of 2024 you would have been in a

22   position to start development of the marina?

23        A.  Right.

24        Q.  Why didn't you start development of the marina in

25   April of 2024?
```

James F. Jacoby                          July 24, 2025
JDI Cumberland Inlet, LLC/In Re:

Page 69

1      A.  Well, we've been trying to get financing and

2   we've been trying to get a development partner, a marina

3   partner.  So that's been challenging.  And we're still in

4   dialogue with a major marina partner that's been on-again

5   off-again.  And then the financing is another issue with

6   this.  I mentioned earlier there's not a lot of marina

7   financial partners out there for financial institutions.

8      Q.  So have you had any discussions with parties that

9   are interested in acquiring the totality of the Property?

10     A.  Yes.

11     Q.  Wouldn't that solve all your problems?

12     A.  Yes.

13     Q.  Why haven't you --

14     A.  We're looking at it right now.  We've had a

15  couple people that have expressed interest in the entire

16  Property.

17     Q.  Is the Property for sale?

18     A.  It's been for sale from day one.  We need to come

19  up with a group that would come in either as a partner or

20  as an acquisition.

21     Q.  How long do you think the Authority should wait

22  for the Debtor to come up with a financing source or come

23  up with a JV partner or come up with somebody to purchase

24  the Property and, you know, have its loan sit there in

25  default?  How long?

James F. Jacoby                     July 24, 2025
JDI Cumberland Inlet, LLC/In Re:

Page 70

1       A.  We are working the project and there's not too

2   many people that we've not introduced it to to say this is

3   the type of project to get involved with.  And how it gets

4   structured, we're open to it.  So we're in dialogue right

5   now with both parties that would be coming in as paying

6   off the bonds and being a venture partner, we're in

7   dialogue with just selling the whole property.

8       Most of the challenge is really just to find financial

9   institutions.  So I think right now the best shot we have

10  is to bring in a partner.  Our goal is to pay off the

11  bonds immediately, as quickly as we can.

12      Q.  So your counsel advised one of the lawyers in my

13  firm I think over the weekend that a transaction was

14  imminent, motions were going to be filed earlier this week

15  to approve the transaction that would get my client paid.

16  Do you know anything about that?

17      A.  Yes.

18      Q.  What's the status of that transaction?

19      A.  That's why I'm looking on my phone to see when

20  the financing is finalized and to go ahead and move

21  forward on that.  That could happen any day.

22      Q.  The financing for whom?  Financing for the

23  perspective joint venture party?

24      A.  The first choice is to pay off the bonds and get

25  that taken care of and then we'll figure out how the rest

James F. Jacoby                                    July 24, 2025
JDI Cumberland Inlet, LLC/In Re:

Page 71

1    of the project is structured, whether they just totally

2    take us out or they want us to stay in.

3         Q.   When do you anticipate --

4         A.   Could be today, could be tomorrow.  It's

5    imminent, though.  I would say within the next -- we've

6    got a couple of different scenarios.  We have other

7    parties that the JDA is familiar with that want to come in

8    as a venture partner, pay off the bonds, and that could

9    take 30 to 60 days is what they're asking for.  So there's

10   a couple of them right now that we're evaluating.  There's

11   documents going back and forth, partnership documents and

12   so forth.  So I would anticipate this is going to happen

13   rapidly.

14        Q.   Do you have a lawyer?  Does the Debtor have a

15   lawyer that's working on that transaction?

16        A.   We've been working on it.  When we get to a

17   certain point, of course we'll have a lawyer.

18        Q.   I mean, I would think if there's an exchange of

19   documents, normally lawyers are involved with that.  I'm

20   just trying to understand where you're --

21             MS. CHRISTY:  I've reviewed the documents.

22        Q.   (By Mr. Rice) So I take it, yes, you have a

23   lawyer?

24        A.   We have a lawyer and they have a lawyer.  So,

25   yes.

James F. Jacoby                                    July 24, 2025
JDI Cumberland Inlet, LLC/In Re:

Page 72

1      Q.  Are there any hurdles in connection with this

2  transaction that have yet to be overcome?

3      A.  Well, one of them has got the cash right now and

4  the other one is getting the financing all teed up and the

5  loan commitments and so forth.

6      Q.  When you say one of them, are there multiple JV

7  partners that are coming in?

8      A.  One or the other.

9      Q.  One or the other?

10      A.  On this scenario right now.

11      Q.  You're working two potential deals?

12      A.  Yes.

13      Q.  One of the perspective JV venturers has their

14  financing in order and the financial wherewithal to

15  consummate the transaction now.  Do I understand that

16  correctly?

17      A.  Yes.

18      Q.  And the other one is still working on their

19  financing?

20      A.  Yes.  It should close any day.

21      Q.  And your understanding is that that's not a

22  problem?

23      A.  That's my understanding.  It's one of the most

24  acclaimed real estate developers in the country.

25      Q.  So how high a probability do you ascribe to

James F. Jacoby                                                July 24, 2025
JDI Cumberland Inlet, LLC/In Re:

Page 73

1    getting one or the other of these transactions done?

2          A.   High.  Very high.  Ninety percent.

3               MR. RICE:  Let's go off the record.

4               THE WITNESS:  Certainly.

5               (Proceedings off the record at 12:37 p.m.)

6               (Proceedings back on the record at 12:56 p.m.)

7          Q.   (By Mr. Rice) Mr. Jacoby, I'm going to hand you

8    what's been marked as Exhibit Number 6.  Do you recognize

9    this?

10         (Exhibit 6 was identified for the record).

11         A.   Yes.

12         Q.   And what is this?

13         A.   A survey of the parcels that we acquired in 2021.

14         Q.   And this depicts the Property, right?

15         A.   Yes.

16         Q.   And not to hide the ball, this is what we've

17   talked about being a continuous tract, correct?  Made up

18   of multiple parcels, correct?

19         A.   Right.

20              MR. RICE:  Can we go off the record?

21              THE COURT REPORTER:  Sure.

22              (Proceedings off the record at 12:57 p.m.)

23              (Proceedings back on the record at 12:58 p.m.)

24         Q.   (By Mr. Rice) Mr. Jacoby, we'd been off the

25   record for a while and we'd been discussing, I'll just

James F. Jacoby                                 July 24, 2025
JDI Cumberland Inlet, LLC/In Re:

Page 74

1    call it the Debtor's current plan.  I'd like you to, if

2    you would, just summarize that, where you are in the

3    process on your plan to get your creditors paid.

4         A.  Well, my plan is, as I said, either to find a

5    joint venture partner or a sale.  Chances are probably

6    slimmer to get a loan right now, and the loans would be

7    exorbitant to pay off the bonds, so we need to find a

8    partner.  And these are both people, groups, that I've

9    dealt with for a number of years.  It's not some of the

10   newer folks that have not been able to do what they said

11   they were going to do.

12        Q.  So as I understand it, your current plan is to

13   obtain a joint venture to make an equity infusion into the

14   Debtor to pay your creditors?

15        A.  That's correct.

16        Q.  And you feel like you're very close to obtaining

17   that transaction?

18        A.  I am, yes.

19        Q.  Have you given any thought to Plan B if that

20   doesn't occur?

21        A.  What is Plan B?

22        Q.  Yeah, Plan B.  Is there a Plan B?

23        A.  I don't know.  Possibly.  You know, we've had

24   some dialogue before with the Authority about either

25   working together with the Authority or other financial

James F. Jacoby                              July 24, 2025
JDI Cumberland Inlet, LLC/In Re:

Page 75

1    instruments.  But I'm not sure where you're --

2         Q.  Look, I was just trying to figure out -- I

3    understand that the, I'll call it The Plan.  And it may

4    not be a plan of organization, but the current intent is

5    to obtain a joint venture partner who will make an equity

6    contribution to the Debtor, sufficient to pay the Debtor's

7    creditors, correct?

8         A.  Correct.

9         Q.  And you believe there is a high probability of

10   that transaction occurring?

11        A.  That's correct.

12        Q.  Which will be good because you'll pay your

13   creditors, including the Authority, correct?

14        A.  Right.

15        Q.  And I'm trying to determine if there's a backup

16   plan or if there's just so much confidence in the ability

17   to bring a JV partner in in the very near future that you

18   don't need a backup plan.  And if you don't have one, you

19   don't have one.

20        A.  No, I don't know what -- I'm always open to

21   suggestions what backup plans might be.  But like I said,

22   we did have some dialogue with the Authority once upon a

23   time about some sort of scenario, splitting the baby or

24   doing something like that.  So I don't know if that's a

25   backup plan.  I don't even know that it's on the table.  I

James F. Jacoby                         July 24, 2025
JDI Cumberland Inlet, LLC/In Re:

Page 76

1    don't know.  I don't have any others right now, but I'm

2    always open to listening to what opportunities might

3    arise, how to get this done.

4              MR. RICE:  Ceci, I think this is a good stopping

5         point to have lunch, and then when we come back from

6         lunch, you can ask your questions.

7              MS. CHRISTY:  Okay.  We can do that.

8              (Proceedings off the record at 1:03 p.m.)

9              (Proceedings back on the record at 1:58 p.m.)

10                       EXAMINATION

11   BY MS. CHRISTY:

12        Q.  Mr. Jacoby, what happened with the original

13   marina partner?  Why did that fall through?

14        A.  So James is familiar with them.  It was Suntec

15   that was -- actually it was Westrec who eventually sold

16   out to Suntec.  He was the largest marina operator.  But

17   they went through a recapitalization and the new people

18   that came in and funded Centerbridge prevented them from

19   doing any new developments.  They were only buying

20   marinas.  Same thing with Safe Harbor, the other big

21   player out there who we've talked to.

22        So yeah, I mean, they were very committed, and that's

23   why we got really excited because they were committed to

24   doing the deal and they even sent -- they had their banker

25   call.  I think James had calls with them.  But they were

James F. Jacoby                                    July 24, 2025
JDI Cumberland Inlet, LLC/In Re:

Page 77

1    so committed.

2          And then interest rates started going up, so the cap

3    rate started going up where they were borrowing money at

4    two percent.  So that became an issue, also.  But they're

5    still in play as of recently.  But anyway, it was a

6    combination of the economy and COVID and you name it.

7          Q.  And what's the first step that has to be taken

8    before the marina can begin construction?

9          A.  Well, we need a little bit of tweaking on the

10   marina design, but before that, we need to go ahead and

11   finalize the remediation and get the hot spots taken out.

12         Q.  And what's the cost of that remediation?

13         A.  That's probably -- it's hard to say for sure

14   because you don't know until you get in there, but it was

15   estimated in the million dollar range.  Million to a

16   million-and-a-half is my guess.

17         Q.  And do you have a marina developer who's

18   interested at this point?

19         A.  Well, the ones that have sort of come back to the

20   table as well as another group that wants to reduce the

21   scale of the marina, which is a timing element that, if we

22   go back for any more permit modifications -- it took us

23   three years from the last time.  We started in 2021 and we

24   got the final in 2024.  So I don't know if reducing the

25   scale of the marina can be done in a timely fashion.  I

James F. Jacoby                    July 24, 2025
JDI Cumberland Inlet, LLC/In Re:

Page 78

1    know it's a good way to go, but timing is important.  So

2    we only got X number of years on the marina permit to go

3    ahead and get that started.  So time is of the essence.

4         MS. CHRISTY:  Okay, thank you.  That's all I

5         have.

6         MR. RICE:  So the deposition -- or the

7         examination -- is going to be continued.  We can

8         reconvene at some point.

9         THE COURT REPORTER:  Okay.  Do you have any other

10        questions to add?

11        MR. RICE:  Not at this time.

12        THE COURT REPORTER:  Okay, thank you.

13

14              (Examination to be Continued)

15               (Concluded at 2:02 p.m.)

16

17

18

19

20

21

22

23

24

25

James F. Jacoby                                      July 24, 2025
JDI Cumberland Inlet, LLC/In Re:

Page 79

1                          CERTIFICATE
2      STATE OF GEORGIA
3      COUNTY OF DEKALB
4

           I hereby certify that the foregoing transcript was
5      taken down as stated in the caption, and the questions,
       answers and statements were typewritten by me; and that
6      the transcript is a true and correct record of the
       evidence given upon said proceeding.
7

           I further certify that I am not a relative or employee
8      or attorney of any party, nor am I financially interested
       in the outcome of this action and have no relationship of
9      interest which would disqualify me from maintaining my
       obligation of impartiality in compliance with the Code of
10     Professional Ethics.
11         I have no written or direct contract with any party in
       this action, and nothing in the arrangements made for this
12     proceeding impacts my absolute commitment to serve all
       parties as an impartial officer of the court.
13
14             This 28th day of July 2025.
15
16
17
18
19
20
21         Mia L. Smith CCR, No. B-2458
22
23
24
25

James F. Jacoby                              July 24, 2025
JDI Cumberland Inlet, LLC/In Re:

**[& - 5th]**                                                   Page 1

| & |
|---|
| **&**   1:16 11:21 12:13 16:10 29:13 |

| 1 |
|---|
| **1**   3:4 6:14,17 |
| **1,041,918.04.**   20:8 |
| **1,080**   29:1 |
| **10**   11:15 35:23 36:4 37:22 38:2,16,20 39:3 |
| **10.b**   2:23 |
| **100**   41:1,4 43:22 44:8,10 44:12,15 |
| **1000**   2:7 9:15 |
| **1001**   2:6 |
| **10:17**   1:13 |
| **10th**   55:12 |
| **11**   1:5 5:12 8:13 27:22 |
| **11:11**   33:14 |
| **11:20**   33:15 |
| **12**   20:22 27:22 |
| **12:20**   65:5 |
| **12:25**   65:6 |
| **12:37**   73:5 |
| **12:56**   73:6 |
| **12:57**   73:22 |
| **12:58**   73:23 |

**14**   3:17,20
**15**   42:4,9
**155**   13:22
**16**   13:19,21
**160**   13:22
**16th**   41:14
**172**   10:1 13:16 13:17,20,20 14:11,21 15:8 15:21
**18**   43:13
**180,000**   46:21
**1:03**   76:8
**1:58**   76:9
**1st**   55:13

| 2 |
|---|
| **2**   3:7 8:11,15 42:7 43:16 67:6 |
| **20**   48:2 |
| **20017**   79:20 |
| **2004**   1:8 3:4 14:1 |
| **2018**   3:17 |
| **2020**   41:10,11 41:14 49:6,8 49:10,12 |
| **2021**   3:22 11:18,19 35:16 36:3 73:13 77:23 |
| **2022**   16:1 |

**2023**   3:20
**2024**   11:23 12:14 20:25 21:2 32:5,6 68:18,21,25 77:24
**2025**   1:12 3:9 35:6,8 37:9 47:23 55:11,12 55:13 79:14
**21**   54:7
**22**   3:9
**24**   1:12 68:8
**2458**   1:22 79:21
**25-55072**   1:3
**28th**   79:14
**2987**   1:17 2:14
**2:02**   78:15
**2nd**   11:23 12:14

| 3 |
|---|
| **3**   3:10 34:7 40:10,13 42:15 42:22 63:15 |
| **30**   3:22 10:5 35:20,24,25 36:6 65:2 71:9 |
| **30329**   1:19 2:16 |
| **30th**   11:18,19 |
| **31558**   9:16 |

**33,000**   56:24 57:3
**33,262**   56:11
**33602**   2:8
**341**   17:6 54:9 54:16 58:11 66:5
**350**   1:18 2:15
**36**   9:13 12:7 18:5 27:22,23 42:4,9 43:13 48:2 54:7

| 4 |
|---|
| **4**   3:14 54:10 66:10,13,15 |
| **4.5**   33:18 34:5 37:1,14,21,25 38:5,11 |
| **4/10**   56:13 |
| **40**   3:10 |
| **400,000**   54:4 |
| **4th**   59:20 60:4 |

| 5 |
|---|
| **5**   3:18 4:3 67:19,21,25 |
| **5/1**   56:13,15 57:6 |
| **5/5**   56:10 |
| **500,000**   46:22 |
| **55**   9:23 |
| **58**   12:5 |
| **5th**   55:11 56:16 56:25 |

James F. Jacoby                    July 24, 2025
JDI Cumberland Inlet, LLC/In Re:

[6 - appraiser]                                      Page 2

| | | | |
|---|---|---|---|
| **6** | **account** 34:13 | **agree** 8:19 | **amount** 11:12 |
| **6** 3:4,21 9:13 | 34:25 45:5,18 | 15:16,17,19 | 18:16 20:8 |
| 12:7 73:8,10 | **acquired** 11:17 | 16:15 26:5 | 21:16 22:8 |
| **60** 71:9 | 51:13,16 66:22 | 39:4 | 28:15 33:18 |
| **66** 3:14 | 73:13 | **agreed** 30:2 | 39:9 55:2 |
| **67** 3:18 | **acquiring** 24:3 | 34:9 38:13 | **answer** 14:2 |
| **7** | 69:9 | **agreement** 3:10 | 25:21 44:6 |
| **73** 3:21 | **acquisition** | 7:24 10:10,12 | **answers** 6:4 |
| **76** 4:4 | 69:20 | 10:21,24 11:4 | 14:9 79:5 |
| **8** | **action** 79:8,11 | 11:6 18:23 | **anticipate** |
| **8** 3:7 | **active** 47:13,17 | 19:4,9,15,18 | 60:24 71:3,12 |
| **9** | 47:20 | 34:3,12,22 | **anybody** 44:11 |
| **9** 12:10 18:5 | **actually** 27:22 | 35:3,4 36:8,11 | **anyway** 77:5 |
| **9,386,336.58** | 65:14 76:15 | 36:23 37:11,17 | **apartments** |
| 18:16 | **add** 48:25 | 37:18,21 38:20 | 59:14 |
| **90** 41:4 | 78:10 | 38:22,24 39:2 | **apparent** 19:10 |
| **a** | **additional** | 39:4 41:18 | **appear** 4:24 |
| **a.m.** 1:13 33:14 | 57:17 | 42:15,21 48:15 | **appearances** |
| 33:15 | **address** 9:19 | 49:6 | 2:1 |
| **abandon** 16:20 | **addressed** 54:1 | **ahead** 28:9 | **appraisal** 10:4 |
| **ability** 23:15 | **admitted** 2:4 | 34:10 47:25 | 11:20,21,25 |
| 68:3,9 75:16 | **advanced** | 67:6 70:20 | 12:13,14,14,23 |
| **able** 74:10 | 56:18,21 | 77:10 78:3 | 12:24 13:5 |
| **above** 49:20 | **advertised** 38:8 | **akm** 3:23 28:23 | 14:3,4,5 15:11 |
| 50:2 53:15 | **advised** 70:12 | 29:7 | 15:14,16,19,23 |
| **abrams** 32:8 | **affairs** 3:8 8:12 | **amend** 30:7 | 16:10,10 |
| **absolute** 79:12 | 48:3 54:8 | 57:21 | **appraisals** 7:16 |
| **absolutely** | **affirmation** | **amended** 3:4 | 12:17,21 15:23 |
| 33:11 | 43:10 | 57:12 | 16:9 27:7,8 |
| **acclaimed** | **age** 30:22 | **amendment** | **appraised** |
| 72:24 | **ago** 28:13 | 39:1 | 10:11 12:10 |
| | 30:11,18,20,22 | **amenity** 53:6 | 14:12 |
| | 31:10,16,18 | 65:25 | **appraiser** |
| | 33:3 | | 14:23 15:12 |

James F. Jacoby                                               July 24, 2025
JDI Cumberland Inlet, LLC/In Re:

**[appropriate - birding]**                                      Page 3

| appropriate | atlantic 63:13 | **b** | based 14:15 |
|---|---|---|---|

**appropriate**
39:13
**approval** 43:7
**approve** 70:15
**approximately**
13:20 46:19
**april** 55:12
68:7,20,21,25
**arant** 2:5
**archaeological**
68:12
**architect** 30:14
**architecture**
30:12
**area** 52:20
**arrangements**
79:11
**article** 2:23
**ascribe** 72:25
**asked** 15:25
17:8 24:20
**asking** 25:14
42:24 45:9
46:1 58:5 71:9
**aspect** 66:24
**asset** 57:25
58:6,20 59:18
59:21
**assets** 8:22,23
9:5
**associated** 28:1
**atlanta** 1:2,19
2:16

**atlantic** 63:13
63:18
**attempts** 7:19
**attorney** 79:8
**attorney's**
20:16 55:16,17
55:22
**attractive**
53:10
**august** 59:20
**authority** 2:3
3:11,15,19
17:18,19,20
18:1,9,13
19:22,25 20:2
20:19 22:14,18
23:14 24:8
26:7 28:5
34:17 36:25
41:20 44:20,23
45:15 57:24
66:19 67:12
69:21 74:24,25
75:13,22
**authority's**
37:5 64:14
**available** 47:15
**aware** 12:23
18:24 57:23
58:9,10 59:22
59:25 60:7

**b**

**b** 1:22 74:19,21
74:22,22 79:21
**baby** 75:23
**back** 11:6,10
14:16,17 22:2
22:4,23 32:15
33:15 35:14,16
36:3,12,17
37:22 44:7
45:9 65:6
71:11 73:6,23
76:5,9 77:19
77:22
**backed** 49:21
**background**
61:15,16
**backup** 75:15
75:18,21,25
**bad** 65:20
**balance** 29:18
**ball** 73:16
**ballpark** 11:12
11:13
**banker** 76:24
**bankers** 52:8
**bankruptcy** 1:1
3:4 8:13 17:18
18:6 24:14
25:23 55:10
**barge** 64:20
**base** 54:1

**based** 14:15
22:9 37:12
**basically** 19:1
28:8
**basin** 67:17
**basis** 29:13,25
30:13,24 31:14
32:23 34:5
**beginning** 28:8
28:12 29:16
**behalf** 1:10 2:3
2:10 19:13
57:19
**belief** 15:10
**believe** 7:15
10:25 11:18,19
14:15,17 15:21
16:1 17:12,14
17:15,16 18:21
20:23,23 23:2
23:4 28:13,18
28:21,22 30:11
32:11 35:4
36:10 38:10
44:10 47:11
55:10,14 62:13
75:9
**benefited** 57:15
57:20
**best** 70:9
**big** 76:20
**bill** 32:2 49:21
**birding** 63:5
64:10

James F. Jacoby                                    July 24, 2025
JDI Cumberland Inlet, LLC/In Re:

**[bit - claim]**                                                    Page 4

| | | | |
|---|---|---|---|
| **bit**  77:9 | **business**  58:23 | 65:10 | **change**  4:21 |
| **blessing**  26:3 | **businesses**  40:8 | **cash**  8:24 72:3 | **changes**  49:19 |
| **board**  2:24 | 58:22 59:4 | **ccjda**  2:19 | **chapter**  1:5 |
| **boating**  63:3,22 | **buy**  53:7 | **ccjda's**  3:3 | 5:12 8:13 |
| **bond**  34:10,14 | **buyers**  22:10 | **ccr**  1:22 79:21 | **chatter**  24:2 |
| 46:10,22 | 24:4 | **ceci**  2:11 13:24 | **check**  30:7 |
| **bonds**  70:6,11 | **buying**  76:19 | 19:13 76:4 | 36:19 55:14 |
| 70:24 71:8 | **c** | **center**  62:21,22 | 57:9 |
| 74:7 | | 63:3 | **checked**  12:11 |
| **book**  10:5 | **calculation** | **centerbridge** | 33:21 42:11 |
| 35:20 | 13:8 | 76:18 | **checkout**  63:5 |
| **borrowing**  77:3 | **california**  52:2 | **centers**  62:24 | **checks**  54:24 |
| **boult**  2:5 | **call**  21:5 74:1 | **century**  2:13 | **choice**  19:17 |
| **box**  12:11 | 75:3 76:25 | **ceo**  47:2,4 | 70:24 |
| 42:11 | **called**  10:24 | **certain**  21:16 | **choices**  19:15 |
| **bradley**  2:5 | 18:10 62:24 | 25:14 28:1 | **choose**  19:17 |
| **brasfield**  29:13 | **calls**  76:25 | 71:17 | **chose**  46:14 |
| **break**  33:13 | **camden**  2:3 | **certainly**  73:4 | **christy**  2:11 4:4 |
| **bring**  20:12,13 | 3:10,14,19 | **certificate** | 9:9 13:24,24 |
| 70:10 75:17 | 17:20 18:9 | 38:19 79:1 | 16:5 19:13,13 |
| **brother**  44:11 | 26:6 | **certify**  79:4,7 | 22:4 33:7 |
| 47:11,13 | **cap**  77:2 | **chairman** | 36:19 38:23 |
| **brought**  24:12 | **capital**  46:5,7 | 40:18 46:25 | 44:5 45:6 46:1 |
| **brownfield** | 50:3,17 | 47:1,2,4 | 54:12,14 55:14 |
| 49:18 51:6,10 | **caption**  79:5 | **challenge**  51:7 | 55:17,19,23 |
| **build**  53:7 | **care**  54:2 70:25 | 52:14 64:5,6 | 56:6,8,15,22 |
| 62:19 66:23 | **careful**  5:22 | 70:8 | 57:13 58:4 |
| 68:3,4,10 | **case**  1:3 5:12 | **challenges** | 60:2,5,9,13 |
| **builders**  53:9 | 8:13 17:18 | 49:14,18 50:20 | 61:3,7 65:4 |
| 53:11 | 28:18,19 38:24 | 51:8 | 71:21 76:7,11 |
| **built**  13:6 | 39:20 52:12 | **challenging** | 78:4 |
| 53:22 59:14 | 55:10 57:1,25 | 51:4 69:3 | **city**  3:12 41:20 |
| 63:14 | 58:16,20 59:18 | **chances**  74:5 | **claim**  18:16 |
| | 59:18,21,22 | | 22:8 23:17 |

James F. Jacoby                                          July 24, 2025
JDI Cumberland Inlet, LLC/In Re:

**[claim - controversial]**                                          Page 5

| | | | |
|---|---|---|---|
| 28:23,24 29:14 | 53:3 56:8 | 47:20 | **constuction** |
| 29:25 30:13,25 | 69:18,19,22,22 | **compiled** 6:24 | 3:15 |
| 31:15 32:9,23 | 69:23 71:7 | **complete** 19:14 | **consummate** |
| 33:17 34:6 | 76:5 77:19 | **compliance** | 72:15 |
| 37:21 38:6 | **comes** 54:2 | 79:9 | **contacting** 52:8 |
| **claims** 19:21 | **coming** 37:13 | **complicated** | **contemplated** |
| 22:6 | 58:25 70:5 | 45:11 50:12,13 | 48:15 53:21 |
| **clairmont** 1:17 | 72:7 | **components** | **contend** 37:14 |
| 2:14 | **commission** | 62:16,17 | 62:14 |
| **clarify** 13:25 | 23:4 | **concluded** | **contends** 58:15 |
| **clean** 65:20 | **commissioned** | 78:15 | 58:20 |
| **clerical** 47:8 | 11:25 12:18 | **concrete** 26:18 | **contention** 59:1 |
| **client** 17:19 | **commitment** | 27:13 51:2 | 59:1,16,19 |
| 70:15 | 7:5 79:12 | **condition** 14:14 | **contiguous** |
| **close** 72:20 | **commitments** | 14:22 15:7 | 17:12 |
| 74:16 | 49:22 72:5 | **conditioned** | **continued** 78:7 |
| **closed** 35:15 | **committed** | 14:3 | 78:14 |
| **closing** 28:22 | 76:22,23 77:1 | **conditions** | **continuing** |
| **closings** 20:17 | **communicating** | 48:24,24,24 | 38:15 |
| **code** 79:9 | 5:21 | **condo** 53:7 | **continuous** |
| **codes** 4:20 | **communicati...** | **conducted** 3:22 | 73:17 |
| **cohesive** 63:25 | 22:18 36:16 | **confidence** | **contract** 79:11 |
| 64:2 | **community** | 75:16 | **contracts** 8:3 |
| **collectively** | 62:3 63:2,3,6 | **confirm** 6:24 | 42:11,16,23 |
| 64:23 66:20 | 63:12,23 64:11 | 48:4 59:15 | **contribute** |
| **combination** | 64:13,25,25 | **confusing** 6:2 | 34:24 |
| 28:21 30:21,23 | 67:15 | 45:10 | **contributed** |
| 66:3 77:6 | **community's** | **connection** | 36:4 |
| **come** 11:6,10 | 64:15 | 6:15 61:22 | **contribution** |
| 14:24 15:12 | **companies** 40:4 | 72:1 | 37:1,4,9 75:6 |
| 26:2,24 27:1,3 | 40:6 | **construction** | **control** 47:5 |
| 37:18,20 38:8 | **company** 3:22 | 29:15,19,20,20 | **controversial** |
| 49:17,24 50:11 | 37:11,12 40:3 | 77:8 | 48:5 |
| 50:21 52:13,24 | 47:9,13,17,20 | | |

James F. Jacoby                                    July 24, 2025
JDI Cumberland Inlet, LLC/In Re:

**[conversation - deal]**                                        Page 6

| | | | |
|---|---|---|---|
| **conversation** | 48:19 49:3,6,9 | **country** 51:10 | 75:7,13 |
| 5:20 26:4 | 49:25 50:4,7 | 52:6 63:7 | **credits** 31:6 |
| 27:21 | 50:18 51:13,16 | 72:24 | **cubic** 54:4 |
| **conversations** | 51:19 53:12 | **county** 2:3 3:11 | **cumberland** |
| 22:14,23 25:22 | 56:1,4 57:10 | 3:14,19 17:20 | 1:4,10 2:10,20 |
| **convert** 34:8,23 | 57:22 58:1,12 | 18:9 23:4 26:6 | 3:5,8 5:12 6:20 |
| 36:8 39:13 | 58:17,18 64:8 | 79:3 | 12:1 62:7 |
| **converted** 37:1 | 66:1,21 67:2 | **couple** 30:18 | **cummings** 2:5 |
| **copy** 11:1,4 | 73:17,18 74:15 | 31:16 33:3 | **current** 9:25 |
| 23:7,9 | 75:7,8,11,13 | 54:25 55:11 | 15:7 16:22 |
| **corp** 33:17 | 79:6 | 63:16 69:15 | 20:13,14 26:14 |
| **corporation** | **correctly** 44:19 | 71:6,10 | 38:5 44:12 |
| 33:24 40:5 | 53:4 58:14 | **course** 24:5,19 | 48:6 74:1,12 |
| **corps** 31:5 | 65:21 72:16 | 24:23 25:1 | 75:4 |
| **correct** 5:13,14 | **correlates** 55:3 | 64:17,20 71:17 | **currently** 14:7 |
| 8:13,22 10:1 | **cost** 28:6 77:12 | **court** 1:1 2:24 | **cushman** 11:21 |
| 10:22 11:22,24 | **costing** 29:21 | 5:22 6:13 | 12:13 16:10 |
| 13:7 15:1 | **costs** 18:22 | 42:20 57:24 | **d** |
| 16:13,14,16,24 | 28:1,22 29:21 | 58:5 59:21 | |
| 16:25 17:1,13 | **coughlin** 2:19 | 60:3 66:11 | **d** 18:6 |
| 18:1,10,14,15 | 24:17,18,20 | 73:21 78:9,12 | **d&r** 68:11 |
| 18:17,18 20:20 | 33:9 | 79:12 | **date** 21:18 33:2 |
| 24:4,18 25:13 | **council** 2:25 | **cover** 20:19 | 41:14 68:17 |
| 26:8,11 27:15 | **counsel** 2:1 7:1 | **covid** 48:24 | **dated** 3:17,20 |
| 27:16,18 33:23 | 7:9 8:8 15:24 | 49:3,7 51:15 | 11:23 55:12,13 |
| 34:1,3,17 35:9 | 23:23 43:7 | 77:6 | **dates** 54:20 |
| 35:17 36:3,7 | 45:24 56:1 | **cpa** 61:16 | 55:3 57:17 |
| 36:22 37:3,6,7 | 70:12 | **create** 63:22 | **dave** 39:24 |
| 41:2,9,12,16,21 | **counterclaims** | **creating** 63:8 | **day** 69:18 |
| 41:24 42:2 | 20:2 22:6 | **creditor** 20:4 | 70:21 72:20 |
| 43:22 44:16,19 | **counterparts** | **creditors** 13:15 | 79:14 |
| 44:20,23,25 | 39:22 | 17:6 18:8 20:5 | **days** 71:9 |
| 45:1,3,5,23 | **counterparty** | 26:15 54:17 | **deal** 52:1,4,9 |
| 48:7,9,12,14,18 | 34:2 | 58:12 74:3,14 | 76:24 |

James F. Jacoby                                    July 24, 2025
JDI Cumberland Inlet, LLC/In Re:

[dealing - discounted]                                    Page 7

| | | | |
|---|---|---|---|
| **dealing** 10:13 | 57:5,7,19,20 | **described** 7:24 | 42:15,21 43:6 |
| 23:18 24:6 | 58:5,6,15,19 | **description** 3:3 | 43:21,24 44:9 |
| 62:5 | 59:24 60:18 | **design** 30:12 | 44:13,15,18 |
| **deals** 72:11 | 62:3,4,8 69:22 | 77:10 | 45:4,12,17 |
| **dealt** 74:9 | 71:14 74:14 | **destination** | 46:2,4,8,23 |
| **debt** 13:18 29:3 | 75:6 | 63:9 | 47:8 48:15 |
| 29:23 30:10 | **debtor's** 7:12 | **detailed** 10:22 | 49:6,18,19 |
| 34:23 36:9 | 8:4 9:25 16:11 | **details** 41:23 | 54:22 55:25 |
| 39:13 | 18:1 39:19 | **determine** | 56:4,9,18,20,23 |
| **debtor** 1:5 2:10 | 46:3 56:1 59:1 | 57:25 59:21 | 56:24 57:2,4,8 |
| 5:12 6:20,21 | 74:1 75:6 | 60:3 75:15 | 57:18,21 61:17 |
| 7:19 8:22 9:5 | **december** 32:5 | **determined** | 64:14,20 65:12 |
| 10:19 11:7,9 | 32:6 | 37:23 | 65:20 66:19 |
| 11:17 12:2,18 | **decided** 52:7 | **develop** 53:3 | 67:12 68:22,24 |
| 13:9,10,14 | 61:8 67:16 | **developed** 14:5 | 69:2 |
| 15:4 16:18 | **decision** 55:7 | 14:8 26:11 | **developments** |
| 17:3 18:3,12 | **default** 69:25 | 41:24 | 76:19 |
| 18:13 19:14,19 | **defenses** 21:24 | **developer** | **dialogue** 38:15 |
| 19:21,24 20:25 | 21:25 22:7 | 40:17 41:20 | 39:10 53:19 |
| 21:2,15,24 | **definitive** 36:14 | 48:16 52:1 | 69:4 70:4,7 |
| 22:5,8,10 | **dekalb** 79:3 | 67:13 77:17 | 74:24 75:22 |
| 23:11 26:15 | **demand** 37:25 | **developers** | **dialogues** 24:14 |
| 28:4 34:21,23 | 38:2 | 22:10,23 53:13 | **different** 14:8 |
| 34:25 35:9,12 | **denotes** 4:24 | 53:14 64:18 | 40:4 50:1,14 |
| 36:5,24 38:10 | **dentons** 29:25 | 72:24 | 58:3,21,22,24 |
| 38:16 41:2 | **depicts** 73:14 | **developing** | 58:25 62:16,17 |
| 42:10 43:22 | **deposit** 9:1 | 13:1 16:19 | 64:19,20 71:6 |
| 44:4,16,20 | **deposition** 5:15 | **development** | **direct** 79:11 |
| 45:7,22 46:2 | 14:1 78:6 | 2:3 3:10,11,13 | **directors** 47:9 |
| 48:5,10 49:14 | **depositions** | 3:15,19 7:24 | **disagree** 15:14 |
| 49:24 50:4 | 5:18 | 8:4 17:20 18:9 | 15:17 |
| 51:13,15 55:6 | **derived** 10:3,7 | 26:6,7 33:17 | **disclosure** 2:23 |
| 56:3,9,9,11,19 | **describe** 18:25 | 33:24 40:5,18 | **discounted** |
| 56:19,22,24,25 | 19:7,11 | 41:1,19 42:2 | 14:16,17 |

James F. Jacoby                                           July 24, 2025
JDI Cumberland Inlet, LLC/In Re:

**[discussed - estate]**                                   Page 8

| discussed  42:15 | dollar  13:19 | **e** | encounter |
|---|---|---|---|
| 42:22 60:10 | 28:15 34:5 | | 51:22 |
| discussing | 35:25 37:1,2 | earlier  5:9 16:3 | ends  39:11 |
| 73:25 | 38:6 77:15 | 34:3 69:6 | 65:24 |
| discussion  17:5 | dollars  10:1,6 | 70:14 | engaged  31:17 |
| 17:7 24:25 | 11:16 14:11,21 | early  32:2,4 | engineering |
| 41:5 54:9 | 15:8,21 28:10 | 35:5 57:8 | 31:25 33:5 |
| discussions | 28:16,16,20 | easier  9:10 | engineers  31:5 |
| 23:15 25:2 | 29:9 33:18 | ecological | entered  34:21 |
| 27:5 69:8 | 35:13,21,23,24 | 30:24 | 36:8 |
| dispose  48:17 | 36:4,6 37:15 | economy  77:6 | entertainment |
| dispute  18:13 | 47:25 | ecotourism | 63:17 |
| 30:3 37:17 | donald  51:23 | 62:19 63:2,8 | enticement |
| 38:7 39:20 | dougherty | 63:21 64:8,10 | 53:11 |
| disputed  30:5,8 | 30:12 | 64:25 | entire  69:15 |
| 33:21 34:11 | downsize  64:6 | ed  5:9 | entities  43:8 |
| 39:6 | drafts  7:22 | edwin  2:4 | entity  18:9 47:5 |
| disqualify  79:9 | drawings  8:2 | effective  41:14 | environmental |
| district  1:1 | dredge  65:16 | efforts  7:19 | 51:12 52:19 |
| dives  63:5 | 65:24 | eight  31:9 | 53:25 65:14 |
| division  1:2 | dredged  52:20 | 63:14 | equity  13:8,10 |
| document | drug  68:5 | either  11:18 | 13:15 14:7,8 |
| 10:15 16:2 | dry  67:6 | 39:9 50:23 | 34:9,23 35:9 |
| 19:16 36:14 | duces  3:5 | 69:19 74:4,24 | 35:11 36:9 |
| 40:11,15,24 | due  17:25 | element  77:21 | 37:1,22 38:3 |
| 66:14,17 67:20 | 18:23 20:21,24 | eleven  13:18 | 39:13 50:4 |
| 67:25 | 21:10,20,23 | email  36:15 | 74:13 75:5 |
| documents | 29:9,23 44:22 | emailed  38:23 | esq  2:4,11 |
| 6:19,25 7:6,12 | 46:14 | 38:25 | essence  78:3 |
| 7:13,18 8:5,7 | dug  52:18 | emails  36:17 | estate  40:7 |
| 71:11,11,19,21 | duly  5:2 | employee  79:7 | 57:25 58:6,16 |
| doing  32:24 | | employees  47:7 | 58:20,23,24 |
| 39:15 52:1 | | 47:8 48:10,11 | 59:18,22 61:16 |
| 75:24 76:19,24 | | 48:13 | 72:24 |

James F. Jacoby                                     July 24, 2025
JDI Cumberland Inlet, LLC/In Re:

**[estimated - financing]**                              Page 9

| | | | |
|---|---|---|---|
| **estimated** 77:15 | 5:4 6:15 76:10 78:7,14 | **expressed** 69:15 | **feet** 63:14,15 63:16 |
| **ethics** 79:10 | **examinations** 4:1 | **expressions** 26:22 27:17 | **fifth** 62:20 |
| **evaluating** 71:10 | **examined** 5:2 | **extend** 21:13 21:15 | **figure** 35:25 70:25 75:2 |
| **evaluation** 31:2 31:3 | **example** 63:13 | **extent** 51:17 | **filed** 3:9 8:12 17:17 46:6 |
| **evaluations** 29:16,21 30:1 32:10,24 | **except** 68:5 | **eye** 31:14 | 55:10 57:24 58:5 70:14 |
| **eventually** 76:15 | **exchange** 71:18 | **f** | **files** 32:15 |
| **everybody** 33:12 | **exchanges** 36:15 | **f** 1:9 5:1 40:18 | **filing** 56:12 58:2 |
| **everything's** 40:12 | **excited** 76:23 | **faced** 49:14 | **fill** 52:18 54:2,4 65:24 66:2,3 |
| **evidence** 60:14 79:6 | **excuse** 33:7 67:24 | **facility** 3:17 | **filming** 63:4 |
| **evidenced** 38:17 | **executed** 41:8 49:5 | **fact** 53:8 58:21 61:4 | **final** 77:24 |
| **evidentiary** 59:24 | **executory** 42:10,16,23 | **fair** 20:18 43:3 44:3 47:19 | **finalize** 77:11 |
| **exact** 11:11 33:2 55:2 | **exhibit** 3:3,4,7 3:10,14,18,21 | **fall** 76:13 | **finalized** 70:20 |
| **exactly** 11:10 13:11 14:18 22:20 23:25 29:1 31:21,22 32:14 40:7 54:25 | 6:14,16,16,17 8:11,15 40:10 40:13 42:7,15 42:22 43:16 66:10,13,15 67:19,21 73:8 73:10 | **familiar** 40:15 66:13 67:19 71:7 76:14 | **finally** 8:2 68:7 |
| **exam** 14:1 62:12 | **exhibits** 3:1 | **far** 21:21 | **finance** 7:24 51:6 |
| **examination** 1:8 3:5 4:3,4 | **exorbitant** 74:7 | **fashion** 77:25 | **financial** 3:7 8:12 48:3 54:8 61:16,19 69:7 69:7 70:8 72:14 74:25 |
| | **expenses** 54:14 54:23 | **february** 3:20 18:1 35:4,5,6,8 36:10,23,25 37:5,9 47:23 68:18 | **financially** 79:8 |
| | **experts** 60:22 60:24 61:4 | **fee** 21:14 56:12 | **financier** 50:6 |
| | **explain** 12:25 28:3 52:16 | **feel** 74:16 | **financing** 48:17 49:15 50:24 69:1,5,22 70:20,22,22 72:4,14,19 |
| | | **fees** 18:22 20:16 54:22 55:16,17,22 57:19 | |

James F. Jacoby                                    July 24, 2025
JDI Cumberland Inlet, LLC/In Re:

[financings - green]                                    Page 10

**financings** 7:5
**find** 15:3 23:8
  40:20 43:19
  50:6 58:5 70:8
  74:4,7
**fine** 43:1
**finished** 39:20
**firm** 31:25
  32:10,23 33:4
  33:4,5,6 70:13
**first** 5:2 7:3
  31:17 39:25
  45:6 53:22
  57:5 63:5 65:9
  65:12,13,15,23
  70:24 77:7
**five** 13:18
**florida** 2:8
**focus** 33:16
  43:6
**folks** 74:10
**follow** 37:10
  49:22
**follows** 5:3
  52:15,16
**foreclosing**
  17:21
**foregoing** 79:4
**forget** 21:14
  40:1
**form** 13:11
**forma** 13:5
**formal** 27:14

**formas** 61:20
**formed** 10:20
**former** 28:19
  33:24 41:6
**formula** 14:19
**forth** 7:6 29:16
  29:21,22 30:2
  34:11 36:12,17
  52:9 63:10,19
  71:11,12 72:5
**forward** 70:21
**found** 53:18
**four** 7:3,7
  28:13 29:17
  54:22
**fourth** 62:19
**frederick** 5:8
**friend** 61:10
**front** 23:6 29:5
**fulfill** 37:24
  39:8
**fulfilled** 37:19
**full** 3:16 5:6
  46:10
**fully** 61:1
**fund** 46:7
  47:23
**funded** 39:5
  76:18
**funding** 37:10
  37:12
**funds** 20:15
  28:4,5 56:18
  56:20

**further** 79:7
**future** 75:17

**g**

**g** 2:4 42:9,17
  42:23
**galvin** 39:25
**gates** 49:21
**gating** 65:8
**geer** 1:16 2:12
**general** 5:17
**generally** 7:4
  41:23
**generated** 17:2
**generates**
  16:25
**georgia** 1:1,19
  2:16,25 3:12
  9:16 79:2
**getting** 26:7
  30:22 50:21
  72:4 73:1
**give** 23:17 37:8
  53:11 68:9
**given** 19:15
  39:12 42:14,21
  51:2 60:20
  74:19 79:6
**go** 5:18 28:9
  32:15 33:11
  34:10,20 37:16
  37:22 47:25
  52:25 67:6
  70:20 73:3,20

  77:10,22 78:1
  78:2
**goal** 70:10
**going** 6:5,13,14
  8:10 9:11 22:4
  30:7 33:7
  34:10 39:6
  40:9 41:24
  44:6 48:17
  49:24 53:7
  64:3,4,11
  65:24 66:12
  67:10,13,15
  70:14 71:11,12
  73:7 74:11
  77:2,3 78:7
**golf** 64:20
**good** 46:11
  75:12 76:4
  78:1
**gorrie** 29:13
**gotten** 26:3
  27:13,14
**governs** 41:18
**grab** 33:7
**grant** 30:2
  32:25,25
**gravitates** 66:1
**green** 10:14
  33:17,24 34:13
  34:16,19,22
  35:8 36:4,6,21
  36:24,24 37:4
  39:19,22 40:3

James F. Jacoby                                    July 24, 2025
JDI Cumberland Inlet, LLC/In Re:

**[green - insolvency]**                                    Page 11

| | | **i** | **income**  16:25 |
|---|---|---|---|

40:4,5
**group**  32:8
49:20 69:19
77:20
**groups**  50:14
74:8
**grulene**  39:24
**guaranteed**
44:19 45:13
**guess**  13:17
19:7 22:21
29:18 31:16
32:2 46:5
49:11 55:2
59:19 63:20
77:16
**guy**  51:5

**h**

**hac**  2:4
**half**  77:16
**hand**  6:13 8:10
40:9 66:12
73:7
**handing**  67:18
**handled**  28:8
**happen**  64:4,10
70:21 71:12
**happened**
39:17 53:20
76:12
**harbor**  76:20
**hard**  77:13

**hats**  61:21
**head**  11:9
**hear**  25:10
**hearing**  59:20
59:25 60:2,9
60:16
**hearsay**  23:7
**help**  41:13 59:7
61:18 64:15
**helping**  61:11
61:14
**helps**  43:10
**hey**  52:9
**hide**  73:16
**high**  72:25 73:2
73:2 75:9
**historical**  68:6
68:13
**historically**
51:19
**hit**  33:10
**hoa**  53:10
**holder**  35:9
**holdings**  40:4
**home**  53:7
**hot**  65:15,17
77:11
**hotel**  53:15,16
62:21
**hotels**  59:13
**hundred**  35:24
**hurdles**  72:1

**i**

**identified**  6:17
8:15 40:13
66:15 67:21
73:10
**identify**  40:10
66:9
**imagine**  56:16
**immediately**
70:11
**imminent**
70:14 71:5
**impacts**  79:12
**impartial**  79:12
**impartiality**
79:9
**implementati...**
7:23
**important**  78:1
**impression**
47:24
**improve**  66:25
**improvement**
67:3
**inappropriate**
24:9,11 25:6
25:20
**inception**  61:11
**include**  18:22
**included**  42:16
42:22
**including**  75:13

**income**  16:25
17:2
**incomplete**
4:22
**incorporated**
18:10 20:5
**incorrect**  4:25
57:6
**increases**  49:19
**incumbent**  6:6
**incurred**  30:10
32:1,17 33:1
**indebtedness**
31:20 32:1,17
33:1
**independent**
62:20
**index**  3:1 4:1
**indicating**
54:12
**industrial**  65:1
**information**
14:23 25:25
29:5
**infusion**  74:13
**initial**  66:25
**initially**  38:17
**inlet**  1:4,10
2:10,20 3:6,8
5:12 6:20 12:1
62:7
**insider**  57:15
**insolvency**
39:14

James F. Jacoby                                      July 24, 2025
JDI Cumberland Inlet, LLC/In Re:

**[instance - know]**                                              Page 12

| | | | |
|---|---|---|---|
| **instance**  28:4 | **interruption**  4:21 | 42:7,9 43:6,21 | **judicial**  2:25 |
| **institutions**  69:7 70:9 | **intervening**  21:10 | 43:24 44:3,8 | **july**  1:12 79:14 |
| **instruments**  75:1 | **intrigued**  52:6 | 44:13,15,18 | **june**  3:22 11:18 |
| **integrated**  36:14 | **introduced**  70:2 | 45:4,12,17 | 11:19 |
| **intend**  46:17 | **investment**  34:7 50:4 | 46:2,4,7,23 | **jv**  49:23 69:23 |
| **intent**  7:5 39:18,20 46:18 75:4 | **investors**  50:2 | 48:2 55:25,25 | 72:6,13 75:17 |
| **intention**  16:22 | **involved**  61:1 62:6,8 70:3 71:19 | 56:3,8,18,20,23 | **k** |
| **intentionally**  16:7 | **issue**  51:15 65:8 69:5 77:4 | 56:24 57:2,4,8 | **keeping**  43:7 |
| **intentions**  16:19,20 | **issued**  3:14,18 | 57:18,20,23 | **kind**  5:17 43:18 63:1 66:1 |
| **interactions**  22:9 | **issues**  32:25 51:12 52:20 54:1,6 68:6,6 | 61:6 66:12 | **kings**  30:2 32:25 |
| **interest**  10:1 18:20,21 20:14 24:3,5 26:7,10 26:22 27:18,20 34:23 37:22 38:3,16,18,20 39:3 46:21 48:24 49:19 51:18 69:15 77:2 79:9 | **it'd**  23:7 24:23 | 67:18 73:7,24 76:12 | **klein**  1:16 2:12 |
|  | **it'll**  60:7 | **jacoby's**  14:2 | **knew**  51:8,11 51:12,15 |
|  | **item**  7:11,18,22 12:4 54:10 | **james**  1:9 2:19 5:1,8 25:15 40:18 76:14,25 | **know**  5:17 6:3 6:6 12:22 13:13 22:20,24 23:14 24:10,13 24:17 25:2,4,6 25:9,12,16,22 29:6 36:18 40:6,11 43:3,5 43:18 46:20 49:7 51:17 56:23 58:22 59:11 60:13,19 60:21,25 69:24 70:16 74:23,23 75:20,24,25 76:1 77:14,24 78:1 |
|  | **itemized**  28:15 | **jda**  19:8 20:14 22:5,7,8,9 25:24,25 26:4 26:6 46:3 52:8 58:4 71:7 |  |
|  | **items**  7:3 9:6 18:23 | **jdi**  1:4,10 2:10 2:20 3:5,8 5:11 6:20 45:4 57:20 |  |
| **interested**  69:9 77:18 79:8 | **j** | **job**  64:14,16 |  |
| **interests**  27:19 | **jacoby**  1:9 3:12 5:1,8,9 8:10 9:12 11:11 14:5 22:6 33:16 40:9,17 40:18 41:1 | **john**  2:20 61:10 |  |
| **interject**  61:3 |  | **joint**  2:3 3:11 3:14,19 17:20 18:8 26:6,6 49:16 50:1,23 66:19 67:12 70:23 74:5,13 75:5 |  |
| **internally**  28:8 |  |  |  |

James F. Jacoby                                                July 24, 2025
JDI Cumberland Inlet, LLC/In Re:

**[known - make]**                                              Page 13

**known**  49:5
  51:21,24
**knowns**  51:24

**l**

**l**  1:22 79:21
**land**  3:21 14:4
  16:16 17:12
**landfill**  31:23
**large**  63:5
**largest**  51:10
  52:5 63:6
  76:16
**late**  20:25 21:2
**latest**  28:25
**law**  32:8,10
  33:4,6
**lawyer**  71:14
  71:15,17,23,24
  71:24
**lawyers**  70:12
  71:19
**leads**  52:3,10
**lease**  7:20
**left**  13:15
**legal**  44:5
  45:24
**leitman**  1:16
  2:12
**lender**  52:13
  59:10,11,11,12
  59:13,14,14
**lenders**  58:17
  59:8,17

**letters**  7:5,5
**level**  54:6 63:19
**lien**  18:25 19:7
  19:7,11
**ligon**  32:23
  33:4
**likely**  60:13
**linchpin**  52:24
**list**  7:4,11,18
  9:15,25 14:11
  18:8,16 24:6
  24:15 30:5
  42:10,16,23
  43:21
**listed**  12:10
  20:4 33:18
  43:4
**listening**  62:12
  76:2
**lists**  10:5 20:8
**little**  33:13
  43:10 77:9
**live**  63:17,23
**living**  62:20
  63:9
**llc**  1:4,10,16
  2:10,12,20 3:6
  3:8 5:12 6:20
  12:1 29:13
  31:14 32:8
**llp**  2:5 29:25
**loan**  18:1,13
  19:16 20:8,11
  20:12,12,13,14

20:16,19,21,22
21:3,5,18,20,22
21:23,24 26:7
27:25 34:9,17
34:25 36:25
37:2,5 41:8
44:20,22 45:5
45:8,13,15,18
45:22 46:3,8
46:15 47:23
48:16 59:13
69:24 72:5
74:6
**loans**  46:5 74:6
**long**  30:20,22
  38:13 61:10
  69:21,25
**longer**  39:10
**look**  7:4 8:14
  8:17 9:9 12:4
  16:5 17:11
  27:1,3 36:20
  54:20,21 75:2
**looking**  13:1,13
  19:7 22:11
  23:21,23 26:25
  27:2 53:16
  54:11 64:19
  65:21 68:17
  69:14 70:19
**looks**  8:18
  40:19 43:18
  57:16

**lot**  5:20 23:20
  24:2,3,16 52:7
  59:10 69:6
**loudon**  2:20
  61:7,9,10
**low**  51:19
  65:24
**lunch**  76:5,6
**lunchbreak**
  65:3

**m**

**made**  2:23
  18:20 19:4,9
  19:16,19 20:23
  26:25 28:14
  36:24 37:25
  38:2 45:17
  55:6 57:15,18
  73:17 79:11
**main**  67:8
**maintaining**
  79:9
**maintenace**
  3:16
**major**  69:4
**make**  5:23 18:3
  20:13 22:11
  28:4 31:4
  34:10,13,17,20
  34:24,25 37:4
  37:9 40:12
  44:7 46:5,8,12
  46:14 47:25

James F. Jacoby                                        July 24, 2025
JDI Cumberland Inlet, LLC/In Re:

**[make - name]**                                                    Page 14

| | | | |
|---|---|---|---|
| 55:7 67:3,5,9 | **marsh**  30:2 | **member**  46:1 | **modify**  66:23 |
| 74:13 75:5 | 31:2,3 32:24 | **mentioned** | **money**  13:15 |
| **making**  37:8 | **mary's**  3:12 | 53:25 63:4 | 21:16 34:24 |
| 45:11 | **marys**  9:16 | 69:6 | 38:13 57:4 |
| **march**  49:10 | 41:20 47:16 | **met**  5:9 | 77:3 |
| **marina**  3:16 | 63:4 | **mia**  1:22 79:21 | **monitoring** |
| 30:14 31:22 | **master**  7:23 | **middle**  12:7 | 31:23 |
| 49:18 52:1,5 | **materialize** | 19:1 49:2 | **month**  20:22,22 |
| 52:10,10,11,13 | 37:13 48:1 | **million**  10:1,5 | 21:9 46:13 |
| 52:14,16,17,23 | **math**  13:17 | 11:15 13:16,19 | **monthly**  21:5 |
| 53:1,2,6,9,13 | **matsco**  18:10 | 13:21,22 14:11 | 46:10,12 |
| 53:16,21 54:1 | 20:5,21 21:5 | 14:21 15:8,21 | **months**  21:14 |
| 58:23 59:9 | **maturity**  21:18 | 33:18 34:5,7 | 21:18 23:21 |
| 62:18,23 63:22 | **mean**  8:14 | 35:13,20,23,24 | 31:10 32:19 |
| 64:4,6,7,9,23 | 11:15 24:1 | 35:25 36:4,6 | **motion**  57:24 |
| 65:8,9,11,13,16 | 27:7,8,9 39:19 | 36:25 37:2,14 | 58:4 |
| 65:17,23,25 | 47:15,24 48:23 | 37:21,25 38:5 | **motions**  46:6 |
| 66:6,18,23 | 49:8,20,23 | 38:11 63:14,15 | 70:14 |
| 67:4,5,15 68:1 | 50:13 51:22 | 63:16 77:15,15 | **mouth**  6:4 |
| 68:4,10,22,24 | 54:20 57:14 | 77:16 | **move**  70:20 |
| 69:2,4,6 76:13 | 59:4 60:1 62:6 | **mind**  5:18 | **movie**  59:13 |
| 76:16 77:8,10 | 71:18 76:22 | 65:19 | 62:18 |
| 77:17,21,25 | **meaning**  36:5 | **minus**  13:17,20 | **multifamily** |
| 78:2 | 48:10 | **minute**  33:12 | 52:22 62:20 |
| **marinas**  76:20 | **means**  12:25 | 65:2 | **multiple**  27:17 |
| **marine**  59:10 | 19:12 62:1 | **model**  63:17 | 27:19 58:16,17 |
| **mark**  6:14 | **meant**  63:25 | **modification** | 59:2,8,17,17 |
| **marked**  8:11 | **mechanic**  67:11 | 3:18 34:20 | 61:21 64:18 |
| 40:10 66:13 | **mechanism** | 37:19 | 72:6 73:18 |
| 67:19 73:8 | 56:5 | **modifications** | |
| **market**  48:23 | **meeting**  9:16 | 77:22 | **n** |
| 49:1 | 17:6 23:4 51:3 | **modified**  64:24 | **name**  5:6 40:1 |
| **marketing** | 54:9,16 58:12 | 66:19 68:1,2 | 77:6 |
| 31:14,16,17 | 66:5 | | |

James F. Jacoby                                    July 24, 2025
JDI Cumberland Inlet, LLC/In Re:

**[names - outstanding]**                                    Page 15

| | | | |
|---|---|---|---|
| **names**  39:23 | **nod**  43:7 | 37:24 42:1 | 76:7 78:4,9,12 |
| **nasdaq**  37:11 | **normal**  5:20 | 46:3 | **old**  29:3,4 |
| **natural**  24:23 | **normally**  71:19 | **obtain**  48:17 | **once**  75:22 |
| **nature**  28:24 | **northern**  1:1 | 74:13 75:5 | **ones**  77:19 |
| 31:19 32:8 | **notice**  3:4 6:14 | **obtaining** | **open**  70:4 |
| **near**  75:17 | 6:16 | 49:15 74:16 | 75:20 76:2 |
| **need**  28:15 39:5 | **november** | **occasions**  29:7 | **operating** |
| 45:24 47:15 | 11:23 12:14 | **occur**  74:20 | 38:23 39:2 |
| 52:20 54:1 | 32:6 | **occurred**  48:20 | **operator**  76:16 |
| 57:4 61:1,4 | **number**  6:14 | **occurring** | **operators**  52:5 |
| 65:15 66:2,3,3 | 8:11 9:23 10:6 | 75:10 | **opportunities** |
| 68:12 69:18 | 10:8 12:4 | **occurs**  35:23 | 76:2 |
| 74:7 75:18 | 13:12,20 14:24 | **october**  20:23 | **opposed**  58:23 |
| 77:9,10 | 15:13 23:21 | 20:24 | **option**  20:22 |
| **needs**  28:20 | 29:7 40:10,19 | **offer**  26:19 | 21:9,12,13,13 |
| 52:17,18 54:2 | 42:7 48:23,25 | 27:14 | 21:15 |
| 54:3,5 64:11 | 49:16 50:22 | **offers**  26:13,17 | **orally**  6:11 |
| 64:13,15 | 52:17 54:10 | 26:18 | **order**  40:12 |
| **negotiated** | 55:20 66:10,13 | **office**  63:16 | 72:14 |
| 36:12 | 67:19,25 73:8 | **officer**  47:12 | **organization** |
| **negotiations** | 74:9 78:2 | 79:12 | 75:4 |
| 38:12 | **numbers**  9:10 | **offsite**  67:17 | **original**  3:18 |
| **neighborhood** | 14:16 | **oh**  12:8 42:8 | 10:9 35:15 |
| 26:23 | **numerous**  52:4 | 54:13 | 58:2 66:18 |
| **net**  10:5 | **o** | **okay**  5:10,17 | 76:12 |
| **never**  17:2 | | 5:24,25 6:8,12 | **originally**  10:9 |
| 26:19 39:5 | **obligated**  45:22 | 6:22 8:16 9:23 | 14:16 34:7 |
| 48:8,13 60:25 | **obligation** | 12:8 18:7 | 67:12 |
| 68:7 | 20:19 34:19 | 27:24 33:9 | **outcome**  39:6 |
| **new**  76:17,19 | 37:2 38:11 | 40:14 41:15 | 79:8 |
| **newer**  74:10 | 39:8 44:20 | 42:8 43:9,20 | **outset**  51:8 |
| **nicolai**  40:2 | 79:9 | 54:7,13,15 | **outstanding** |
| **ninety**  73:2 | **obligations** | 58:7 60:6 | 13:18 26:14 |
| | 26:14 34:13,16 | 62:14 67:18 | |

James F. Jacoby
July 24, 2025
JDI Cumberland Inlet, LLC/In Re:

**[overcome - perspective]**

Page 16

**overcome** 72:2
**overlooked**
16:7
**overseas** 27:1
**overseeing**
29:15
**owed** 20:19
29:18 37:14
**owes** 26:15
44:20
**owned** 17:3
**owner** 41:2,4,5
43:22 44:2,4,8
44:13,16 49:24
**ownership** 64:3
**owns** 43:24,25

**p**

**p.m.** 65:5,6
73:5,6,22,23
76:8,9 78:15
**pa** 30:12
**page** 3:3 4:2
9:8,13 12:7
18:5 19:1
27:22,22 40:19
42:4,6,9 43:13
43:17 48:2
54:7,11
**pages** 40:12
43:19
**paid** 11:9 21:15
26:8 28:20
29:8,9,17

44:22 45:2,4,7
46:2 55:25
56:9,9,24,25
57:7,9 61:12
70:15 74:3
**parcels** 3:21
73:13,18
**park** 13:1,3
**part** 12:10 13:1
27:25 29:17
32:2,4 63:11
65:19 67:16
**parties** 10:22
25:22 36:5
39:18,19 42:1
49:5 69:8 70:5
71:7 79:12
**partner** 10:19
33:25 41:6
52:1,10,11,13
69:2,3,4,19,23
70:6,10 71:8
74:5,8 75:5,17
76:13
**partners** 49:17
50:2 69:7 72:7
**partnership**
10:10,12,13,20
10:21,24 34:2
34:8,12 38:18
38:20,22 71:11
**party** 23:16
49:23 50:6
70:23 79:8,11

**paul** 39:25
**pay** 11:7 22:1
26:23 27:25
28:5,9 30:3
31:11 35:11,14
37:5 38:11
45:22 53:10
54:24 56:19
57:4 70:10,24
71:8 74:7,14
75:6,12
**paying** 28:21
70:5
**payment** 17:25
18:3 21:1,2,3,6
29:8 34:20,24
34:25 36:25
37:5,9 46:8,9,9
46:10,10,11,13
46:14,19,21,22
47:23,25 56:13
56:14 57:7,17
57:19
**payments**
21:10 34:10,13
34:17 45:18
46:12 57:14
**pays** 13:14
**people** 5:20
23:18,20,24,25
24:1,6,13,15,16
24:21,24,25
25:24 26:24
50:14,22 52:23

53:6,18 62:4
63:9,23 69:15
70:2 74:8
76:17
**percent** 14:18
14:18 35:24,24
36:5 37:22
38:3,16,20
39:3 41:1,4,5
43:22 44:8,10
44:13,15 73:2
77:4
**performed**
11:21 31:7,9
**performing**
31:12
**period** 38:13
39:10
**permit** 3:14,18
3:20 64:23
66:18,23,24,25
67:7 68:2,9,18
77:22 78:2
**permits** 66:6,8
**person** 5:19,23
47:20 55:6
60:11,14
**personal** 54:24
**personally** 44:4
47:23
**perspective**
22:15 24:4
26:22 27:6
32:11,11,13

James F. Jacoby                                                    July 24, 2025
JDI Cumberland Inlet, LLC/In Re:

[perspective - property]                                           Page 17

| | | | |
|---|---|---|---|
| 70:23 72:13 | **port** 64:20 | **previous** 20:12 | **process** 28:3,6 |
| **peter** 30:15 | **position** 37:23 | 51:5 61:13 | 50:15 74:3 |
| **ph** 4:23 | 38:9 39:5,8,16 | 67:13 68:2 | **produced** |
| **phase** 67:6 | 46:23 68:19,22 | **price** 13:24 | 38:24 |
| **phone** 70:19 | **positive** 43:10 | **prices** 27:6 | **professional** |
| **phonetic** 39:25 | **possible** 27:6 | **primary** 20:18 | 12:10 79:10 |
| **phonetically** | **possibly** 74:23 | 65:25 | **project** 49:15 |
| 4:23 | **post** 14:8 | **principal** 18:19 | 50:12,13 51:4 |
| **phrase** 4:24 | **potential** 22:9 | 18:19,21 20:14 | 51:25 52:3,10 |
| **piece** 9:15 | 51:25 52:21 | **prior** 24:14 | 52:11 54:22 |
| **place** 31:8 57:5 | 53:13,14 59:17 | 25:22 | 61:11,18,23 |
| 66:2,4 | 72:11 | **pro** 2:4 13:5 | 62:5,25 65:1 |
| **plan** 7:23,23,23 | **pre** 31:1,4 | 61:20 | 70:1,3 71:1 |
| 74:1,3,4,12,19 | **predevelopm...** | **probability** | **projects** 58:17 |
| 74:21,22,22 | 28:1,6,10 | 72:25 75:9 | 58:25 59:2,17 |
| 75:3,4,16,18,25 | **prepared** 26:23 | **probably** 9:10 | 61:13 62:7,15 |
| **plans** 8:2 75:21 | 27:9 50:25 | 13:19 23:20 | **property** 3:21 |
| **play** 63:10,18 | 51:1 | 26:2 27:20 | 7:20 8:4 9:3,15 |
| 63:20,21 77:5 | **present** 2:18 | 29:8 30:9,17 | 9:19,21,22 |
| **player** 76:21 | 31:4 | 31:9,18 32:6 | 10:10 11:7,8 |
| **plays** 38:15 | **presentation** | 33:2 46:21,22 | 11:17 12:9,18 |
| **plaza** 2:13 | 31:5 | 54:4,23 64:3 | 13:2,3,9,16 |
| **please** 5:6 | **presented** | 74:5 77:13 | 14:7,11,13,14 |
| 40:11 | 24:16 | **problem** 5:21 | 14:21 15:6 |
| **plus** 54:2 | **presenting** | 72:22 | 16:11,13,16,18 |
| **point** 22:25 | 60:14 | **problems** 69:11 | 16:19,25 17:5 |
| 24:12,13 27:11 | **presently** 40:1 | **proceeding** | 17:8,12 22:10 |
| 53:18 57:8 | **president** 40:1 | 39:14 79:6,12 | 22:15,19 23:16 |
| 68:5 71:17 | 46:24 47:3 | **proceedings** | 23:21 24:4,20 |
| 76:5 77:18 | **pretty** 29:16 | 33:14,15 65:5 | 24:24 25:15 |
| 78:8 | 49:8 | 65:6 73:5,6,22 | 26:10,14 27:1 |
| **political** 49:19 | **prevented** | 73:23 76:8,9 | 27:4,15,18 |
| **poorly** 57:18 | 76:18 | **proceeds** 27:25 | 28:1 35:18 |
| | | | 36:6 41:19,23 |

James F. Jacoby
JDI Cumberland Inlet, LLC/In Re:

July 24, 2025

**[property - reflect]**

Page 18

48:18 49:2
50:18,23,24
51:13,16 52:19
52:21 54:4
57:14 59:5
62:10 64:19
66:22 68:13
69:9,16,17,24
70:7 73:14
**proposal**  27:13
32:12,13 51:2
**prospectus**
31:2,4
**provide**  11:13
34:12 64:15
**provided**  6:25
7:9 15:24 24:6
36:18
**public**  37:11
62:5
**published**  23:1
23:3
**pull**  17:10
23:12
**pulled**  7:6,13
7:20,25 8:4
**purchase**  16:18
26:13 27:6,15
27:18 35:15,18
69:23
**purchased**  49:2
51:20
**purchaser**
26:22

**purchasers**
22:15,19 27:6
**purpose**  20:18
**pursuant**  2:23
**put**  6:3 11:9
15:1 31:1 38:8
39:8 57:16
66:2,4

**q**

**question**  6:1,5
12:9 14:6 22:5
22:16 42:18,19
44:5 45:6,21
45:25 46:11
61:4
**questions**  6:4
17:8 76:6
78:10 79:5
**quickly**  70:11

**r**

**raise**  22:8 50:3
50:17
**raising**  54:5
**range**  13:19,22
13:23 77:15
**rapidly**  71:13
**rate**  48:24
49:19 77:3
**rates**  51:18
77:2
**raw**  14:4
**reached**  25:24
35:3,4 50:14

50:22
**reaching**  25:23
25:24
**reads**  57:13
**real**  7:20 8:4
9:3 16:11,13
16:15 40:7
57:25 58:6,16
58:20,22,23
59:18,21 61:16
72:24
**realistic**  53:17
**really**  47:14,18
61:20 68:7
70:8 76:23
**reason**  17:17
22:1 37:8
47:22 57:16
58:15
**reasons**  46:6
48:23,25 49:17
52:17 58:19
**recall**  10:8
12:22 13:11
16:4,6 17:6,21
19:6 28:7,11
28:17 29:11,24
30:17,19 32:14
32:18 33:2
54:9,10,16,25
55:2,5 56:5
**recapitalization**
76:17

**recapitalizati...**
52:7
**received**  26:13
27:17 56:11,16
**recently**  77:5
**recognize**  73:8
**recognized**
51:18
**recollection**
32:16
**reconvene**  78:8
**record**  5:7 6:17
8:15 22:12
33:12,14,15
40:13 45:10
65:5,6 66:15
67:21 73:3,5,6
73:10,20,22,23
73:25 76:8,9
79:6
**reduce**  77:20
**reducing**  77:24
**reduction**  39:9
**refer**  6:21
17:19 39:18
**referred**  11:20
**referring**  6:21
9:22 10:12
12:15 17:19
19:5 34:3
**refers**  19:19
**reflect**  39:2
57:21

James F. Jacoby                                    July 24, 2025
JDI Cumberland Inlet, LLC/In Re:

**[reflected - rountree]**                                        Page 19

| | | | |
|---|---|---|---|
| **reflected**  9:22 55:4 | **repaid**  48:16 57:2 | **responders** 63:5 | **rid**  65:15 67:10 |
| **reformulate** 6:7 | **repair**  67:4,10 67:15 | **responsive**  7:6 7:13 | **right**  9:2 10:18 15:5 17:9 |
| **regarding**  8:3 30:1 54:10 | **repeat**  22:16 42:19 | **rest**  22:25 52:19 54:3 70:25 | 20:20 21:11,17 21:19 23:6,10 24:2 25:21 |
| **regulations** 2:24 | **reporter**  2:23 5:22 6:13 | **restart**  64:5 | 33:22,25 35:1 37:17,24 38:7 |
| **reimbursable** 18:23 | 42:20 66:11 73:21 78:9,12 | **restroom**  33:10 | 38:14,25 39:15 40:19 41:22 |
| **reimbursed** 56:3,20,22 | **reporting**  2:24 | **restructuring** 40:2 | 43:12 44:9,14 49:13 50:5,16 |
| **reimbursement** 54:14,23 55:3 55:7 57:6 | **represent** 61:22,24 | **retail**  53:3,14 62:23 63:16,21 | 50:19 51:9 52:12 53:19 |
| **reimburseme...** 54:19 55:12 | **representative** 5:11 | **retained**  60:22 | 54:11,12 55:18 56:21 58:13 |
| **relate**  7:4 40:6 | **request**  7:14 25:17 28:4,22 | **retainer**  30:3 56:1,4,10,10,19 57:1 | 59:4,6 65:14 65:20,21,22 |
| **related**  7:12 | **requested**  6:19 59:24 | **return**  38:2 | 66:2,7,10 67:1 67:22 68:23 |
| **relates**  6:15 19:10 22:5 | **requests**  7:7 16:2 28:9,14 | **revenues**  48:6,8 | 69:14 70:4,9 71:10 72:3,10 |
| **relationship** 41:19 79:8 | **residential** 52:22 53:8,11 | **reviewed**  71:21 | 73:14,19 74:6 75:14 76:1 |
| **relative**  79:7 | 53:14 63:15 | **rice**  2:4 4:3 5:5 5:9 9:11,12 | **rights**  19:24 |
| **relinquishment** 39:2 | **resilience**  63:19 | 14:10 16:8,9 19:18 22:4,13 | **rise**  23:17 54:6 63:19 |
| **remediation** 77:11,12 | **resolve**  39:20 | 33:11,16 36:22 39:1 42:19,24 | **road**  1:17 2:14 5:18 |
| **remember** 11:11 32:12 35:20 56:7 | **resolved**  68:7 68:14,15 | 44:7 45:9,12 55:24 56:13,17 | **roll**  61:20 |
| **rent**  62:19 | **resort**  64:24 | 57:11,23 60:15 61:5,9 65:2,7 | **rookery**  63:6 |
| **rents**  59:14 | **respect**  7:3 22:14,17,18 23:15 42:1 | 66:10,12 71:22 73:3,7,20,24 | **rountree**  1:16 2:12 |
| | **respond**  6:10 | 76:4 78:6,11 | |

James F. Jacoby                                    July 24, 2025
JDI Cumberland Inlet, LLC/In Re:

**[rule - somewhat]**                                              Page 20

| | | | |
|---|---|---|---|
| **rule**  1:8 3:4 | **scenarios**  50:1 | 67:14 | **signed**  19:16 |
| **rules**  2:24 5:17 | 71:6 | **selling**  70:7 | 40:24 41:16 |
| **rumsfeld**  51:23 | **schedule**  15:1 | **sense**  28:15 | **similar**  51:5 |
| **running**  47:19 | 18:6 20:4 42:9 | 63:21 | **single**  36:14 |
| **rush**  8:14 | 42:17,23 | **sent**  76:24 | 57:25 58:6,16 |
| **rv**  12:21,22,24 | **schedules**  3:7 | **separate**  62:14 | 58:20 59:18,21 |
| 13:1,3 15:23 | 8:11,22 9:23 | 64:3 | **sit**  27:4 59:15 |
| 15:25 16:10 | 12:4 18:6,25 | **september**  3:17 | 69:24 |
| | 19:14,17 30:7 | 20:25 41:11,14 | **site**  54:5 65:17 |
| **s** | 35:21 42:5 | 46:15 49:6,8 | **sits**  14:21 15:7 |
| | 43:14 48:3 | 49:10,12 | **situation**  22:21 |
| **s&g**  10:16,17 | 54:8 57:11 | **sequencing** | **situations** |
| 10:19,20 38:15 | **sea**  54:5 63:18 | 65:8 | 22:25 51:6,23 |
| **safe**  10:13 | 63:18 | **series**  36:15 | **six**  20:22 21:9 |
| 33:17,24 34:13 | **second**  7:22 | **serve**  79:12 | 21:14,18 31:9 |
| 34:16,19,22 | 62:18 67:7 | **service**  3:16 | 32:19 46:13 |
| 35:8 36:4,5,20 | **secured**  18:8 | **services**  31:7 | **sixth**  62:21 |
| 36:23,24 37:4 | 20:5 | **setoff**  19:24 | **sleeves**  61:21 |
| 39:19,22 40:3 | **security**  9:1 | **several**  24:4 | **slimmer**  74:6 |
| 40:3,5 76:20 | 35:9 | 29:9 39:24 | **slip**  53:9 |
| **sale**  50:23 | **see**  6:16,18 | **shot**  70:9 | **smith**  1:22 |
| 69:17,18 74:5 | 9:12,16 12:5,9 | **show**  7:19 | 79:21 |
| **salt**  30:2 31:2,3 | 19:1,6,11 20:5 | 24:20 27:12 | **sms**  1:3 |
| 32:24 | 20:9 29:1 | 62:10 | **sold**  76:15 |
| **saying**  15:11 | 33:19 36:20 | **showcasing** | **sole**  44:2 |
| 23:22,22 24:12 | 40:17,19,20 | 63:18 | **solutions**  30:24 |
| 25:24 28:12 | 42:12 52:23 | **showing**  24:24 | **solve**  69:11 |
| 52:9 68:11 | 55:24 70:19 | 25:15,17 | **somebody** |
| **says**  9:13 18:25 | **seem**  30:19 | **shown**  27:7,8 | 32:14 50:21 |
| 19:4,9,18 | 51:23 | **shut**  49:9,12 | 52:24 53:2 |
| 57:14 | **seems**  58:24 | **sic**  4:24 | 59:9 69:23 |
| **scale**  77:21,25 | 64:22 | **signature**  40:17 | **somewhat** |
| **scenario**  50:3 | **sell**  7:19 23:16 | 40:22 79:20 | 11:15 |
| 50:23 72:10 | 27:9 50:4,18 | | |
| 75:23 | | | |

James F. Jacoby                                July 24, 2025
JDI Cumberland Inlet, LLC/In Re:

**[sorry - terracon]**                                          Page 21

| | | | |
|---|---|---|---|
| **sorry**  42:7 | **started**  49:10 | **successful** | 75:25 77:20 |
| **sort**  48:25 | 52:23 64:18,22 | 50:11 | **take**  8:13 33:12 |
| 61:20 65:8 | 77:2,3,23 78:3 | **sufficient**  75:6 | 34:8 38:13 |
| 67:11 75:23 | **starting**  27:11 | **suggestions** | 40:11 49:23 |
| 77:19 | **state**  5:6 32:25 | 75:21 | 54:21,23 60:15 |
| **source**  37:10,12 | 63:7 79:2 | **suite**  1:18 2:7 | 64:1 65:2 |
| 69:22 | **stated**  79:5 | 2:15 | 66:24 67:10 |
| **speak**  62:3 | **statement**  3:7 | **summarize** | 68:17 71:2,9 |
| **speaking**  62:4 | 8:12 48:3 54:8 | 74:2 | 71:22 |
| **specific**  28:19 | **statements** | **suntec**  76:14,16 | **taken**  5:15 |
| 29:12 59:11,12 | 79:5 | **supplied**  50:13 | 52:20 54:2 |
| **specifically** | **states**  1:1 | **supporting** | 64:17 70:25 |
| 24:1 | **station**  63:13 | 7:12 | 77:7,11 79:5 |
| **specifications** | 63:18 | **supposed**  42:10 | **talk**  5:19,20 |
| 8:3 | **status**  38:5 | 63:11,22 | 26:19 27:4 |
| **speculate**  25:19 | 70:18 | **sure**  5:23 14:18 | **talked**  16:2 |
| **spelled**  4:23 | **stay**  71:2 | 16:8 22:11,20 | 73:17 76:21 |
| **spelling**  39:25 | **step**  77:7 | 22:24 23:25 | **talking**  46:9 |
| **split**  40:3 | **stepped**  51:5 | 29:1,2 31:21 | 50:15 |
| **splitting**  75:23 | **stop**  17:18 | 31:23 40:7,12 | **talks**  5:23 |
| **spots**  65:15,17 | **stopping**  76:4 | 42:20 44:7,10 | **tampa**  2:8 |
| 77:11 | **storks**  63:6 | 56:18 65:4 | **technically** |
| **spread**  39:9 | **straight**  43:8 | 73:21 75:1 | 21:20 |
| 52:18 54:3,5 | **street**  2:6 9:16 | 77:13 | **tecum**  3:5 |
| **square**  63:14 | **stroke**  47:14 | **surprises**  51:22 | **tedious**  43:19 |
| 63:15,16 | **structured**  70:4 | **survey**  3:21,22 | 43:19 |
| **st**  3:12 9:16 | 71:1 | 29:11 73:13 | **teed**  72:4 |
| 41:20 47:16 | **studio**  58:22 | **surveying**  3:23 | **tell**  27:2,12 |
| 63:4 | 59:12,13 62:18 | 28:23,25 29:10 | 55:19 63:1 |
| **stacks**  67:6 | **stuff**  65:20 | **sworn**  5:2 | **term**  21:8 |
| **stalled**  52:11 | **subcontracts** | | **terms**  21:22,23 |
| **stands**  14:7 | 8:3 | **t** | 30:19 51:1,1 |
| **start**  65:9,11,12 | **subdevelopers** | **table**  49:17 | **terracon**  31:19 |
| 68:19,22,24 | 52:22 58:25 | 50:21 52:24 | 31:24 |

James F. Jacoby                                July 24, 2025
JDI Cumberland Inlet, LLC/In Re:

**[testified - under]**                                                          Page 22

| | | | |
|---|---|---|---|
| **testified** 5:2 | **thirdly** 52:21 | 63:11,25 64:4 | **true** 14:1 17:23 |
| 17:10,17 22:6 | **thought** 4:21 | 74:25 | 45:13,18 48:5 |
| 66:6 | 4:22 39:12 | **told** 26:24 27:3 | 79:6 |
| **testify** 60:9,15 | 42:14,20,25,25 | **tomorrow** 71:4 | **try** 6:6 23:8 |
| 60:18,22,24 | 43:2 49:21 | **took** 14:17 | **trying** 6:3,3 |
| 61:4 | 60:20 74:19 | 15:12 68:13 | 14:20 15:3 |
| **testimony** | **thousand** 29:9 | 77:22 | 19:11 34:21 |
| 17:21,23 54:16 | 63:15 | **top** 9:9,12 | 51:6,21 52:12 |
| 58:11,14 | **three** 8:22,23 | **total** 13:10 | 62:2 69:1,2 |
| **thank** 78:4,12 | 9:6 31:18 | **totality** 69:9 | 71:20 75:2,15 |
| **thing** 6:1,10 | 35:13,23 36:4 | **totally** 71:1 | **turn** 9:8 18:5 |
| 76:20 | 36:25 50:24 | **tourism** 63:4 | 27:22,22 42:4 |
| **things** 48:4 | 63:14 77:23 | **tourists** 63:9 | 43:13 48:2 |
| 51:21,23 53:17 | **time** 5:19,21,24 | **town** 62:21,22 | 54:7 |
| 64:19,21 67:8 | 8:13 10:11,11 | 62:24 63:3,3 | **tweaking** 77:9 |
| **think** 10:9 16:3 | 17:10 29:18 | **tract** 17:12 | **twenty** 14:18 |
| 22:24 23:16 | 30:20,22 33:9 | 73:17 | **two** 14:8 18:8 |
| 24:8,11,23 | 36:3 38:13 | **traction** 53:2 | 30:11 40:4,6 |
| 26:2 28:7,12 | 39:10 40:11 | **transaction** | 55:21 67:8 |
| 29:4,4 31:8 | 51:11 61:10 | 41:8 51:9 | 72:11 77:4 |
| 36:17,20 37:16 | 67:7 75:23 | 70:13,15,18 | **type** 59:12 |
| 37:17,23 38:7 | 77:23 78:3,11 | 71:15 72:2,15 | 64:24 70:3 |
| 38:12,14 48:4 | **timely** 77:25 | 74:17 75:10 | **typed** 4:25 |
| 55:21 63:8 | **times** 5:20 | **transactions** | **types** 64:21 |
| 64:24 65:10 | 25:14 | 57:22 73:1 | **typewritten** |
| 66:5,8 67:7,14 | **timing** 30:19,21 | **transcript** 4:20 | 79:5 |
| 68:7 69:21 | 77:21 78:1 | 17:11 79:4,6 | **typical** 20:16 |
| 70:9,13 71:18 | **today** 6:21 9:21 | **transfer** 28:5 | |
| 76:4,25 | 17:15 24:17 | **transfers** 57:14 | **u** |
| **thinks** 22:1 | 27:21 51:4 | **trial** 60:7 | **ultimate** 44:4 |
| **third** 6:10 | 59:15 71:4 | **trick** 6:3 | **under** 17:25 |
| 23:16 50:6,17 | **today's** 6:15 | **tried** 50:9 | 18:23 19:6 |
| 62:19 | **together** 31:1 | **trips** 26:25 | 21:22,23 46:3 |
| | 38:14 52:2 | | 47:24 50:22 |

James F. Jacoby                    July 24, 2025
JDI Cumberland Inlet, LLC/In Re:

**[understand - work]**                                    Page 23

**understand**
5:11 6:2,5,7
8:21 12:25
14:20 16:24
18:12 33:23
34:21 42:18
44:18 45:21
53:12 55:24
56:17 58:14
59:7,8 62:2,4
64:16 65:7
66:5,21 71:20
72:15 74:12
75:3
**understanding**
9:22 10:22
11:13 14:6
15:4,6 22:13
22:17 36:23
44:12 53:3
72:21,23
**understood**
62:6
**undeveloped**
15:7 16:13,16
**unduly** 45:11
**unit** 64:1,2
**united** 1:1
**units** 63:15
**upscale** 67:5,9
**used** 20:15 29:7
**utility** 9:1
29:21

**utilized** 27:25

**v**

**valuation** 7:13
10:3 31:5
**value** 9:25 10:5
10:6 14:11,13
14:14,15 35:20
**valued** 10:10
36:6
**various** 42:1
48:25 50:1
**vendor** 28:16
28:16,19
**venture** 49:16
50:2,23 70:6
70:23 71:8
74:5,13 75:5
**venturers**
72:13
**verbatim** 4:25
**vet** 61:1
**vice** 2:4
**video** 22:21
23:1,1
**videoconfere...**
2:21
**view** 9:10
**vision** 62:25
63:1
**visit** 63:23
**voss** 30:15

**w**

**wait** 69:21
**waiting** 23:19
**wakefield**
11:21 12:13
16:10
**want** 6:4,24
13:25 17:11
23:7 38:25
40:12 48:4
52:9,23 59:15
63:23 65:1
66:8 67:3,16
71:2,7
**wanted** 22:11
27:3 34:8
66:23,25 67:4
67:5,6,9 68:4
68:10
**wants** 64:12,14
64:15,25,25
77:20
**water** 2:6 33:8
**way** 6:7 13:14
50:6,17 57:13
67:14 78:1
**we've** 24:5,6
26:24 27:7
29:7,9 36:18
38:24 39:24
49:16 50:13,14
50:21 52:4,24
54:20 60:10

64:17 69:1,2
69:14 70:2
71:5,16 73:16
74:23 76:21
**wear** 61:21
**week** 70:14
**weekend** 70:13
**went** 30:3 52:6
66:18 76:17
**westrec** 76:15
**what'd** 27:2
**wherewithal**
72:14
**who've** 23:20
**wife** 47:11,17
**willing** 39:7
52:25
**withheld** 8:7
**witness** 45:24
54:11,13 55:16
55:18,21 56:6
58:7 60:4,11
73:4
**witnesses** 60:7
61:5
**wood** 63:6
**word** 4:24
**worded** 57:18
**words** 6:4
**work** 28:3,6
30:1,15,16
38:14 63:10,11
63:17,20,21,25
64:3 65:12,15

James F. Jacoby                                                    July 24, 2025
JDI Cumberland Inlet, LLC/In Re:

**[worked - zoom]**                                                Page 24

| | |
|---|---|
| **worked**  28:7 | **year**  12:11 |
| 61:13 | 15:25 21:9,10 |
| **working**  31:1 | 32:3,3,4,4 |
| 31:13 52:2 | 57:15 59:20 |
| 61:14 70:1 | 68:6,14 |
| 71:15,16 72:11 | **years**  28:13 |
| 72:18 74:25 | 29:17 30:11,18 |
| **world**  49:8 | 31:16,18 33:3 |
| **worth**  13:6,16 | 54:22 74:9 |
| 14:21 15:7,21 | 77:23 78:2 |
| **would've**  56:8 | **youtube**  22:22 |
| 56:15 | 23:2,8,9,12,12 |
| **writing**  26:20 | **z** |
| 36:11,13 | **zoom**  60:12 |
| **written**  27:14 | |
| 39:1,4 79:11 | |
| **wrong**  16:24 | |
| 26:1 33:23 | |
| 36:22 44:19 | |
| 53:13 66:22 | |
| **wrote**  54:24 | |
| **x** | |
| **x**  26:23,23 | |
| 28:15,20 78:2 | |
| **y** | |
| **y**  28:16 | |
| **yards**  54:4 | |
| **yeah**  9:11 | |
| 11:15,18 49:4 | |
| 49:10 50:1 | |
| 54:12 57:13 | |
| 64:17 74:22 | |
| 76:22 | |

Federal Rules of Civil Procedure

Rule 30


(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the
deponent or a party before the deposition is
completed, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to
sign a statement listing the changes and the
reasons for making them.

(2) Changes Indicated in the Officer's Certificate.
The officer must note in the certificate prescribed
by Rule 30(f)(1) whether a review was requested
and, if so, must attach any changes the deponent
makes during the 30-day period.



DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the

foregoing transcript is a true, correct and complete

transcript of the colloquies, questions and answers

as submitted by the court reporter. Veritext Legal

Solutions further represents that the attached

exhibits, if any, are true, correct and complete

documents as submitted by the court reporter and/or

attorneys in relation to this deposition and that

the documents were processed in accordance with

our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining

the confidentiality of client and witness information,

in accordance with the regulations promulgated under

the Health Insurance Portability and Accountability

Act (HIPAA), as amended with respect to protected

health information and the Gramm-Leach-Bliley Act, as

amended, with respect to Personally Identifiable

Information (PII). Physical transcripts and exhibits

are managed under strict facility and personnel access

controls. Electronic files of documents are stored

in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.

## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

IN RE:

JDI CUMBERLAND INLET, LLC

    Debtor.

CASE NO: 25-55072-SMS

CHAPTER 11

### AMENDED NOTICE OF BANKRUPTCY RULE 2004 EXAMINATION
### DUCES TECUM OF JDI CUMBERLAND INLET, LLC[1]

Camden County Joint Development Authority ("CCJDA"), pursuant to Federal Rules of

Bankruptcy Procedure 2004, and the Court's Order Granting Motion for Rule 2004 Examination

Pursuant to Fed. R. Bankr. P. 2004 (Doc. 20) (the "**2004 Order**"), gives this amended notice that

it will conduct the examination of JDI Cumberland Inlet, LLC (the "**Debtor**"), as agreed by the

Debtor's and CCJDA's counsel, on **July 24, 2025, at 10:00 a.m. EST** at the following location:

**Rountree Leitman Klein & Geer, LLC**
Century Plaza I
2987 Clairmont Rd., Ste. 350
Atlanta, Georgia 30329

The examination is being conducted pursuant to Federal Rule of Bankruptcy Procedure

2004 and will be taken before an officer authorized to record the testimony of the Debtor. The

scope of the examination shall be as described in Bankruptcy Rule 2004. The examination may

continue from day to day until its completion.

---

[1] The only change from the earlier notice is the location where the 2004 exam will be conducted which is being
modified to accommodate the Debtor. Nothing contained herein shall be deemed as a waiver of or consent to extend
any document production deadlines.



EXHIBIT

tabbies

Jacoby    7/24/25

Pursuant to the 2004 Order the Debtor shall produce to the undersigned counsel no later

than five (5) business days in advance of the examination the documents described in attached

**Exhibit "A."**

Respectfully submitted this 21st day of July, 2025

BRADLEY ARANT BOULT CUMMINGS LLP

*/s/ Bryan E. Bates*
Georgia Bar No. 140856
1230 Peachtree St., NE, Suite 2100
Atlanta, GA 30309
Phone: (404) 868-2794
Facsimile: (404) 868-2100
Email:  bebates@bradley.com

and

*/s/ Edwin G. Rice*
Edwin G. Rice
Florida Bar No. 855944
1001 Water Street, Suite 1000
Tampa, FL  33602
Phone: (813) 559-5500
Facsimile: (813) 229-5946
Primary email: erice@bradley.com
Secondary email: ajecevicus@bradley.com
***Admitted Pro Hac Vice***

and

*/s/ Doroteya N. Wozniak*
Georgia Bar No. 627491
1230 Peachtree St., NE, Suite 2100
Atlanta, GA 30309
Phone: (404) 868-2794
Facsimile: (404) 868-2100
Email:  dwozniak@bradley.com

*Counsel for Camden County Joint Development
Authority*

4916-0121-5826.1

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on July 21, 2025, a true and correct copy of Notice of

Bankruptcy Rule 2004 Examination Duces Tecum of JDI Cumberland Inlet, LLC has been filed

electronically with the Court's Pacer CM/ECF electronic filing system which will provide a copy

to all counsel of record. Additionally on July 21, 2025, a copy has been sent via U.S. First

Class Mail to the below parties:

JDI Cumberland Inlet, LLC
8200 Roberts Drive
Suite 475
Atlanta, Georgia 30350-4132

By:    /s/ *Doroteya N. Wozniak*
Doroteya N. Wozniak
Georgia Bar No. 627491
1230 Peachtree St., NE, Suite 2100
Atlanta, GA 30309
Phone: (404) 868-2794
Facsimile: (404) 868-2100
Email:  dwozniak@bradley.com

## Exhibit A

- All letters of intent, commitment letters, expressions of interest, or similar documents regarding refinancing the Loan[2];

- All letters of intent, commitment letters, expressions of interest, or similar documents regarding financing development of the Debtor's real property;

- All documents that the Debtor contends show its efforts to secure financing to develop the Debtor's real property in conformity with the Development Agreement or otherwise;

- All documents that the Debtor contends shows its efforts to raise additional capital to develop the Debtor's real property in conformity with the Development Agreement or otherwise;

- All documents related to or otherwise supporting the Debtor's valuation of its real property as reflected in the Schedules;

- All appraisals of the Debtor's real property or any portion thereof;

- All documents that show any attempts or efforts by the Debtor to sell or lease its real property or any portion thereof in conformity with the Development Agreement or otherwise;

- Any drafts of the "Master Plan", the "Implementation Plan", and the "Plan of Finance" described in the Development Agreement; and

- All plans, drawings, specifications, contracts, and subcontracts regarding development of Debtor's real property.

---

[2] Capitalized terms shall have the meaning ascribed to such terms in the Motion of Camden County Joint Development Authority for Rule 2004 Examination of the Debtor and Request for Documents (Doc 19).

Fill in this information to identify the case:

Debtor name ___JDI Cumberland Inlet, LLC_____

United States Bankruptcy Court for the: __Northern District of Georgia_____

Case number (if known): __25-55072_____

☐ Check if this is an
amended filing

## Official Form 206A/B

## Schedule A/B: Assets — Real and Personal Property    12/15

Disclose all property, real and personal, which the debtor owns or in which the debtor has any other legal, equitable, or future interest. Include all property in which the debtor holds rights and powers exercisable for the debtor's own benefit. Also include assets and properties which have no book value, such as fully depreciated assets or assets that were not capitalized. In Schedule A/B, list any executory contracts or unexpired leases. Also list them on *Schedule G: Executory Contracts and Unexpired Leases* (Official Form 206G).

Be as complete and accurate as possible. If more space is needed, attach a separate sheet to this form. At the top of any pages added, write the debtor's name and case number (if known). Also identify the form and line number to which the additional information applies. If an additional sheet is attached, include the amounts from the attachment in the total for the pertinent part.

For Part 1 through Part 11, list each asset under the appropriate category or attach separate supporting schedules, such as a fixed asset schedule or depreciation schedule, that gives the details for each asset in a particular category. List each asset only once. In valuing the debtor's interest, do not deduct the value of secured claims. See the instructions to understand the terms used in this form.

### Part 1:   Cash and cash equivalents

1. **Does the debtor have any cash or cash equivalents?**

   ☐ No. Go to Part 2.
   ☑ Yes. Fill in the information below.

   All cash or cash equivalents owned or controlled by the debtor

   Current value of debtor's interest

2. **Cash on hand**                                    $ 0.00

3. **Checking, savings, money market, or financial brokerage accounts** *(Identify all)*

| Name of institution (bank or brokerage firm) | Type of account | Last 4 digits of account number | |
|---|---|---|---|
| 3.1. Bank of America 1510 | Checking | 1  5  1  0 | $ 11,784.84 |
| 3.2. | | | $ |

4. **Other cash equivalents** *(Identify all)*

   4.1. _____     $ _____
   4.2. _____     $ _____

5. **Total of Part 1**                                 $ 11,784.84
   Add lines 2 through 4 (including amounts on any additional sheets). Copy the total to line 80.

### Part 2:   Deposits and prepayments

6. **Does the debtor have any deposits or prepayments?**

   ☐ No. Go to Part 3.
   ☑ Yes. Fill in the information below.

   **EXHIBIT**
   tabbies
   2
   Jacoby    7/24/25

   Current value of debtor's interest

7. **Deposits, including security deposits and utility deposits**

   Description, including name of holder of deposit
   7.1. Georgia Power Security Deposit                 $ 1,145.00
   7.2. _____             $ _____

Debtor    JDI Cumberland Inlet, LLC
<u>Name</u>    Case number *(if known)* 25-55072

8. **Prepayments, including prepayments on executory contracts, leases, insurance, taxes, and rent**

   Description, including name of holder of prepayment

   8.1. _____    $ _____

   8.2. _____    $ _____

9. **Total of Part 2.**

   Add lines 7 through 8. Copy the total to line 81.    $ 1,145.00

---

## Part 3:    Accounts receivable

10. **Does the debtor have any accounts receivable?**

   ☑ No. Go to Part 4.

   ☐ Yes. Fill in the information below.

                                                                        Current value of debtor's
                                                                        interest

11. **Accounts receivable**

   11a. 90 days old or less:  _____  –  _____  = ......→    $ _____
                             face amount    doubtful or uncollectible accounts

   11b. Over 90 days old:  _____  –  _____  = ......→    $ _____
                          face amount    doubtful or uncollectible accounts

12. **Total of Part 3**

   Current value on lines 11a + 11b = line 12. Copy the total to line 82.    $ _____

---

## Part 4:    Investments

13. **Does the debtor own any investments?**

   ☑ No. Go to Part 5.

   ☐ Yes. Fill in the information below.

                                                    Valuation method          Current value of debtor's
                                                    used for current value     interest

14. **Mutual funds or publicly traded stocks not included in Part 1**

   Name of fund or stock:

   14.1. _____    _____    $ _____

   14.2. _____    _____    $ _____

15. **Non-publicly traded stock and interests in incorporated and unincorporated businesses, including any interest in an LLC, partnership, or joint venture**

   Name of entity:                              % of ownership:

   15.1. _____    _____ %    _____    $ _____

   15.2. _____    _____ %    _____    $ _____

16. **Government bonds, corporate bonds, and other negotiable and non-negotiable instruments not included in Part 1**

   Describe:

   16.1. _____    _____    $ _____

   16.2. _____    _____    $ _____

17. **Total of Part 4**

   Add lines 14 through 16. Copy the total to line 83.    $ _____

---

Case 25-55072-sms   Doc 41-2   Filed 08/20/25   Entered 08/20/25 16:40:15   Desc
Exhibit B - Transcript of Rule 2004 Examination of James Jacoby   Page 113 of 256
Case 25-55072-sms   Doc 4   Exhibit B Examination of James Jacoby   Page 3 of 36 Main
Document   Page 3 of 36

Debtor _____
    JDI Cumberland Inlet, LLC                       Case number (if known)_____ 25-55072
    Name

---

**Part 5:**    Inventory, excluding agriculture assets

18. **Does the debtor own any inventory (excluding agriculture assets)?**
    - ☑ No. Go to Part 6.
    - ☐ Yes. Fill in the information below.

| General description | Date of the last physical inventory | Net book value of debtor's interest (Where available) | Valuation method used for current value | Current value of debtor's interest |
|---|---|---|---|---|
| 19. **Raw materials** | | | | |
| _____ | MM / DD / YYYY | $ _____ | _____ | $ _____ |
| 20. **Work in progress** | | | | |
| _____ | MM / DD / YYYY | $ _____ | _____ | $ _____ |
| 21. **Finished goods, including goods held for resale** | | | | |
| _____ | MM / DD / YYYY | $ _____ | _____ | $ _____ |
| 22. **Other inventory or supplies** | | | | |
| _____ | MM / DD / YYYY | $ _____ | _____ | $ _____ |

23. **Total of Part 5**
    Add lines 19 through 22. Copy the total to line 84.      $ _____

24. **Is any of the property listed in Part 5 perishable?**
    - ☐ No
    - ☐ Yes

25. **Has any of the property listed in Part 5 been purchased within 20 days before the bankruptcy was filed?**
    - ☐ No
    - ☐ Yes. Book value _____ Valuation method_____ Current value_____

26. **Has any of the property listed in Part 5 been appraised by a professional within the last year?**
    - ☐ No
    - ☐ Yes

---

**Part 6:**    Farming and fishing-related assets (other than titled motor vehicles and land)

27. **Does the debtor own or lease any farming and fishing-related assets (other than titled motor vehicles and land)?**
    - ☑ No. Go to Part 7.
    - ☐ Yes. Fill in the information below.

| General description | Net book value of debtor's interest (Where available) | Valuation method used for current value | Current value of debtor's interest |
|---|---|---|---|
| 28. **Crops—either planted or harvested** | | | |
| _____ | $ _____ | _____ | $ _____ |
| 29. **Farm animals** *Examples*: Livestock, poultry, farm-raised fish | | | |
| _____ | $ _____ | _____ | $ _____ |
| 30. **Farm machinery and equipment** (Other than titled motor vehicles) | | | |
| _____ | $ _____ | _____ | $ _____ |
| 31. **Farm and fishing supplies, chemicals, and feed** | | | |
| _____ | $ _____ | _____ | $ _____ |
| 32. **Other farming and fishing-related property not already listed in Part 6** | | | |
| _____ | $ _____ | _____ | $ _____ |

---

Debtor   JDI Cumberland Inlet, LLC
      Name

Case number *(if known)* 25-55072

---

33. **Total of Part 6.**

Add lines 28 through 32. Copy the total to line 85.

$_____

34. **Is the debtor a member of an agricultural cooperative?**

☐ No

☐ Yes. Is any of the debtor's property stored at the cooperative?

   ☐ No

   ☐ Yes

35. **Has any of the property listed in Part 6 been purchased within 20 days before the bankruptcy was filed?**

☐ No

☐ Yes. Book value $_____ Valuation method _____ Current value $_____

36. **Is a depreciation schedule available for any of the property listed in Part 6?**

☐ No

☐ Yes

37. **Has any of the property listed in Part 6 been appraised by a professional within the last year?**

☐ No

☐ Yes

## Part 7:   Office furniture, fixtures, and equipment; and collectibles

38. **Does the debtor own or lease any office furniture, fixtures, equipment, or collectibles?**

☑ No. Go to Part 8.

☐ Yes. Fill in the information below.

| General description | Net book value of debtor's interest (Where available) | Valuation method used for current value | Current value of debtor's interest |
|---|---|---|---|
| 39. **Office furniture** | $_____ | _____ | $_____ |
| 40. **Office fixtures** | $_____ | _____ | $_____ |
| 41. **Office equipment, including all computer equipment and communication systems equipment and software** | $_____ | _____ | $_____ |
| 42. **Collectibles** *Examples:* Antiques and figurines; paintings, prints, or other artwork; books, pictures, or other art objects; china and crystal; stamp, coin, or baseball card collections; other collections, memorabilia, or collectibles | | | |
| 42.1 _____ | $_____ | _____ | $_____ |
| 42.2 _____ | $_____ | _____ | $_____ |
| 42.3 _____ | $_____ | _____ | · $_____ |

43. **Total of Part 7.**

Add lines 39 through 42. Copy the total to line 86.

$_____

44. **Is a depreciation schedule available for any of the property listed in Part 7?**

☐ No

☐ Yes

45. **Has any of the property listed in Part 7 been appraised by a professional within the last year?**

☐ No

☐ Yes

Debtor    JDI Cumberland Inlet, LLC                          Case number (if known) 25-55072
            Name

| Part 8: | Machinery, equipment, and vehicles |

**46. Does the debtor own or lease any machinery, equipment, or vehicles?**

☑ No. Go to Part 9.

☐ Yes. Fill in the information below.

| General description<br><br>Include year, make, model, and identification numbers (i.e., VIN, HIN, or N-number) | Net book value of debtor's interest<br><br>(Where available) | Valuation method used for current value | Current value of debtor's interest |
|---|---|---|---|

**47. Automobiles, vans, trucks, motorcycles, trailers, and titled farm vehicles**

| | | | |
|---|---|---|---|
| 47.1 _____ | $ _____ | _____ | $ _____ |
| 47.2 _____ | $ _____ | _____ | $ _____ |
| 47.3 _____ | $ _____ | _____ | $ _____ |
| 47.4 _____ | $ _____ | _____ | $ _____ |

**48. Watercraft, trailers, motors, and related accessories** Examples: Boats, trailers, motors, floating homes, personal watercraft, and fishing vessels

| | | | |
|---|---|---|---|
| 48.1 _____ | $ _____ | _____ | $ _____ |
| 48.2 _____ | $ _____ | _____ | $ _____ |

**49. Aircraft and accessories**

| | | | |
|---|---|---|---|
| 49.1 _____ | $ _____ | _____ | $ _____ |
| 49.2 _____ | $ _____ | _____ | $ _____ |

**50. Other machinery, fixtures, and equipment (excluding farm machinery and equipment)**

| | | | |
|---|---|---|---|
| | $ _____ | _____ | $ _____ |

**51. Total of Part 8.**

Add lines 47 through 50. Copy the total to line 87.

$ _____

**52. Is a depreciation schedule available for any of the property listed in Part 8?**

☐ No

☐ Yes

**53. Has any of the property listed in Part 8 been appraised by a professional within the last year?**

☐ No

☐ Yes

| Debtor | JDI Cumberland Inlet, LLC | Case number *(if known)* 25-55072 |
|---|---|---|
| | Name | |

---

### Part 9:    Real property

54. **Does the debtor own or lease any real property?**

☐ No. Go to Part 10.

☑ Yes. Fill in the information below.

55. **Any building, other improved real estate, or land which the debtor owns or in which the debtor has an interest**

| Description and location of property<br>Include street address or other description such as<br>Assessor Parcel Number (APN), and type of property<br>(for example, acreage, factory, warehouse, apartment<br>or office building), if available. | Nature and extent<br>of debtor's interest<br>in property | Net book value of<br>debtor's interest<br>(Where available) | Valuation method used<br>for current value | Current value of<br>debtor's interest |
|---|---|---|---|---|
| 55.1  1000 Meeting Street, St. Marys, Georgia 31558 | Real Estate | $ 30,000,000.00 | Liquidated Land Value | $ 172,000,000.00 |
| 55.2 | | $ | | $ |
| 55.3 | | $ | | $ |

56. **Total of Part 9.**

Add the current value on lines 55.1 through 55.6 and entries from any additional sheets. Copy the total to line 88.

$ 172,000,000.00

57. **Is a depreciation schedule available for any of the property listed in Part 9?**

☑ No

☐ Yes

58. **Has any of the property listed in Part 9 been appraised by a professional within the last year?**

☐ No

☑ Yes

---

### Part 10:    Intangibles and intellectual property

59. **Does the debtor have any interests in intangibles or intellectual property?**

☑ No. Go to Part 11.

☐ Yes. Fill in the information below.

| General description | Net book value of<br>debtor's interest<br>(Where available) | Valuation method<br>used for current value | Current value of<br>debtor's interest |
|---|---|---|---|
| 60. **Patents, copyrights, trademarks, and trade secrets** | $ | | $ |
| 61. **Internet domain names and websites** | $ | | $ |
| 62. **Licenses, franchises, and royalties** | $ | | $ |
| 63. **Customer lists, mailing lists, or other compilations** | $ | | $ |
| 64. **Other intangibles, or intellectual property** | $ | | $ |
| 65. **Goodwill** | $ | | $ |

66. **Total of Part 10.**

Add lines 60 through 65. Copy the total to line 89.

$

---

Debtor    JDI Cumberland Inlet, LLC                                    Case number (if known) 25-55072
            Name

67. **Do your lists or records include personally identifiable information of customers** (as defined in 11 U.S.C. §§ 101(41A) and 107)?
   - ☐ No
   - ☐ Yes

68. **Is there an amortization or other similar schedule available for any of the property listed in Part 10?**
   - ☐ No
   - ☐ Yes

69. **Has any of the property listed in Part 10 been appraised by a professional within the last year?**
   - ☐ No
   - ☐ Yes

## Part 11:    All other assets

70. **Does the debtor own any other assets that have not yet been reported on this form?**

   Include all interests in executory contracts and unexpired leases not previously reported on this form.
   - ☑ No. Go to Part 12.
   - ☐ Yes. Fill in the information below.

|  | | Current value of debtor's interest |
|---|---|---|

71. **Notes receivable**
   Description (include name of obligor)

   _____   _____  −  _____  = →   $ _____
                                   Total face amount    doubtful or uncollectible amount

72. **Tax refunds and unused net operating losses (NOLs)**

   Description (for example, federal, state, local)

   _____   Tax year _____   $ _____
   _____   Tax year _____   $ _____
   _____   Tax year _____   $ _____

73. **Interests in insurance policies or annuities**

   _____        $ _____

74. **Causes of action against third parties (whether or not a lawsuit has been filed)**

   _____        $ _____

   **Nature of claim**   _____

   **Amount requested**   $ _____

75. **Other contingent and unliquidated claims or causes of action of every nature, including counterclaims of the debtor and rights to set off claims**

   _____        $ _____

   **Nature of claim**   _____

   **Amount requested**   $ _____

76. **Trusts, equitable or future interests in property**

   _____        $ _____

77. **Other property of any kind not already listed**   *Examples:* Season tickets, country club membership

   _____        $ _____
   _____        $ _____

78. **Total of Part 11.**

   Add lines 71 through 77. Copy the total to line 90.        $ _____

79. **Has any of the property listed in Part 11 been appraised by a professional within the last year?**
   - ☐ No
   - ☐ Yes

Debtor    JDI Cumberland Inlet, LLC                                              Case number (if known) 25-55072
          Name

| Part 12: | Summary |
| --- | --- |

In Part 12 copy all of the totals from the earlier parts of the form.

| Type of property | Current value of personal property | Current value of real property |
| --- | --- | --- |
| 80. **Cash, cash equivalents, and financial assets.** *Copy line 5, Part 1.* | $ 11,784.84 | |
| 81. **Deposits and prepayments.** *Copy line 9, Part 2.* | $ 1,145.00 | |
| 82. **Accounts receivable.** *Copy line 12, Part 3.* | $ 0.00 | |
| 83. **Investments.** *Copy line 17, Part 4.* | $ 0.00 | |
| 84. **Inventory.** *Copy line 23, Part 5.* | $ 0.00 | |
| 85. **Farming and fishing-related assets.** *Copy line 33, Part 6.* | $ 0.00 | |
| 86. **Office furniture, fixtures, and equipment; and collectibles.** *Copy line 43, Part 7.* | $ 0.00 | |
| 87. **Machinery, equipment, and vehicles.** *Copy line 51, Part 8.* | $ 0.00 | |
| 88. **Real property.** *Copy line 56, Part 9.* ............................. → | | $ 172,000,000.00 |
| 89. **Intangibles and intellectual property.** *Copy line 66, Part 10.* | $ 0.00 | |
| 90. **All other assets.** *Copy line 78, Part 11.* | + $ 0.00 | |
| 91. **Total.** Add lines 80 through 90 for each column. ...........................91a. | $ 12,929.84 | + 91b. $ 172,000,000.00 |

92. **Total of all property on Schedule A/B.** Lines 91a + 91b = 92. .....172,012,929.84..................................................  $ 172,012,929.84

**Fill in this information to identify the case:**

Debtor name **JDI Cumberland Inlet, LLC**

United States Bankruptcy Court for the: **Northern District of Georgia**

Case number (If known): **25-55072**

☐ Check if this is an amended filing

## Official Form 206D

# Schedule D: Creditors Who Have Claims Secured by Property     12/15

Be as complete and accurate as possible.

1. **Do any creditors have claims secured by debtor's property?**
   - ☐ No. Check this box and submit page 1 of this form to the court with debtor's other schedules. Debtor has nothing else to report on this form.
   - ☑ Yes. Fill in all of the information below.

| Part 1: | List Creditors Who Have Secured Claims |
| --- | --- |

2. **List in alphabetical order all creditors who have secured claims.** If a creditor has more than one secured claim, list the creditor separately for each claim.

| | | Column A<br>Amount of claim<br>Do not deduct the value of collateral. | Column B<br>Value of collateral that supports this claim |
| --- | --- | --- | --- |

**2.1**
Creditor's name
Joint Development Authority of Camden County

Describe debtor's property that is subject to a lien
1000 Meeting Street, St. Marys, Georgia 31558

$ 9,386,336.58 | $ 172,000,000.00

Creditor's mailing address
531 N Lee Street
Kingsland, GA 31548

Describe the lien
Agreement you made

Creditor's email address, if known

Is the creditor an insider or related party?
☑ No
☐ Yes

Date debt was incurred  09/16/2020

Last 4 digits of account number

Is anyone else liable on this claim?
☐ No
☑ Yes. Fill out *Schedule H: Codebtors* (Official Form 206H).

Do multiple creditors have an interest in the same property?
☐ No
☑ Yes. Specify each creditor, including this creditor,

Joint Development Authority of Camden County, 1st; Matsco

As of the petition filing date, the claim is:
Check all that apply.
☐ Contingent
☐ Unliquidated
☐ Disputed

**2.2**
Creditor's name
Matsco, Incorporated

Describe debtor's property that is subject to a lien
1000 Meeting Street, St. Marys, Georgia 31558

$1,041,918.04 | $172,000,000.00

Creditor's mailing address
PO Drawer 970
Marietta, GA 30061

Creditor's email address, if known
lburton@cwmatthews.com

Describe the lien
Agreement you made

Date debt was incurred  10/17/2024
Last 4 digits of account number

Is the creditor an insider or related party?
☑ No
☐ Yes

Is anyone else liable on this claim?
☑ No
☐ Yes. Fill out *Schedule H: Codebtors* (Official Form 206H).

Do multiple creditors have an interest in the same property?
☐ No
☑ Yes. Have you already specified the relative priority?
   ☐ No. Specify each creditor, including this creditor, and its relative priority.

As of the petition filing date, the claim is:
Check all that apply.
☐ Contingent
☐ Unliquidated
☐ Disputed

   ■ Yes. The relative priority of creditors is specified on lines 2.1

3. **Total of the dollar amounts from Part 1, Column A, including the amounts from the Additional Page, if any.**     $ 10,428,254.62

Debtor      JDI Cumberland Inlet, LLC                                Case number *(if known)*   25-55072
            Name

## Part 2:  List Others to Be Notified for a Debt Already Listed in Part 1

List in alphabetical order any others who must be notified for a debt already listed in Part 1. Examples of entities that may be listed are collection agencies, assignees of claims listed above, and attorneys for secured creditors.

If no others need to be notified for the debts listed in Part 1, do not fill out or submit this page. If additional pages are needed, copy this page.

| Name and address | On which line in Part 1 did you enter the related creditor? | Last 4 digits of account number for this entity |
|---|---|---|
| Daniel J. Strowe, Esq. Roberts \| Tate LLC 2487 Demere Road Ste. 400 Saint Simons Island, GA, 31522 | Line 2. 1 | |
| Matsco, Inc. 1600 Kenview Drive, N.W. Marietta, GA, 30060 | Line 2. 2 | |
| Matthew Burton Matsco, Incorporated 1600 Kenview Drive NW Marietta, GA, 30060 | Line 2. 2 | |
| Samuel Richards, Esq. Matsco, Incorporated PO Drawer 970 Marietta, GA, 30061 | Line 2. 2 | |
| | Line 2. __ | |
| | Line 2. __ | |
| | Line 2. __ | |
| | Line 2. __ | |
| | Line 2. __ | |
| | Line 2. __ | |
| | Line 2. __ | |
| | Line 2. __ | |
| | Line 2. __ | |
| | Line 2. __ | |
| | Line 2. __ | |

**Fill in this information to identify the case:**

| | |
|---|---|
| Debtor | JDI Cumberland Inlet, LLC |
| United States Bankruptcy Court for the: | Northern District of Georgia |
| Case number (if known) | 25-55072 |

☐ Check if this is an amended filing

Official Form 206E/F

# Schedule E/F: Creditors Who Have Unsecured Claims

12/15

Be as complete and accurate as possible. Use Part 1 for creditors with PRIORITY unsecured claims and Part 2 for creditors with NONPRIORITY unsecured claims. List the other party to any executory contracts or unexpired leases that could result in a claim. Also list executory contracts on *Schedule A/B: Assets - Real and Personal Property* (Official Form 206A/B) and on *Schedule G: Executory Contracts and Unexpired Leases* (Official Form 206G). Number the entries in Parts 1 and 2 in the boxes on the left. If more space is needed for Part 1 or Part 2, fill out and attach the Additional Page of that Part included in this form.

## Part 1: List All Creditors with PRIORITY Unsecured Claims

**1. Do any creditors have priority unsecured claims?** (See 11 U.S.C. § 507).
☐ No. Go to Part 2.
☑ Yes. Go to line 2.

**2. List in alphabetical order all creditors who have unsecured claims that are entitled to priority in whole or in part.** If the debtor has more than 3 creditors with priority unsecured claims, fill out and attach the Additional Page of Part 1.

| | | Total claim | Priority amount |
|---|---|---|---|
| **2.1** Priority creditor's name and mailing address<br>Camden County Tax Commissioner<br>PO Box 698<br>Woodbine, GA 31569 | As of the petition filing date, the claim is: $ 125,000.00<br>*Check all that apply.*<br>☐ Contingent<br>☐ Unliquidated<br>☐ Disputed | | $ 125,000.00 |
| Date or dates debt was incurred | **Basis for the claim:**<br>Taxes & Other Government Units | | |
| Last 4 digits of account number _____ | **Is the claim subject to offset?**<br>☑ No<br>☐ Yes | | |
| Specify Code subsection of PRIORITY unsecured claim: 11 U.S.C. § 507(a) ( 8 ) | | | |
| **2.2** Priority creditor's name and mailing address<br>City of St. Mary's<br>418 Osborne Street<br>Saint Marys, GA 31558 | As of the petition filing date, the claim is: $ 25,000.00<br>*Check all that apply.*<br>☐ Contingent<br>☐ Unliquidated<br>☐ Disputed | | $ 25,000.00 |
| Date or dates debt was incurred | **Basis for the claim:**<br>Taxes & Other Government Units | | |
| Last 4 digits of account number _____ | **Is the claim subject to offset?**<br>☑ No<br>☐ Yes | | |
| Specify Code subsection of PRIORITY unsecured claim: 11 U.S.C. § 507(a) ( 8 ) | | | |
| **2.3** Priority creditor's name and mailing address | As of the petition filing date, the claim is: $ _____<br>*Check all that apply.*<br>☐ Contingent<br>☐ Unliquidated<br>☐ Disputed | | $ _____ |
| Date or dates debt was incurred | **Basis for the claim:** | | |
| Last 4 digits of account number _____ | **Is the claim subject to offset?**<br>☐ No<br>☐ Yes | | |
| Specify Code subsection of PRIORITY unsecured claim: 11 U.S.C. § 507(a) ( ___ ) | | | |

Debtor _____    Name

## Part 2:    List All Creditors with NONPRIORITY Unsecured Claims

3. **List in alphabetical order all of the creditors with nonpriority unsecured claims.** If the debtor has more than 6 creditors with nonpriority unsecured claims, fill out and attach the Additional Page of Part 2.

|   | | Amount of claim |
|---|---|---|

| 3.1 | Nonpriority creditor's name and mailing address<br>AKM Surveying, Inc.<br>PO Box 5730<br>Saint Marys, GA 31558 | As of the petition filing date, the claim is:<br>*Check all that apply.*<br>☐ Contingent<br>☐ Unliquidated<br>☐ Disputed<br>Basis for the claim: Suppliers or Vendors | $ 1,080.00 |
|---|---|---|---|
| | Date or dates debt was incurred _____<br>Last 4 digits of account number _____ | Is the claim subject to offset?<br>☑ No<br>☐ Yes | |

| 3.2 | Nonpriority creditor's name and mailing address<br>Brasfield & Gorrie, LLC<br>3021 7th Avenue South<br>Birmingham, AL 35233 | As of the petition filing date, the claim is:<br>*Check all that apply.*<br>☐ Contingent<br>☐ Unliquidated<br>☐ Disputed<br>Basis for the claim: Services | $ 31,846.00 |
|---|---|---|---|
| | Date or dates debt was incurred _____<br>Last 4 digits of account number _____ | Is the claim subject to offset?<br>☑ No<br>☐ Yes | |

| 3.3 | Nonpriority creditor's name and mailing address<br>Dentons US LLP<br>303 Peachtree St NE Ste 5300<br>Atlanta, GA 30308 | As of the petition filing date, the claim is:<br>*Check all that apply.*<br>☐ Contingent<br>☐ Unliquidated<br>☐ Disputed<br>Basis for the claim: Services | $ 21,686.00 |
|---|---|---|---|
| | Date or dates debt was incurred _____<br>Last 4 digits of account number _____ | Is the claim subject to offset?<br>☑ No<br>☐ Yes | |

| 3.4 | Nonpriority creditor's name and mailing address<br>Dougherty Architecture & Design, P.A.<br>4475 Legendary Drive, Ste. D<br>Destin, FL 32541 | As of the petition filing date, the claim is:<br>*Check all that apply.*<br>☐ Contingent<br>☐ Unliquidated<br>☐ Disputed<br>Basis for the claim: Services | $ 2,500.00 |
|---|---|---|---|
| | Date or dates debt was incurred _____<br>Last 4 digits of account number _____ | Is the claim subject to offset?<br>☑ No<br>☐ Yes | |

| 3.5 | Nonpriority creditor's name and mailing address<br>Ecological Solutions, Inc.<br>630 Colonial Park Drive, Ste. 200<br>Roswell, GA 30075 | As of the petition filing date, the claim is:<br>*Check all that apply.*<br>☐ Contingent<br>☐ Unliquidated<br>☐ Disputed<br>Basis for the claim: Suppliers or Vendors | $ 6,000.00 |
|---|---|---|---|
| | Date or dates debt was incurred _____<br>Last 4 digits of account number _____ | Is the claim subject to offset?<br>☑ No<br>☐ Yes | |

| 3.6 | Nonpriority creditor's name and mailing address<br>Marketing Eye, LLC<br>3344 Peachtree Road, Ste. 800<br>Atlanta, GA 30326 | As of the petition filing date, the claim is:<br>*Check all that apply.*<br>☐ Contingent<br>☐ Unliquidated<br>☐ Disputed<br>Basis for the claim: Suppliers or Vendors | $ 24,400.00 |
|---|---|---|---|
| | Date or dates debt was incurred _____<br>Last 4 digits of account number _____ | Is the claim subject to offset?<br>☑ No<br>☐ Yes | |

Debtor _____
        Name

**Part 2:    Additional Page**

Copy this page only if more space is needed. Continue numbering the lines sequentially from the
previous page. If no additional NONPRIORITY creditors exist, do not fill out or submit this page.

Amount of claim

---

3. 7 | Nonpriority creditor's name and mailing address

Safe and Green Development Corp.
fka SG Development Crop
990 Biscayne Blvd.
Miami, FL 33132

As of the petition filing date, the claim is:
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☑ Disputed

Basis for the claim: Monies Loaned / Advanced

$ 4,500,000.00

Is the claim subject to offset?
☑ No
☐ Yes

Date or dates debt was incurred    _____
Last 4 digits of account number    _____

---

3. 8 | Nonpriority creditor's name and mailing address

Terracon
10841 S. Ridgeview Road
Olathe, KS 66061

As of the petition filing date, the claim is:
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim:  Suppliers or Vendors

$ 23,688.69

Is the claim subject to offset?
✓ No
☐ Yes

Date or dates debt was incurred    _____
Last 4 digits of account number    _____

---

3. 9 | Nonpriority creditor's name and mailing address

The Abram Law Group, LLC
1200 Ashwood Parkway
Ste. 560
Atlanta, GA 30338

As of the petition filing date, the claim is:
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim: Services

$ 2,920.00

Is the claim subject to offset?
✓ No
☐ Yes

Date or dates debt was incurred    _____
Last 4 digits of account number    _____

---

3. 10 | Nonpriority creditor's name and mailing address

The Ligon Firm
158 Scranton Connector
Brunswick, GA 31525

As of the petition filing date, the claim is:
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim:  Services

$ 30,453.05

Is the claim subject to offset?
☑ No
☐ Yes

Date or dates debt was incurred    _____
Last 4 digits of account number    _____

---

3. ___ | Nonpriority creditor's name and mailing address

As of the petition filing date, the claim is:
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim:

$ _____

Is the claim subject to offset?
☐ No
☐ Yes

Date or dates debt was incurred    _____
Last 4 digits of account number    _____

---

Debtor _____
      Name

| Part 4: | Total Amounts of the Priority and Nonpriority Unsecured Claims |

**5. Add the amounts of priority and nonpriority unsecured claims.**

|  |  |  | Total of claim amounts |
|---|---|---|---|
| 5a. Total claims from Part 1 | 5a. |  | $ 150,000.00 |
| 5b. Total claims from Part 2 | 5b. | + | $ 4,644,573.74 |
| 5c. Total of Parts 1 and 2<br>Lines 5a + 5b = 5c. | 5c. |  | $ 4,794,573.74 |

**Fill in this information to identify the case:**

Debtor name ___JDI Cumberland Inlet, LLC___

United States Bankruptcy Court for the: ___Northern District of Georgia___

Case number (If known): ___25-55072___            Chapter ___11___

☐ Check if this is an
amended filing

## Official Form 206G

# Schedule G: Executory Contracts and Unexpired Leases            12/15

Be as complete and accurate as possible. If more space is needed, copy and attach the additional page, numbering the entries consecutively.

1. **Does the debtor have any executory contracts or unexpired leases?**

   ■ No. Check this box and file this form with the court with the debtor's other schedules. There is nothing else to report on this form.

   ☐ Yes. Fill in all of the information below even if the contracts or leases are listed on *Schedule A/B: Assets - Real and Personal Property* (Official Form 206A/B).

2. **List all contracts and unexpired leases**

**State the name and mailing address for all other parties with whom the debtor has an executory contract or unexpired lease**

| | | |
|---|---|---|
| **2.1** | State what the contract or lease is for and the nature of the debtor's interest | |
| | State the term remaining | |
| | List the contract number of any government contract | |
| **2.2** | State what the contract or lease is for and the nature of the debtor's interest | |
| | State the term remaining | |
| | List the contract number of any government contract | |
| **2.3** | State what the contract or lease is for and the nature of the debtor's interest | |
| | State the term remaining | |
| | List the contract number of any government contract | |
| **2.4** | State what the contract or lease is for and the nature of the debtor's interest | |
| | State the term remaining | |
| | List the contract number of any government contract | |
| **2.5** | State what the contract or lease is for and the nature of the debtor's interest | |
| | State the term remaining | |
| | List the contract number of any government contract | |

**Fill in this information to identify the case:**

Debtor name   JDI Cumberland Inlet, LLC

United States Bankruptcy Court for the:   Northern District of Georgia

Case number (If known):   25-55072

☐ Check if this is an amended filing

## Official Form 206H

## Schedule H: Codebtors

12/15

Be as complete and accurate as possible. If more space is needed, copy the Additional Page, numbering the entries consecutively. Attach the Additional Page to this page.

1. **Does the debtor have any codebtors?**

   ☐ No. Check this box and submit this form to the court with the debtor's other schedules. Nothing else needs to be reported on this form.

   ☑ Yes

2. **In Column 1, list as codebtors all of the people or entities who are also liable for any debts listed by the debtor in the schedules of creditors, Schedules D-G.** Include all guarantors and co-obligors. In Column 2, identify the creditor to whom the debt is owed and each schedule on which the creditor is listed. If the codebtor is liable on a debt to more than one creditor, list each creditor separately in Column 2.

   *Column 1:* **Codebtor**

   *Column 2:* **Creditor**

| | Name | Mailing address | Name | Check all schedules that apply: |
|---|---|---|---|---|
| 2.1 | Jacoby Development Inc. | 8200 Roberts Drive Ste. 475 Atlanta, GA 30350 | Joint Development Authority of Camden County | ☑ D<br>☐ E/F<br>☐ G |
| 2.2 | | | | ☐ D<br>☐ E/F<br>☐ G |
| 2.3 | | | | ☐ D<br>☐ E/F<br>☐ G |
| 2.4 | | | | ☐ D<br>☐ E/F<br>☐ G |
| 2.5 | | | | ☐ D<br>☐ E/F<br>☐ G |
| 2.6 | | | | ☐ D<br>☐ E/F<br>☐ G |

Fill in this information to identify the case:

Debtor name _____JDI Cumberland Inlet, LLC_____

United States Bankruptcy Court for the: ____Northern District of Georgia____

Case number (If known): _____25-55072_____    (State)

☐ Check if this is an
amended filing

# Official Form 206Sum

## Summary of Assets and Liabilities for Non-Individuals                    12/15

---

### Part 1:    Summary of Assets

1. **Schedule A/B: Assets–Real and Personal Property** (Official Form 206A/B)

    1a. **Real property:**
    Copy line 88 from *Schedule A/B* ...........................................................................................................................        $ 172,000,000.00

    1b. **Total personal property:**
    Copy line 91A from *Schedule A/B*.........................................................................................................................        $      12,929.84

    1c. **Total of all property:**
    Copy line 92 from *Schedule A/B* ...........................................................................................................................        $ 172,012,929.84

---

### Part 2:    Summary of Liabilities

2. **Schedule D: Creditors Who Have Claims Secured by Property** (Official Form 206D)
    Copy the total dollar amount listed in Column A, *Amount of claim*, from line 3 of *Schedule D* ............................        $ 10,428,254.62

3. **Schedule E/F: Creditors Who Have Unsecured Claims** (Official Form 206E/F)

    3a. **Total claim amounts of priority unsecured claims:**
    Copy the total claims from Part 1 from line 6a of *Schedule E/F*...........................................................................        $      150,000.00

    3b. **Total amount of claims of nonpriority amount of unsecured claims:**
    Copy the total of the amount of claims from Part 2 from line 6b of *Schedule E/F*.............................................        +$   4,644,573.74

4. **Total liabilities**...............................................................................................................................................................        $ 15,222,828.36
    Lines 2 + 3a + 3b

**United States Bankruptcy Court**

**IN RE:**                                          Case No. 25-55072

JDI Cumberland Inlet, LLC                           Chapter  11

## LIST OF EQUITY SECURITY HOLDERS

| Registered name and last known address of security holder | Shares (Or Percentage) | Security Class (or kind of interest) |
|---|---|---|
| Jacoby Development Inc. 8200 Roberts Drive Ste. 200, Atlanta, GA 30350 | 100 | Other (Member) |

Fill in this information to identify the case and this filing:

Debtor Name    JDI Cumberland Inlet, LLC

United States Bankruptcy Court for the:   Northern District of Georgia

Case number (*If known*):    25-55072

---

Official Form 202

## Declaration Under Penalty of Perjury for Non-Individual Debtors    12/15

An individual who is authorized to act on behalf of a non-individual debtor, such as a corporation or partnership, must sign and submit this form for the schedules of assets and liabilities, any other document that requires a declaration that is not included in the document, and any amendments of those documents. This form must state the individual's position or relationship to the debtor, the identity of the document, and the date. Bankruptcy Rules 1008 and 9011.

WARNING -- Bankruptcy fraud is a serious crime. Making a false statement, concealing property, or obtaining money or property by fraud in connection with a bankruptcy case can result in fines up to $500,000 or imprisonment for up to 20 years, or both. 18 U.S.C. §§ 152, 1341, 1519, and 3571.

### Declaration and signature

I am the president, another officer, or an authorized agent of the corporation; a member or an authorized agent of the partnership; or another individual serving as a representative of the debtor in this case.

I have examined the information in the documents checked below and I have a reasonable belief that the information is true and correct:

☑ *Schedule A/B: Assets—Real and Personal Property* (Official Form 206A/B)

☑ *Schedule D: Creditors Who Have Claims Secured by Property* (Official Form 206D)

☑ *Schedule E/F: Creditors Who Have Unsecured Claims* (Official Form 206E/F)

☑ *Schedule G: Executory Contracts and Unexpired Leases* (Official Form 206G)

☑ *Schedule H: Codebtors* (Official Form 206H)

☑ *Summary of Assets and Liabilities for Non-Individuals* (Official Form 206Sum)

☐ Amended *Schedule* ____

☐ *Chapter 11 or Chapter 9 Cases: List of Creditors Who Have the 20 Largest Unsecured Claims and Are Not Insiders* (Official Form 204)

☐ Other document that requires a declaration _____

I declare under penalty of perjury that the foregoing is true and correct.

Executed on   05/19/2025     ✘ /s/ James F. Jacoby
      MM / DD / YYYY      Signature of individual signing on behalf of debtor

                        James F. Jacoby
                        Printed name

                        Authorized Representative
                        Position or relationship to debtor

| Fill in this information to identify the case: | |
|---|---|
| Debtor name | JDI Cumberland Inlet, LLC |
| United States Bankruptcy Court for the: | Northern District of Georgia |
| Case number (if known): | 25-55072 |

☐ Check if this is an
amended filing

## Official Form 207

# Statement of Financial Affairs for Non-Individuals Filing for Bankruptcy     04/25

The debtor must answer every question. If more space is needed, attach a separate sheet to this form. On the top of any additional pages,
write the debtor's name and case number (if known).

### Part 1:     Income

1.  **Gross revenue from business**

    ☑ None

| Identify the beginning and ending dates of the debtor's fiscal year, which may be a calendar year | | | | Sources of revenue Check all that apply | Gross revenue (before deductions and exclusions) |
|---|---|---|---|---|---|
| **From the beginning of the fiscal year to filing date:** | From _____ MM / DD / YYYY | to | Filing date | ☐ Operating a business<br>☐ Other | $_____ |
| **For prior year:** | From _____ MM / DD / YYYY | to | _____ MM / DD / YYYY | ☐ Operating a business<br>☐ Other | $_____ |
| **For the year before that:** | From _____ MM / DD / YYYY | to | _____ MM / DD / YYYY | ☐ Operating a business<br>☐ Other | $_____ |

2.  **Non-business revenue**

    Include revenue regardless of whether that revenue is taxable. *Non-business income* may include interest, dividends, money collected
    from lawsuits, and royalties. List each source and the gross revenue for each separately. Do not include revenue listed in line 1.

    ☑ None

| | | | | Description of sources of revenue | Gross revenue from each source (before deductions and exclusions) |
|---|---|---|---|---|---|
| **From the beginning of the fiscal year to filing date:** | From _____ MM / DD / YYYY | to | Filing date | _____ | $_____ |
| **For prior year:** | From _____ MM / DD / YYYY | to | _____ MM / DD / YYYY | _____ | $_____ |
| **For the year before that:** | From _____ MM / DD / YYYY | to | _____ MM / DD / YYYY | _____ | $_____ |

| Debtor | JDI Cumberland Inlet, LLC | Case number (if known) | 25-55072 |
| --- | --- | --- | --- |
| | Name | | |

## Part 2: List Certain Transfers Made Before Filing for Bankruptcy

**3. Certain payments or transfers to creditors within 90 days before filing this case**

List payments or transfers—including expense reimbursements—to any creditor, other than regular employee compensation, within 90 days before filing this case unless the aggregate value of all property transferred to that creditor is less than $8,575. (This amount may be adjusted on 4/01/28 and every 3 years after that with respect to cases filed on or after the date of adjustment.)

☑ None

| Creditor's name and address | Dates | Total amount or value | Reasons for payment or transfer |
| --- | --- | --- | --- |
| | | | Check all that apply |
| 3.1. _____ Creditor's name | | $ _____ | ☐ Secured debt<br>☐ Unsecured loan repayments<br>☐ Suppliers or vendors<br>☐ Services<br>☐ Other _____ |
| 3.2. _____ Creditor's name | | $ _____ | ☐ Secured debt<br>☐ Unsecured loan repayments<br>☐ Suppliers or vendors<br>☐ Services<br>☐ Other _____ |

**4. Payments or other transfers of property made within 1 year before filing this case that benefited any insider**

List payments or transfers, including expense reimbursements, made within 1 year before filing this case on debts owed to an insider or guaranteed or cosigned by an insider unless the aggregate value of all property transferred to or for the benefit of the insider is less than $8,575. (This amount may be adjusted on 4/01/28 and every 3 years after that with respect to cases filed on or after the date of adjustment.) Do not include any payments listed in line 3. *Insiders* include officers, directors, and anyone in control of a corporate debtor and their relatives; general partners of a partnership debtor and their relatives; affiliates of the debtor and insiders of such affiliates; and any managing agent of the debtor. 11 U.S.C. § 101(31).

☐ None

| Insider's name and address | Dates | Total amount or value | Reasons for payment or transfer |
| --- | --- | --- | --- |
| 4.1. Jacoby Development Inc. <br> Insider's name <br> 8200 Roberts Drive, Ste. 475 <br> Atlanta, GA 30350 | 05/16/2024 <br> 09/26/2024 <br> 10/24/2024 | $ 52,600.00 | Reimbursement of expenses; additional payment dates: 10/31/2024; 12/05/2024; 4/10/2025; and 5/1/2025 |
| **Relationship to debtor** <br> Corporate Parent | | | |
| 4.2. _____ Insider's name | | $ _____ | |
| **Relationship to debtor** <br> _____ | | | |

| Debtor | JDI Cumberland Inlet, LLC | Case number (if known) 25-55072 |
|---|---|---|
| | Name | |

---

**5. Repossessions, foreclosures, and returns**

List all property of the debtor that was obtained by a creditor within 1 year before filing this case, including property repossessed by a creditor, sold at a foreclosure sale, transferred by a deed in lieu of foreclosure, or returned to the seller. Do not include property listed in line 6.

☑ None

| Creditor's name and address | Description of the property | Date | Value of property |
|---|---|---|---|
| **5.1.** | | | |
| Creditor's name | | _____ | $_____ |
| **5.2.** | | | |
| Creditor's name | | _____ | $_____ |

---

**6. Setoffs**

List any creditor, including a bank or financial institution, that within 90 days before filing this case set off or otherwise took anything from an account of the debtor without permission or refused to make a payment at the debtor's direction from an account of the debtor because the debtor owed a debt.

☑ None

| Creditor's name and address | Description of the action creditor took | Date action was taken | Amount |
|---|---|---|---|
| Creditor's name | | _____ | $_____ |

Last 4 digits of account number: XXXX– _____

---

## Part 3:    Legal Actions or Assignments

**7. Legal actions, administrative proceedings, court actions, executions, attachments, or governmental audits**

List the legal actions, proceedings, investigations, arbitrations, mediations, and audits by federal or state agencies in which the debtor was involved in any capacity—within 1 year before filing this case.

☑ None

| Case title | Nature of case | Court or agency's name and address | Status of case |
|---|---|---|---|
| **7.1.** | | | ☐ Pending |
| | | | ☐ On appeal |
| Case number | | | ☐ Concluded |
| _____ | | | |
| **7.2.** Case title | | Court or agency's name and address | ☐ Pending |
| | | | ☐ On appeal |
| Case number | | | ☐ Concluded |
| _____ | | | |

---

| Debtor | JDI Cumberland Inlet, LLC | | Case number *(if known)* 25-55072 |
|---|---|---|---|
| | Name | | |

---

**8. Assignments and receivership**

List any property in the hands of an assignee for the benefit of creditors during the 120 days before filing this case and any property in the hands of a receiver, custodian, or other court-appointed officer within 1 year before filing this case.

☑ None

| Custodian's name and address | Description of the property | Value |
|---|---|---|
| | | $ |
| Custodian's name | Case title | Court name and address |
| | | Name |
| | Case number | |
| | Date of order or assignment | |

---

**Part 4:   Certain Gifts and Charitable Contributions**

**9. List all gifts or charitable contributions the debtor gave to a recipient within 2 years before filing this case unless the aggregate value of the gifts to that recipient is less than $1,000**

☑ None

| Recipient's name and address | Description of the gifts or contributions | Dates given | Value |
|---|---|---|---|
| 9.1. Recipient's name | | | $ |
| | | | $ |
| Recipient's relationship to debtor | | | |
| 9.2. Recipient's name | | | $ |
| | | | $ |
| Recipient's relationship to debtor | | | |

---

**Part 5:   Certain Losses**

**10. All losses from fire, theft, or other casualty within 1 year before filing this case.**

☑ None

| Description of the property lost and how the loss occurred | Amount of payments received for the loss | Date of loss | Value of property lost |
|---|---|---|---|
| | If you have received payments to cover the loss, for example, from insurance, government compensation, or tort liability, list the total received. | | |
| | List unpaid claims on Official Form 106A/B (*Schedule A/B: Assets — Real and Personal Property*). | | |
| | | | $ |

---

| Debtor | JDI Cumberland Inlet, LLC | Case number *(if known)* | 25-55072 |
|--------|---------------------------|---------------------------|----------|
|        | Name                      |                           |          |

## Part 6:   Certain Payments or Transfers

**11. Payments related to bankruptcy**

List any payments of money or other transfers of property made by the debtor or person acting on behalf of the debtor within 1 year before the filing of this case to another person or entity, including attorneys, that the debtor consulted about debt consolidation or restructuring, seeking bankruptcy relief, or filing a bankruptcy case.

☐ None

|       | Who was paid or who received the transfer? | If not money, describe any property transferred | Dates | Total amount or value |
|-------|--------------------------------------------|-------------------------------------------------|-------|-----------------------|
| 11.1. | Rountree Leitman Klein Geer | Retainer and filing fee | 05/2025 | $ 38,262.00 |
|       | **Address** | | | |
|       | 2987 Clairmont Road, Ste. 350 Atlanta, GA 30329 | | | |
|       | **Email or website address** rlkglaw.com | | | |
|       | **Who made the payment, if not debtor?** | | | |

|       | Who was paid or who received the transfer? | If not money, describe any property transferred | Dates | Total amount or value |
|-------|--------------------------------------------|-------------------------------------------------|-------|-----------------------|
| 11.2. | | | | $ |
|       | **Address** | | | |
|       | **Email or website address** | | | |
|       | **Who made the payment, if not debtor?** | | | |

**12. Self-settled trusts of which the debtor is a beneficiary**

List any payments or transfers of property made by the debtor or a person acting on behalf of the debtor within 10 years before the filing of this case to a self-settled trust or similar device.
Do not include transfers already listed on this statement.

☑ None

| Name of trust or device | Describe any property transferred | Dates transfers were made | Total amount or value |
|-------------------------|-----------------------------------|---------------------------|-----------------------|
| | | | $ |
| **Trustee** | | | |

| Debtor | JDI Cumberland Inlet, LLC | | Case number (if known) 25-55072 |
|---|---|---|---|
| | Name | | |

### 13. Transfers not already listed on this statement

List any transfers of money or other property—by sale, trade, or any other means—made by the debtor or a person acting on behalf of the debtor within 2 years before the filing of this case to another person, other than property transferred in the ordinary course of business or financial affairs. Include both outright transfers and transfers made as security. Do not include gifts or transfers previously listed on this statement.

☑ None

| | Who received transfer? | Description of property transferred or payments received or debts paid in exchange | Date transfer was made | Total amount or value |
|---|---|---|---|---|
| 13.1. | _____ | | _____ | $ _____ |
| | **Address** | | | |
| | | | | |
| | **Relationship to debtor** | | | |
| | _____ | | | |
| 13.2. | Who received transfer? | | _____ | $ _____ |
| | _____ | | | |
| | **Address** | | | |
| | | | | |
| | **Relationship to debtor** | | | |
| | _____ | | | |

### Part 7:  Previous Locations

### 14. Previous addresses

List all previous addresses used by the debtor within 3 years before filing this case and the dates the addresses were used.

☐ Does not apply

| | Address | | Dates of occupancy | |
|---|---|---|---|---|
| 14.1. | 8200 Roberts Drive
Ste. 200
Atlanta, GA 30350 | | From  01/01/2013 | To  01/2023 |
| 14.2. | | | From  _____ | To  _____ |

---

Statement of Financial Affairs for Non-Individuals Filing for Bankruptcy

| Debtor | JDI Cumberland Inlet, LLC | Case number (if known) 25-55072 |
|---|---|---|
| | Name | |

---

## Part 8:  Health Care Bankruptcies

### 15. Health Care bankruptcies

Is the debtor primarily engaged in offering services and facilities for:

— diagnosing or treating injury, deformity, or disease, or

— providing any surgical, psychiatric, drug treatment, or obstetric care?

☑ No. Go to Part 9.

☐ Yes. Fill in the information below.

| Facility name and address | Nature of the business operation, including type of services the debtor provides | If debtor provides meals and housing, number of patients in debtor's care |
|---|---|---|
| 15.1. _____ Facility name | | |
| | Location where patient records are maintained (if different from facility address). If electronic, identify any service provider. | How are records kept? |
| | | Check all that apply: |
| | | ☐ Electronically  ☐ Paper |
| Facility name and address | Nature of the business operation, including type of services the debtor provides | If debtor provides meals and housing, number of patients in debtor's care |
| 15.2. _____ Facility name | | |
| | Location where patient records are maintained (if different from facility address). If electronic, identify any service provider. | How are records kept? |
| | | Check all that apply: |
| | | ☐ Electronically  ☐ Paper |

---

## Part 9:  Personally Identifiable Information

### 16. Does the debtor collect and retain personally identifiable information of customers?

☑ No.

☐ Yes. State the nature of the information collected and retained. _____

Does the debtor have a privacy policy about that information?

☐ No

☐ Yes

### 17. Within 6 years before filing this case, have any employees of the debtor been participants in any ERISA, 401(k), 403(b), or other pension or profit-sharing plan made available by the debtor as an employee benefit?

☑ No. Go to Part 10.

Yes. Does the debtor serve as plan administrator?

☐ No. Go to Part 10.

☐ Yes. Fill in below:

| Name of plan | Employer identification number of the plan |
|---|---|
| _____ | EIN: _____ |

Has the plan been terminated?

☐ No

☐ Yes

---

| Debtor | JDI Cumberland Inlet, LLC | Case number (if known) 25-55072 |
|---|---|---|
| | Name | |

---

**Part 10:   Certain Financial Accounts, Safe Deposit Boxes, and Storage Units**

**18. Closed financial accounts**

Within 1 year before filing this case, were any financial accounts or instruments held in the debtor's name, or for the debtor's benefit, closed, sold, moved, or transferred?

Include checking, savings, money market, or other financial accounts; certificates of deposit; and shares in banks, credit unions, brokerage houses, cooperatives, associations, and other financial institutions.

☑ None

| Financial institution name and address | Last 4 digits of account number | Type of account | Date account was closed, sold, moved, or transferred | Last balance before closing or transfer |
|---|---|---|---|---|
| 18.1. _____<br>Name | XXXX-_____ | ☐ Checking<br>☐ Savings<br>☐ Money market<br>☐ Brokerage<br>☐ Other_____ | _____ | $_____ |
| 18.2. _____<br>Name | XXXX-_____ | ☐ Checking<br>☐ Savings<br>☐ Money market<br>☐ Brokerage<br>☐ Other_____ | _____ | $_____ |

**19. Safe deposit boxes**

List any safe deposit box or other depository for securities, cash, or other valuables the debtor now has or did have within 1 year before filing this case.

☑ None

| Depository institution name and address | Names of anyone with access to it | Description of the contents | Does debtor still have it? |
|---|---|---|---|
| _____<br>Name<br><br>Address | | | ☐ No<br>☐ Yes |

**20. Off-premises storage**

List any property kept in storage units or warehouses within 1 year before filing this case. Do not include facilities that are in a part of a building in which the debtor does business.

☑ None

| Facility name and address | Names of anyone with access to it | Description of the contents | Does debtor still have it? |
|---|---|---|---|
| _____<br>Name<br><br>Address | | | ☐ No<br>☐ Yes |

---

| Debtor | JDI Cumberland Inlet, LLC | Case number (if known) 25-55072 |
|---|---|---|
| | Name | |

## Part 11: Property the Debtor Holds or Controls That the Debtor Does Not Own

**21. Property held for another**

List any property that the debtor holds or controls that another entity owns. Include any property borrowed from, being stored for, or held in trust. Do not list leased or rented property.

☑ None

| Owner's name and address | Location of the property | Description of the property | Value |
|---|---|---|---|
| | | | $ _____ |
| Name | | | |

## Part 12: Details About Environmental Information

For the purpose of Part 12, the following definitions apply:

- *Environmental law* means any statute or governmental regulation that concerns pollution, contamination, or hazardous material, regardless of the medium affected (air, land, water, or any other medium).

- *Site* means any location, facility, or property, including disposal sites, that the debtor now owns, operates, or utilizes or that the debtor formerly owned, operated, or utilized.

- *Hazardous material* means anything that an environmental law defines as hazardous or toxic, or describes as a pollutant, contaminant, or a similarly harmful substance.

Report all notices, releases, and proceedings known, regardless of when they occurred.

**22. Has the debtor been a party in any judicial or administrative proceeding under any environmental law?** Include settlements and orders.

☑ No
☐ Yes. Provide details below.

| Case title | Court or agency name and address | Nature of the case | Status of case |
|---|---|---|---|
| | | | ☐ Pending |
| Case number | | | ☐ On appeal |
| | Name | | ☐ Concluded |

**23. Has any governmental unit otherwise notified the debtor that the debtor may be liable or potentially liable under or in violation of an environmental law?**

☑ No
☐ Yes. Provide details below.

| Site name and address | Governmental unit name and address | Environmental law, if known | Date of notice |
|---|---|---|---|
| Name | Name | | |

| Debtor | JDI Cumberland Inlet, LLC | | Case number *(if known)* 25-55072 |
|---|---|---|---|
| | Name | | |

---

**24. Has the debtor notified any governmental unit of any release of hazardous material?**

☑ No

☐ Yes. Provide details below.

| Site name and address | Governmental unit name and address | Environmental law, if known | Date of notice |
|---|---|---|---|
| Name | Name | | |

---

**Part 13:**     **Details About the Debtor's Business or Connections to Any Business**

**25. Other businesses in which the debtor has or has had an interest**

List any business for which the debtor was an owner, partner, member, or otherwise a person in control within 6 years before filing this case.
Include this information even if already listed in the Schedules.

☑ None

| | Business name and address | Describe the nature of the business | Employer Identification number
Do not include Social Security number or ITIN. |
|---|---|---|---|
| 25.1. | _____
Name | | EIN: _____
**Dates business existed**
From _____    To _____ |
| 25.2. | **Business name and address**
_____
Name | Describe the nature of the business | EIN: _____
**Dates business existed**
From _____    To _____ |
| 25.3. | **Business name and address**
_____
Name | Describe the nature of the business | EIN: _____
**Dates business existed**
From _____    To _____ |

---

| Debtor | JDI Cumberland Inlet, LLC | Case number (if known) 25-55072 |
|---|---|---|
| | Name | |

---

## 26. Books, records, and financial statements

26a. List all accountants and bookkeepers who maintained the debtor's books and records within 2 years before filing this case.

☑ None

| | Name and address | Dates of service |
|---|---|---|
| 26a.1. | _____ | From _____ |
| | Name | To _____ |

| | Name and address | Dates of service |
|---|---|---|
| 26a.2. | _____ | From _____ |
| | Name | To _____ |

26b. List all firms or individuals who have audited, compiled, or reviewed debtor's books of account and records or prepared a financial statement within 2 years before filing this case.

☐ None

| | Name and address | Dates of service |
|---|---|---|
| 26b.1. | Matt Williams | Frazier & Deeter | From 06/01/2021 |
| | Name | To 05/05/2025 |
| | 1230 Peachtree Street NE, Ste. 1500, Atlanta, GA 30309 | |

| | Name and address | Dates of service |
|---|---|---|
| 26b.2. | _____ | From _____ |
| | Name | To _____ |

26c. List all firms or individuals who were in possession of the debtor's books of account and records when this case is filed.

☐ None

| | Name and address | If any books of account and records are unavailable, explain why |
|---|---|---|
| 26c.1. | Karin Appling | Jacoby Development Inc. | |
| | Name | |

---

| Debtor | JDI Cumberland Inlet, LLC | Case number *(if known)* 25-55072 |
|--------|---------------------------|-----------------------------------|
|        | Name                      |                                   |

| Name and address | If any books of account and records are unavailable, explain why |
|------------------|-------------------------------------------------------------------|

26c.2.

Name

26d. List all financial institutions, creditors, and other parties, including mercantile and trade agencies, to whom the debtor issued a financial statement within 2 years before filing this case.

☑ None

Name and address

26d.1.

Name

Name and address

26d.2.

Name

## 27. Inventories

Have any inventories of the debtor's property been taken within 2 years before filing this case?

☑ No

☐ Yes. Give the details about the two most recent inventories.

| Name of the person who supervised the taking of the inventory | Date of inventory | The dollar amount and basis (cost, market, or other basis) of each inventory |
|---------------------------------------------------------------|-------------------|------------------------------------------------------------------------------|
|                                                               |                   | $                                                                            |

Name and address of the person who has possession of inventory records

27.1.

Name

| Debtor | JDI Cumberland Inlet, LLC | | Case number (if known) | 25-55072 |
|--------|---------------------------|---|------------------------|----------|
| | Name | | | |

| Name of the person who supervised the taking of the inventory | | Date of inventory | The dollar amount and basis (cost, market, or other basis) of each inventory |
|---|---|---|---|
| | | | $ |
| **Name and address of the person who has possession of inventory records** | | | |
| 27.2. | | | |
| Name | | | |

**28. List the debtor's officers, directors, managing members, general partners, members in control, controlling shareholders, or other people in control of the debtor at the time of the filing of this case.**

| Name | Address | Position and nature of any interest | % of interest, if any |
|------|---------|-------------------------------------|-----------------------|
| Jacoby Development Inc. | 8200 Roberts Drive Ste. 200, Atlanta, GA 30350 | Partner | 100 |

**29. Within 1 year before the filing of this case, did the debtor have officers, directors, managing members, general partners, members in control of the debtor, or shareholders in control of the debtor who no longer hold these positions?**

☐ No

☑ Yes. Identify below.

| Name | Address | Position and nature of any interest | Period during which position or interest was held |
|------|---------|-------------------------------------|---------------------------------------------------|
| Safe & Green Development Corporation | Miami, Florida | 10% | 06/30/2021 To 03/01/2025 |
| | | | _____ To _____ |
| | | | _____ To _____ |
| | | | _____ To _____ |

**30. Payments, distributions, or withdrawals credited or given to insiders**

Within 1 year before filing this case, did the debtor provide an insider with value in any form, including salary, other compensation, draws, bonuses, loans, credits on loans, stock redemptions, and options exercised?

☑ No

☐ Yes. Identify below.

| Name and address of recipient | Amount of money or description and value of property | Dates | Reason for providing the value |
|-------------------------------|------------------------------------------------------|-------|--------------------------------|
| 30.1. | | | |
| Name | | | |
| | | | |
| | | | |
| Relationship to debtor | | | |

| Debtor | JDI Cumberland Inlet, LLC | Case number *(if known)* 25-55072 |
|---|---|---|
| | Name | |

**Name and address of recipient**

30.2 _____
    Name

**Relationship to debtor**

31. **Within 6 years before filing this case, has the debtor been a member of any consolidated group for tax purposes?**

☑ No

☐ Yes. Identify below.

| Name of the parent corporation | Employer Identification number of the parent corporation |
|---|---|
| _____ | EIN: _____ |

32. **Within 6 years before filing this case, has the debtor as an employer been responsible for contributing to a pension fund?**

☑ No

☐ Yes. Identify below.

| Name of the pension fund | Employer Identification number of the pension fund |
|---|---|
| _____ | EIN: _____ |

---

| **Part 14:** | **Signature and Declaration** |
|---|---|

**WARNING** -- Bankruptcy fraud is a serious crime. Making a false statement, concealing property, or obtaining money or property by fraud in connection with a bankruptcy case can result in fines up to $500,000 or imprisonment for up to 20 years, or both.
18 U.S.C. §§ 152, 1341, 1519, and 3571.

I have examined the information in this *Statement of Financial Affairs* and any attachments and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on   05/19/2025
              MM / DD / YYYY

✖ /s/ James F. Jacoby                                    Printed name  James F. Jacoby
Signature of individual signing on behalf of the debtor

Position or relationship to debtor  Authorized Representative

---

Are additional pages to *Statement of Financial Affairs for Non-Individuals Filing for Bankruptcy* (Official Form 207) attached?

☑ No

☐ Yes

# United States Bankruptcy Court

Northern District of Georgia

**In re** JDI Cumberland Inlet, LLC

Case No. 25-55072

**Debtor**

Chapter 11

## DISCLOSURE OF COMPENSATION OF ATTORNEY FOR DEBTOR

1. Pursuant to 11 U .S.C. § 329(a) and Fed. Bankr. P. 2016(b), I certify that I am the attorney for the above named debtor(s) and that compensation paid to me within one year before the filing of the petition in bankruptcy, or agreed to be paid to me, for services rendered or to be rendered on behalf of the debtor(s) in contemplation of or in connection with the bankruptcy case is as follows:

☐ FLAT FEE

For legal services, I have agreed to accept . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $ _____

Prior to the filing of this statement I have received. . . . . . . . . . . . . . . . . . . . . . . . $ _____

Balance Due. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $ _____

☑ RETAINER

For legal services, I have agreed to accept a retainer of . . . . . . . . . . . . . . . . . . . . $ 38,262.00

The undersigned shall bill against the retainer at an hourly rate of . . . . . . . . . . $ 595.00

[Or attach firm hourly rate schedule.] Debtor(s) have agreed to pay all Court approved fees and expenses exceeding the amount of the retainer.

2. The source of the compensation paid to me was:

☑ Debtor    ☐ Other (specify)

3. The source of compensation to be paid to me is:

☑ Debtor    ☐ Other (specify)

4. ☑ I have not agreed to share the above-disclosed compensation with any other person unless they are members and associates of my law firm.

☐ I have agreed to share the above-disclosed compensation with a other person or persons who are not members or associates of my law firm. A copy of the Agreement, together with a list of the names of the people sharing the compensation is attached.

5. In return of the above-disclosed fee, I have agreed to render legal service for all aspects of the bankruptcy case, including:

   a. Analysis of the debtor's financial situation, and rendering advice to the debtor in determining whether to file a petition in bankruptcy;
   b. Preparation and filing of any petition, schedules, statements of affairs and plan which may be required;
   c. Representation of the debtor at the meeting of creditors and confirmation hearing, and any adjourned hearings thereof;

d. [Other provisions as needed]

A. prepare and file on behalf of the client all petitions, schedules, statements, plans, and other documents or pleadings;

B. attend and represent the client at all meetings of creditors, hearings, trials, conferences, and other proceedings, whether in or out of court;

C. provide legal advice to the client as to the rights, duties, and powers of the client as a debtor in possession in a chapter 11 case, and as to other matters arising in or related to the chapter 11 case; and

D. otherwise assist, advise, and represent the client on matters related to the chapter 11 case as requested by the client.

Attorney: Standard Hourly Rate:
William A. Rountree $595.00
Will B. Geer $595.00
Michael Bargar $535.00
Hal Leitman $425.00
David S. Klein $495.00
Alexandra Dishun $425.00
Elizabeth Childers $425.00
Ceci Christy $425.00
Caitlyn Powers $375.00
Shawn Eisenberg $300.00
William Matthews $425.00
Paralegals: Standard Hourly Rate:
Dorothy Sideris   $225.00
Elizabeth Miller $290.00
Megan Winokur $175.00
Catherine Smith $150.00

6. By agreement with the debtor(s), the above-disclosed fee does not include the following services:
None

## CERTIFICATION

I certify that the foregoing is a complete statement of any agreement or arrangement for payment to me for representation of the debtor(s) in this bankruptcy proceeding.

05/19/2025                          /s/ William Rountree, 616503

*Date*                              *Signature of Attorney*

                                    Rountree, Leitman, Klein & Geer, LLC

                                    *Name of law firm*
                                    2987 Clairmont Road
                                    Suite 350
                                    Atlanta, GA 30329

# DEVELOPMENT AGREEMENT

### by and among

## CAMDEN COUNTY JOINT DEVELOPMENT AUTHORITY,

## THE CITY OF ST. MARYS, GEORGIA

### and

## JACOBY DEVELOPMENT INC.

62232107v.29



**EXHIBIT**

3

Jacoby        7/24/25

# TABLE OF CONTENTS

**Page**

ARTICLE 1 GENERAL TERMS AND PROVISIONS ................................................................. 4

    Section 1.1    Definitions............................................................................................. 4

    Section 1.2    Usage of Words..................................................................................... 12

    Section 1.3    Redevelopment Powers Law................................................................. 12

    Section 1.4    Recitals................................................................................................. 12

    Section 1.5    Closing; Closing Conditions ................................................................ 12

    Section 1.6    Pledges; Developer Guaranty .............................................................. 12

    Section 1.7    Activation Notices and Acceptance Notices........................................ 13

ARTICLE 2 REPRESENTATIONS AND WARRANTIES.......................................................... 13

    Section 2.1    Representations and Warranties of Developer...................................... 13

    Section 2.2    Representations and Warranties of JDA ............................................... 14

    Section 2.3    Representations and Warranties of the City.......................................... 15

ARTICLE 3 DEVELOPMENT OF THE DEVELOPER PROJECT AND MARINA
PROJECT............................................................................................................................ 15

    Section 3.1    Real Estate Matters .............................................................................. 16

    Section 3.2    Marina Project....................................................................................... 18

    Section 3.3    Developer Project.................................................................................. 19

    Section 3.4    Plan of Finance ..................................................................................... 19

    Section 3.5    Restriction on Further Pledges............................................................. 20

    Section 3.6    JDA Approval Rights; No Unauthorized Changes ............................... 20

    Section 3.7    No Defaults Permitted........................................................................... 21

    Section 3.8    Liquidity Events.................................................................................... 21

    Section 3.9    Waterfall; Flow of Funds ...................................................................... 21

    Section 3.10   TAD Financing ..................................................................................... 24

    Section 3.11   Conditions to TAD Financing.............................................................. 24

    Section 3.12   Disbursements...................................................................................... 24

    Section 3.13   Project Budget....................................................................................... 26

    Section 3.14   Use of TAD Financing.......................................................................... 26

    Section 3.15   Limitation of Liability.......................................................................... 26

    Section 3.16   Legislative Findings............................................................................. 26

ARTICLE 4 DUTIES OF THE DEVELOPER; MASTER PLAN; PROJECT REVIEW
AND APPROVAL......................................................................................................... 27

Section 4.1    Master Plan; Infrastructure Improvements ........................................ 27

Section 4.2    Contractors, Subcontractors, Materialmen and Consultants............. 28

Section 4.3    Employees of Developer ...................................................................... 29

Section 4.4    Lien Waivers ........................................................................................ 29

Section 4.5    Licenses, Permits and Approvals......................................................... 29

Section 4.6    Completion of the Developer Project and the Marina Project............ 29

Section 4.7    Records and Accounts; Reporting ........................................................ 30

Section 4.8    Compliance with Documents ............................................................... 30

Section 4.9    Notice of Litigation; Material Modification ....................................... 30

Section 4.10    Liens and Other Charges..................................................................... 30

Section 4.11    Compliance with Laws, Contracts, Licenses, and Permits .............. 31

Section 4.12    Taxes .................................................................................................... 31

Section 4.13    Further Assurances and Corrective Instruments ................................ 31

Section 4.14    Restrictions on Easements and Covenants; Access .......................... 31

Section 4.15    Master Project Due Diligence ............................................................ 32

Section 4.16    Cooperation and Applications............................................................. 32

Section 4.17    Advances by City or JDA ................................................................... 32

Section 4.18    Developer Responsible ....................................................................... 32

ARTICLE 5 ECONOMIC DEVELOPMENT GOALS AND PUBLIC BENEFIT .................. 32

Section 5.1    Economic Development Goals ............................................................. 32

Section 5.2    Public Benefit........................................................................................ 32

ARTICLE 6 INDEMNIFICATION..................................................................................... 33

Section 6.1    Indemnification ..................................................................................... 33

Section 6.2    Exceptions ............................................................................................. 33

Section 6.3    Parcel Developers ................................................................................. 33

ARTICLE 7 DEFAULT ....................................................................................................... 34

Section 7.1    Default by Developer ............................................................................ 34

Section 7.2    Remedies................................................................................................ 34

Section 7.3    Remedies Cumulative .......................................................................... 34

Section 7.4    Agreement to Pay Attorneys' Fees and Expenses ............................. 35

Section 7.5    Default by JDA or City ........................................................... 35

Section 7.6    Developer's Remedies ............................................................. 35

ARTICLE 8 TERM AND TERMINATION ............................................................ 35

Section 8.1    Term of Agreement ................................................................. 35

Section 8.2    Delay ..................................................................................... 35

Section 8.3    Approval by Governing Bodies ............................................... 36

Section 8.4    Closing Conditions ................................................................. 36

Section 8.5    The Termination Rights of City and JDA ............................... 36

Section 8.6    Developer's Termination Rights ............................................. 38

Section 8.7    Effect of Termination ............................................................. 38

ARTICLE 9 MISCELLANEOUS ....................................................................... 38

Section 9.1    Notices .................................................................................. 38

Section 9.2    Amendments and Waivers ...................................................... 40

Section 9.3    Invalidity ............................................................................... 40

Section 9.4    Successors and Assigns .......................................................... 40

Section 9.5    Schedules; Titles of Articles; Sections ................................... 41

Section 9.6    Applicable Law ...................................................................... 41

Section 9.7    Entire Agreement ................................................................... 41

Section 9.8    Additional Actions ................................................................. 41

Schedule 1.1A - JDA Senior Security Site

Schedule 1.1B - Marina Project Site

Schedule 1.1C - JDA Junior Security Site

Schedule 1.1D- Developer Project Site Part 2

Schedule 3.1.2 - Phase 1

Schedule 3.1.4 - Developer-JDA PSA

Schedule 3.3 - Developer Project Site Part 1

Schedule 3.4.3 - Sources and Uses

Schedule 5.1 - Economic Development Goals

Schedule 9.4.1-A - Permitted Assignment Agreement

Schedule 9.4.1-B - Permitted Assignment Guaranty

# DEVELOPMENT AGREEMENT

**THIS DEVELOPMENT AGREEMENT** (this "**Agreement**") is entered into as of the Effective Date (defined below) by and among **CAMDEN COUNTY JOINT DEVELOPMENT AUTHORITY** (the "**JDA**"), a joint development authority duly organized and validly existing under the Constitution and laws of the State of Georgia (the "**State**") including the Development Authorities Law (O.C.G.A. Sec. 36 62 1, *et seq.*), as amended (the "**Act**"), particularly O.C.G.A. Sec. 36-62-5.1, the **CITY OF ST. MARYS, GEORGIA** ("**City**"), a Georgia municipal corporation, and **JACOBY DEVELOPMENT INC.**, a Georgia corporation (the "**Developer**"), each a "**Party**" and collectively the "**Parties**."

## RECITALS

A.    The purpose of this Agreement is to express the definitive terms and conditions for the development of a "**Master Project**" consisting of, (1) (a) a mixed-use development  to include properties developed for multi-family, vacation rentals, commercial, hotels, restaurants, and conservation uses, all on the Developer Project Site Part 1 (defined below), and, (b) if Activation (defined below) has occurred, an aquaponics or other commercial or industrial project located on the Developer Project Site Part 2 (defined below),  and (2) a marina (the "**Marina Project**") located on the Marina Project Site (defined below, and not being included in the meaning of Marina Project), (3) the Marina Project Site, and (4) the Marina Project's marina   basin and its bulkhead wall (the "**Marina Project Infrastructure**") located on the Marina Project Site. The projects referred to in the preceding clauses 1(a) and, if Activation (defined below) occurs, 1(b), are sometimes referred to herein collectively as the "**Developer Project**", which term includes the Developer Project Site Part 1 and, if Activation occurs, the Developer Project Site Part 2, which are sometimes referred to herein collectively as the "**Developer Project Site**." Developer will own the Developer Project and the Marina Project. JDA will own the Marina Project Site and the Marina Project Infrastructure. JDA intends to excavate and construct the Marina Project Infrastructure. JDA will ground lease the Marina Project Site and the Marina Project Infrastructure to Developer under the Ground Lease (defined below).

B.    JDA will partially finance the costs of the Master Project Site, as well as its share of the Pre-Development Costs (defined below) and the cost of purchasing the Marina Project Site from Developer, and will finance certain other costs, through its 2020 Bonds (defined below). To the extent that funding is available in accordance with this Agreement from the TAD Financing (defined below), such funding will be used in accordance with the Waterfall (defined below).

C.    This Agreement also contemplates certain Infrastructure Improvements (defined below) being constructed to support the Master Project, but the same are not part of the Master Project.

D.    "**Phase 1**" of the Master Project consists of, (a) a multi-family development including approximately 400 rental units which is part of the Developer Project and is located on approximately 20 acres of the Developer Project Site; and (b) the Marina Project.  The

Development Schedule (defined below) shall give first priority among its projects to Phase 1.

E.    The Master Project is entirely contained within the borders of the City, and further, lies entirely within the tax allocation district created by the Redevelopment Plan (defined below) (the "**TAD**").

F.    Developer, JDA and City are not partners or joint ventureers, and each will be responsible for its own obligations and liabilities, and not for the obligations and liabilities of another.

G.    In connection with the Master Project, JDA will issue the 2020 Bonds, which will be secured as described in Section 3.4.5 below, and Developer will borrow the Developer's Loan (defined below) from Developer's Lender.

H.    The members of JDA have found and determined, and do hereby find and determine, that each component of the Master Project, individually and collectively, constitute a project that JDA is authorized to carry out under the Act and the Constitution of the State, and the other laws of the State, inasmuch as:

a.    The Master Project will create new jobs within the borders of the City, and will also represent new investment in the City, as described in the Economic Development Goals (defined below).

b.    The Act provides, at O.C.G.A. Sec. 36-62-2(6)(N), that authorized projects for JDA include the "acquisition, construction, installation, modification, renovation, or rehabilitation of land, interests in land, buildings, structures, facilities, or other improvements and the acquisition, installation, modification, renovation, rehabilitation, or furnishing of fixtures, machinery, equipment, furniture, or other property of any nature whatsoever used on, in, or in connection with any such land, interest in land, building, structure, facility, or other improvement, all for the essential public purpose of the development of trade, commerce, industry, and employment opportunities." Said subsection further provides that: "A project may be for any industrial, commercial, business, office, parking, public, or other use, provided that a majority of the members of the authority determines, by a duly adopted resolution, that the project and such use thereof would further the public purpose of [the Development Authorities Law]." A majority of the members of JDA have found, and do hereby find, that each component of the Master Project, individually and collectively, are for a proper commercial and business use, and that such use would further the public purpose of the Development Authorities Law.

c.    Each component of the Master Project is located within the area of operation of JDA and each of them constitutes a "project" as defined in the Act and specifically, and, without limitation, JDA may undertake each such component, individually and collectively, as a "project" as defined in O.C.G.A. Sec. 36-62-2(6)(N).

d.    Each component of the Master Project will be physically and economically integrated. The Public Benefit (defined below) represented by each of them would not be possible without the others.

2

e.    JDA is authorized to carry out projects on land owned or leased by others, O.C.G.A. Sec. 36-62-6(a)(12). It is not necessary for JDA to be the owner of property, such as the Developer Project Site Part 1, that it is financing. *Cottrell v. Atlanta Development Authority*, 770 S.E.2d (2015). Further, JDA is authorized to make loans to finance authorized projects. O.C.G.A. Sec. 36-62-6(a)(10).

f.    Each component of the Master Project, individually and collectively:

      i.    will meet the Constitutional and statutory definition of trade, commerce or industry,

      ii.    is being carried out for a proper public use or purpose under the Constitution of Georgia,

      iii.    will promote the objectives of the Act and employment in the territorial area of JDA will be increased or maintained as a direct result of the Master Project,

      iv.    will be in the public interest of the inhabitants of the City and of the State, and

      v.    will facilitate the development of the City and stimulate its economy, thereby promoting for the public good and general welfare trade, commerce, industry, and employment opportunities within the City and promoting the general welfare of this State.

g.    The Master Project provides Public Benefit that will inure to the City, the County, JDA and the State and that will be equal to or greater than the benefits to be derived by private sector persons and entities. This Agreement assures such Public Benefit by requiring Developer to repay the 2020 Bonds through repaying the JDA Loan (defined below), by requiring the Developer Guaranty, and by securing the Developer's obligations, as set forth below. Therefore, notwithstanding the JDA Loan and the security contemplated herein for the other borrowings contemplated hereby, the Master Project does not violate any prohibition in the Georgia Constitution including the prohibition of the payment by public bodies of gratuities to private sector persons or entities. Hence, this Agreement and the Master Project and each of its components are authorized by the Act and the Constitution of the State.

h.    Therefore, JDA has the power and is authorized, among other things, (1) to finance through the 2020 Bonds the cost of purchasing the Marina Project Site as a project that JDA will own and lease under the Ground Lease as contemplated herein, (2) to carry out its undertakings related to the Marina Project Infrastructure as a project as contemplated herein, the costs thereof being paid by TAD Financing, (3) to finance, through the 2020 Bonds and by means of the JDA Loan, a portion of Developer's costs of the Master Project Site, (4) to finance through the 2020 Bonds its share of the Pre-Development Costs of the Master Project as contemplated herein, (5) to finance the other costs being financed by the 2020 Bonds as

3

contemplated herein, and (6) otherwise to enter into and perform this Agreement as contemplated herein.

## AGREEMENTS

## ARTICLE 1

### GENERAL TERMS AND PROVISIONS

**Section 1.1** **Definitions**. Unless the context clearly requires a different meaning, the following terms are used herein with the following meanings:

"**2018 Bond**" means JDA's Taxable Industrial Development Revenue Bond, Series 2018, in a maximum principal amount not to exceed $1,200,000.00 issued by JDA in order to finance the costs of acquiring certain industrial land located in the City.

"**2020 Bonds**" has the meaning provided in Section 3.4.4, below. Such term includes any refunding bonds issued to refinance the 2020 Bonds.

"**Act of Bankruptcy**" means the making of an assignment for the benefit of creditors, the filing of a petition in bankruptcy, the petitioning or application to any tribunal for any receiver or any trustee of the applicable Person or any substantial part of its property, the commencement of any proceeding relating to the applicable Person under any reorganization, arrangement, readjustments of debt, dissolution or liquidation law or statute of any jurisdiction, whether now or hereafter in effect, or if, within 60 days after the filing of a bankruptcy petition or the commencement of any proceeding against the applicable Person seeking any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any present or future statute, law or regulation, the proceedings have not been dismissed, or, if, within 60 days after the appointment, without the consent or acquiescence of the applicable Person, of any trustee, receiver or liquidator of the applicable Person or of the land owned by the applicable Person, the appointment has not been vacated.

"**Acceptance Notice**" has the meaning provided in Section 1.7, below.

"**Activated**" means that all requisite Activation Notices and Approval Notices are timely given such that (1) the projects referred to in clause 1(b) of Recital A, above are part of the Developer Project, (2) the Developer Project Site Part 2 is part of the Developer Project Site, and (3) provisions hereof relating to such sites and/or to the Developer Project Site Part 2 are effective. "Activation" means that the foregoing actions successfully occur.

"**Activation Notice**" has the meaning provided in Section 1.7, below.

"**Affiliate**" means, with respect to any Person, (a) a parent, partner, member or owner of such Person or of any Person identified in clause (b), and (b) any other Person that, directly or indirectly through one or more intermediaries, controls, is controlled by or is under common control with such Person. As used in this definition, the term "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

"**Approved**" means approved by JDA and City, each in its own discretion. "**Approval**" is the granting of such Approved status by JDA and City. If an item is submitted by Developer and not Approved, Developer shall re-submit such item in the form requisite to obtain Approval until Approval is granted, or termination of this Agreement, whichever first occurs.

"**Bond Counsel**" has the meaning provided in the definition of Finance Team.

"**Brownfield Documents**" means all materials, documents, applications, and the like, prepared by, or on behalf of, Developer in connection with the Georgia Brownfield Program and relating to any portion of the Master Project Site.

"**Business Day**" means a day which is not a Saturday, Sunday, a legal holiday, or any other day on which banking institutions are authorized to be closed in the State.

"**City**" has the meaning provided in the Recitals above.

"**City IGA**" has the meaning provided in Section 3.11(a), below.

"**Closing**" has the meaning provided in Section 1.5, below.

"**Closing Condition**" has the meaning provided in Section 1.5, below.

"**Construction Law**" has the meaning provided in Section 3.2.1, below.

"**County**" has the meaning provided in Section 3.4.4, below.

"**County IGA**" has the meaning provided in Section 3.4.4, below.

"**CSR**" has the meaning provided in Section 3.1.8, below.

"**Debt Service Fund**" has the meaning provided in Section 3.9.2(a), below.

"**Developer Guaranty**" has the meaning provided in Section 1.6, below.

"**Developer Project**" has the meaning provided in the Recitals above.

"**Developer Project Site**" has the meaning provided in the Recitals above.

"**Developer Project Site Part 1**" means the site described on Schedule 3.3 attached hereto and incorporated herein by reference. It does not include the Marina Project Site or certain other portions of the Master Project Site.

"**Developer Project Site Part 2**" means approximately 74.46 acres of land located in the City, said portion being more fully described on Schedule 1.1D attached hereto and incorporated herein by reference. Such term includes a leasehold estate, or alternatively ownership of the fee interest, in such land as appropriate from time to time.

"**Developer-JDA PSA**" has the meaning provided in Section 3.1.4, below. The form of the Developer-JDA PSA is attached as Schedule 3.1.4 hereto and incorporated herein by reference.

5

"**Developer's Lender**" means the lender providing the Developer's Loan to Developer.

"**Developer's Loan**" means the financing provided by Developer's Lender to pay the costs indicated on <u>Schedule 3.4.3</u> hereto. Such term does not include the 2020 Bonds or any TAD Financing. Where this Agreement contemplates costs being paid by proceeds of Developer's Loan, such costs may instead be paid out of cash equity investments in Developer.

"**Developer's Loan Documents**" means the documents and instruments evidencing and securing the Developer's Loan.

"**Development Schedule**" means a schedule for the Substantial Completion of the Master Project, and for the attainment of the Economic Development Goals, which shall be included in the Implementation Plan (defined below), and which shall be prepared by Developer for Approval by City and JDA.

"**Disbursement**" has the meaning provided in Section 3.12, below.

"**Economic Development Goals**" has the meaning provided in Section 5.1, below.

"**Economic Development Millage**" means up to one mill of financial assistance to JDA as authorized by O.C.G.A. Sec. 48-5-220(20) on the terms and conditions thereof.

"**Effective Date**" means September 16, 2020.

"**Environmental Laws**" means all federal, state, and local laws, rules, regulations, ordinances, programs, permits, guidance, orders, and consent decrees relating to health, safety, and environmental matters, including, but not limited to, all current Environmental Laws as of the date hereof, or as those Environmental Laws may be amended, revised or superseded, of any governmental authority having jurisdiction over the Master Project addressing pollution or the protection of human health or the environment, including without limitation, the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. § 9601, *et seq.*; the Resource Conservation and Recovery Act, 42 U.S.C. § 6901, *et seq.*; the Federal Water Pollution Control Act, 33 U.S.C. § 1251, *et seq.*; the Clean Air Act, 42 U.S.C. § 7401, *et seq.*; the Toxic Substances Control Act, 15 U.S.C. §§ 2601 through 2629; the Oil Pollution Act, 33 U.S.C. § 2701, *et seq.*; the Emergency Planning and Community Right-to-Know Act, 42 U.S.C. § 11001, *et seq.*; the Safe Drinking Water Act, 42 U.S.C. §§ 300f through 300j; and all similar laws (including implementing regulations) of any governmental authority having jurisdiction over the proposed Master Project.

"**EPD**" has the meaning provided in Section 3.1.8, below.

"**Finance Team**" means the professionals engaged by JDA and City in connection with the Plan of Finance and the execution thereof, initially Seyfarth Shaw, LLP, Atlanta, Georgia, as bond counsel ("**Bond Counsel**"), and Stephens, Inc. as Financial Advisor for City.

"**Flow of Funds**" has the meaning provided in Section 3.9.2, below.

"**Force Majeure**" means any event or circumstance which is (a) beyond the reasonable control of the Person whose performance is required by this Agreement and (b) caused by fire,

6

earthquake, flood, explosion, war, acts of terrorism, invasion, insurrection, mob violence, sabotage, lockouts, litigation, condemnation, riots or other civil disorder, national or local emergency, acts of God, unusual and unanticipated delays in transportation, unusual and unanticipated delays in obtaining lawful permits or consents to which the applicant is legally entitled, strike or labor dispute, severe weather conditions,  inability to procure materials or supplies, failure or insufficiency of electricity, water, sewer, gas or other utilities, or pandemic. Any provision hereof to the contrary notwithstanding, in no event shall Force Majeure apply to, (a) excuse or delay any payment obligation, or (b) any event or circumstance which should have been foreseen or was foreseeable at the time of entering into this Agreement. The benefits of Force Majeure may be claimed only in circumstances expressly authorized in this Agreement. In order to claim the benefit of Force Majeure, the Developer must give written notice to the other Parties as soon as reasonably practical after the start of the Force Majeure event or occurrence giving rise to the delay, specifically identifying the occurrence or event and the anticipated resulting delay, and likewise must give prompt written notice to the other Parties of the abatement of such event or occurrence.

"**GAAP**" means Generally Accepted Accounting Principles, a commonly accepted set of accounting principles and ways of recording and reporting accounting information.

"**General Contractor**" means an experienced, licensed, bondable and reputable general contractor selected by Developer and under contract with Developer to construct the Developer Project and/or the Marina Project, as the context may require.

"**Georgia Brownfield Act**" has the meaning provided in Section 3.1.8, below.

"**Governmental Authorizations**" has the meaning provided in Section 4.5, below

"**Ground Lease**" has the meaning provided in Section 3.1.6, below.

"**Implementation Plan**" means a detailed plan prepared by Developer for presentation to JDA and City for Approval, for the step by step implementation of the Master Project. At a minimum, the Implementation Plan shall include: (a) the Approved components of the Project Budget (defined below) for the Developer Project and Marina Project; (b) annual operating pro formas for no less than five years; (c) a comprehensive marketing plan for no less than five years; (d) the components of the Plan of Finance (defined below) for the Developer Project and Marina Project, including an updated sources and uses of funds, accompanied by evidence satisfactory to JDA that such sources are actually available and committed, as well as well as the components thereof relating to financing provided by JDA and City to be included in the Plan of Finance as provided in this Agreement; (e) a listing of all the Persons proposed to be involved in the implementation, especially those parties proposed to be in privity with the City or JDA; (f) a Development Schedule; (g) provisions relating to Infrastructure Improvements that are consistent with the Master Plan, and (h) any other information deemed necessary or appropriate by JDA in its sole discretion. The Implementation Plan is subject to Approval.

"**Infrastructure Improvements**" means the public infrastructure improvements necessary and appropriate to support of the Master Project, as reflected on the Master Plan, as approved, including roads, sidewalks, water, street lighting, green space, storm water, and sewer.

"**JDA Bond Documents**" means the documents related to the 2020 Bonds as prepared by Bond Counsel and approved by the JDA.

"**JDA Consultants**" has the meaning provided in Section 4.17, below.

"**JDA Loan**" means the loan by JDA to Developer of certain of the net proceeds of the 2020 Bonds as contemplated by Section 3.1.3, below.

"**JDA Loan Documents**" means the documents evidencing and securing the JDA Loan. Without limitation, if JDA should so require, the JDA Loan Documents shall include an intercreditor agreement between JDA and Developer's Lender, a guaranty of the JDA Loan by such Persons as JDA may require, and third party security such as a commercial bank letter of credit.

"**JDA Junior Security Site**" means the below-defined Master Project Site, less the Marina Project Site, less any portion of the JDA Senior Security Site not included in the Marina Project Site, less any portion of the Master Project Site on which is located a landfill, less Parcel C and Parcel D described in the Seller-Developer PSA, and less any other portion of the Master Project Site that JDA requires to be excluded from the pledge to secure the JDA Loan of the JDA Junior Security Site in the discretion of JDA, whether or not because of environmental issues. The JDA Junior Security Site is more fully described on Schedule 1.1C attached hereto and incorporated herein by reference.

"**JDA Senior Security Site**" means approximately 49.40 acres of land located in the City and being a portion of the Master Project Site, said portion being more fully described on Schedule 1.1A attached hereto and incorporated herein by reference. The JDA Senior Security Site includes but is not limited to the Marina Project Site.

"**Land Acquisition Costs**" has the meaning provided in Section 3.4.6, below.

"**Liquidity Event**" means, with respect to the Developer, any one or more of (a) a sale, sale-leaseback, or capital lease, of property (or an interest therein) included in the Developer Project or in the Marina Project, and includes, without interest, any interest in the Ground Lease or the Marina Project, as well as (b) any debt or equity financing or refinancing (whether debt, equity, or both), or other liquidity generating transaction or transactions (whether cash, property, or both) with respect to the Developer Project, the Marina Project, or the Master Project Site, such as any event whereby cash or equivalent or a financial instrument is received in exchange for or in connection with state or federal conservation tax credits; provided, however, the Developer's Loan shall not be categorized as a Liquidity Event.

"**Manager**" has the meaning provided in Section 3.2.2, below.

"**Marina Management Contract**" has the meaning provided in Section 3.2.2, below.

"**Marina Project**" has the meaning provided in the Recitals above. Such term does not include JDA's interest in the Marina Project Site or the Marina Project Infrastructure.

62232107v.29

"**Marina Project Infrastructure**" has the meaning provided in the Recitals above. The Marina Project Infrastructure will be owned by JDA.

"**Marina Project Site**" means approximately 13 acres located in the City and being a portion of the Master Project Site, said portion being more fully described on Schedule 1.1B attached hereto and incorporated herein by reference. The Marina Project Site is a portion of approximately 50 acres of land (the "**Wharf Project Site**") that was the subject of a purchase and sale agreement between the below-defined Seller and JDA (the "**Seller-JDA PSA**").

"**Master Plan**" means the comprehensive plan for the redevelopment of the Master Project Site, as revised from time to time as provided for herein, to include the Master Project, as more specifically described in Section 4.1 hereof. The Master Plan is subject to Approval.

"**Master Project**" has the meaning provided in the recitals above.

"**Master Project Site**" means the totality of, (a) approximately 1,298 acres located in the City and being the "**Purchased Properties**" as defined and described in the Seller-Developer PSA, which includes Parcel C and Parcel D described in the Seller-Developer PSA, and (b), if Activation has occurred, the Developer Project Site Part 2.

"**Master Project TAD Increment**" means all positive tax increment derived from ad valorem taxes on real property within the borders of the Master Project Site, net of collection and other generally applicable governmental fees and charges for the collection and administration of real property taxes in the City and County, and net of the Prorated PILOT Payment. For purposes of clarification, Master Project TAD Increment is calculated using the property taxes specified in the Redevelopment Plan to be the taxes that will be included in the tax increment base for the TAD. Further, if a tax parcel does not lie entirely within the borders of the Master Project Site, the tax increment generated therefrom shall be allocated between the Master Project Site and other areas as City and JDA may Approve.

"**Material Modification**" means a substantial modification to the Implementation Plan or the Master Project, which shall require prior Approval, i.e. any change in the Implementation Plan that would cause it not to substantially conform to its Approved version or to the Master Project that would cause it not to substantially conform to its description in this Agreement.

"**Maximum Amount**" means the maximum amount that the Redevelopment Plan contemplates being paid for Redevelopment Costs incurred within Master Project Site, which is agreed to be, (a) if Activation occurs, $80,375,000, less the amount of any Redevelopment Costs related to the Master Project Site that, as of Closing, the City has already paid or has binding commitments to third parties to pay, or (b) if Activation does not occur, $72,700,000, less the amount of any Redevelopment Costs related to the Master Project Site that, as of Closing, the City has already paid or has binding commitments to third parties to pay.

"**MOU**" means that certain "Memorandum of Understanding" between JDA and Developer regarding the subject matter of this Agreement, having an effective date of January 23, 2020.

"**Parcel**" has the meaning provided in Section 3.3, below.

9

"**Parcel Developers**" has the meaning provided in Section 3.3, below. Such term may include, at Developer's election, a special purpose entity in which Developer is an investor.

"**Permitted Assignee**" means JDI Cumberland Inlet, LLC, a Georgia limited liability company.

"**Permitted Assignment Agreement**" has the meaning provided in Section 9.4, below.

"**Permitted Assignment Guaranty**" has the meaning provided in Section 9.4, below.

"**Person**" includes a corporation, a trust, an association, a partnership (including a limited liability partnership), a joint venture, an unincorporated organization, a business, an individual or natural person, a joint stock company, a limited liability company, a public body or any other entity.

"**Phase 1**" has the meaning provided in the Recitals above.

"**Plan of Finance**" means the proposed structure, nature, method and manner to obtain any financing for the Master Project, including an updated sources and uses of funds. The Plan of Finance shall be coordinated by JDA and includes input regarding financings for which City and Developer are responsible as provided herein, in addition to financings for which JDA is responsible as provided herein. The Plan of Finance is subject to Approval.

"**PPCAP**" has the meaning provided in Section 3.1.8, below.

"**Pre-Development Costs**" means predevelopment costs which are customarily incurred and shall have been actually incurred after the effective date of the MOU (or, with the approval of JDA, before the effective date of the MOU) by Developer or JDA in connection with the Master Project and shall include, without limitation, architectural, engineering or related professional services required to prepare plans, specifications or work write-ups; application, commitment and/or origination fees in connection with construction and/or permanent financing contemplated by this Agreement; land use entitlements and building permits; utilities fees; property insurance; title and other insurance, legal and accounting fees; tests to determine the condition of the Master Project Site; costs of environmental review; development impact fees; property taxes; fees for financial and advisory services and any other appropriate predevelopment costs reasonably approved by JDA, provided, that such term does not include, (a) payments to Developer (except for reimbursement of costs otherwise included in such term and Approved), (b) costs that are not capitalized or capitalizable for federal income tax purposes or that may not legally be financed by the JDA under the Act, or (c) development fees payable to Developer or an Affiliate and any portion of Developer's general and administrative expenses including salaries.

"**Project Budget**" means the Approved final hard and soft costs capitalizable under GAAP, for the acquisition, financing, and construction of the Master Project. The Developer Project and Marina Project components of the Project Budget shall be prepared by Developer and are subject to Approval. City shall provide the components of the Project Budget related to Infrastructure Improvements. JDA shall provide the components of the Project Budget related to the Marina Project Infrastructure. The Project Budget is not final until both City and JDA have Approved all components of it.

10

"**Project Financing**" means any loans, financing, equity investment, or other financial arrangement provided to or for the benefit of a Party hereto with respect to the Master Project that has been Approved. For the avoidance of doubt, except for TAD Financing (to the extent, if any, provided), and the JDA Loan, neither the City nor JDA contemplate providing any Project Financing for the benefit of Developer.

"**Project Fund**" has the meaning provided in Section 3.12, below.

"**Prorated PILOT Payment**" means a share of the payments in lieu of taxes ("**PILOTs**") payable each year by City to the County pursuant to its resolution passed and adopted on December 8, 2015, consenting to the inclusion of county ad valorem real property taxes within the TAD in the computation of the tax allocation increment for the TAD, and by City to the Board of Education pursuant to its resolution passed and adopted on December 8, 2015, consenting to the inclusion of educational ad valorem real property taxes within the TAD in the computation of the tax allocation increment for the TAD, such share being equal to a fraction whose numerator is the positive tax increment derived from ad valorem taxes on real property within the borders of the Master Project Site for the year for which such PILOTs are being paid, and whose denominator is the positive tax increment derived from ad valorem taxes on all real property within the borders of the TAD (including, but not limited to, the Master Project Site) for the year for which such PILOTs are being paid. The amount of such share shall be determined by multiplying such fraction times the amount of such PILOTs.

"**Public Benefit**" has the meaning provided in Section 5.2, below.

"**Quarterly Report**" has the meaning provided in Section 4.5, below.

"**Redevelopment Costs**" has the meaning set forth in the Redevelopment Powers Law as defined at O.C.G.A Sec. 36-44-3(8).

"**Redevelopment Plan**" means that certain "City of St. Marys Tax Allocation District #1: Historic and Industrial District Redevelopment Plan" dated September 22, 2015, as approved by the City. Such term includes any subsequent amendment thereto, upon the effectiveness of such an amendment.

"**Redevelopment Powers Law**" means the Redevelopment Powers Law, O.C.G.A. Sec. 36-44-1, *et seq.*, as amended.

"**Requisition**" means a written request for payment conforming to Section 3.12, below.

"**Schedule of Values**" has the meaning provided in Section 3.12(b), below.

"**Seller**" means the seller of the Master Project Site which is identified in the definition below of Seller-Developer PSA.

"**Seller-Developer PSA**" means that certain "Asset Purchase Agreement" dated as of July 23, 2019, between Old Weed and Ready Plantation, LLC, a Georgia limited liability company (i.e., the Seller), as seller and Developer as buyer.

11

"**Seller-JDA PSA**" has the meaning provided in the definition of Marina Project Site.

"**State**" has the meaning provided in the first paragraph of this Agreement.

"**Subcontractor**" means a subcontractor (at any tier) of Developer. The term includes, without limitation, the General Contractor for construction.

"**Substantial Completion**" means the stage in the progress of the work when the work or designated portion thereof is sufficiently complete in accordance with the contract documents so that it can be occupied or utilized for its intended use, as evidenced by a Certificate of Occupancy issued by the City.

"**TAD**" has the meaning provided in the Recitals above.

"**TAD Financing**" means amounts from the TAD's special fund, derived solely from Master Project TAD Increments, disbursed to pay Redevelopment Costs, such as "pay/go" payments. Such term specifically does not include any "tax allocation bonds" as defined in the Redevelopment Powers Law.

"**TAD Financing Documents**" has the meaning provided in Section 3.11(a), below.

"**Total Project Cost**" has the meaning provided in Section 3.4.9, below.

"**Trustee**" has the meaning provided in Section 3.12, below.

"**Waterfall**" has the meaning provided in Section 3.9, below.

**Section 1.2    Usage of Words**. Words used herein in the singular, where the context so permits, also include the plural and vice versa.  The definitions of words in the singular herein also apply to such words when used in the plural where the context so permits and vice versa.

**Section 1.3    Redevelopment Powers Law**. Capitalized terms that are used but not defined herein but which are defined in the Redevelopment Powers Law shall have the same meaning herein as therein when the context so requires.

**Section 1.4    Recitals**.  The recitals above are incorporated into this Agreement as a part hereof.

**Section 1.5    Closing; Closing Conditions**. As used herein, the "**Closing**" is the event at which the 2020 Bonds are issued, the JDA Loan Documents are executed and delivered, and the other events occur that are contemplated herein to occur at such time. References herein to a "**Closing Condition**" are to the optional right of a Party hereto, based on a Closing Condition, to exercise a right provided herein in its favor and to avoid the Closing and terminate this Agreement as provided in Sections 8.4, Section 8.5 and Section 8.6, respectively, below.

**Section 1.6    Pledges; Developer Guaranty**. The JDA Loan Documents shall include a first priority pledge by Developer in form and substance acceptable to JDA of the Governmental Authorizations to secure repayment of the JDA Loan, provided, that Parcel Developers holding

12

any Governmental Authorizations must make a similar pledge to JDA of such Governmental Authorizations in form and substance satisfactory to JDA. At Closing Developer shall issue to JDA a guaranty in form and substance acceptable to JDA and City (the "**Developer Guaranty**") whereby Developer guarantees the timely payment in full of all amounts necessary to ensure that net proceeds of the TAD Financing, available under the "First" subparagraph in the Waterfall, are sufficient at all times, whether before or after the repayment of the JDA Loan, that recourse to contract payments by the County under Section 3.9.2(c), below, is not necessary for the timely repayment of the 2020 Bonds. The Developer Guaranty shall be secured by a pledge of the Governmental Authorizations and by such other collateral as JDA may reasonably request, provided, that Parcel Developers holding any Governmental Authorizations must make a similar pledge to JDA of such Governmental Authorizations in form and substance satisfactory to JDA. Proceeds of the Developer Guaranty and the security therefor, paid or realized for such purpose, shall be treated for purposes of the Flow of Funds as though they were the payment being guaranteed. The Developer Guaranty is part of the JDA Loan Documents. Such pledge(s) of the Governmental Authorizations related to the Developer Guaranty shall be first priority, subject only to pledge(s) of the Governmental Authorizations to secure repayment of the JDA Loan.

Section 1.7    Activation Notices and Acceptance Notices. Any provision hereof to the contrary notwithstanding, the projects referred to in clause 1(b) of Recital A, above, are not part of the Developer Project, the Developer Project Site Part 2 is not part of the Developer Project Site, and provisions hereof relating to such sites and/or to the Developer Project Site Part 2 are not effective, unless by 5:00 o'clock p.m., Camden County, Georgia time on December 31, 2020, each of the following occurs: (a) Developer in its discretion gives to each of JDA and City a notice (each, an "**Activation Notice**") that Developer elects that, (1) the projects referred to in clause 1(b) of Recital A, above, shall be part of the Developer Project, (2) the Developer Project Site Part 2 shall be part of the Developer Project Site, and (3) provisions hereof relating to such sites and/or to the Developer Project Site Part 2 shall be effective, and, (b) JDA and City, each in its discretion, gives a notice (each, an "**Acceptance Notice**") to Developer that it agrees with and accepts such election. For the avoidance of doubt, neither JDA nor City is obligated to give an Acceptance Notice.

## ARTICLE 2

## REPRESENTATIONS AND WARRANTIES

Section 2.1    **Representations and Warranties of Developer**.   Developer hereby represents and warrants to JDA that as of the date hereof:

2.1.1    Organization and Authority. Developer is duly organized and in good standing as a Georgia corporation. Developer has the requisite power and authority to execute and deliver this Agreement, to incur and perform its obligations hereunder, and to carry out the transactions contemplated by this Agreement.

2.1.2    Due Authorization, Execution and Delivery. The execution, delivery and performance of this Agreement has been duly authorized by all necessary action and proceedings by or on behalf of Developer, and no further approvals or filings of any kind, including any approval of or filing with any governmental authority, are required by or on behalf of Developer

as a condition to the valid execution, delivery, and performance by it of this Agreement. This Agreement, when duly executed and delivered by each Party hereto, will be the valid, binding and enforceable obligation of Developer in accordance with its terms, subject to matters and laws affecting creditors' right generally and to general principles of equity.

**2.1.3**  Organizational Documents. Developer's organizational documents are in full force and effect as of the Effective Date, and no fact or circumstance has occurred that, by itself or with the giving of notice or the passage of time or both, would constitute a default thereunder.

**2.1.4**  Bankruptcy. No Act of Bankruptcy has occurred with respect to Developer.

**2.1.5**  No Litigation. There is no action, suit or proceeding pending or, to the knowledge of Developer, threatened against or affecting Developer in any court or tribunal or before any administrative agency, board, mediator or arbitrator, provided, that the foregoing representation and warranty shall not apply to any particular action, suit or proceeding if, (a) its material aspects were disclosed to JDA in writing prior to the Effective Date, and (b) it would not, if adjudicated against Developer, have a material and adverse impact on Developer's ability to perform its obligations under this Agreement.

**2.1.6**  No Default. Developer is not in default under or in breach of any contract or agreement, and no event has occurred which, with the passage of time or giving of notice (or both) would constitute such a default, provided, that the foregoing representation and warranty shall not apply to any particular default, if, (a) its material aspects were disclosed to JDA in writing prior to the Effective Date, and (b) it will not have a material and adverse impact on Developer's ability to perform its obligations under this Agreement.

**2.1.7**  Principal Office. The address of Developer's principal place of business is 8200 Roberts Drive, Suite 200, Atlanta, Georgia 30350.

**2.1.8**  Capitalization. Developer hereby makes a good faith representation that, based upon its understanding of the obligations incurred by it in the performance of this Agreement and the actions contemplated hereby that it is sufficiently capitalized to meet its obligations to JDA and City in the performance of this Agreement and the actions contemplated hereby. It shall be a Closing Condition in favor of each of City and JDA that Developer shall provide evidence, satisfactory to JDA and City, each in its sole discretion, of Developer's financial wherewithal to meet its obligations under this Agreement. Developer hereby covenants to timely inform JDA and City of any material adverse change in its financial condition occurring after the Effective Date of this Agreement.

**Section 2.2**  **Representations and Warranties of JDA**.  JDA hereby represents and warrants to Developer that as of the date hereof:

**2.2.1**  Organization and Authority. JDA is a joint development authority duly created and existing under the laws of the State. JDA has the requisite power and authority to execute and deliver this Agreement, to incur and perform its obligations hereunder, and to carry out the transactions contemplated by this Agreement.

62232107v.29

**2.2.2**    Due Authorization, Execution and Delivery. The execution, delivery, and performance of this Agreement has been duly authorized by all necessary action and proceedings by or on behalf of JDA, and no further approvals or filings of any kind, including any approval of or filing with any governmental authority, are required by or on behalf of JDA as a condition to the valid execution, delivery, and performance by JDA of this Agreement. This Agreement, when duly executed and delivered by each Party hereto, will be the valid, binding and enforceable obligation of JDA in accordance with its terms, subject to matters and laws affecting creditors' right generally as to political bodies and to general principles of equity.

**2.2.3**    No Litigation. There are no actions, suits, proceedings or investigations of any kind pending or threatened against JDA before any court, tribunal or administrative agency or board or any mediator or arbitrator that questions the validity of this Agreement or any action taken or to be taken pursuant hereto.

**Section 2.3**    **Representations and Warranties of the City**. City hereby represents and warrants to Developer and JDA that:

**2.3.1**    Organization and Authority. City is a municipal corporation duly created and existing under the laws of the State. City has the requisite power and authority to execute and deliver this Agreement, to incur and perform its obligations hereunder, and to carry out the transactions contemplated by this Agreement.

**2.3.2**    Due Authorization, Execution and Delivery. The execution, delivery, and performance of this Agreement has been duly authorized by all necessary action and proceedings by or on behalf of the City, and no further approvals or filings of any kind, including any approval of or filing with any governmental authority, are required by or on behalf of City as a condition to the valid execution, delivery, and performance by City of this Agreement. This Agreement, when duly executed and delivered by each Party hereto, will be the valid, binding and enforceable obligation of City in accordance with its terms, subject to matters and laws affecting creditors' right generally as to political bodies and to general principles of equity.

**2.3.3**    No Litigation. There are no actions, suits, proceedings or investigations of any kind pending or threatened against City before any court, tribunal or administrative agency or board or any mediator or arbitrator that questions the validity of this Agreement or any action taken or to be taken pursuant hereto.

## ARTICLE 3

## DEVELOPMENT OF THE DEVELOPER PROJECT AND MARINA PROJECT

Developer's obligations and responsibilities under this Article 3 shall be assumed as to each Parcel by the related Parcel Developer as a part of its Implementation Plan agreement with JDA under Section 3.3 hereof. Such assumption shall not release Developer from its obligations hereunder unless such release is Approved.

15

62232107v.29

**Section 3.1**     **Real Estate Matters**.

**3.1.1**    Maintenance of Seller-Developer PSA. Developer will use commercially reasonable efforts at its own expense to ensure that the Seller-Developer PSA continues in effect until Closing, including, without limitation, making such payments to the Seller thereunder as may be provided for in the Seller-Developer PSA or as the Seller may require for such purpose. Developer will not agree to any amendment of the Seller-Developer PSA or grant any consents or waivers thereunder without JDA's prior written consent, except to the extent necessary to ensure that the Seller-Developer PSA remains in effect at least until the Closing. JDA shall not unreasonably withhold, condition or delay its consent to any amendments of the Seller-Developer PSA. Furthermore, with respect to any amendment to the Seller-Developer PSA for which JDA and/or City's approval is requested, such approval will be deemed given if the recipient of such request shall have failed to either approve or deny such request, or request any information and/or documentation relating to such request as may be required in order to approve or disapprove such matter within ten (10) Business Days of receipt of the foregoing initial notice.

**3.1.2**    Surveys. Phase 1 is identified on Schedule 3.1.2 hereto and consists of acreage for the Marina Project and for the first two (2) pods of apartments in the Developer Project. No more than three (3) Business Days after the Effective Date, Developer shall provide JDA with copies of all existing surveys of the Master Project Site in its possession and a boundary survey of the Marina Project Site and of Phase 1. If any of such surveys are not already certified to JDA, the Developer shall cause the surveyor at Developer's expense at least 10 days before Closing to provide such certification of same to JDA as JDA may reasonably request.

**3.1.3**    Purchase of Master Project Site. Developer will close the purchase from the Seller of the Master Project Site pursuant to the Seller-Developer PSA using up to $7,020,000 of the net proceeds of the 2020 Bonds loaned to Developer by JDA pursuant to the JDA Loan Documents, with the balance of the necessary funding being provided by Developer's Lender; i.e., Developer's Loan. JDA shall not have any responsibilities or liabilities under the Seller-Developer PSA.

**3.1.4**    Purchase of Marina Project Site. At such time as a Parcel Developer has committed to the construction of the first pod of apartments (not less than 400 rental units) or a substitute project such as an Eco RV Park in Phase 1 that is satisfactory to JDA, amounting in any case to at least $65 million in fair market value, as determined by JDA in its discretion, and has purchased the necessary land for such pod or substitute project in the Developer Project Site from Developer, Developer will sell, and JDA will purchase, the Marina Project Site pursuant to a purchase and sale agreement in substantially the form attached as Schedule 3.1.4 hereto and incorporated herein by reference (the "**Developer-JDA PSA**"), provided, that (1) the price per acre of the Marina Project Site shall not exceed $84,500 per usable acre, and the total gross purchase price payable for all of the Marina Project Site shall not exceed $1,098,500 in the aggregate, and (2) the sole source for payment of such purchase price shall be the available net proceeds of the 2020 Bonds. The following shall be conditions to JDA's obligation to close such purchase: (i) Developer is not in default under this Agreement, the Developer's Loan Documents, or the JDA Loan Documents, and (ii) the Economic Development Goals to the date of such closing have been attained by Developer. For the avoidance of doubt, Developer will not carry out the

16

Marina Project until JDA has purchased the Marina Project Site and has installed the Marina Project Infrastructure.

**3.1.5**   <u>JDA Loan- Security; Repayment Terms</u>. Developer shall at Closing execute, deliver and/or grant the JDA Loan Documents to JDA. Payments of debt service (principal and interest) under the JDA Loan Documents shall match payments of debt service (principal and interest) under the 2020 Bonds, provided, that each such payment under the JDA Loan Documents shall be due on the 15th day of the month prior to the corresponding monthly payment due under the JDA Bond Documents. In addition to such other collateral or security for the JDA Loan that may be required by this Agreement, the JDA Loan shall be secured by:

(a)   a first priority pledge by Developer of the JDA Senior Security Site (including all improvements);

(b)   a second priority pledge by Developer of the JDA Junior Security Site (including all improvements); and

(c)   the Developer Guaranty, which shall be secured as provided in the definition thereof.

Any provision hereof to the contrary notwithstanding, in no event may proceeds of the JDA Loan or any TAD Financing be used directly or indirectly to pay or reimburse the payment of the costs of Developer's acquisition of Parcel C or Parcel D described in the Seller-Developer PSA.

**3.1.6**   <u>Ground Lease</u>. Upon the request of a Parcel Developer and JDA's determination that the commencement of the Marina Project is feasible, JDA will grant a 99-year ground lease of the Marina Project Site to such Parcel Developer pursuant to a ground lease that is mutually satisfactory in form and substance to Developer and JDA (the "**Ground Lease**"), provided, that, (i) the Ground Lease shall require the Parcel Developer to pay property taxes on the Marina Project Site and Marina Project Infrastructure or payments in lieu of taxes to the extent necessary that payments totaling 100% of normal property taxes are paid to the appropriate tax collectors, and (ii) upon the expiration or earlier termination of the Ground Lease, title to the Marina Project shall vest in JDA free of charge and free and clear of any deed to secure debt or other liens or encumbrances. The Marina Project shall be subject to normal ad valorem property taxation in any event. The JDA may in its sole discretion offer to sell the Marina Project Site and Marina Project Infrastructure to the Parcel Developer or the Manager (as defined below) on such terms and conditions as JDA in its sole discretion shall determine. If made, such offer shall be subject to acceptance by the Parcel Developer or the Manager, as appropriate, in its sole discretion. For the avoidance of doubt, payments required under the forgoing clause (i) are in addition to the obligations of Developer under the Developer Guaranty.

**3.1.7**   <u>Simultaneous Events</u>. The events contemplated in this Article to occur at Closing shall all occur simultaneously as part of the Closing.

**3.1.8**   <u>Brownfield</u>. JDA understands that all or a portion of the Master Project Site has been entered into the Georgia Brownfield Program through submittal of a Prospective Purchaser Corrective Action Plan ("**PPCAP**"), as provided for under the Georgia Brownfield Act,

17

O.C.G.A. § 12-8-200, *et seq.*, as amended (the "**Georgia Brownfield Act**"). Developer shall perform or caused to be performed all work under the PPCAP, by the dates specified therein, and shall submit and cause to be approved a Compliance Status Report ("**CSR**") and shall obtain a final Limitation of Liability under the Georgia Brownfield Act. Insofar as JDA's interests are concerned, Developer shall, prior to Closing or within 30 days thereafter, amend the PPCAP to include JDA as a co-applicant, and cause the Limitation of Liability to be issued by the Georgia Environmental Protection Division ("**EPD**") jointly to Developer and JDA. JDA shall have the right to review, comment on, and approve the CSR before submission to EPD and if necessary shall sign the CSR as a co-applicant. It shall be a Closing Condition in favor of JDA that it be satisfied with the environmental condition of all real estate pledged to it as security.

**Section 3.2    Marina Project**.

**3.2.1**   Marina Project Infrastructure. JDA will construct and install the Marina Project Infrastructure, provided, that the sole source for payment of the costs thereof shall be the net proceeds of TAD Financing actually received by JDA and available therefor. JDA will be the owner of the Marina Project Infrastructure. If JDA should so request, Developer shall act as JDA's construction manager-not-at-risk for purposes of the construction and installation of the Marina Project Infrastructure, in compliance with the Georgia Local Government Public Works Construction Law (the "**Construction Law**"), as directed by JDA and to JDA's satisfaction.

**3.2.2**   Marina Project. Developer will develop, finance (i.e., as part of the Developer's Loan), install and construct the Marina Project, including, without limitation, performing all necessary site work and site development on the Marina Project Site as required by JDA to JDA's satisfaction. Developer shall at its expense install docks, slips, fueling facilities and all other revenue producing components of the Marina. Developer will be the owner of all improvements paid for by Developer and constituting the Marina Project and the same shall be fully subject to ad valorem property taxation, notwithstanding the Ground Lease. Further, it is the intention of the Parties that the Construction Law not apply to the construction of the Marina Project inasmuch as Developer will be the owner thereof and will let the construction contract therefor. Developer shall contract (the "**Marina Management Contract**") with a marina management firm (the "**Manager**") approved by JDA for the management of the Marina Project. The Marina Management Contract shall, among other things, require that the Marina Project be managed in such a manner that it is sustainable and provides a safe, attractive environment for commercial and recreational boaters. A Marina Management Contract shall be in effect so long as the Ground Lease is in effect, but Developer may from time to time change the Manager. The Marina Management Contract and the Manager shall be subject to the approval of JDA, which shall not be unreasonably withheld, conditioned or delayed.

**3.2.3**   Sequencing. The JDA's acquisition of the Marina Project Site and construction and installation of the Marina Project Infrastructure will be consistent with the Development Schedule, subject to all terms and conditions of this Agreement. For the avoidance of doubt, Developer will not carry out the Marina Project until JDA's purchase of the Marina Project Site contemplated above has occurred and installation by JDA of the Marina Project Infrastructure has been completed.

62232107v.29

**Section 3.3**    **Developer Project**. Developer will develop, finance (i.e. Developer's Loan), install and construct the Developer Project, provided that construction activities will be carried out through Developer's selling or leasing parcels (each, a "**Parcel**") of the Developer Project Site to other developers (each, a "**Parcel Developer**") for such purpose. The performance of such activities and work by the Parcel Developers shall be in accordance with an Approved Development Schedule and subject to all terms and conditions of this Agreement. The Implementation Plan shall contain provisions regarding the attainment of milestones, the types and quality of property uses in the Developer Project, approval rights and remedies in favor of JDA, and other matters necessary to assure that JDA, the County and the City obtain the bargained-for Public Benefit. Each Parcel Developer must provide JDA with its written agreement to the Implementation Plan in favor of JDA, including Economic Development Goals, insofar as its Parcel is concerned. Such agreement must be satisfactory to JDA and be approved by JDA before the closing of the sale or lease of the related Parcel to the Parcel Developer.

**Section 3.4**    **Plan of Finance**. The Plan of Finance for the Master Project will reflect the following provisions, among others:

**3.4.1**    Investment in Developer Project. Developer estimates that the total private sector investment in the Developer Project upon Substantial Completion, excluding the Marina Project, will be approximately $400 million. Such figure includes investment by Developer and Parcel Developers in Phase 1 and the other phases of the Developer Project. Developer estimates that the total private sector investment in the Marina Project upon Substantial Completion will be approximately $33 million.

**3.4.2**    TAD Financing. To the extent, and as, provided in an Approved final Plan of Finance, City will financially assist the Master Project to the extent of the TAD Financing, and on the terms and conditions of this Agreement. For purposes of evaluating the TAD Financing, using data provided by the Parties, the Finance Team will provide to the Parties estimates of what TAD Financing will be available for purposes of the Waterfall. The timing of the funding of the TAD Financing is as set forth in the Approved final Plan of Finance, subject to all of the terms and conditions hereof.

**3.4.3**    Sources and Uses. Estimated sources and uses for the costs of the Master Project Site, the Pre-Development Costs, and certain other costs are set forth on Schedule 3.4.3 attached hereto and incorporate herein by reference. Such costs may not be increased without the consent of the Party bearing same. The use of proceeds of the 2020 Bonds is limited as specified in Section 3.4.4, below.

**3.4.4**    2020 Bonds. JDA will be responsible on the terms and conditions of this Agreement, for issuing its revenue bonds (the "**2020 Bonds**") to pay the costs specified in Schedule 3.4.3 hereof as being paid out of the net proceeds thereof. The 2020 Bonds will be revenue bonds secured by a pledge of the revenues from an intergovernmental agreement (the "**County IGA**") to be entered into between Camden County, Georgia ("**County**") and JDA, in which County agrees to make payments from Economic Development Millage as necessary to pay the principal, interest and any premium on the 2020 Bonds. However, recourse to such payments is not the intended source for repayment of the 2020 Bonds, which (after a period of capitalized interest) is the other

19

components of the Flow of Funds. The timing of the funding of the 2020 Bonds is as set forth in the Approved final Plan of Finance, subject to all of the terms and conditions hereof.

**3.4.5** Developer's Loan. Developer will be responsible for obtaining the Developer's Loan from Developer's Lender to pay the costs contemplated in this Agreement as being paid out of the net proceeds thereof, consistent with this Agreement. It is understood that Developer's Lender will have terms and conditions that Developer must meet, such as provision of sufficient equity and/or security for Developer's Loan. To the extent that Developer's Loan is not available or is not sufficient, Developer shall be responsible for obtaining sufficient funding to meet its obligations hereunder from other sources, which must be consistent with this Agreement or approved in advance in writing by JDA. The Developer's Loan shall be secured, in part, by a first priority pledge by Developer of the JDA Junior Security Site (including all improvements). The timing of the funding of the Developer's Loan is as set forth in the Development Schedule, subject to all of the terms and conditions hereof.

**3.4.6** Land Acquisition Costs. The total of "**Land Acquisition Costs**" (*i.e.*, the costs of the purchase by the Developer of the Master Project Site) shall not exceed $9 million in the aggregate. As set forth on Schedule 3.4.3 hereof, Land Acquisition Costs consist of $7,020,000 to be borrowed by Developer for that purpose through the JDA Loan at Closing (the JDA Loan being funded out of proceeds of the 2020 Bonds), and $1,980,000 to be borrowed by Developer for that purpose through the Developer's Loan at Closing (the Developer's Loan being funded by Developer's Lender).

**3.4.7** Pre-Development Costs- Cap and Responsibilities. The total of Pre-Development Costs shall not exceed $3 million in the aggregate. JDA and Developer shall each be responsible for 50% of the amounts required to pay Pre-Development Costs, not to exceed $1.5 million per Party. Each Party shall pay half of the amount required each time that there is a requirement. The sources for payment of Pre-Development Costs by Developer shall be Developer's Loan and/or Developer equity and by JDA shall be the 2020 Bonds.

**3.4.8** Pre-Development Costs- Use of Funds. At least 80% of the funding of Pre-Development Costs will be used for planning, engineering, environmental remediation and site work on Phase 1.

**Section 3.5    Restriction on Further Pledges**. Except as expressly authorized above, Developer shall not pledge the JDA Senior Security Site, the JDA Junior Security Site or the Marina Project Site to secure any debt, liability or obligation, or, without the prior written approval of JDA, or permit any of them to be subject to any other security title, security interest, lien or encumbrance. For the avoidance of doubt, this Agreement does not allow the Developer to pledge the JDA Senior Security Site or the Marina Project Site except to secure the JDA Loan as provided herein.

**Section 3.6    JDA Approval Rights; No Unauthorized Changes**. The Developer's Loan Documents shall be subject to JDA's prior written approval, which shall not be unreasonably withheld, conditioned or delayed. Developer shall not amend, modify, increase, or grant waivers or consents with respect to the Developer's Loan Documents without the prior written consent of JDA, which shall not be unreasonably withheld, conditioned or delayed.

20

**Section 3.7    No Defaults Permitted**. Developer shall not permit any default or Event of Default (as defined in the related documents) to exist with respect to the Developer's Loan, or the JDA Loan, or any monetary default or Event of Default to exist with respect to the 2020 Bonds.

**Section 3.8    Liquidity Events**. Without limitation of Developer's general obligation to repay the JDA Loan, the JDA Loan Documents will require that at least 80% of the net proceeds of any Liquidity Event be used to pay or prepay the JDA Loan. Upon any Liquidity Event resulting from a sale of any portion of the Developer Project Site or of the Marina Project, Developer shall cause the security title and other lien or encumbrance in favor of the related lender to be released with respect to the sold portion. For purposes of this Subsection, the term "net proceeds", in respect of a sale of any portion of the Developer Project Site or of the Marina Project, means gross sales price less any commission of an unrelated licensed third party real estate broker up to 10% of the sales price and less the seller's prorated share of any ad valorem property taxes.

**Section 3.9    Waterfall; Flow of Funds**.

**3.9.1    Use of TAD Financing**. Subject to provisions in the TAD Financing Documents regarding reserves and funds, net proceeds of the TAD Financing will be disbursed in the following order, from highest priority downwards (the "**Waterfall**"):

First- repayment of the 2020 Bonds, in accordance with this Section and Section 3.9.2, below, to the extent other sources for repayment (particularly including payments by Developer as the result of a Liquidity Event, but not including payments under the County IGA) are not available;

Second- payment of costs of the Marina Project Infrastructure;

Third- payment of costs of the (a) Developer's share of the Pre-Development Costs, (b) Developer's purchase of the Master Project Site to the extent such costs were not funded through the JDA Loan, except for costs of the purchase of the Marina Project Site, (c) Developer's purchase of the Marina Project Site, (d) Developer Project, to the extent not previously specified in this subsection, including eligible costs incurred prior to the Effective Date, provided, that any disbursement pursuant to this clause (d) must be for the purpose of paying the cost of public infrastructure (including purchasing from Developer or another private party an asset that will be become public infrastructure as a result of such purchase), or must be Approved and (e) Marina Project (provided in each of the foregoing clauses that such costs are Redevelopment Costs that City may lawfully pay pursuant to the Redevelopment Powers Law (O.C.G.A. Sec. 36-44-1, et seq.)). The sequencing of the preceding clauses does not indicate priority.  For purposes of the foregoing, payment may be by means of reimbursement; e.g., for amounts borrowed by Developer under the Developer's Loan. However, there shall be no duplication; for example, if JDA has purchased the Marina Project Site from Developer, then Developer may not be reimbursed the same amount under the Waterfall, or if Developer has received any reimbursement under the Waterfall for its purchase of the Marina Project Site from the Seller, then the JDA's purchase price shall be reduced accordingly. Any provision hereof to the contrary notwithstanding, in no event may proceeds of the JDA Loan or any TAD Financing be used

directly or indirectly to pay or reimburse the payment of the costs of Developer's acquisition of Parcel C or Parcel D described in the Seller-Developer PSA.

Fourth- payment of costs of Infrastructure Improvements.

### 3.9.1.1 Special Provisions.

**3.9.1.1.1**     The foregoing and any other provision hereof to the contrary notwithstanding:

(i)     The sole source for payment of Redevelopment Costs pursuant to this Agreement shall be Master Project TAD Increments, and then only to the extent actually collected and available. City shall segregate the Master Project TAD Increments from tax allocation increments generated in other parts of the TAD. Without limitation, neither City nor JDA shall be obligated to advance any general or other funds of City or JDA to any person or entity under this Agreement, other than, as to City, as provided herein regarding Master Project TAD Increments.

(ii)     In the event that an item of Redevelopment Costs that this Agreement contemplates being paid is not authorized to be paid by the Redevelopment Plan, such payment shall be deferred, and the City will amend the Redevelopment Plan to provide the requisite authorization, subject to the Redevelopment Powers Law (O.C.G.A. § 36-44-1, et seq.). Any item of Redevelopment Costs whose payment was deferred because of the need for such amendment shall be paid as promptly as possible, consistent with the Waterfall, once such amendment is effective.

(iii)     Without limitation, City shall establish a separate account (actual, not just by bookkeeping) within the TAD's special fund to hold the Master Project TAD Increments for purposes of this Agreement.

(iv)     City and JDA covenant and agree that they shall not use, encumber or pledge Master Project TAD Increments other than as provided herein until the Series 2020 Bonds have been paid in full and all other Redevelopment Costs to be paid hereunder have been paid, at which point this Agreement's provisions regarding the dedication of the Master Project TAD Increments shall no longer be effective.

(v)     For purposes of clause (d) of Section 3.9.1, above, Reimbursable Costs shall be limited to hard, soft, construction management and other costs directly relating to the Developer Project and shall not include any corporate overhead, corporate costs, developer's fees or developer's profits, or costs for goods, services or materials that exceed the market cost for similar items in the County as adjusted for all relevant factors.

(vi)     If JDA should issue revenue bonds (i.e., Parity Bonds, as to be defined in the Bond Resolution) that are secured by a pledge of revenues from the County IGA, as to be amended, or from a similar new intergovernmental agreement

22

between JDA and the County, for the purpose of financing the Marina Project Infrastructure, then, for purposes of this Section 3.9.1 and Section 3.9.2, below, and of any other appropriate provision hereof pertaining to TAD Financing, references to the 2020 Bonds shall be deemed to include such Parity Bonds. The purpose of this provision is to permit such Parity Bonds, as well as the 2020 Bonds, to be repaid out of TAD Financing on the same basis provided herein for the repayment of the 2020 Bonds. For purposes of the Developer Guaranty, funds used to repay the Parity Bonds shall be deemed to have been available to repay the 2020 Bonds, to avoid adversely affecting the Developer's obligations under the Developer Guaranty relating to the repayment of the 2020 Bonds.

**3.9.2** Revenues. In addition to other necessary provisions for the repayment of the 2020 Bonds, the JDA Bond Documents will make the provisions (the "**Flow of Funds**") for the repayment of the 2020 Bonds that are set forth below out of the revenues specified below, and each component thereof shall be used for such purpose in the order of priority in which it is listed below, from highest priority downwards:

(a)     JDA shall apply the following payments received by it to the repayment of the 2020 Bonds, and upon receipt shall deposit the same directly in the "**Debt Service Fund**" to be created by the JDA Bond Documents:

(i)     Repayments by Developer of the JDA Loan, including, without limitation, payments made in connection with a Liquidity Event.

(ii)     Other proceeds of the JDA Loan Documents, including, without limitation, the proceeds of foreclosure or the other exercise of remedies, of condemnation and of casualty insurance.

To the extent available, such payments shall be used, before any other component of the Flow of Funds is used, to repay the 2020 Bonds. Until the 2020 Bonds have been paid in full, such payments shall not be used for any other purpose.

The foregoing requirements shall be more fully expressed in the JDA Loan Documents.

(b)     Net proceeds of the TAD Financing, available under the "First" subparagraph in the Waterfall, shall represent the next priority for repayment of the 2020 Bonds. Within three (3) Business Days after a deposit of Master Project TAD Increment is made into the TAD's special fund, City shall withdraw the amount thereof from the TAD's special fund, and deposit the same into the Debt Service Fund, except to the extent that, within such three (3)-Business Day period, City shall have requested of, and received from, the custodian of the Debt Service Fund, written notification that such amount is not needed for the payment of debt service (principal and interest) on the 2020 Bonds for the current calendar year or the ensuing calendar year, or for the capitalization of or replenishing of any fund under the JDA Bond Documents, including notification of how deposits other than into the Debt Service Fund shall be made. To the extent not so needed, amounts in the special fund may be applied as otherwise provided in the Waterfall. The foregoing

23

requirements shall be more fully expressed in the City IGA and the JDA Bond Documents. Pursuant to the Developer Guaranty, Developer shall guarantee to pay any amounts necessary to ensure that such net proceeds of the TAD Financing, available under the "First" subparagraph in the Waterfall, are sufficient that recourse to contract payments by the County under (c), below, are not necessary for the timely repayment of the 2020 Bonds.

(c)     To the extent that funds are not available on a timely basis under (a) or (b), above, contract payments made by the County pursuant to the County IGA shall be used to repay the 2020 Bonds. The foregoing requirement shall be more fully expressed in the County IGA. Reimbursement of such payments shall be made under the "First" subparagraph in the Waterfall, treating such reimbursement as a payment for the repayment of the 2020 Bonds, without duplication of reimbursement that may be made from other sources.

**Section 3.10   TAD Financing**. The obligations of City hereunder regarding the TAD Financing shall be subject to the Redevelopment Powers Law, the Redevelopment Plan, an Approved final Plan of Finance, and the conditions set forth in this Agreement. Without limitation, no disbursement of TAD Financing shall be made except for the payment of qualified Redevelopment Costs. Subject to Section 3.9(b), above, the timing of the payment of the TAD Financing shall be as reasonably determined by City in accordance therewith, but in no event shall payment occur until the availability of TAD Financing.

**Section 3.11   Conditions to TAD Financing**. Each other Party hereby acknowledges and agrees that City's undertaking to make available TAD Financing is contingent upon satisfaction of the following conditions on or prior to the payment of TAD Financing:

(a)     City has Approved the related documents (collectively, the "**TAD Financing Documents**"). The TAD Financing Documents will include, without limitation, an intergovernmental agreement (the "**City IGA**") between City and JDA relating in part to the provision of TAD Financing by the City in accordance with the Waterfall.

(b)     Developer shall certify that all representations, warranties and covenants made by it in this Agreement and in the Development Agreement are true and correct in all material respects.

(c)     Developer has provided an opinion of legal counsel in form and substance satisfactory to Bond Counsel to the effect that this Agreement, and the transaction documents identified in such opinion (i) have been duly authorized by it and will be valid, binding and enforceable against it subject to standard enforceability exceptions, and (ii) will not violate or otherwise contravene its organizational documents or any agreement or instrument to which it is a party or to which its property or assets are bound.

(d)     Developer has delivered evidence of financial commitments sufficient to allow it to pay the costs of acquiring and constructing the Developer Project in excess of the proceeds of the TAD Financing.

**Section 3.12   Disbursements**. Net proceeds of any TAD Financing shall be held in the TAD's special fund until disbursed. The special fund is sometimes referred to herein as the

24

"**Project Fund**", and the amounts therein may be referred to as the "**Project Funds**." Subject to compliance by the requesting entity with all of the terms and conditions of this Agreement, the Project Funds, to the extent required to provide the TAD Financing, but not to exceed in the aggregate the Maximum Amount, will be disbursed in several disbursements at such times and in such amounts as determined (each a "**Disbursement**") in accordance with the following procedures:

(a)     Applicable procedures for Disbursements will be set forth in the TAD Financing Documents.

(b)     In addition, in the case of Disbursements to or for the account of Developer, not less than three Business Days prior to the date on which Developer desires a Disbursement, Developer will submit to City a Requisition approved by Developer. The Requisition will include (i) copies of the related portions of the Project Budget and the itemized schedule of values prepared by the General Contractor or Developer of the total "hard costs" of costs for which Project Funds are requested, (the "**Schedule of Values**"), (ii) all costs incurred for construction and non-construction expenses for the related costs to the date of the Requisition, which costs have been itemized under the applicable line items of the Project Budget and the Schedule of Values, (iii) the percentage of completion of each line item on the Project Budget and the Schedule of Values; (iii) the related building permit with attendant cost certification pursuant to applicable City requirements; and (iv) such other materials, if any, as may be required by the TAD Financing Documents. The accuracy of the cost breakdown and percentage completion in the Requisition must be certified by the Developer and, if appropriate in the opinion of City, the General Contractor. If City should determine in its discretion that any Requisition does not completely comply with all of the requirements, and satisfy all of the conditions, set forth in this Agreement, it may return the Requisition to the Developer, citing briefly the grounds therefor. Failure to cite any ground shall not constitute a waiver thereof or prevent it from being cited if the Requisition is resubmitted. Developer may resubmit a Requisition to City after correcting the cited matters.

(c)     Further, the Requisition must be accompanied by evidence in form and content reasonably satisfactory to City (including, but not limited to, certificates and affidavits of the Developer and such other Persons as City may reasonably require) showing:

(i)     The subject costs qualify as Redevelopment Costs authorized by the Redevelopment Plan that are within the categories of costs set forth in the Waterfall and the other terms and conditions of this Agreement;

(ii)     The subject costs must be Redevelopment Costs that City may lawfully pay pursuant to the Redevelopment Powers Law (O.C.G.A. Section 36-44-1, et seq.).

(iii)     The aggregate of the requested payment and amounts previously funded by Disbursements (regardless of to whom Disbursements have been made) does not exceed the Maximum Amount;

(iv)    Copies of all bills or statements or canceled checks for any indirect or soft cost expense for which the Disbursement is requested;

(v)    If the Requisition includes amounts to be paid to any contractor or represents reimbursement therefor, a contractor's application for payment showing the amount paid by Developer with respect to each such line item and, upon request of City, copies of all bills or statements or canceled checks for expenses incurred by Developer for which the Disbursement is requested and a copy of a satisfactory "Interim Waiver and Release upon Payment" pursuant to O.C.G.A. Section 44-14-366 from the contractor;

(vi)    That all construction has been conducted substantially in accordance with this Agreement; and

(vii)    That there are no liens outstanding against the Developer Project except for those permitted by this Agreement.

(d)    The construction related to any Requisition must be reviewed and approved by City or its appointed consultant to verify the approval of the construction, the cost of completed construction, the percentage of completion and the compliance with the Development Agreement.

**Section 3.13    Project Budget**. Developer must pay when due all costs to be paid by Developer as set forth in the Project Budget to the extent TAD Financing is not available therefor. Notwithstanding any other provision of this Agreement, Developer warrants and agrees that it will not be entitled to recover any alleged cost or budget overruns from City in excess of the amount of TAD Financing actually available and actually allocated to Developer under the Waterfall, regardless of cause.

**Section 3.14    Use of TAD Financing**. TAD Financing will be used by Developer solely to pay or reimburse Redevelopment Costs incurred by Developer authorized by the Redevelopment Plan (all as set forth in the Approved Project Budget) and for no other purpose. Additionally, notwithstanding anything to the contrary herein, no TAD Financing shall be used for any purpose inconsistent with the Redevelopment Powers Law (O.C.G.A. § 36-44-1, *et seq.*) or any other provision of Georgia law.

**Section 3.15    Limitation of Liability**.

**3.15.1** The sole source for the payment of Redevelopment Costs by City shall be the TAD's special fund and only to the extent that amounts therein are sufficient therefor.

**3.15.2** No director, member, official, officer, employee or agent of City or JDA will be personally responsible for any liability arising under or growing out of the Agreement.

**Section 3.16    Legislative Findings**. Therefore, after careful study and investigation of the nature of the Master Project, City hereby makes the following findings and determinations:

(a)    The Master Project is located within the TAD.

26

(b)    The provision of the TAD Financing on the terms and conditions contemplated herein will facilitate the catalytic redevelopment of the TAD.

(c)    The Master Project is an authorized redevelopment project under the Redevelopment Powers Law, particularly O.C.G.A Sec. 36-44-3(5)(A)–(C).

(d)    The TAD Financing constitutes an authorized method of financing certain costs of the Master Project under the Redevelopment Powers Law, and for the payment of Redevelopment Costs under the Redevelopment Powers Law.

(e)    The Master Project will promote the objectives of the Redevelopment Powers Law and of the TAD.

(f)    The Master Project will be in the public interest of the inhabitants of City.

(g)    Therefore, this Agreement and the Master Project are authorized by the Redevelopment Powers Law and the Constitution of the State.

## ARTICLE 4

## DUTIES OF THE DEVELOPER; MASTER PLAN; PROJECT REVIEW AND APPROVAL

Developer's obligations and responsibilities under this Article 4 shall be assumed as to each Parcel by the related Parcel Developer as a part of its Implementation Plan agreement with JDA under Section 3.3 hereof. Such assumption shall not release Developer from its obligations hereunder unless such release is Approved.

**Section 4.1    Master Plan; Infrastructure Improvements**.

(a)    At its sole cost and expense, Developer shall prepare the comprehensive Master Plan for the Project, which shall comply with all TAD requirements. The Master Plan shall, without limitation, identify (i) the configuration and total number of rental housing units to be included in the Developer Project, and shall include the number of proposed "market rate" non-income restricted units and any low income housing tax credit units; (ii) the configuration, proposed uses and total amount of commercial square footage in the Project, (iii) the design and configuration of other proposed uses and (iv) all Infrastructure Improvements required in connection with the Master Project, all of which are understood to be good faith estimates. The Master Plan shall be submitted to City and JDA no later than August 31, 2020, and shall be subject to Approval.

(b)    Developer shall have two opportunities to resubmit for Approval a revised Master Plan if the initially submitted Master Plan is not Approved. JDA and City will advise Developer within 30 days of receipt thereof whether such submittal is Approved by it or rejected by it. Developer must make each resubmittal within 30 days of rejection by the City and/or JDA of the submitted Master Plan. This Agreement shall automatically terminate, without liability on the part of any Party, except as may expressly be provided herein, (i) if a submission is not fully Approved and Developer fails to timely resubmit a

27

revised Master Plan, or (ii) if Developer timely makes two resubmittals and neither is fully Approved.

(c)     Developer shall submit to JDA all designs and construction plans 60 days prior to the commencement of construction of the Developer Project, and JDA will issue to Developer any comments or objections as to the designs or plans within 30 days. Developer and JDA agree to work together in good faith to resolve any material objections to the designs or plans, and if agreement between JDA and Developer cannot be reached through initial consultation, such shall be a Default by Developer. Developer's foregoing obligations shall be assumed as to each Parcel by the related Parcel Developer as a part of its Implementation Plan agreement with Developer under Section 3.3, above, and a failure to agree under the immediately preceding sentence shall be a default by such Parcel Developer under such agreement.

(d)     As provided in an Approved Implementation Plan, the construction of Infrastructure Improvements may be by Developer with the Infrastructure Improvements being purchased by City upon Substantial Completion, but exclusively out of the proceeds of TAD Financing, or by City, with the cost thereof being paid by TAD Financing.

**Section 4.2     Contractors, Subcontractors, Materialmen and Consultants.**

(a)     Developer shall be responsible, at its own cost and expense, for engaging all Subcontractors, professionals, laborers and materialmen in connection with the Developer Project and Marina Project and shall use reasonable care to ensure that all Persons selected in connection with the design, development, and implementation of the Developer Project and Marina Project shall be qualified to do the work they are engaged to perform, and Developer shall make necessary inquiries as to such Persons' background, experience and reputation to assure they are well qualified to undertake such work.

(b)     For the avoidance of doubt, City and/or JDA are only contracting with Developer under this Agreement, and City and/or JDA shall have no contractual or other obligations or liabilities to any other Person under this Agreement, provided that the foregoing shall not be interpreted to prevent a Parcel Developer's Implementation Plan agreement with Developer under Section 3.3, above.  On the contrary, Developer shall indemnify, hold harmless and defend City, JDA, their agencies and authorities and their commissioners, members, directors, officials, officers, employees and agents from and against any and all claims, losses and liabilities on the part of any such Subcontractor, or its laborers or materialmen, provided, that such indemnity shall not apply, as to any particular indemnitee, to any claim, loss or liability that is the result of the gross negligence or intentional misconduct of such indemnitee. Said indemnity shall survive the expiration or earlier termination of this Agreement.

(c)     With respect to all contracts or subcontracts in excess of $250,000 and any contracts or subcontracts expressly specified by JDA, JDA will have the right to review and approve any and all Subcontractors from whom Developer, or its Subcontractors, may obtain bids or proposals to subcontract portions of the work. In no case shall JDA's approval of any Subcontractor, at any tier, impose on JDA any responsibility or obligation

28

for such work or serve as a waiver or release of any of Developer's responsibilities or obligations under this Agreement. If JDA has reasonably objected to the use of any Subcontractor, Developer shall not use or utilize such Subcontractor and shall propose another Subcontractor to whom JDA has no reasonable objection. Developer shall use local Subcontractors to the extent such Subcontractors are qualified, available, and competitive.

(d)     Upon reasonable prior written notice, JDA and City shall be entitled to audit the books and records of Developer which are related to the Master Project, which audit shall be conducted at Developer's office or such other reasonable location specified by Developer and convenient for the JDA and the City. Such books and records shall be maintained by Developer for a period of three years from the date of hereof unless a shorter period is authorized by JDA in writing.

**Section 4.3    Employees of Developer**. All Persons supplied or engaged by Developer in connection with the Master Project will not be deemed employees or Subcontractors of City or JDA, or any of its agencies or departments, for all purposes whatsoever. Developer will be solely responsible for the compensation of all such Persons including, but not limited to, the withholding of any income, social security and other payroll taxes and for the coverage of all worker's compensation benefits.

**Section 4.4    Lien Waivers**. Developer will furnish to JDA, upon written request, either (a) affidavits listing all laborers, Subcontractors, materialmen, and any other Persons who might or could claim statutory or common law liens and are furnishing or have furnished labor or material to the Developer Project or the Marina Project or any part thereof, or (b) other evidence satisfactory to JDA, showing that such parties have been paid all amounts then due for labor and materials furnished to the Developer Project or the Marina Project. Upon certification of Substantial Completion of the Developer Project and the Marina Project, Developer shall furnish to JDA final lien waivers from the General Contractor and all other Subcontractors and materialmen who provided goods or services to said Projects. Affidavits and other materials submitted pursuant to this section are subject to approval by City.

**Section 4.5    Licenses, Permits and Approvals**. Developer shall be responsible, at its own cost and expense, for securing all licenses, permits, approvals, zoning, and other similar entitlements (collectively, "**Governmental Authorizations**") necessary for the management, construction or potential renovation of the Developer Project and the Marina Project or necessary in connection with the conduct of its business, affairs and transactions as contemplated by this Agreement. Developer shall comply in all material respects with all Legal Requirements of any governmental body in connection with Governmental Authorizations as they relate to the Developer Project or the Marina Project.

**Section 4.6    Completion of the Developer Project and the Marina Project**. Subject to any delays for Force Majeure, and notwithstanding any other provision of this Agreement, Developer will cause commencement and completion of the Developer Project and the Marina Project substantially by the dates provided for same in the Development Schedule, with diligence and in a good and workmanlike manner, free and clear of all liens and claims for materials supplied or for labor or services performed. Upon Substantial Completion of the construction of the Developer Project and the Marina Project, Developer will provide JDA with a final cost summary

29

of all costs and expenses associated with the Developer Project and the Marina Project, a certification that the Developer Project and the Marina Project have been completed, and evidence that all amounts owing to contractors, subcontractors and materialmen have been paid in full evidenced by customary affidavits executed by such contractors, subcontractors and materialmen.

**Section 4.7    Records and Accounts; Reporting**. Developer will keep true and accurate records and books of account in connection with the Developer Project and the Marina Project, in which full, true and correct entries will be made on a consistent basis, in accordance with GAAP in all material aspects. Such records and accounts shall at all times be made available to JDA or its designees upon reasonable prior written notice. Developer agrees to keep City and JDA informed of its progress in performing this Agreement. Further, Developer shall provide City and JDA with a quarterly report that details the status of the Master Project activities (the "**Quarterly Report**"). Such Quarterly Report shall include, at a minimum, a description of the predevelopment and construction work performed at the Master Project Site, progress in maintaining the Development Schedule, status of all financing applications, certifications and permits necessary for the work, progress in meeting the Economic Development Goals, and expenditures as compared to the Project Budget. JDA will be invited to attend the monthly construction draw meetings.

**Section 4.8    Compliance with Documents**. Developer, in implementing the Master Project, shall at all times remain in compliance with its obligations and covenants in this Agreement and any other applicable agreements, including any such agreements regarding the location of the Master Project within the TAD. Developer will perform, or have performed, all acts to be performed by it hereunder and will refrain from taking or omitting to take any action that would materially violate Developer's representations and warranties hereunder or render the same materially inaccurate.

**Section 4.9    Notice of Litigation; Material Modification**. Developer will promptly notify City and JDA in writing: (a) of receipt of actual notice thereof, of any actual, pending or threatened claim, demand, litigation or adversarial proceeding related to the Master Project in which a claim is made against Developer, a Subcontractor, the Master Project, City, or JDA; (b) of any judgment rendered against Developer, a Subcontractor, or the Developer Project or the Marina Project in excess of $25,000, (c) of any matter or circumstance that is reasonably likely to result or does result in a material adverse change in the financial condition or operation of Developer, a Subcontractor, or the Master Project, and (d) of any necessary or proposed Material Modification to the Implementation Plan or the Master Project, which Material Modification shall require the prior Approval of JDA and City. Prior to Developer making a Material Modification to the Master Project, Developer will submit the proposed modifications to JDA and City in writing for review. Any such submission must clearly identify all changes, omissions and additions as compared to the previously approved description of the Master Project. City and JDA, as soon as reasonably possible, will put a request for modification of the Implementation Plan or the Master Project on a meeting agenda for consideration by City or JDA, as appropriate. City and JDA will act on the requested modification within an amount of time that is reasonably required to consider the request.

**Section 4.10    Liens and Other Charges**. Developer will dutifully pay and discharge, or cause to be paid and discharged, before the same become overdue, all claims for labor, materials,

or supplies in connection with the Developer Project or the Marina Project or the related provisions of the Implementation Plan, including but not limited to those charges or assessments which, if unpaid might by law become a lien or charge upon the Developer Project or the Marina Project or the Master Project Site. Developer may lawfully protest the same, in which case Developer will provide a suitable "**mechanics lien bond**" to discharge such lien. Without limitation, throughout the term of this Agreement, Developer shall keep the Developer Project and the Marina Project free and clear of all liens and encumbrances except for those consented to by JDA.

Section 4.11   **Compliance with Laws, Contracts, Licenses, and Permits**. Developer will diligently comply in all material respects with (a) all applicable laws related to the Master Project; (b) all material agreements and instruments related to or regarding the Master Project; (c) all restrictions, covenants and easements affecting the Master Project or the Master Project Site; (d) all applicable decrees, orders and judgments related to or regarding the Master Project; and (e) all licenses and permits required by applicable laws and regulations for the ownership, use, or operation of the Master Project.

Section 4.12   **Taxes**. Notwithstanding anything herein to the contrary, Developer will pay when due all taxes imposed upon or assessed against the Developer Project or the Marina Project, including but not limited to those taxes imposed upon the ownership, leasing, occupancy, use, possession, revenues, rents, issues, income and profits of the Developer Project or the Marina Project, or arising in respect thereof. Developer will provide to JDA, within 10 days after a written request therefor, validated receipts showing the payment of such taxes when due. Developer will have the reasonable right to appeal or contest any assessment of taxes.

Section 4.13   **Further Assurances and Corrective Instruments**. Developer agrees that it will, from time to time, execute, acknowledge and deliver, or cause to be executed, acknowledged and delivered to JDA and City, such supplements and amendments hereto and such further instruments as may reasonably be required for carrying out the intention or facilitating the performance of this Agreement.

Section 4.14   **Restrictions on Easements and Covenants; Access**.

(a)   Except for Approved encumbrances, and except for easements and rights of ways customary for utilities which relate to the use of the Master Project for the intended purposes or that relate to future alterations and construction of improvements on the Master Project Site, Developer will not create or suffer to be created or to exist any easement, right of way, restriction, covenant, condition, license or other right in favor of any Person which adversely affects or might adversely affect the management, use or occupancy of the Master Project Site or the Master Project, or any part thereof, without obtaining the prior approval of JDA (such approval not to be unreasonably withheld).

(b)   Developer will permit persons designated by JDA and/or City to access the Master Project Site and to discuss the progress and status of the Master Project with representatives of Developer all in such detail and at such times as JDA may reasonably request. All such access must be during normal business hours and in a manner that will not unreasonably interfere with construction activities of the Master Project or with the business operations generally of Developer.

31

**Section 4.15    Master Project Due Diligence**. Prior to Closing, Developer may at its own expense examine title, and conduct survey and other diligence activities with respect to the Master Project.

**Section 4.16    Cooperation and Applications**. At JDA's request, Developer shall make commercially reasonable efforts to support JDA's applications for grants, loans, incentives and other subsidies from third parties necessary or appropriate for the successful implementation of the Master Project. Developer acknowledges that JDA is not obligated or required to apply for or accept any such grants or other incentives. Developer shall cooperate and work with City and JDA in all reasonable efforts to identify and consummate any Project Financing.

**Section 4.17    Advances by City or JDA**. If Developer shall fail to do or cause to be done any act or pay or cause to be paid any insurance premiums, taxes, assessments, fees, charges or insurance premiums regarding the Master Project Site or the Master Project required by this Agreement, City or JDA may (but shall be under no obligation to), after expiration of applicable notice and cure periods, do any such act or pay any such taxes, assessments, fees, charges or insurance premiums required by this Agreement, and all amounts so advanced therefor by City or JDA shall become an additional obligation of Developer to City or JDA, which amounts may be collected by City or JDA or deducted by City or JDA from any amounts owed by City or JDA to Developer for any reason.

**Section 4.18    Developer Responsible**. City and JDA each acknowledges that Developer may subcontract the services to be performed with respect to the Master Project on the terms and conditions of this Agreement, but no such subcontracting shall relieve Developer of its duties and responsibilities under this Agreement.

## ARTICLE 5

## ECONOMIC DEVELOPMENT GOALS AND PUBLIC BENEFIT

**Section 5.1    Economic Development Goals**. Developer shall use commercially reasonable efforts to carry out the Developer Project and the Marina Project, through its own efforts to the extent provided herein, and otherwise through the use of Parcel Developers. Thereby, Developer and the Parcel Developers shall each respectively attain each goal (the "**Economic Development Goals**") applicable to it respectively that is set forth on Schedule 5.1 attached hereto and incorporated herein by reference, each by the related date set forth on the Development Schedule for its attainment.

**Section 5.2    Public Benefit**. JDA and City each has found and determined, and does hereby find and determine, that the consideration to be received by City, County, JDA and their citizens, pursuant to this Agreement includes the following "**Public Benefit**": (a) the agreement of Developer and the Parcel Developers to the Economic Development Goals; (b) value being added to the Developer Project and the Marina Project and to adjacent and nearby property on the tax digest, that would otherwise not be available; (c) other public revenues such as sales and use taxes and business license fees that will be generated by the Master Project that otherwise would not be received by the City or the County, (d) the Master Project will add economic stimulus to the redevelopment area in which the Master Project is located; (d) JDA will receive title to the

32

Marina Project paid for by Developer, which Marina Project shall be free of charge and free and clear of any deed to secure debt or other lien or encumbrance, upon the expiration or earlier termination of the Ground Lease, (e) the Master Project will facilitate the catalytic redevelopment of the TAD, which will promote the revitalization and redevelopment of the TAD, thereby developing and promoting for the public good and general welfare trade, commerce, industry, and employment opportunities and promoting the general welfare of the State, (f) Developer will repay the JDA Loan, which repayment will be used to partially repay the 2020 Bonds and will provide the Developer Guaranty to support repayment of the 2020 Bonds and the sufficiency of the TAD Financing, (g) Developer will pay the ground rent to JDA under the Ground Lease, and (h) Developer will be responsible for the maintenance of the Marina Project Infrastructure pursuant to the Ground Lease, thereby relieving JDA of such costs.

### ARTICLE 6

### INDEMNIFICATION

**Section 6.1    Indemnification**.  Developer shall indemnify, hold harmless and defend City and JDA and the respective officials, its members, officers, employees and representatives of each from and against any and all loss, liabilities and claims (including, without limitation, liens and encumbrances resulting from construction and installation activities) that may arise out of or relate to: (a) any act or omission by or attributable to Developer or its General Contractor or any of the Subcontractors (including, without limitation, the acts or omissions of their respective vendors, contractors or subcontractors, agents, employees or representatives) related to any component of the Master Project; or (b) any breach or violation by Developer under the JDA Loan; or (c) any breach or violation by Developer of this Agreement, or (d) the ownership or operation of any aspect of the Master Project.  Said indemnity shall survive the Closing and the expiration or earlier termination of this Agreement or the Ground Lease. The indemnities set forth above specifically extend to, but are not limited to claims, liabilities or losses arising under or related to Environmental Laws regardless of whether or not any of same relates to any period prior to the acquisition of any portion of the Master Project by JDA or Developer or its acquisition or occupancy by Developer.

**Section 6.2    Exceptions**.  The foregoing notwithstanding, indemnities by the Developer contained in Section 6.1, above, shall not apply, in the case of any particular indemnitee, to any claim, loss or liability which is the result of the gross negligence or willful misconduct of the indemnitee.

**Section 6.3    Parcel Developers**. Developer's obligations and responsibilities under this Article 6 shall be assumed as to each Parcel by the related Parcel Developer as a part of its Implementation Plan agreement with Developer under Section 3.3 hereof. Such assumption shall not release Developer from its said obligations and responsibilities unless such release is Approved.

## ARTICLE 7

## DEFAULT

**Section 7.1**    **Default by Developer**.

**7.1.1**    Each of the following will constitute a "**Default**" by Developer:

(a)    Failure of Developer to timely comply with and perform any of its covenants, conditions or obligations set forth in this Agreement related to the payment of money, continued for more than one (1) day after the Person entitled to the benefit of same gives notice of such failure to Developer;

(b)    Failure of Developer to materially and timely comply with and perform any of its covenants, conditions or obligations set forth in this Agreement, other than as set forth in (a), above, following receipt of written notice and a thirty (30) day cure period; provided, however, if such failure cannot be cured within such 30-day period, Developer shall be given a reasonable period of time to cure so long as Developer has promptly commenced and diligently pursues such cure;

(c)    The exercise of any remedy by any lender or other creditor of Developer;

(d)    An Act of Bankruptcy of Developer;

(e)    Any material representation or warranty made by Developer in this Agreement or subsequently made by it in any written statement or document furnished to the JDA or City and related to this Agreement is false, inaccurate or fraudulent in any material respect as of the date such representation or warranty is made;

(f)    Any material report, certificate or other document or instrument furnished to the JDA by Developer in relation to this Agreement is false, inaccurate or misleading in any material respect;

(g)    Any event provided elsewhere in this Agreement to be a Default by Developer.

**Section 7.2**    **Remedies**.  If a Default by Developer occurs, then each of JDA and City will be entitled to avail itself of any or all of the following remedies: (i) seek any remedy at law or in equity that may be available as a consequence of Developer's Default; (ii) pursue specific performance of this Agreement or injunctive relief; (iii) terminate this Agreement, or (iv) waive such Default.

**Section 7.3**    **Remedies Cumulative**.  All remedies of the Parties provided for herein are cumulative and will be in addition to any and all other rights and remedies provided for or available hereunder, at law or in equity.

62232107v.29

**Section 7.4**   **Agreement to Pay Attorneys' Fees and Expenses**.

**7.4.1**   In the event of an Event of Default by Developer, if JDA or City employs attorneys or incurs other expenses for the collection of amounts due hereunder or for the enforcement of the performance or observance of any covenants or agreements on the part of Developer contained herein, and prevails in such action, Developer agrees that it will on demand therefor pay to the JDA or City, as appropriate, the reasonable fees of such attorneys and such other reasonable expenses so incurred by the JDA or City, the amount of such fees of attorneys to be without regard to any statutory presumption.

**Section 7.5**   **Default by JDA or City**.  The following will constitute a "**Default**" by the JDA or City, as the case may be:  Any material breach by it of any representation made in this Agreement or any material failure by it to observe and perform any covenant, condition or agreement on its part to be observed or performed hereunder, for a period of 90 days after written notice specifying such breach or failure and requesting that it be remedied, given to it by Developer; provided that in the event such breach or failure can be corrected but cannot be corrected within said 90-day period, the same will not constitute a default hereunder if corrective action is instituted by the JDA or City, as appropriate, or on behalf of JDA or City, as appropriate, within said 90-day period and is being diligently pursued.

**Section 7.6**   **Developer's Remedies**.  If a Default by JDA or City, as the case may be, occurs, then Developer will be entitled to avail itself of any or all of the following remedies: (i) seek any remedy at law or in equity that may be available as a consequence of Default by JDA or City, as appropriate; (ii) pursue specific performance of this Agreement or injunctive relief (to the extent that such relief may be available under Georgia law); (iii) terminate this Agreement, or (iv) waive such Default.

## ARTICLE 8

## TERM AND TERMINATION

**Section 8.1**   **Term of Agreement**.  This Agreement will commence on the Effective Date and will expire, subject to earlier termination, as provided herein, upon the occurrence of both of the following:  (i) the 2020 Bonds have been paid in full, and (ii) all Redevelopments Costs authorized by this Agreement to be paid have been paid in full, provided, that indemnification obligations and other obligations intended to survive termination shall so survive. The foregoing notwithstanding, (a) any agreement between JDA and City shall not be effective for more than 50 years, and (b) no agreement contained herein between City and Developer relating to the exercise of City's redevelopment powers under the Redevelopment Powers Law shall be in effect for a period exceeding 30 years.

**Section 8.2**   **Delay**.  If, despite the good faith efforts of the Parties, this Agreement is not fully executed on or before 5:00 o'clock p.m., St. Marys, Georgia, time, on August 31, 2020, or the Closing has not occurred by 5:00 o'clock p.m., St. Marys, Georgia, time, on December 31, 2020, then any Party may terminate this Agreement by written notice to the other Party, without any further liability except as otherwise expressly provided in this Agreement.

**Section 8.3     Approval by Governing Bodies**.  Upon its execution of this Agreement, each Party represents and warrants that its governing body or other authorized committee or official thereof has approved and authorized its entry into such Agreement.

**Section 8.4     Closing Conditions**.  Any Party shall have the right to terminate this Agreement prior to the Closing, without any further liability except as otherwise expressly provided in this Agreement, effective immediately upon giving written notice to the other Parties, if:

**8.4.1**   The other Party is in Default under this Agreement.

**8.4.2**   There has been commenced or threatened against JDA, City, or Developer, or any Affiliate of the Developer, any proceeding (a) involving any challenge to, or seeking damages or other relief in connection with, any of the matters that are the subjects of this Agreement, or (b) that may have the effect of preventing, delaying, making illegal, imposing limitations or conditions on, or otherwise interfering with, any of such matters.

**Section 8.5     The Termination Rights of City and JDA**.

**8.5.1**   Right to Terminate.  Prior to Closing, each of City and JDA shall have the right to terminate this Agreement, without any further liability except as otherwise expressly provided in this Agreement, effective immediately upon giving written notice thereof to the other Parties, pursuant to any provision allowing it to do so contained elsewhere in this Agreement. Without limitation, each such Party shall have the right to terminate this Agreement, effective immediately upon giving written notice to the other Parties if, by the Closing (or if this Agreement specifies another time therefor, then by such time) each Closing Condition set forth herein in favor of it has not been satisfied.  If such Party does not exercise any such right to terminate by Closing (or by such other time specified), then, as of the Closing, such right shall be deemed waived by it with respect to the subject thereof.

**8.5.2**   Certain Closing Conditions-City and JDA.  In addition to any other Closing Condition set forth elsewhere in this Agreement, each of the following shall constitute a Closing Condition in favor of each of City and JDA:

(a)   Developer's Funding Sources.

(i)     JDA shall have received from Developer, no later than two (2) weeks prior to the date of the meeting at which JDA's board is scheduled to consider adoption of its Bond Resolution authorizing the issuance of the 2020 Bonds, such information regarding Developer's funding sources and creditworthiness as may be required by this Agreement or may be reasonably requested by JDA, and no later than the date of such board meeting, JDA is satisfied in its sole discretion with the Developer's funding sources and creditworthiness.

(ii)     Without limitation, Developer has provided to JDA no later than 5:00 o'clock p.m., Camden County, Georgia, time, at least ten (10) Business Days before Closing, a commitment from Developer's Lender to make the Developer's Loan on terms and conditions consistent with this Agreement, including, without

36

limitation, agreeing to the provisions hereof regarding the security therefor and repayment sources therefor.

(iii)     JDA shall have received such reports and information from public sources as JDA may require regarding the financial condition, funding sources and creditworthiness of Developer and the Control Group (as defined in Section 9.4.5, below), and by date of the Closing, JDA has not deemed such financial condition, funding sources or creditworthiness to be unsatisfactory or unsuitable for the transaction contemplated by this Agreement.

(b)     <u>Financial Advisor Report</u>. A financial advisor engaged by JDA or City at Developer's expense has provided a report of the finances of Developer and the Master Project to JDA and City that each such Party in its discretion deems to be satisfactory.

(c)     <u>Zoning</u>. Each of Developer, City, and JDA shall have deemed the zoning by City of the Master Site, including any necessary rezoning and variances, to be satisfactory for purposes of the Master Project.

(d)     <u>2018 Bond Proceeds</u>. JDA being able to retire the 2018 Bond out of existing proceeds thereof.

(e)     <u>2020 Bonds</u>. The issuance of the 2020 Bonds as tax-exempt or taxable revenue bonds being feasible, as determined by JDA in its discretion, to pay or reimburse the costs contemplated herein using the proceeds thereof, including the feasibility of successful judicial validation of such bonds and related legal issues and the feasibility of the repayment thereof.

(f)     <u>County IGA</u>. The County IGA is in full force and effect and is satisfactory to JDA.

(g)     <u>JDA Loan</u>. The JDA Loan Documents, the security for the JDA Loan and the creditworthiness of Developer are satisfactory to JDA in its discretion.

(h)     <u>Developer-JDA PSA</u>. The Developer-JDA PSA is in full force and effect and is satisfactory to JDA.

(i)     <u>Seller-Developer PSA</u>. The Seller-Developer PSA is in full force and effect and is satisfactory to JDA.

(j)     <u>City IGA</u>. The City IGA is in full force and effect and is satisfactory to JDA.

(k)     <u>Commitment for Marina Project</u>. Developer shall have provided to JDA a written firm commitment, that is satisfactory to JDA, from Suntex Marina Investors, a Delaware limited liability company, or another marina operator satisfactory to JDA in its discretion, to act as a Parcel Developer and carry out the Marina Project in accordance with this Agreement.

37

(l)    Brownfield Documents. JDA and City shall have Approved all Brownfield Documents.

(m)    Economic Study. A study of the economic benefit of the Master Project  has been received and Approved.

(n)    Plan of Finance. The Plan of Finance has been prepared and Approved.

**8.5.3**    Certain Closing Conditions- Developer. In addition to any other Closing Condition set forth elsewhere in this Agreement, the following shall constitute a Closing Condition in favor of Developer: the results of any Master Project due diligence conducted by Developer pursuant to Section 4.13, above, are reasonably satisfactory to Developer.

**Section 8.6    Developer's Termination Rights**.

**8.6.1**    Developer's Right to Terminate. Prior to Closing, Developer shall have the right to terminate this Agreement, without any further liability except as otherwise expressly provided in this Agreement, effective immediately upon giving written notice thereof to the other Parties, pursuant to any provision allowing it to do so contained elsewhere in this Agreement. Without limitation, Developer shall have the right to terminate this Agreement, effective immediately upon giving written notice to the other Parties if, by the Closing (or if this Agreement specifies another time therefor, then by such time) each Closing Condition set forth herein in favor of the Developer has not been satisfied.  If Developer does not exercise any such right to terminate by Closing (or by such other time specified), then, as of the Closing, such right shall be deemed waived with respect to the subject thereof.

**Section 8.7    Effect of Termination**.  If any Party terminates this Agreement prior to Closing pursuant to a right provided herein or if this Agreement expires prior to Closing, this Agreement, shall terminate as to all Parties without any further liability on the part of any Party, except as may theretofore have accrued, or except as otherwise expressly provided in this Agreement, or therein, or shall exist as a result of any prior breach hereof or thereof, provided, that if this Agreement is terminated prior to Closing for any reason, then Developer shall pay or reimburse JDA for all costs related incurred by JDA, including, without limitation, the fees and disbursements of JDA's counsel related hereto, such as those for the negotiation and preparation of this Agreement and of the MOU, and for work on the issuance of the 2020 Bonds.

## ARTICLE 9

## MISCELLANEOUS

**Section 9.1    Notices**.  Any notice sent under this Agreement (except as otherwise expressly required) must be written and mailed or sent by overnight courier or personally delivered to an officer of the receiving party at the following addresses:

**If to the JDA:**

Camden County Joint Development Authority
531 N. Lee Street
Kingsland, Georgia 31548
Attn: James Coughlin, Executive Director

With a copy to:

Seyfarth Shaw
1075 Peachtree Street
Suite 2500
Atlanta, Georgia 30309
Attn: Daniel M. McRae, Esq.

And a copy to:

Kinney & Kinney LLC
1815 Osborne Road
St. Marys, Georgia 31558
Attn: Stephen V. Kinney, Esq.

**If to the City:**

City of St. Marys
St. Marys City Hall
418 Osborne Street
St. Marys, Georgia  31558
Attn: City Manager

With a copy to:

Brown Readdick Bumgartner Carter Stickland &
    Watkins LLP
5 Glynn Avenue
Brunswick, Georgia  31520
Attn: Steven Blackerby, Esq.

**If to Developer:**

Jacoby Development Inc.
8200 Roberts Drive, Suite 200
Atlanta, Georgia  30350
Attn:  James F. Jacoby, Chairman

With a copy to:

Troutman Pepper Hamilton Sanders LLP
600 Peachtree Street, Suite 3000
Atlanta, Georgia 30308
Attn: Andrea L. Rimer, Esq.

Each Party may change its address by written notice in accordance with this Section. Any communication addressed and mailed in accordance with this Section will be deemed to be given when so mailed, and any communication so delivered in person will be deemed to be given when receipted for by, or actually received by, the Party identified above.

**Section 9.2** **Amendments and Waivers**. Any provision of this Agreement may be amended or waived if such amendment or waiver is in writing and is signed by the parties hereto. No course of dealing on the part of any party to this Agreement, nor any failure or delay by any party to this Agreement with respect to exercising any right, power or privilege hereunder will operate as a waiver thereof.

**Section 9.3** **Invalidity**. In the event that any provision of this Agreement is held unenforceable in any respect, such unenforceability will not affect any other provision of this Agreement.

**Section 9.4** **Successors and Assigns**. This Agreement is not assignable by any Party without the prior written consent of the other Parties, provided, that, at or after the Closing, Developer shall have a one-time right to assign its rights hereunder to the Permitted Assignee subject to the following terms and conditions:

**9.4.1** The instrument to effect such assignment ("**Permitted Assignment Agreement**") shall be in the form attached hereto as Schedule 9.4.1-A and incorporated herein by reference, with only such changes as may be approved in his discretion by JDA's Chair in consultation with JDA counsel.

**9.4.2** No subsequent assignment of this Agreement or any of the other agreements and documents contemplated herein may be made by the Permitted Assignee unless JDA in its discretion consents in writing to same.

**9.4.3** The assignment permitted by this Section 9.4 shall not release or relieve the within-named Developer from primary liability for the obligations and liabilities of the Developer hereunder incurred theretofore or thereafter that are contained herein or that arise hereunder, unless the JDA in its discretion consents in writing to same.

**9.4.4** Without limitation, (a) as provided in the Permitted Assignment Agreement, the Permitted Assignee shall assume the obligations and liabilities of the Developer hereunder incurred theretofore or thereafter that are contained herein or that arise hereunder, and (b) the within-named Developer shall guarantee all such obligations and liabilities incurred after such assignment by entering into a guaranty ("**Permitted Assignment Guaranty**") in the form attached hereto as Schedule 9.4.1-B and incorporated herein by reference, with only such changes as may be approved in his discretion by JDA's Chair in consultation with JDA counsel.

40

**9.4.5**   On the Effective Date and on the effective date of the Permitted Assignment Agreement, the Developer and the Permitted Assignee shall be controlled by those Persons (the "**Control Group**") whom Developer has represented in writing to JDA possess such control. Thereafter, transfers of direct or indirect equity ownership interests in Developer and the Permitted Assignee are permitted, on the condition that the Control Group continues to control the Developer and the Permitted Assignee.  If the foregoing condition is at any time breached or for whatever reason fails to be satisfied, then the Permitted Assignee and the Developer shall immediately give written notice thereof to JDA. Regardless of whether or not such notice is given, such breach or failure at JDA's option shall constitute an immediate Default. For such purposes, "**control**" means the power to direct or cause the direction of the management, policies and activities of Developer or the Permitted Assignee, as appropriate.

**Section 9.5**   **Schedules; Titles of Articles; Sections**.  The Schedules attached to this Agreement are incorporated herein and will be considered a part of this Agreement for the purposes stated herein, except that in the event of any conflict between any of the provisions of such Schedules and the provisions of this Agreement, the provisions of this Agreement will prevail. All titles or headings are only for the convenience of the parties and may not be construed to have any effect or meaning as to the agreement between the parties hereto.  Any reference herein to a Section or subsection will be considered a reference to such Section or subsection of this Agreement unless otherwise stated.   Any reference herein to a Schedule will be considered a reference to the applicable Schedule attached hereto unless otherwise stated.

**Section 9.6**   **Applicable Law**.  This Agreement is a contract made under and will be construed in accordance with and governed by the laws of the United States of America and the State of Georgia.  Venue shall be in Camden County, Georgia.

**Section 9.7**   **Entire Agreement**.  This written agreement represents the final agreement between the parties and may not be contradicted by evidence of prior, contemporaneous, or subsequent oral agreements of the parties.  There are no unwritten oral agreements between the parties. This Agreement supersedes the MOU.

**Section 9.8**   **Additional Actions**.  The Parties agree to take such actions, including the execution and delivery of such documents, instruments, petitions and certifications as may be necessary or appropriate, from time to time, to carry out the terms, provisions and intent of this Agreement and to aid and assist each other in carrying out said terms, provisions and intent.

*[Signatures on the following pages]*

**IN WITNESS WHEREOF**, the parties hereto have caused this instrument to be duly executed as of the Effective Date:

The "JDA"

**CAMDEN COUNTY JOINT DEVELOPMENT AUTHORITY**

By: _____
Jeff Barker, Chairman

ATTEST:

_____
Secretary

[Authority Seal]

*[Signatures continued on the following page]*

[Development Agreement - Authority Signature Page]



**The "City"**

**CITY OF ST. MARYS, GEORGIA**

By: _____
    Mayor

ATTEST:

[City Seal]

City Clerk

*[Signatures continued on the following page]*

The¨ Developer¨

**JACOBY DEVELOPMENT INC.,**
a Georgia corporation

By: _____
James F. Jacoby, Chairman

ATTEST:

_____
Mitchell Jacoby, Secretary

[CORPORATE SEAL]

[Development Agreement - Developer Signature Page]

## SCHEDULE 1.1A
## JDA SENIOR SECURITY SITE

[attached]

# A K M
## SURVEYING, INC.
### Surveyors & Land Planners

P.O. Box 5730
St. Marys, Georgia 31558
Phone: (912)729-1507
Fax: (912)729-1509
Email: akm_surveying@tds.net

September 24, 2020

## LEGAL DESCRIPTION OF SENIOR SECURITY SITE:

ALL THAT CERTAIN TRACT OR PARCEL OF LAND LYING AND BEING IN THE CITY OF ST. MARYS, (BEING A PORTION OF LANDS AS DESCRIBED IN DEED RECORDED IN DEED BOOK 1531, PAGE 130, PUBLIC RECORDS OF SAID COUNTY) AND BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS: FOR A POINT OF BEGINNING COMMENCE AT THE POINT WHERE THE NORTHERLY RIGHT-OF-WAY LINE OF MEETING STREET (A 100 FOOT RIGHT-OF-WAY) INTERSECTS THE EASTERLY RIGHT-OF-WAY LINE OF OSBORNE STREET (A 100 FOOT RIGHT-OF-WAY) AND  RUN THENCE NORTH 11° 12' 00" EAST ALONG THE EASTERLY RIGHT-OF-WAY LINE OF OSBORNE STREET, A DISTANCE 530.40 FEET TO A POINT, SAID POINT BEING THE SOUTH WEST CORNER OF LANDS NOW OR FORMERLY OF THEATRE BY THE TRAX, LLC (ACCORDING TO DEED RECORDED IN DEED BOOK 1589, PAGE 750, PUBLIC RECORDS OF SAID COUNTY); RUN THENCE SOUTH 78° 48' 00" EAST ALONG THE SOUTHERLY LINE OF SAID LANDS, A DISTANCE OF 141.91 FEET TO A POINT OF CURVATURE; RUN THENCE IN AN EASTERLY DIRECTION ALONG THE ARC OF A CURVE IN SAID SOUTHERLY LINE OF LAST MENTIONED LANDS, SAID CURVE BEING CONCAVE TO THE NORTH AND HAVING A RADIUS OF 332.00 FEET, A CHORD DISTANCE OF 130.71 FEET TO A POINT OF COMPOUND CURVATURE, THE BEARING OF THE AFOREMENTIONED CHORD BEING NORTH 82° 50' 29" EAST; RUN THENCE IN A NORTHEASTERLY DIRECTION ALONG THE ARC OF A CURVE IN THE SOUTHEASTERLY LINE OF LAST MENTIONED LANDS, SAID CURVE BEING CONCAVE TO THE NORTHWEST AND HAVING A RADIUS OF 554.41 FEET, A CHORD DISTANCE OF 206.05 FEET TO A POINT, THE BEARING OF THE AFOREMENTIONED CHORD BEING NORTH 60° 46' 46" EAST; RUN THENCE NORTH 33° 48' 00" WEST ALONG THE NORTHEASTERLY LINE OF THE LAST MENTIONED LANDS, A DISTANCE OF 69.06 FEET TO A POINT; RUN THENCE NORTH 78° 48' 00" WEST ALONG THE NORTHERLY LINE OF LAST MENTIONED LANDS, A DISTANCE OF 374.00 FEET TO A POINT IN THE WESTERLY LINE OF BLOCK 48; RUN THENCE NORTH 11° 12' 00" EAST, A DISTANCE OF 754.00 FEET TO A POINT ON THE EASTERLY RIGHT-OF-WAY LINE OF OSBORNE STREET (A 100 FOOT RIGHT-OF-WAY); RUN THENCE SOUTH 78° 48' 00" EAST, A DISTANCE OF 570.00 FEET TO A POINT; RUN THENCE SOUTH 11° 12' 00" WEST, A DISTANCE OF 436.00 FEET TO A POINT; RUN THENCE SOUTH 32° 00' 00" EAST, A DISTANCE OF 174.57 FEET TO A POINT; RUN THENCE NORTH 77° 30' 00" EAST, A DISTANCE OF 900 FEET, MORE OR LESS, TO THE HIGH WATER LINE OF NORTH RIVER; RUN THENCE IN A SOUTHERLY DIRECTION ALONG MEANDERING OF THE HIGH WATER LINE OF NORTH RIVER, A DISTANCE OF 1065 FEET, MORE OR LESS, TO A POINT ON THE NORTHERLY LINE OF LANDS NOW OR FORMERLY OF THE CITY OF ST. MARYS (ACCORDING TO DEED RECORDED IN DEED BOOK 744, PAGE 229, PUBLIC RECORDS OF SAID COUNTY); RUN THENCE NORTH 87° 04' 26" WEST ALONG THE NORTHERLY LINE OF LAST MENTIONED LANDS, A DISTANCE OF 55 FEET, MORE OR LESS TO A POINT; RUN THENCE SOUTH 43° 00' 26" WEST ALONG THE NORTHWESTERLY LINE OF LAST MENTIONED LANDS, A DISTANCE 172.25 FEET TO A POINT; RUN THENCE SOUTH 23° 58' 36" WEST  ALONG SAID NORTHWESTERLY LINE, A DISTANCE OF 205.62 FEET TO A POINT; RUN THENCE SOUTH 64° 46' 38" WEST ALONG

# A K M
## SURVEYING, INC.
### Surveyors & Land Planners

P.O. Box 5730
St. Marys, Georgia 31558
Phone: (912)729-1507
Fax: (912)729-1509
Email: akm_surveying@tds.net

SAID NORTHWESTERLY LINE, A DISTANCE OF 129.20 FEET TO A POINT; RUN THENCE NORTH 59° 51' 01" WEST ALONG THE NORTHEASTERLY LINE OF LAST MENTIONED LANDS, A DISTANCE OF 130.00 FEET TO A POINT LYING ON THE NORTHERLY RIGHT-OF-WAY LINE OF MEETING STREET (A 100 FOOT RIGHT-OF-WAY); RUN THENCE NORTH 78° 48' 00" WEST ALONG SAID NORTHERLY RIGHT-OF-WAY LINE, A DISTANCE OF 588.53 FEET TO A POINT WHERE THE NORTHERLY RIGHT-OF-WAY LINE OF MEETING STREET INTERSECTS THE EASTERLY RIGHT-OF-WAY LINE OF NORRIS STREET (A 100 FOOT RIGHT-OF-WAY); RUN THENCE NORTH 11° 12' 00" EAST ALONG SAID EASTERLY RIGHT-OF-WAY LINE, A DISTANCE OF 200.00 FEET TO A POINT; RUN THENCE NORTH 78° 48' 00" WEST, A DISTANCE OF 50.00 FEET TO A POINT LYING IN THE CENTERLINE OF NORRIS STREET; RUN THENCE SOUTH 11° 12' 00" WEST ALONG SAID CENTERLINE, A DISTANCE OF 120.00 FEET TO A POINT; RUN THENCE NORTH 78° 48' 00" WEST, A DISTANCE OF 50.00 FEET TO A POINT LYING IN THE WESTERLY RIGHT-OF-WAY LINE OF NORRIS STREET; RUN THENCE SOUTH 11° 12' 00" WEST ALONG SAID WESTERLY RIGHT-OF-WAY LINE, A DISTANCE OF 80.00 FEET TO A POINT WHERE THE WESTERLY RIGHT-OF-WAY LINE OF NORRIS STREET INTERSECTS THE AFOREMENTIONED NORTHERLY RIGHT-OF-WAY LINE OF MEETING STREET; RUN THENCE NORTH 78° 48' 00" WEST ALONG SAID NORTHERLY RIGHT-OF-WAY LINE, A DISTANCE OF 400.00 FEET TO A POINT WHERE THE NORTHERLY RIGHT-OF-WAY LINE OF MEETING STREET INTERSECTS THE EASTERLY RIGHT-OF-WAY LINE READY STREET (A 100 FOOT RIGHT-OF-WAY); RUN THENCE NORTH 11° 12' 00" EAST ALONG SAID EASTERLY RIGHT-OF-WAY LINE, A DISTANCE OF 80.00 FEET TO A POINT; RUN THENCE NORTH 78° 48' 00" WEST, A DISTANCE OF 100.00 FEET TO A POINT LYING ON THE WESTERLY RIGHT-OF-WAY LINE OF READY STREET; RUN THENCE SOUTH 11° 12' 00" WEST ALONG SAID WESTERLY RIGHT-OF-WAY LINE, A DISTANCE OF 80.00 FEET TO A POINT WHERE THE WESTERLY RIGHT-OF-WAY LINE OF READY STREET INTERSECTS THE AFOREMENTIONED NORTHERLY RIGHT-OF-WAY LINE OF MEETING STREET; RUN THENCE NORTH 78° 48' 00" WEST ALONG SAID NORTHERLY RIGHT-OF-WAY LINE, A DISTANCE OF 400.00 FEET TO THE POINT OF BEGINNING.

THE LAND THUS DESCRIBED CONTAINS 49.4 ACRES, MORE OR LESS, ACCORDING TO THAT CERTAIN BOUNDARY SURVEY FOR CAMDEN COUNTY JOINT DEVELOPMENT AUTHORITY, DATED JULY 22, 2020, LAST REVISED SEPTEMBER 24, 2020, AND PREPARED BY AKM SURVEYING, INC., JEFFREY S. FOSTER, GRLS NO. 3143, AND IS SUBJECT TO ANY EASEMENTS OF RECORD WHICH MAY LIE WITHIN.

**SCHEDULE 1.1B**

**MARINA PROJECT SITE**

[attached]



**SCHEDULE 1.1C**

**<u>JDA JUNIOR SECURITY SITE</u>**

[Attached]

# A K M
## SURVEYING, INC.
### Surveyors & Land Planners

P.O. Box 5730
St. Marys, Georgia 31558
Phone: (912)729-1507
Fax: (912)729-1509
Email: akm_surveying@tds.net

September 24, 2020

## LEGAL DESCRIPTION OF JUNIOR SECURITY SITE:

ALL THAT CERTAIN TRACT OR PARCEL OF LAND LYING AND BEING IN THE CITY OF ST. MARYS, 29TH DISTRICT, G.M., CAMDEN COUNTY, GEORGIA AND BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS: FOR A POINT OF BEGINNING COMMENCE AT THE NORTHEASTERLY CORNER OF BLOCK 107 (ACCORDING TO THE OFFICIAL PLAN OF ST. MARYS RECORDED AT PLAT BOOK 1, PAGE 94, PUBLIC RECORDS OF SAID COUNTY) WHERE THE SOUTHERLY RIGHT-OF-WAY LINE OF ASHLEY STREET INTERSECTS THE EASTERLY RIGHT-OF-WAY LINE OF COLE STREET (BOTH AS ESTABLISHED FOR A 100-FOOT RIGHT-OF-WAY) AND RUN NORTH 11° 12' 00" EAST, TO AND ALONG THE WESTERLY LINE OF BLOCK 108 (ACCORDING TO SAID OFFICIAL PLAN OF ST. MARYS) AND THE NORTHERLY PROLONGATION THEREOF, THE SAME BEING THE EASTERLY RIGHT-OF-WAY LINE OF SAID COLE STREET, 636.00 FEET TO THE SOUTHWESTERLY CORNER OF BLOCK 109 (ACCORDING TO SAID OFFICIAL PLAN OF ST. MARYS) WHERE THE EASTERLY RIGHT-OF-WAY LINE OF SAID COLE STREET INTERSECTS THE NORTHERLY RIGHT-OF-WAY LINE OF MEETING STREET (AS ESTABLISHED FOR A 100-FOOT RIGHT-OF-WAY); THENCE RUN NORTH 78° 48' 00" WEST TO AND ALONG THE SOUTHERLY LINE OF BLOCK 15 (ACCORDING TO SAID OFFICIAL PLAN OF ST. MARYS), THE SAME BEING THE NORTHERLY RIGHT-OF-WAY LINE OF SAID MEETING STREET, 500.00 FEET TO THE SOUTHWESTERLY CORNER OF SAID BLOCK 15 WHERE THE NORTHERLY RIGHT-OF-WAY LINE OF SAID MEETING STREET INTERSECTS THE EASTERLY RIGHT-OF-WAY LINE OF NORRIS STREET (AS ESTABLISHED FOR A 100-FOOT RIGHT-OF-WAY); THENCE NORTH 11° 12' 00" EAST ALONG THE EASTERLY RIGHT-OF-WAY LINE OF SAID NORRIS STREET, THE SAME BEING THE WESTERLY LINE OF SAID BLOCK 15 AND THE SAME BEING THE WESTERLY LINE OF LANDS DESCRIBED IN DEED RECORDED IN DEED BOOK 1531, PAGE 130, PUBLIC RECORDS OF SAID COUNTY, 200.00 FEET TO THE NORTHWESTERLY CORNER OF LAST MENTIONED LANDS; THENCE NORTH 78° 48' 00" WEST ALONG THE WESTERLY PROLONGATION OF LAST MENTIONED LANDS, 50.00 FEET TO THE CENTERLINE OF SAID NORRIS STREET; THENCE SOUTH 11° 12' 00" WEST ALONG SAID CENTERLINE, 120.00 FEET; THENCE NORTH 78° 48' 00" WEST, 50.00 FEET TO THE EASTERLY LINE OF BLOCK 34 (ACCORDING TO SAID OFFICIAL PLAN OF ST. MARYS), THE SAME BEING THE WESTERLY RIGHT-OF-WAY LINE OF SAID NORRIS STREET; THENCE SOUTH 11° 12' 00" WEST ALONG LAST MENTIONED EASTERLY LINE, 80.00 FEET TO THE SOUTHEASTERLY CORNER OF SAID BLOCK 34 WHERE THE WESTERLY RIGHT-OF-WAY LINE OF SAID NORRIS STREET INTERSECTS THE NORTHERLY RIGHT-OF-WAY LINE OF SAID MEETING STREET; THENCE NORTH 78° 48' 00" WEST ALONG THE SOUTHERLY LINE OF SAID BLOCK 34, THE SAME BEING THE NORTHERLY RIGHT-OF-WAY LINE OF SAID MEETING STREET, 400.00 FEET TO THE SOUTHWESTERLY CORNER OF SAID BLOCK 34 WHERE THE NORTHERLY RIGHT-OF-WAY LINE OF SAID MEETING STREET INTERSECTS THE EASTERLY RIGHT -OF-WAY LINE OF READY STREET (AS ESTABLISHED FOR A 100-FOOT RIGHT-OF-WAY); THENCE NORTH 11° 12' 00" EAST ALONG THE WESTERLY LINE OF SAID BLOCK 34, THE SAME BEING THE EASTERLY RIGHT-OF-

# A K M
## SURVEYING, INC.
### Surveyors & Land Planners

P.O. Box 5730
St. Marys, Georgia 31558
Phone: (912)729-1507
Fax: (912)729-1509
Email: akm_surveying@tds.net

WAY LINE OF SAID READY STREET, 80.00 FEET; THENCE NORTH 78° 48' 00" WEST, 100.00 FEET TO THE EASTERLY LINE OF BLOCK 90C (ACCORDING TO SAID OFFICIAL PLAN OF ST. MARYS), THE SAME BEING THE WESTERLY RIGHT-OF-WAY LINE OF SAID READY STREET; THENCE SOUTH 11° 12' 00" WEST ALONG LAST MENTIONED EASTERLY LINE, 80.00 FEET TO THE SOUTHEASTERLY CORNER OF SAID BLOCK 90C WHERE THE WESTERLY RIGHT-OF-WAY LINE OF SAID READY STREET INTERSECTS THE NORTHERLY RIGHT-OF-WAY OF SAID MEETING STREET; THENCE NORTH 78° 48' 00" WEST ALONG THE SOUTHERLY LINE OF SAID BLOCK 90C, THE SAME BEING THE NORTHERLY RIGHT-OF-WAY LINE OF SAID MEETING STREET, 400.00 FEET TO THE SOUTHWESTERLY CORNER OF SAID BLOCK 90C WHERE THE NORTHERLY RIGHT-OF-WAY LINE OF SAID MEETING STREET INTERSECTS THE EASTERLY RIGHT-OF-WAY LINE OF OSBORNE STREET (AS ESTABLISHED FOR A 100-FOOT RIGHT-OF-WAY); THENCE NORTH 11° 12' 00" EAST ALONG THE WESTERLY LINE OF SAID BLOCK 90C AND THE NORTHERLY PROLONGATION THEREOF, THE SAME BEING THE EASTERLY RIGHT-OF-WAY LINE OF SAID OSBORNE STREET, 530.40 FEET TO THE SOUTHWESTERLY CORNER OF LANDS DESCRIBED IN DEED RECORDED IN DEED BOOK 1589, PAGE 750, PUBLIC RECORDS OF SAID COUNTY; THENCE IN AN EASTERLY, NORTHEASTERLY, NORTHWESTERLY AND WESTERLY DIRECTION ALONG THE SOUTHERLY, SOUTHEASTERLY, NORTHEASTERLY AND NORTHERLY LINES OF LAST MENTIONED LANDS THE FOLLOWING FIVE (5) COURSES: COURSE NO. 1 - SOUTH 78° 48' 00" EAST, 141.91 FEET TO A POINT OF CURVATURE; COURSE NO. 2 - THENCE IN AN EASTERLY DIRECTION ALONG THE ARC OF A CURVE, SAID CURVE BEING CONCAVE NORTHERLY AND HAVING A RADIUS OF 332.00 FEET, A CHORD BEARING AND DISTANCE OF NORTH 82° 50' 29" EAST, 130.71 FEET TO A POINT OF COMPOUND CURVATURE; COURSE NO. 3 - THENCE IN A NORTHEASTERLY DIRECTION ALONG THE ARC OF A CURVE, SAID CURVE BEING CONCAVE NORTHWESTERLY AND HAVING A RADIUS OF 554.41 FEET, A CHORD BEARING AND DISTANCE OF NORTH 60° 46' 46" EAST, 206.05 FEET; COURSE NO. 4 - NORTH 33° 48' 00" WEST, 69.06 FEET; COURSE NO. 5 - NORTH 78° 48' 00" WEST, 374.00 FEET TO THE POINT OF BEGINNING.

FROM THE POINT OF BEGINNING THUS DESCRIBED THENCE NORTH 78° 48' 00" WEST, 30.48 FEET TO A POINT LYING ON THE CURVED EASTERLY RIGHT-OF-WAY LINE OF OSBORNE ROAD (RIGHT-OF-WAY VARIES); THENCE IN A NORTHWESTERLY DIRECTION ALONG THE ARC OF A CURVE IN THE NORTHEASTERLY RIGHT-OF-WAY LINE OF SAID OSBORNE ROAD, SAID CURVE BEING CONCAVE WESTERLY AND HAVING A RADIUS OF 1,487.59 FEET, A CHORD BEARING AND DISTANCE OF NORTH 14° 47' 30" WEST, 648.75 FEET TO THE MOST SOUTHERLY CORNER OF LANDS DESCRIBED IN DEED RECORDED IN DEED BOOK 1597, PAGE 245, PUBLIC RECORDS OF SAID COUNTY; THENCE NORTH 62° 41' 50" EAST ALONG THE SOUTHEASTERLY LINE OF LAST MENTIONED LANDS, 274.46 FEET TO THE MOST EASTERLY CORNER THEREOF AT THE NORTHEASTERLY CORNER OF BLOCK 62 (ACCORDING TO SAID OFFICIAL PLANS OF ST. MARYS) WHERE THE SOUTHERLY RIGHT-OF-WAY LINE OF LIBERTY STREET (AS ESTABLISHED FOR A 100-FOOT RIGHT-OF-WAY LINE OF SAID OSBORNE STREET; THENCE SOUTH 78° 48' 00" EAST ALONG THE EASTERLY PROLONGATION OF THE NORTHERLY LINE OF SAID BLOCK 62, 100.00 FEET TO THE NORTHWESTERLY CORNER OF BLOCK 49 (ACCORDING TO SAID OFFICIAL PLAN OF ST. MARYS) WHERE THE SOUTHERLY RIGHT-OF-WAY LINE OF SAID LIBERTY STREET INTERSECTS THE EASTERLY RIGHT-OF-WAY LINE OF SAID OSBORNE STREET; THENCE NORTH

# A K M
## SURVEYING, INC.
### Surveyors & Land Planners

P.O. Box 5730
St. Marys, Georgia 31558
Phone: (912)729-1507
Fax: (912)729-1509
Email: akm_surveying@tds.net

11° 12' 00" EAST TO AND ALONG THE WESTERLY LINE OF BLOCK 50 AND TO AND ALONG THE
WESTERLY LINE OF BLOCK 51 (BOTH ACCORDING TO SAID OFFICIAL PLAN OF ST. MARYS), THE
SAME BEING THE EASTERLY RIGHT-OF-WAY LINE OF SAID OSBORNE STREET, 862.00 FEET TO
THE SOUTHWESTERLY CORNER OF LANDS DESCRIBED IN DEED RECORDED IN DEED BOOK 663,
PAGE 67, PUBLIC RECORDS OF SAID COUNTY; THENCE SOUTH 78° 48' 00" EAST ALONG THE
SOUTHERLY LINE OF LAST MENTIONED LANDS, 150.00 FEET TO THE SOUTHEASTERLY CORNER
THEREOF; THENCE NORTH 11° 12' 00" EAST ALONG THE EASTERLY LINE OF LAST MENTIONED
LANDS, ALONG THE EASTERLY LINE OF LANDS DESCRIBED IN DEED RECORDED IN DEED BOOK
136, PAGE 660, PUBLIC RECORDS OF SAID COUNTY AND THE NORTHERLY PROLONGATION
THEREOF, 310.00 FEET TO THE SOUTHERLY LINE OF BOOK 52 (ACCORDING TO SAID OFFICIAL
PLAN OF ST. MARYS, THE SAME BEING THE NORTHERLY RIGHT-OF-WAY LINE OF FINLEY
STREET (AS ESTABLISHED FOR A 100-FOOT RIGHT-OF-WAY) THENCE NORTH 78° 48' 00" WEST
ALONG LAST MENTIONED SOUTHERLY LINE, 150.00 FEET TO THE SOUTHWESTERLY CORNER OF
SAID BLOCK 52 WHERE THE NORTHERLY RIGHT-OF-WAY LINE OF SAID FINLEY STREET
INTERSECTS THE EASTERLY RIGHT-OF-WAY LINE OF SAID OSBORNE STREET; THENCE NORTH
11° 12' 00" EAST ALONG THE WESTERLY LINE OF SAID BLOCK 52 AND TO AND ALONG THE
WESTERLY LINE OF BLOCK 53 (ACCORDING TO SAID OFFICIAL PLAN OF ST. MARYS), THE SAME
BEING THE EASTERLY RIGHT-OF-WAY LINE OF SAID OSBORNE STREET, 972.00 FEET TO THE
NORTHWESTERLY CORNER OF SAID BLOCK 53 WHERE LAST MENTIONED EASTERLY RIGHT-OF-
WAY LINE INTERSECTS THE SOUTHERLY RIGHT-OF-WAY LINE OF NORTH STREET (AS
ESTABLISHED FOR A 100-FOOT RIGHT-OF-WAY); THENCE NORTH 78° 48' 00" WEST ALONG THE
WESTERLY PROLONGATION OF THE NORTHERLY LINE OF SAID BLOCK 53, 100.00 FEET TO THE
NORTHEASTERLY CORNER OF BLOCK 66 (ACCORDING TO SAID OFFICIAL PLAN OF ST. MARYS)
WHERE THE SOUTHERLY RIGHT-OF-WAY LINE OF SAID NORTH STREET INTERSECTS THE
WESTERLY RIGHT-OF-WAY LINE OF SAID OSBORNE STREET; THENCE SOUTH 11° 12' 00" WEST
ALONG THE EASTERLY LINE OF SAID BLOCK 66, THE SAME BEING LAST MENTIONED
WESTERLY RIGHT-OF-WAY LINE, 218.00 FEET TO THE NORTHEASTERLY CORNER OF LANDS
DESCRIBED IN DEED RECORDED IN DEED BOOK 1212, PAGE 127, PUBLIC RECORDS OF SAID
COUNTY; THENCE NORTH 78° 48' 00" WEST ALONG THE NORTHERLY LINE OF LAST MENTIONED
LANDS, 400.00 FEET TO THE NORTHWESTERLY CORNER THEREOF LYING ON THE WESTERLY
LINE OF SAID BLOCK 66, THE SAME BEING THE EASTERLY RIGHT-OF-WAY LIE OF WHEELER
STREET (AS ESTABLISHED FOR A 100-FOOT RIGHT-OF-WAY); THENCE NORTH 11° 12' 00" EAST
ALONG LAST MENTIONED WESTERLY LINE, 218.00 FEET TO THE NORTHWESTERLY CORNER OF
SAID BLOCK 66 WHERE THE EASTERLY RIGHT-OF-WAY LINE OF SAID WHEELER STREET
INTERSECTS THE SOUTHERLY RIGHT-OF-WAY LINE OF SAID NORTH STREET; THENCE NORTH
78° 48' 00" WEST ALONG THE WESTERLY PROLONGATION OF THE NORTHERLY LINE OF SAID
BLOCK 66, 100.00 FEET TO THE NORTHEASTERLY CORNER OF BLOCK 87 (ACCORDING TO SAID
OFFICIAL PLAN OF ST. MARYS) WHERE THE SOUTHERLY RIGHT-OF-WAY LINE OF SAID NORTH
STREET INTERSECTS THE WESTERLY RIGHT-OF-WAY LINE OF SAID WHEELER STREET; THENCE
SOUTH 11° 12' 00" WEST ALONG THE EASTERLY LINE OF SAID BLOCK 87, THE SAME BEING THE
WESTERLY RIGHT-OF-WAY LINE OF SAID WHEELER STREET, 118.00 FEET TO THE
NORTHEASTERLY CORNER OF LANDS DESCRIBED IN DEED RECORDED IN DEED BOOK 175, PAGE
726; THENCE NORTH 78° 48' 00" WEST ALONG THE NORTHERLY LINE OF LAST MENTIONED

# A K M
## SURVEYING, INC.
Surveyors & Land Planners

P.O. Box 5730
St. Marys, Georgia 31558
Phone: (912)729-1507
Fax: (912)729-1509
Email: akm_surveying@tds.net

LANDS AND ALONG THE NORTHERLY LINE OF LANDS DESCRIBED IN DEED RECORDED IN DEED
BOOK 324, PAGE 15, 400.00 FEET TO THE NORTHWESTERLY CORNER OF LAST MENTIONED
LANDS LYING ON THE EASTERLY RIGHT-OF-WAY LINE OF SEAGROVE STREET (AS
ESTABLISHED FOR A 100-FOOT RIGHT-OF-WAY); THENCE NORTH 11° 12' 00" EAST ALONG THE
WESTERLY LINE OF SAID BLOCK 87, THE SAME BEING THE EASTERLY RIGHT-OF-WAY LINE OF
SAID SEAGROVE STREET, 118.00 FEET TO THE NORTHWESTERLY CORNER OF SAID BLOCK 87
WHERE LAST MENTIONED EASTERLY RIGHT-OF-WAY LINE INTERSECTS THE SOUTHERLY
RIGHT-OF-WAY LINE OF SAID NORTH STREET; THENCE NORTH 78° 48' 00" WEST ALONG THE
WESTERLY PROLONGATION OF THE NORTHERLY LINE OF SAID BLOCK 87, 100.00 FEET TO THE
NORTHEASTERLY CORNER OF BLOCK 88 (ACCORDING TO SAID OFFICIAL PLAN OF ST. MARYS)
WHERE THE LAST MENTIONED SOUTHERLY RIGHT-OF-WAY LINE INTERSECTS THE WESTERLY
RIGHT-OF-WAY LINE OF SAID SEAGROVE STREET; THENCE SOUTH 11° 12' 00" WEST ALONG THE
EASTERLY LINE OF SAID BLOCK 88, THE SAME BEING THE WESTERLY RIGHT-OF-WAY LINE OF
SAID SEAGROVE STREET, 436.00 FEET TO THE SOUTHEASTERLY CORNER OF SAID BLOCK 88
WHERE LAST MENTIONED WESTERLY RIGHT-OF-WAY LINE INTERSECTS THE NORTHERLY
RIGHT-OF-WAY LINE OF UNION STREET (AS ESTABLISHED FOR A 100-FOOT RIGHT-OF-WAY);
THENCE NORTH 78° 48' 00" WEST ALONG THE SOUTHERLY LINE OF SAID BLOCK 88 AND THE
WESTERLY PROLONGATION THEREOF, THE SAME BEING THE NORTHERLY RIGHT-OF-WAY LINE
OF SAID UNION STREET, 500.00 FEET TO THE SOUTHEASTERLY CORNER OF BLOCK 213
(ACCORDING TO SAID OFFICIAL PLAN OF ST. MARYS) WHERE LAST MENTIONED NORTHERLY
RIGHT-OF-WAY LINE INTERSECTS THE WESTERLY RIGHT-OF-WAY LINE OF BARTLETT STREET
(AS ESTABLISHED FOR A 100-FOOT RIGHT-OF-WAY); THENCE SOUTH 11° 12' 00" WEST TO AND
ALONG THE EASTERLY LINE OF BLOCK 212 (ACCORDING TO SAID OFFICIAL PLAN OF ST.
MARYS), THE SAME BEING THE WESTERLY RIGHT-OF-WAY LINE OF SAID BARTLETT STREET,
536.00 FEET TO THE SOUTHEASTERLY CORNER OF SAID BLOCK 212 WHERE LAST MENTIONED
WESTERLY RIGHT-OF-WAY LINE INTERSECTS THE NORTHERLY RIGHT-OF-WAY LINE OF SAID
FINLEY STREET; THENCE NORTH 78° 48' 00" WEST ALONG THE SOUTHERLY LINE OF SAID BLOCK
212 AND THE WESTERLY PROLONGATION THEREOF, ALONG THE SOUTHERLY LINE OF BLOCK
233 (ACCORDING TO SAID OFFICIAL PLAN OF ST. MARYS) AND THE WESTERLY PROLONGATION
THEREOF, THE SAME BEING THE NORTHERLY RIGHT-OF-WAY LINE OF SAID FINLEY STREET,
1,000.00 FEET TO THE SOUTHEASTERLY CORNER OF BLOCK 243 (ACCORDING TO SAID OFFICIAL
PLAN OF ST. MARYS) WHERE LAST MENTIONED NORTHERLY RIGHT-OF-WAY LINE INTERSECTS
THE WESTERLY RIGHT-OF-WAY LINE OF BORRELL STREET (AS ESTABLISHED FOR A 100-FOOT
RIGHT-OF-WAY); THENCE NORTH 11° 12' 00" EAST ALONG THE EASTERLY LINE OF SAID BLOCK
243, THE SAME BEING THE WESTERLY RIGHT-OF-WAY LINE OF SAID BORRELL STREET AND THE
SAME BEING THE EASTERLY LINE OF LANDS DESCRIBED IN DEED RECORDED IN DEED BOOK
338, PAGE 276, PUBLIC RECORDS OF SAID COUNTY, 200.00 FEET TO THE NORTHEASTERLY
CORNER OF LAST MENTIONED LANDS; THENCE NORTH 78° 48' 00" WEST ALONG THE
NORTHERLY LINE OF LAST MENTIONED LANDS AND ALONG THE NORTHERLY LINE OF LANDS
DESCRIBED IN DEED RECORDED IN DEED BOOK 1581, PAGE 657, PUBLIC RECORDS OF SAID
COUNTY, 475.72 FEET TO THE NORTHWESTERLY CORNER OF LAST MENTIONED LANDS LYING
ON THE EASTERLY RIGHT-OF-WAY LINE OF OLD POINT PETER ROAD (AS ESTABLISHED FOR AN
80-FOOT RIGHT-OF-WAY); THENCE NORTH 07° 38' 00" EAST ALONG LAST MENTIONED EASTERLY

# A K M

## SURVEYING, INC.

Surveyors & Land Planners

P.O. Box 5730
St. Marys, Georgia 31558
Phone: (912)729-1507
Fax: (912)729-1509
Email: akm_surveying@tds.net

RIGHT-OF-WAY LINE, 3,509.27 FEET TO THE SOUTHWESTERLY CORNER OF LANDS DESCRIBED IN DEED RECORDED IN DEED BOOK 79, PAGE 565, PUBLIC RECORDS OF SAID COUNTY; THENCE IN AN EASTERLY, NORTHERLY AND WESTERLY DIRECTION ALONG THE SOUTHERLY, EASTERLY AND NORTHERLY LINES OF LAST MENTIONED LANDS THE FOLLOWING THREE (3) COURSES: COURSE NO. 1 - SOUTH 82° 19' 23" EAST, 400.00 FEET TO THE SOUTHEASTERLY CORNER THEREOF; COURSE NO. 2 - NORTH 07° 41' 17" EAST, 100.00 FEET TO THE NORTHEASTERLY CORNER THEREOF; COURSE NO. 3 - NORTH 82° 18' 43" WEST, 200.96 FEET TO THE SOUTHEASTERLY CORNER OF LANDS DESCRIBED IN DEED RECORDED IN DEED BOOK 86, PAGE 329, PUBLIC RECORDS OF SAID COUNTY; THENCE NORTH 07° 41' 17" EAST ALONG THE EASTERLY LINE OF LAST MENTIONED LANDS, ALONG THE EASTERLY LINE OF LANDS DESCRIBED IN DEED RECORDED IN DEED BOOK 125, PAGE 363, PUBLIC RECORDS OF SAID COUNTY AND ALONG THE EASTERLY LINE OF LANDS DESCRIBED IN DEED RECORDED IN DEED BOOK 464, PAGE 608, PUBLIC RECORDS OF SAID COUNTY, 300.11 FEET TO THE NORTHEASTERLY CORNER OF LAST MENTIONED LANDS AND THE SOUTHEASTERLY CORNER OF "H" STREET (RIGHT-OF-WAY AS NOW ESTABLISHED); THENCE NORTH 82° 22' 00" WEST ALONG THE NORTHERLY LINE OF LAST MENTIONED LANDS THE SAME BEING THE SOUTHERLY RIGHT-OF-WAY LINE OF SAID "H" STREET, 199.43 FEET TO THE NORTHWESTERLY CORNER OF LAST MENTIONED LANDS WHERE THE SOUTHERLY RIGHT-OF-WAY LINE OF SAID "H" STREET INTERSECTS THE EASTERLY RIGHT-OF-WAY LINE OF SAID OLD POINT PETER ROAD; THENCE NORTH 07° 38' 00" EAST ALONG LAST MENTIONED EASTERLY RIGHT-OF-WAY LINE 50.75 FEET TO THE SOUTHWESTERLY CORNER OF LANDS DESCRIBED IN DEED RECORDED IN DEED BOOK 57, PAGE 581, PUBLIC RECORDS OF SAID COUNTY; THENCE SOUTH 82° 22' 00" EAST ALONG THE SOUTHERLY LINE OF LAST MENTIONED LANDS, THE SAME BEING THE NORTHERLY RIGHT-OF-WAY LINE OF SAID "H" STREET, 199.48 FEET TO THE SOUTHEASTERLY CORNER OF LAST MENTIONED LANDS; THENCE NORTH 07° 41' 17" EAST ALONG THE EASTERLY LINE OF LAST MENTIONED LANDS, ALONG THE EASTERLY LINE OF LANDS DESCRIBED IN DEED RECORDED IN DEED BOOK 57, PAGE 579, PUBLIC RECORDS OF SAID COUNTY AND ALONG THE EASTERLY LINE OF LANDS DESCRIBED IN DEED RECORDED IN DEED BOOK 86, PAGE 173, PUBLIC RECORDS OF SAID COUNTY, 300.04 FEET TO THE NORTHEASTERLY CORNER OF LAST MENTIONED LANDS, THE SAME BEING THE SOUTHWESTERLY CORNER OF LANDS DESCRIBED IN DEED RECORDED IN DEED BOOK 342, PAGE 14, PUBLIC RECORDS OF SAID COUNTY; THENCE SOUTH 82° 16' 46" EAST ALONG THE SOUTHERLY LINE OF LAST MENTIONED LANDS AND ALONG THE SOUTHERLY LINE OF NORTH RIVER MARSHES SUBDIVISION, PH. 1 (ACCORDING TO MAP RECORDED IN PLAT BOOK 8, PAGE 62, PUBLIC RECORDS OF SAID COUNTY), 540.00 FEET TO THE MOST SOUTHERLY CORNER OF LOT 14, BLOCK "C", SAID NORTH RIVER MARSHES SUBDIVISION, PH. 1; THENCE NORTH 07° 43' 14" EAST ALONG THE EASTERLY LINE OF SAID LOT 14, 50.00 FEET TO THE SOUTHWESTERLY CORNER OF LOT 28, BLOCK "C", SAID NORTH RIVER MARSHES SUBDIVISION, PH. 1; THENCE SOUTH 82° 16' 46" EAST ALONG THE SOUTHERLY LINE OF SAID LOT 28 AND THE EASTERLY PROLONGATION THEREOF, 200.00 FEET TO A POINT ON THE WESTERLY LINE OF LOT 49, NORTH RIVER MARSHES SUBDIVISION, PH.2 (ACCORDING TO MAP THEREOF RECORDED IN PLAT CABINET 1, FILE 13A, PUBLIC RECORDS OF SAID COUNTY); THENCE SOUTH 07° 43' 14" WEST ALONG LAST MENTIONED WESTERLY LINE, 5.00 FEET TO THE SOUTHWESTERLY CORNER THEREOF; THENCE SOUTH 82° 16' 46" EAST ALONG THE SOUTHERLY LINE OF LOTS 49, 48, 47 AND

# A K M
## SURVEYING, INC.
### Surveyors & Land Planners

P.O. Box 5730
St. Marys, Georgia 31558
Phone: (912)729-1507
Fax: (912)729-1509
Email: akm_surveying@tds.net

46, SAID NORTH RIVER MARSHES SUBDIVISION - PH. 2, 405.78 FEET TO THE SOUTHEASTERLY CORNER OF SAID LOT 46, THE SAME BEING A POINT ON THE WESTERLY LINE OF BLOCK S-19 (ACCORDING TO SAID OFFICIAL PLAN OF ST. MARYS); THENCE NORTH 11° 17' 14" EAST ALONG THE EASTERLY LINE OF LOT 46 AND 45, SAID NORTH RIVER MARSHES SUBDIVISION - PH. 2, 127.72 FEET TO THE NORTHWESTERLY CORNER OF SAID BLOCK S-19; THENCE SOUTH 78° 52' 32" EAST ALONG THE SOUTHERLY LINE OF LOTS 25, 24, 23, 19 AND 18, SAID NORTH RIVER MARSHES SUBDIVISION - PH. 2 AND THE EASTERLY PROLONGATION THEREOF, THE SAME BEING THE NORTHERLY LINE OF SAID BLOCK S-19 AND THE EASTERLY PROLONGATION THEREOF, THE NORTHERLY LINE OF BLOCK S-18 (ACCORDING TO SAID OFFICIAL PLAN OF ST. MARYS) AND THE EASTERLY PROLONGATION THEREOF, THE NORTHERLY LINE OF BLOCK S-17 (ACCORDING TO SAID OFFICIAL PLAN OF ST. MARYS) AND THE EASTERLY PROLONGATION THEREOF AND THE NORTHERLY LINE OF BLOCK S-16 (ACCORDING TO SAID OFFICIAL PLAN OF ST. MARYS), 3,206 FEET, MORE OR LESS, TO THE SOUTHWESTERLY EDGE OF THE OPEN WATER OF THE NORTH RIVER; THENCE IN A SOUTHEASTERLY, SOUTHWESTERLY, SOUTHEASTERLY, SOUTHWESTERLY, NORTHWESTERLY, SOUTHWESTERLY AND SOUTHERLY DIRECTION ALONG THE MEANDERINGS OF THE SOUTHWESTERLY, NORTHWESTERLY, SOUTHWESTERLY, NORTHWESTERLY, NORTHEASTERLY, NORTHWESTERLY AND WESTERLY EDGE OF THE OPEN WATER OF THE NORTH RIVER, 18,927 FEET, MORE OR LESS, TO A POINT; THENCE SOUTH 77° 30' 00" WEST, 900 FEET, MORE OR LESS, TO A POINT; THENCE NORTH 32° 00' 00" WEST, 174.57 FEET TO A POINT; THENCE NORTH 11° 12' 00" EAST, 436.00 FEET TO A POINT; THENCE NORTH 78° 48' 00" WEST, 570.00 FEET TO A POINT; THENCE SOUTH 11° 12' 00" WEST, 754.00 FEET TO THE POINT OF BEGINNING.

LESS AND EXCEPT LANDFILL NUMBER ONE CONTAINING 10.77 ACRES, MORE OR LESS.
LESS AND EXCEPT LANDFILL NUMBER TWO CONTAINING 30.53 ACRES, MORE OR LESS.

THE LAND THUS DESCRIBED CONTAINS 614 ACRES, MORE OR LESS, ACCORDING TO THAT CERTAIN BOUNDARY SURVEY FOR CAMDEN COUNTY JOINT DEVELOPMENT AUTHORITY, DATED AUGUST 21, 2020, LAST REVISED SEPTEMBER 24, 2020, AND PREPARED BY AKM SURVEYING, INC., JEFFREY S. FOSTER, GRLS NO. 3143.

**SCHEDULE 1.1D**

**DEVELOPER PROJECT SITE PART 2**

[Attached]

# A K M
## SURVEYING, INC.
### Surveyors & Land Planners

P.O. Box 5730
St. Marys, Georgia  31558
Phone: (912)729-1507
Fax: (912)729-1509
Email: akm_surveying@tds.net

July 29, 2020

## LEGAL DESCRIPTION OF MASTER DEVELOPER PROJECT SITE 2:

ALL THAT TRACT OR PARCEL OF LAND LYING IN THE CITY OF ST. MARYS, 29th G.M. DISTRICT, CAMDEN COUNTY, GEORGIA, BEING A PORTION OF LANDS NOW OR FORMERLY OF THE ST. MARYS AIRPORT AUTHORITY (ACCORDING TO DEED RECORDED IN DEED BOOK 141, PAGE 709, PUBLIC RECORDS OF SAID COUNTY) AND ALL OF LOT 7, ST. MARYS INDUSTRIAL PARK, SITE 2 (ACCORDING TO PLAT RECORDED IN PLAT CABINET 1, FOLIO 21-C, PUBLIC RECORDS OF SAID COUNTY) AND BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS: FOR A POINT OF BEGINNING COMMENCE AT A POINT LYING AT THE SOUTHERLY CORNER OF LOT 10, ST. MARYS INDUSTRIAL PARK, NORTH SITE (ACCORDING TO PLAT RECORDED IN PLAT DRAWER 7, MAP NUMBER 98, PUBLIC RECORDS OF SAID COUNTY), HAVING GEORGIA STATE PLANE COORDINATES (EAST ZONE) NORTH 274553.10', EAST 846336.30' AND RUN THENCE NORTH 62°-13'-11" EAST TO AND ALONG THE SOUTHEASTERLY LINE OF LOT 11 AND LOT 12, ST. MARYS INDUSTRIAL PARK, NORTH SITE, ACCORDING TO PLAT RECORDED IN PLAT DRAWER 7, MAP NUMBER 98, PUBLIC RECORDS OF SAID COUNTY), A DISTANCE OF 1119.86 FEET TO A POINT; RUN THENCE NORTH 35°-41'-39" EAST ALONG THE SOUTHEASTERLY LINE OF THE AFOREMENTIONED LOT 12 TO AND ALONG THE SOUTHEASTERLY RIGHT-OF-WAY LINE OF DOUGLAS DRIVE (AN 80 FOOT RIGHT-OF-WAY) TO AND ALONG THE SOUTHEASTERLY LINE OF LANDS NOW OR FORMER OF THE CITY OF ST. MARYS, A DISTANCE OF 3130.66 FEET TO A POINT; RUN THENCE SOUTH 84°-11'-14" EAST ALONG THE SOUTHERLY LINE OF THE CITY OF ST. MARYS, A DISTANCE OF 518.27 FEET TO A POINT LYING ON THE WESTERLY RIGHT-OF-WAY LINE OF POINT PETER ROAD (A 100 FOOT RIGHT-OF-WAY); RUN THENCE SOUTH 07°-20'-36" WEST ALONG THE LAST MENTIONED WESTERLY RIGHT-OF-WAY LINE A DISTANCE OF 309.00 FEET TO A POINT LYING AT THE NORTHERLY CORNER OF LOT 10, ST. MARYS INDUSTRIAL PARK, SITE 2, (ACCORDING TO PLAT RECORDED IN PLAT CABINET 1, FOLIO 21-C, PUBLIC RECORDS OF SAID COUNTY); RUN THENCE SOUTH 35°-37'-47" WEST ALONG THE NORTHWESTERLY LINE OF THE AFOREMENTIONED LOT 10 TO AND ALONG THE NORTHWESTERLY LINE OF LOT 9 AND LOT 8, A DISTANCE OF 1957.91 FEET TO A POINT LYING AT THE SOUTHWESTERLY CORNER OF THE AFOREMENTIONED LOT 8, ST. MARYS INDUSTRIAL PARK, SITE 2; RUN THENCE SOUTH 46°-52'-22" EAST ALONG THE AFOREMENTIONED LOT 8, A DISTANCE OF 488.54 FEET TO A POINT LYING ON THE NORTHWESTERLY RIGHT-OF-WAY LINE OF INDUSTRIAL DRIVE (A 60 FOOT RIGHT-OF-WAY, ACCORDING TO PLAT RECORDED IN PLAT CABINET 1, FOLIO 21-C, PUBLIC RECORDS OF SAID COUNTY); RUN THENCE IN A SOUTHWESTERLY DIRECTION ALONG THE ARC OF A CURVE IN LAST MENTIONED NORTHWESTERLY RIGHT-OF-WAY LINE, SAID CURVE BEING CONCAVE TO THE WEST AND HAVING A RADIUS OF 804.48 FEET, A CHORD DISTANCE OF 348.24 FEET TO A POINT LYING AT THE NORTHEASTERLY CORNER OF LOT 6, ST. MARYS INDUSTRIAL PARK, SITE 2 (ACCORDING TO PLAT RECORDED IN PLAT CABINET 1, FOLIO 21-C, PUBLIC RECORDS OF SAID COUNTY) IN LAST MENTIONED NORTHWESTERLY RIGHT-OF-WAY LINE OF INDUSTRIAL DRIVE, A BEARING OF THE AFOREMENTIONED CHORD BEING SOUTH 32°-45'-47" WEST; RUN THENCE

# A K M
## SURVEYING, INC.
Surveyors & Land Planners

P.O. Box 5730
St. Marys, Georgia 31558
Phone: (912)729-1507
Fax: (912)729-1509
Email: akm_surveying@tds.net

NORTH 55°-54'-19" WEST ALONG THE NORTHEASTERLY LINE OF THE AFOREMENTIONED LOT 6, A DISTANCE OF 501.96 FEET TO A POINT LYING AT THE NORTHWESTERLY CORNER THEREOF; RUN THENCE SOUTH 35°-37'-47" WEST ALONG THE NORTHWESTERLY LINE OF THE AFOREMENTIONED LOT 6 TO AND ALONG THE NORTHWESTERLY LINE OF LOT 5, ST. MARYS INDUSTRIAL PARK, SITE 2 (ACCORDING TO PLAT RECORDED IN PLAT CABINET 1, FOLIO 21-C, PUBLIC RECORDS OF SAID COUNTY), A DISTANCE OF 732.61 FEET TO A POINT; RUN THENCE SOUTH 09°-06'47" WEST ALONG THE WESTERLY LINE OF THE LAST MENTIONED LOT 5 TO AND ALONG THE WESTERLY LINE OF LOT 4 TO AND ALONG THE WESTERLY LINE OF LOT 3 (ACCORDING TO PLAT RECORDED IN PLAT CABINET 1, FOLIO 21-C, PUBLIC RECORDS OF SAID COUNTY), A DISTANCE OF 1119.06 FEET TO A PIONT; RUN THENCE NORTH 54°-23'-58" WEST, A DISTANCE OF 1600.49 FEET TO THE POINT OF BEGINNING.

THE LANDS THUS DESCRIBED CONTAINS 74.46 ACRES, MORE OR LESS, ACCORDING TO THAT CERTAIN BOUNDARY SURVEY FOR CAMDEN COUNTY JOINT DEVELOPMENT AUTHORITY, DATED JULY 27, 2020, AND PREPARED BY AKM SURVEYING, INC., JEFFREY S. FOSTER, GRLS NO. 3143, AND IS SUBJECT TO ANY EASEMENTS OF RECORD WHICH MAY LIE WITHIN.

**SCHEDULE 3.1.2**

<u>**PHASE 1**</u>

[attached]



The site for Phase 1 is depicted in green above.

62232107v.29

## SCHEDULE 3.1.4

## DEVELOPER-JDA PSA

[attached]

# DRAFT

## REAL ESTATE SALES CONTRACT

As a result of the efforts of mutual negotiations, the undersigned Purchaser agrees to buy, and the undersigned Seller agrees to sell, all that lot, tract or parcel of land lying and being in the City of St. Marys, 29th G. M. District, Camden County, Georgia, more particularly described as follows:

**See Exhibit "A" attached hereto.**

together with all electrical, mechanical, plumbing, air conditioning and any other systems or fixtures as are attached thereto and all plants, trees, and shrubbery now on the premises.

The purchase price of said property shall be $1,098,500.00, to be paid in cash at closing.

Seller warrants that it shall obtain title to the property prior to closing, and at the time the sale is consummated, it agrees to convey good and marketable title to said property to Purchaser by limited warranty deed subject only to (1) zoning ordinances affecting said property, (2) general utility easements of record serving said property, and (3) subdivision restrictions of record.

Purchaser shall move promptly and in good faith after acceptance of this contract to examine title and to furnish Seller with a written statement of objections affecting the marketability of said title. Seller shall have reasonable time after receipt of such objections to satisfy all valid objections and if Seller fails to satisfy such valid objections within a reasonable time, then at the option of Purchaser, evidenced by written notice to Seller, this contract shall be null and void. Marketable title as used herein shall mean title which a title insurance company licensed to do business in the State of Georgia will insure at its regular rates, subject only to standard exceptions unless otherwise specified herein.

Seller and Purchaser agree that such papers as may be necessary to carry out the terms of this contract shall be executed and delivered by such parties at the time the sale is consummated.

Purchaser, its agents or representatives, at Purchaser's expense and at reasonable times during normal business hours, shall have the right to enter upon the property for the purpose of inspecting, examining (including soil boring), testing, and surveying the property. Purchaser assumes all responsibility for the acts of itself, its agents or representatives in exercising its rights under this paragraph and agrees to hold Seller harmless from any damages resulting therefrom.

All notices required herein or required by law shall be in writing and sent by certified or registered mail to the other party at the address of such party listed below.

Seller warrants that when the sale is consummated the improvements on the property will be in the same condition as they are on the date this contract is signed by Seller, natural wear and tear excepted.  However, should the premises be destroyed or substantially damaged before the sale is consummated, then at the election of Purchaser:  (a) this contract may be cancelled; or (b) Purchaser may close the sale and receive such insurance as is paid on the claim of loss.  The election is to be exercised within 10 days after Purchaser has been notified in writing by Seller of the amount of the insurance proceeds, if any, Seller will receive on the claim of loss.  If Purchaser has not been notified within 45 days after the occurrence of such damage or destruction, Purchaser may at its option cancel this contract.

Time is of the essence of this contract.

This contract shall inure to the benefit of, and be binding upon, the parties hereto, their heirs, successors, administrators, executors, and assigns.  All references herein to the singular shall include the plural, and the masculine includes the feminine and the neuter.

This contract constitutes the sole and entire agreement between the parties hereto and no modification of this contract shall be binding unless attached hereto and signed by all parties to this agreement.  No representation, promise, or inducement not included in this contract shall be binding upon any party hereto.

The following stipulations shall, if conflicting with the above, control:

## SPECIAL STIPULATIONS

1. Sale shall be closed within 30 days of Seller's sale of the property described in Exhibit "B" hereto to a third party for use as a multi-family housing complex. Additionally, the net sales proceeds due Seller shall be held in escrow by {insert escrow agent} until {insert condition}.  Upon the {happening of the condition}, the aforementioned escrow agent will release the sales proceeds to Seller.  Should the aforementioned {insert condition} not occur on or before the date which is 12 months after the closing of the sale contemplated by this contract, said sale shall be rescinded, the sales proceeds shall be returned to Purchaser and Purchaser shall execute a quitclaim deed to Seller conveying the subject property to Seller.

2. Seller shall retain possession of the premises until the time of closing.

3. Real estate taxes on the property shall be prorated as of the date of closing.

4. At closing, Purchaser shall pay the following:

   a. State of Georgia transfer tax;

b.   All costs, fees and charges to have the closing attorney search title and prepare: (a) the limited warranty deed; (b) owner's affidavits; (c) Purchaser's power of attorney; and (d) all promissory notes, deeds to secure debt and other loan documents required by any lender providing financing in the transaction; and

c. All closing costs, tax service charges, recording costs, courier fees, overnight delivery fees, document preparation fees, underwriting fees, delivery, copying and handling charges, and all other costs, fees, charges and amounts to otherwise close this transaction except as they relate to the clearance of title encumbrances and/or defects necessary for Seller to be able to convey good and marketable title to the property.

5.  At closing, Seller shall pay the following:

a. All sums, costs, charges, and fees necessary to clear title encumbrances and/or defects to allow Seller to be able to convey good and marketable title to the property; and

b. Any extra costs, fees, and charges resulting from Seller not being able to attend the closing in person.

6.  Closing and title examination shall be conducted by the firm of Kinney & Kinney, LLC, St. Marys, Georgia.

7.  This contract is contingent upon Seller's purchase of the subject property from Old Weed & Ready Plantation, LLC.  If Seller does not purchase the subject property from Old Weed & Ready Plantation, LLC on or before {insert date}, this contract may be rescinded at the option of Purchaser.

IN WITNESS WHEREOF, the parties have hereunto set their hands and affixed their seals this ___ day of _____, 2020 (date of last signature).

SELLER:

JACOBY DEVELOPMENT INC.

By:_____(SEAL)
    Its _____

Jacoby Development Inc.
8200 Roberts Drive, Suite 200
Atlanta, Georgia 30350

[Signature Page - Real Estate Sales Contract]

PURCHASER:

CAMDEN COUNTY JOINT
DEVELOPMENT AUTHORITY

By:_____
     Its Chairman


Attest:_____
     Its Secretary/Treasurer


Camden County Joint Development Authority
531 N. Lee Street
Kingsland, Georgia 31548

[AUTHORITY SEAL]

2

[Signature Page – Real Estate Sales Contract]

Exhibit "A"

{Use revised legal description}

Exhibit "B"

**SCHEDULE 3.3**

<u>**DEVELOPER PROJECT SITE PART 1**</u>

[Attached]

# A K M
## SURVEYING, INC.
### Surveyors & Land Planners

P.O. Box 5730
St. Marys, Georgia 31558
Phone: (912)729-1507
Fax: (912)729-1509
Email: akm_surveying@tds.net

July 29, 2020

## LEGAL DESCRIPTION OF MASTER DEVELOPER PROJECT SITE 1:

ALL THAT CERTAIN TRACT OR PARCEL OF LAND LYING AND BEING IN THE CITY OF ST. MARYS, 29TH DISTRICT, G.M., CAMDEN COUNTY, GEORGIA AND BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS: FOR A POINT OF REFERENCE COMMENCE AT THE NORTHWESTERLY CORNER OF BLOCK 107 (ACCORDING TO THE OFFICIAL PLAN OF ST. MARYS RECORDED AT PLAT BOOK 1, PAGE 94, PUBLIC RECORDS OF SAID COUNTY) WHERE THE SOUTHERLY RIGHT-OF-WAY LINE OF ASHLEY STREET INTERSECTS THE EASTERLY RIGHT-OF-WAY LINE OF COLE STREET (BOTH AS ESTABLISHED FOR A 100-FOOT RIGHT-OF-WAY) AND RUN NORTH 11° 12' 00" EAST, TO AND ALONG THE WESTERLY LINE OF BLOCK 108 (ACCORDING TO SAID OFFICIAL PLAN OF ST. MARYS) AND THE NORTHERLY PROLONGATION THEREOF, THE SAME BEING THE EASTERLY RIGHT-OF-WAY LINE OF SAID COLE STREET, 636.00 FEET TO THE SOUTHWESTERLY CORNER OF BLOCK 109 (ACCORDING TO SAID OFFICIAL PLAN OF ST. MARYS) WHERE THE EASTERLY RIGHT-OF-WAY LINE OF SAID COLE STREET INTERSECTS THE NORTHERLY RIGHT-OF-WAY LINE OF MEETING STREET (AS ESTABLISHED FOR A 100-FOOT RIGHT-OF-WAY) FOR THE PONT OF BEGINNING.

FROM THE POINT OF BEGINNING THUS DESCRIBED RUN NORTH 78° 48' 00" WEST TO AND ALONG THE SOUTHERLY LINE OF BLOCK 15 (ACCORDING TO SAID OFFICIAL PLAN OF ST. MARYS), THE SAME BEING THE NORTHERLY RIGHT-OF-WAY LINE OF SAID MEETING STREET, 500.00 FEET TO THE SOUTHWESTERLY CORNER OF SAID BLOCK 15 WHERE THE NORTHERLY RIGHT-OF-WAY LINE OF SAID MEETING STREET INTERSECTS THE EASTERLY RIGHT-OF-WAY LINE OF NORRIS STREET (AS ESTABLISHED FOR A 100-FOOT RIGHT-OF-WAY); THENCE NORTH 11° 12' 00" EAST ALONG THE EASTERLY RIGHT-OF-WAY LINE OF SAID NORRIS STREET, THE SAME BEING THE WESTERLY LINE OF SAID BLOCK 15 AND THE SAME BEING THE WESTERLY LINE OF LANDS DESCRIBED IN DEED RECORDED IN DEED BOOK 1531, PAGE 130, PUBLIC RECORDS OF SAID COUNTY, 200.00 FEET TO THE NORTHWESTERLY CORNER OF LAST MENTIONED LANDS; THENCE NORTH 78° 48' 00" WEST ALONG THE WESTERLY PROLONGATION OF LAST MENTIONED LANDS, 50.00 FEET TO THE CENTERLINE OF SAID NORRIS STREET; THENCE SOUTH 11° 12' 00" WEST ALONG SAID CENTERLINE, 120.00 FEET; THENCE NORTH 78° 48' 00" WEST, 50.00 FEET TO THE EASTERLY LINE OF BLOCK 34 (ACCORDING TO SAID OFFICIAL PLAN OF ST. MARYS), THE SAME BEING THE WESTERLY RIGHT-OF-WAY LINE OF SAID NORRIS STREET; THENCE SOUTH 11° 12' 00" WEST ALONG LAST MENTIONED EASTERLY LINE, 80.00 FEET TO THE SOUTHEASTERLY CORNER OF SAID BLOCK 34 WHERE THE WESTERLY RIGHT-OF-WAY LINE OF SAID NORRIS STREET INTERSECTS THE NORTHERLY RIGHT-OF-WAY LINE OF SAID MEETING STREET; THENCE NORTH 78° 48' 00" WEST ALONG THE SOUTHERLY LINE OF SAID BLOCK 34, THE SAME BEING THE NORTHERLY RIGHT-OF-WAY LINE OF SAID

# A K M
## SURVEYING, INC.
### Surveyors & Land Planners

P.O. Box 5730
St. Marys, Georgia 31558
Phone: (912)729-1507
Fax: (912)729-1509
Email: akm_surveying@tds.net

MEETING STREET, 400.00 FEET TO THE SOUTHWESTERLY CORNER OF SAID BLOCK 34 WHERE THE NORTHERLY RIGHT-OF-WAY LINE OF SAID MEETING STREET INTERSECTS THE EASTERLY RIGHT-OF-WAY LINE OF READY STREET (AS ESTABLISHED FOR A 100-FOOT RIGHT-OF-WAY); THENCE NORTH 11° 12' 00" EAST ALONG THE WESTERLY LINE OF SAID BLOCK 34, THE SAME BEING THE EASTERLY RIGHT-OF-WAY LINE OF SAID READY STREET, 80.00 FEET; THENCE NORTH 78° 48' 00" WEST, 100.00 FEET TO THE EASTERLY RIGHT-OF BLOCK 90C (ACCORDING TO SAID OFFICIAL PLAN OF ST. MARYS), THE SAME BEING THE WESTERLY RIGHT-OF-WAY LINE OF SAID READY STREET; THENCE SOUTH 11° 12' 00" WEST ALONG LAST MENTIONED EASTERLY LINE, 80.00 FEET TO THE SOUTHEASTERLY CORNER OF SAID BLOCK 90C WHERE THE WESTERLY RIGHT-OF-WAY LINE OF SAID READY STREET INTERSECTS THE NORTHERLY RIGHT-OF-WAY OF SAID MEETING STREET; THENCE NORTH 78° 48' 00" WEST ALONG THE SOUTHERLY LINE OF SAID BLOCK 90C, THE SAME BEING THE NORTHERLY RIGHT-OF-WAY LINE OF SAID MEETING STREET, 400.00 FEET TO THE SOUTHWESTERLY CORNER OF SAID BLOCK 90C WHERE THE NORTHERLY RIGHT-OF-WAY LINE OF SAID MEETING STREET INTERSECTS THE EASTERLY RIGHT-OF-WAY LINE OF OSBORNE STREET (AS ESTABLISHED FOR A 100-FOOT RIGHT-OF-WAY); THENCE NORTH 11° 12' 00" EAST ALONG THE WESTERLY LINE OF SAID BLOCK 90C AND THE NORTHERLY PROLONGATION THEREOF, THE SAME BEING THE EASTERLY RIGHT-OF-WAY LINE OF SAID OSBORNE STREET, 530.40 FEET TO THE SOUTHWESTERLY CORNER OF LANDS DESCRIBED IN DEED RECORDED IN DEED BOOK 1589, PAGE 750, PUBLIC RECORDS OF SAID COUNTY; THENCE IN AN EASTERLY, NORTHEASTERLY, NORTHWESTERLY AND WESTERLY DIRECTION ALONG THE SOUTHERLY, SOUTHEASTERLY, NORTHEASTERLY AND NORTHERLY LINES OF LAST MENTIONED LANDS THE FOLLOWING FIVE (5) COURSES: COURSE NO. 1 - SOUTH 78° 48' 00" EAST, 141.91 FEET TO A POINT OF CURVATURE; COURSE NO. 2 - THENCE IN AN EASTERLY DIRECTION ALONG THE ARC OF A CURVE, SAID CURVE BEING CONCAVE NORTHERLY AND HAVING A RADIUS OF 332.00 FEET, A CHORD BEARING AND DISTANCE OF NORTH 82° 50' 29" EAST, 130.71 FEET TO A POINT OF COMPOUND CURVATURE; COURSE NO. 3 - THENCE IN A NORTHEASTERLY DIRECTION ALONG THE ARC OF A CURVE, SAID CURVE BEING CONCAVE NORTHWESTERLY AND HAVING A RADIUS OF 554.41 FEET, A CHORD BEARING AND DISTANCE OF NORTH 60° 46' 46" EAST, 206.05 FEET; COURSE NO. 4 - NORTH 33° 48' 00" WEST, 69.06 FEET; CURSE NO. 5 - NORTH 78° 48' 00" WEST, 404.48 FEET TO THE CURVED EASTERLY RIGHT-OF-WAY LINE OF OSBORNE ROAD (RIGHT-OF-WAY VARIES); THENCE IN A NORTHWESTERLY DIRECTION ALONG THE ARC OF A CURVE IN THE EASTERLY RIGHT-OF-WAY LINE OF SAID OSBORNE ROAD, SAID CURVE BEING CONCAVE WESTERLY AND HAVING A RADIUS OF 1,487.59 FEET, A CHORD BEARING AND DISTANCE OF NORTH 14° 47' 30" WEST, 648.75 FEET TO THE MOST SOUTHERLY CORNER OF LANDS DESCRIBED IN DEED RECORDED IN DEED BOOK 1597, PAGE 245, PUBLIC RECORDS OF SAID COUNTY; THENCE NORTH 62° 41' 50" EAST ALONG THE SOUTHEASTERLY LINE OF LAST MENTIONED LANDS, 274.46 FEET TO THE MOST EASTERLY CORNER THEREOF AT THE NORTHEASTERLY CORNER OF BLOCK 62 (ACCORDING TO SAID OFFICIAL PLANS OF ST. MARYS) WHERE THE SOUTHERLY RIGHT-OF-WAY LINE OF LIBERTY STREET (AS ESTABLISHED FOR A 100-FOOT RIGHT-OF-WAY) INTERSECTS THE WESTERLY RIGHT-OF-

# A K M
## SURVEYING, INC.
### Surveyors & Land Planners

P.O. Box 5730
St. Marys, Georgia 31558
Phone: (912)729-1507
Fax: (912)729-1509
Email: akm_surveying@tds.net

WAY LINE OF SAID OSBORNE STREET; THENCE SOUTH 78° 48' 00" EAST ALONG THE EASTERLY PROLONGATION OF THE NORTHERLY LINE OF SAID BLOCK 62, 100.00 FEET TO THE NORTHWESTERLY CORNER OF BLOCK 49 (ACCORDING TO SAID OFFICIAL PLAN OF ST. MARYS) WHERE THE SOUTHERLY RIGHT-OF-WAY LINE OF SAID LIBERTY STREET INTERSECTS THE EASTERLY RIGHT-OF-WAY LINE OF SAID OSBORNE STREET; THENCE NORTH 11° 12' 00" EAST TO AND ALONG THE WESTERLY LINE OF BLOCK 50 AND TO AND ALONG THE WESTERLY LINE OF BLOCK 51 (BOTH ACCORDING TO SAID OFFICIAL PLAN OF ST. MARYS), THE SAME BEING THE EASTERLY RIGHT-OF-WAY LINE OF SAID OSBORNE STREET, 862.00 FEET TO THE SOUTHWESTERLY CORNER OF LANDS DESCRIBED IN DEED RECORDED IN DEED BOOK 663, PAGE 67, PUBLIC RECORDS OF SAID COUNTY; THENCE SOUTH 78° 48' 00" EAST ALONG THE SOUTHERLY LINE OF LAST MENTIONED LANDS, 150.00 FEET TO THE SOUTHEASTERLY CORNER THEREOF; THENCE NORTH 11° 12' 00" EAST ALONG THE EASTERLY LINE OF LAST MENTIONED LANDS, ALONG THE EASTERLY LINE OF LANDS DESCRIBED IN DEED RECORDED IN DEED BOOK 136, PAGE 660, PUBLIC RECORDS OF SAID COUNTY AND THE NORTHERLY PROLONGATION THEREOF, 310.00 FEET TO THE SOUTHERLY LINE OF BOOK 52 (ACCORDING TO SAID OFFICIAL PLAN OF ST. MARYS) THE SAME BEING THE NORTHERLY RIGHT-OF-WAY LINE OF FINLEY STREET (AS ESTABLISHED FOR A 100-FOOT RIGHT-OF-WAY); THENCE NORTH 78° 48' 00" WEST ALONG LAST MENTIONED SOUTHERLY LINE, 150.00 FEET TO THE SOUTHWESTERLY CORNER OF SAID BLOCK 52 WHERE THE NORTHERLY RIGHT-OF-WAY LINE OF SAID FINLEY STREET INTERSECTS THE EASTERLY RIGHT-OF-WAY LINE OF SAID OSBORNE STREET; THENCE NORTH 11° 12' 00" EAST ALONG THE WESTERLY LINE OF SAID BLOCK 52 AND TO AND ALONG THE WESTERLY LINE OF BLOCK 53 (ACCORDING TO SAID OFFICIAL PLAN OF ST. MARYS), THE SAME BEING THE EASTERLY RIGHT-OF-WAY LINE OF SAID OSBORNE STREET, 972.00 FEET TO THE NORTHWESTERLY CORNER OF SAID BLOCK 53 WHERE LAST MENTIONED EASTERLY RIGHT-OF-WAY LINE INTERSECTS THE SOUTHERLY RIGHT-OF-WAY LINE OF NORTH STREET (AS ESTABLISHED FOR A 100-FOOT RIGHT-OF-WAY); THENCE NORTH 78° 48' 00" WEST ALONG THE WESTERLY PROLONGATION OF THE NORTHERLY LINE OF SAID BLOCK 53, 100.00 FEET TO THE NORTHEASTERLY CORNER OF BLOCK 66 (ACCORDING TO SAID OFFICIAL PLAN OF ST. MARYS) WHERE THE SOUTHERLY RIGHT-OF-WAY LINE OF SAID NORTH STREET INTERSECTS THE WESTERLY RIGHT-OF-WAY LINE OF SAID OSBORNE STREET; THENCE SOUTH 11° 12' 00" WEST ALONG THE EASTERLY LINE OF SAID BLOCK 66, THE SAME BEING LAST MENTIONED WESTERLY RIGHT-OF-WAY LINE, 218.00 FEET TO THE NORTHEASTERLY CORNER OF LANDS DESCRIBED IN DEED RECORDED IN DEED BOOK 1212, PAGE 127, PUBLIC RECORDS OF SAID COUNTY; THENCE NORTH 78° 48' 00" WEST ALONG THE NORTHERLY LINE OF LAST MENTIONED LANDS, 400.00 FEET TO THE NORTHWESTERLY CORNER THEREOF LYING ON THE WESTERLY LINE OF SAID BLOCK 66, THE SAME BEING THE EASTERLY RIGHT-OF-WAY LINE OF WHEELER STREET (AS ESTABLISHED FOR A 100-FOOT RIGHT-OF-WAY); THENCE NORTH 11° 12' 00" EAST ALONG LAST MENTIONED WESTERLY LINE, 218.00 FEET TO THE NORTHWESTERLY CORNER OF SAID BLOCK 66 WHERE THE EASTERLY RIGHT-OF-WAY LINE OF SAID WHEELER STREET INTERSECTS THE SOUTHERLY RIGHT-OF-WAY LINE OF SAID NORTH STREET; THENCE

# A K M
## SURVEYING, INC.
### Surveyors & Land Planners

P.O. Box 5730
St. Marys, Georgia 31558
Phone: (912)729-1507
Fax: (912)729-1509
Email: akm_surveying@tds.net

NORTH 78° 48' 00" WEST ALONG THE WESTERLY PROLONGATION OF THE NORTHERLY LINE OF SAID BLOCK 66, 100.00 FEET TO THE NORTHEASTERLY CORNER OF BLOCK 87 (ACCORDING TO SAID OFFICIAL PLAN OF ST. MARYS) WHERE THE SOUTHERLY RIGHT-OF-WAY LINE OF SAID NORTH STREET INTERSECTS THE WESTERLY RIGHT-OF-WAY LINE OF SAID WHEELER STREET; THENCE SOUTH 11° 12' 00" WEST ALONG THE EASTERLY LINE OF SAID BLOCK 87, THE SAME BEING THE WESTERLY RIGHT-OF-WAY LINE OF SAID WHEELER STREET, 118.00 FEET TO THE NORTHEASTERLY CORNER OF LANDS DESCRIBED IN DEED RECORDED IN DEED BOOK 175, PAGE 726; THENCE NORTH 78° 48' 00" WEST ALONG THE NORTHERLY LINE OF LAST MENTIONED LANDS AND ALONG THE NORTHERLY LINE OF LANDS DESCRIBED IN DEED RECORDED IN DEED BOOK 324, PAGE 15, 400.00 FEET TO THE NORTHWESTERLY CORNER OF LAST MENTIONED LANDS LYING ON THE EASTERLY RIGHT-OF-WAY LINE OF SEAGROVE STREET (AS ESTABLISHED FOR A 100-FOOT RIGHT-OF-WAY); THENCE NORTH 11° 12' 00" EAST ALONG THE WESTERLY LINE OF SAID BLOCK 87, THE SAME BEING THE EASTERLY RIGHT-OF-WAY LINE OF SAID SEAGROVE STREET, 118.00 FEET TO THE NORTHWESTERLY CORNER OF SAID BLOCK 87 WHERE LAST MENTIONED EASTERLY RIGHT-OF-WAY LINE INTERSECTS THE SOUTHERLY RIGHT-OF-WAY LINE OF SAID NORTH STREET; THENCE NORTH 78° 48' 00" WEST ALONG THE WESTERLY PROLONGATION OF THE NORTHERLY LINE OF SAID BLOCK 87, 100.00 FEET TO THE NORTHEASTERLY CORNER OF BLOCK 88 (ACCORDING TO SAID OFFICIAL PLAN OF ST. MARYS) WHERE THE LAST MENTIONED SOUTHERLY RIGHT-OF-WAY LINE INTERSECTS THE WESTERLY RIGHT-OF-WAY LINE OF SAID SEAGROVE STREET; THENCE SOUTH 11° 12' 00" WEST ALONG THE EASTERLY LINE OF SAID BLOCK 88, THE SAME BEING THE WESTERLY RIGHT-OF-WAY LINE OF SAID SEAGROVE STREET, 436.00 FEET TO THE SOUTHEASTERLY CORNER OF SAID BLOCK 88 WHERE LAST MENTIONED WESTERLY RIGHT-OF-WAY LINE INTERSECTS THE NORTHERLY RIGHT-OF-WAY LINE OF UNION STREET (AS ESTABLISHED FOR A 100-FOOT RIGHT-OF-WAY); THENCE NORTH 78° 48' 00" WEST ALONG THE SOUTHERLY LINE OF SAID BLOCK 88 AND THE WESTERLY PROLONGATION THEREOF, THE SAME BEING THE NORTHERLY RIGHT-OF-WAY LINE OF SAID UNION STREET, 500.00 FEET TO THE SOUTHEASTERLY CORNER OF BLOCK 213 (ACCORDING TO SAID OFFICIAL PLAN OF ST. MARYS) WHERE LAST MENTIONED NORTHERLY RIGHT-OF-WAY LINE INTERSECTS THE WESTERLY RIGHT-OF-WAY LINE OF BARTLETT STREET (AS ESTABLISHED FOR A 100-FOOT RIGHT-OF-WAY); THENCE SOUTH 11° 12' 00" WEST TO AND ALONG THE EASTERLY LINE OF BLOCK 212 (ACCORDING TO SAID OFFICIAL PLAN OF ST. MARYS), THE SAME BEING THE WESTERLY RIGHT-OF-WAY LINE OF SAID BARTLETT STREET, 536.00 FEET TO THE SOUTHEASTERLY CORNER OF SAID BLOCK 212 WHERE LAST MENTIONED WESTERLY RIGHT-OF-WAY LINE INTERSECTS THE NORTHERLY RIGHT-OF-WAY LINE OF SAID FINLEY STREET; THENCE NORTH 78° 48' 00" WEST ALONG THE SOUTHERLY LINE OF SAID BLOCK 212 AND THE WESTERLY PROLONGATION THEREOF, ALONG THE SOUTHERLY LINE OF BLOCK 233 (ACCORDING TO SAID OFFICIAL PLAN OF ST. MARYS) AND THE WESTERLY PROLONGATION THEREOF, THE SAME BEING THE NORTHERLY RIGHT-OF-WAY LINE OF SAID FINLEY STREET, 1,000.00 FEET TO THE SOUTHEASTERLY CORNER OF BLOCK 243 (ACCORDING TO SAID OFFICIAL PLAN OF ST. MARYS) WHERE LAST MENTIONED

# A K M
## SURVEYING, INC.
### Surveyors & Land Planners

P.O. Box 5730
St. Marys, Georgia 31558
Phone: (912)729-1507
Fax: (912)729-1509
Email: akm_surveying@tds.net

NORTHERLY RIGHT-OF-WAY LINE INTERSECTS THE WESTERLY RIGHT-OF-WAY LINE OF
BORRELL STREET (AS ESTABLISHED FOR A 100-FOOT RIGHT-OF-WAY); THENCE NORTH
11° 12' 00" EAST ALONG THE EASTERLY LINE OF SAID BLOCK 243, THE SAME BEING THE
WESTERLY RIGHT-OF-WAY LINE OF SAID BORRELL STREET AND THE SAME BEING THE
EASTERLY LINE OF LANDS DESCRIBED IN DEED RECORDED IN DEED BOOK 338, PAGE 276,
PUBLIC RECORDS OF SAID COUNTY, 200.00 FEET TO THE NORTHEASTERLY CORNER OF
LAST MENTIONED LANDS; THENCE NORTH 78° 48' 00" WEST ALONG THE NORTHERLY
LINE OF LAST MENTIONED LANDS AND ALONG THE NORTHERLY LINE OF LANDS
DESCRIBED IN DEED RECORDED IN DEED BOOK 1581, PAGE 657, PUBLIC RECORDS OF
SAID COUNTY, 475.72 FEET TO THE NORTHWESTERLY CORNER OF LAST MENTIONED
LANDS LYING ON THE EASTERLY RIGHT-OF-WAY LINE OF OLD POINT PETER ROAD (AS
ESTABLISHED FOR AN 80-FOOT RIGHT-OF-WAY); THENCE NORTH 07° 38' 00" EAST ALONG
LAST MENTIONED EASTERLY RIGHT-OF-WAY LINE, 3,509.27 FEET TO THE
SOUTHWESTERLY CORNER OF LANDS DESCRIBED IN DEED RECORDED IN DEED BOOK 79,
PAGE 565, PUBLIC RECORDS OF SAID COUNTY; THENCE IN AN EASTERLY, NORTHERLY
AND WESTERLY DIRECTION ALONG THE SOUTHERLY, EASTERLY AND NORTHERLY
LINES OF LAST MENTIONED LANDS THE FOLLOWING THREE (3) COURSES: COURSE NO. 1
- SOUTH 82° 19' 23" EAST, 400.00 FEET TO THE SOUTHEASTERLY CORNER THEREOF;
COURSE NO. 2 - NORTH 07° 41' 17" EAST, 100.00 FEET TO THE NORTHEASTERLY CORNER
THEREOF; COURSE NO. 3 - NORTH 82° 18' 43" WEST, 200.96 FEET TO THE SOUTHEASTERLY
CORNER OF LANDS DESCRIBED IN DEED RECORDED IN DEED BOOK 86, PAGE 329, PUBLIC
RECORDS OF SAID COUNTY; THENCE NORTH 07° 41' 17" EAST ALONG THE EASTERLY
LINE OF LAST MENTIONED LANDS, ALONG THE EASTERLY LINE OF LANDS DESCRIBED
IN DEED RECORDED IN DEED BOOK 125, PAGE 363, PUBLIC RECORDS OF SAID COUNTY
AND ALONG THE EASTERLY LINE OF LANDS DESCRIBED IN DEED RECORDED IN DEED
BOOK 464, PAGE 608, PUBLIC RECORDS OF SAID COUNTY, 300.11 FEET TO THE
NORTHEASTERLY CORNER OF LAST MENTIONED LANDS AND THE SOUTHEASTERLY
CORNER OF "H" STREET (RIGHT-OF-WAY AS NOW ESTABLISHED); THENCE NORTH 82° 22'
00" WEST ALONG THE NORTHERLY LINE OF LAST MENTIONED LANDS THE SAME BEING
THE SOUTHERLY RIGHT-OF-WAY LINE OF SAID "H" STREET, 199.43 FEET TO THE
NORTHWESTERLY CORNER OF LAST MENTIONED LANDS WHERE THE SOUTHERLY
RIGHT-OF-WAY LINE OF SAID "H" STREET INTERSECTS THE EASTERLY RIGHT-OF-WAY
LINE OF SAID OLD POINT PETER ROAD; THENCE NORTH 07° 38' 00" EAST ALONG LAST
MENTIONED EASTERLY RIGHT-OF-WAY LINE 50.75 FEET TO THE SOUTHWESTERLY
CORNER OF LANDS DESCRIBED IN DEED RECORDED IN DEED BOOK 57, PAGE 581, PUBLIC
RECORDS OF SAID COUNTY; THENCE 82° 22' 00" EAST ALONG THE SOUTHERLY LINE OF
LAST MENTIONED LANDS, THE SAME BEING THE NORTHERLY RIGHT-OF-WAY LINE OF
SAID "H" STREET, 199.48 FEET TO THE SOUTHEASTERLY CORNER OF LAST MENTIONED
LANDS; THENCE NORTH 07° 41' 17" EAST ALONG THE EASTERLY LINE OF LAST
MENTIONED LANDS, ALONG THE EASTERLY LINE OF LANDS DESCRIBED IN DEED
RECORDED IN DEED BOOK 57, PAGE 579, PUBLIC RECORDS OF SAID COUNTY AND ALONG
THE EASTERLY LINE OF LANDS DESCRIBED IN DEED RECORDED IN DEED BOOK 86, PAGE
173, PUBLIC RECORDS OF SAID COUNTY, 300.04 FEET TO THE NORTHEASTERLY CORNER

# A K M
## SURVEYING, INC.
### Surveyors & Land Planners

P.O. Box 5730
St. Marys, Georgia 31558
Phone: (912)729-1507
Fax: (912)729-1509
Email: akm_surveying@tds.net

OF LAST MENTIONED LANDS, THE SAME BEING THE SOUTHWESTERLY CORNER OF LANDS DESCRIBED IN DEED RECORDED IN DEED BOOK 342, PAGE 14, PUBLIC RECORDS OF SAID COUNTY; THENCE SOUTH 82° 16' 46" EAST ALONG THE SOUTHERLY LINE OF LAST MENTIONED LANDS AND ALONG THE SOUTHERLY LINE OF NORTH RIVER MARSHES SUBDIVISION, PH. 1 (ACCORDING TO MAP RECORDED IN PLAT BOOK 8, PAGE 62, PUBLIC RECORDS OF SAID COUNTY), 540.00 FEET TO THE MOST SOUTHERLY CORNER OF LOT 14, BLOCK "C", SAID NORTH RIVER MARSHES SUBDIVISION, PH. 1; THENCE NORTH 07° 43' 14" EAST ALONG THE EASTERLY LINE OF SAID LOT 14, 50.00 FEET TO THE SOUTHWESTERLY CORNER OF LOT 28, BLOCK "C", SAID NORTH RIVER MARSHES SUBDIVISION, PH. 1; THENCE SOUTH 82° 16' 46" EAST ALONG THE SOUTHERLY LINE OF SAID LOT 28 AND THE EASTERLY PROLONGATION THEREOF, 200.00 FEET TO A POINT ON THE WESTERLY LINE OF LOT 49, NORTH RIVER MARSHES SUBDIVISION - PH.2 (ACCORDING TO MAP THEREOF RECORDED IN PLAT CABINET 1, FILE 13A, PUBLIC RECORDS OF SAID COUNTY); THENCE SOUTH 07° 43' 14" WEST ALONG LAST MENTIONED WESTERLY LINE, 5.00 FEET TO THE SOUTHWESTERLY CORNER THEREOF; THENCE SOUTH 82° 16' 46" EAST ALONG THE SOUTHERLY LINE OF LOTS 49, 48, 47 AND 46, SAID NORTH RIVER MARSHES SUBDIVISION - PH. 2, 405.78 FEET TO THE SOUTHEASTERLY CORNER OF SAID LOT 46, THE SAME BEING A POINT ON THE WESTERLY LINE OF BLOCK S-19 (ACCORDING TO SAID OFFICIAL PLAN OF ST. MARYS); THENCE NORTH 11° 17' 14" EAST ALONG THE EASTERLY LINE OF LOTS 46 AND 45, SAID NORTH RIVER MARSHES SUBDIVISION - PH. 2, 127.72 FEET TO THE NORTHWESTERLY CORNER OF SAID BLOCK S-19; THENCE SOUTH 78° 52' 32" EAST ALONG THE SOUTHERLY LINE OF LOTS 25, 24, 23, 19 AND 18, SAID NORTH RIVER MARSHES SUBDIVISION - PH. 2 AND THE EASTERLY PROLONGATION THEREOF, THE SAME BEING THE NORTHERLY LINE OF SAID BLOCK S-19 AND THE EASTERLY PROLONGATION THEREOF, (ACCORDING TO SAID OFFICIAL PLAN OF ST. MARYS) 509 FEET, MORE OR LESS, TO THE SOUTHWESTERLY EDGE OF THE MARSHES OF THE NORTH RIVER; THENCE IN A SOUTHWESTERLY, NORTHEASTERLY, SOUTHEASTERLY, NORTHEASTERLY, SOUTHWESTERLY, SOUTHEASTERLY, SOUTHWESTERLY AND SOUTHERLY DIRECTION ALONG THE MEANDERINGS OF THE MARSHES OF NORTH RIVER, 11,571 FEET, MORE OR LESS, TO THE NORTHEASTERLY CORNER OF LANDS NOW OR FORMERLY OF THE CITY OF ST. MARYS (BOAT RAMP PARCEL) ACCORDING TO DEED RECORDED IN DEED BOOK 744, PAGE 229, PUBLIC RECORDS OF SAID COUNTY; THENCE IN A SOUTHWESTERLY DIRECTION ALONG THE NORTHWESTERLY LINE OF LAST MENTIONED LANDS THE FOLLOWING SIX (6) COURSES: COURSE NO. 1 - NORTH 87° 04' 26" WEST, 55 FEET, MORE OR LESS; COURSE NO. 2 - SOUTH 43° 00' 26" WEST, 172.25 FEET; COURSE NO. 3 - SOUTH 23° 58' 36" WEST, 205.62 FEET; COURSE NO. 4 - SOUTH 64° 46' 38" WEST, 129.20 FEET; COURSE NO. 5 - NORTH 59° 51' 01" WEST, 130.00 FEET; COURSE NO. 6 - NORTH 78° 48' 00" WEST 88.53 FEET TO THE NORTHWESTERLY CORNER OF LAST MENTIONED LANDS AND THE POINT OF BEGINNING.

THE LAND THUS DESCRIBED CONTAINS 558 ACRES, MORE OR LESS, ACCORDING TO THAT CERTAIN BOUNDARY SURVEY FOR CAMDEN COUNTY JOINT DEVELOPMENT AUTHORITY, DATED JULY 29, 2020, AND PREPARED BY AKM SURVEYING, INC., JEFFREY S.

# A K M
## SURVEYING, INC.
### Surveyors & Land Planners

P.O. Box 5730
St. Marys, Georgia 31558
Phone: (912)729-1507
Fax: (912)729-1509
Email: akm_surveying@tds.net

FOSTER, GRLS NO. 3143, AND IS SUBJECT TO ANY EASMENTS OF RECORD WHICH MAY
LIE WITHIN.

## SCHEDULE 3.4.3

## ESTIMATED SOURCES AND USES



| | USES | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **USED BY:** | JDA | JDA | JDA | JDA | JDA | JDA | JDA | DEVELOPER | DEVELOPER | DEVELOPER | DEVELOPER | DEVELOPER | DEVELOPER | CITY | | |
| | JDA Loan to Developer for protion of costs of Master Project Site | JDA purchase of Marina Project Site from Developer (post-Closing draw) | Pre-Development Costs- JDA share | capitalized interest | costs of issuance | reserve | Marina Project Infrastructure | remaining Developer costs for purchase of the Master Project Site except Marina Project Site | Pre-Development Costs-Developer share | Developer purchase of Marina Project Site from Seller | Marina Project | Developer Project | Infrastructure Improvements | Infrastructure Improvements | **TOTAL** | **NOTES** |
| **2020 Bonds** | $7,020,000 | $1,098,500 | $1,500,000 | $936,119 | $170,400 | $123,481 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | $10,848,500 | (when fully funded) |
| **TAD Financing** | as needed up to amount funded by 2020 Bonds | as needed up to amount funded by 2020 Bonds | as needed up to amount funded by 2020 Bonds | as needed up to amount funded by 2020 Bonds | as needed up to amount funded by 2020 Bonds | as needed up to amount funded by 2020 Bonds | $12,000,000 | $? | $? | $? | $? | $? | N/A | $? | $22,848,500 | max per Redevelopment Plan is $104.5 million |
| **Developer's Loan (includes Parcel Developer financing)** | N/A | N/A | N/A | N/A | N/A | N/A | N/A | $1,980,000 | $1,500,000 | $1,098,500 | $33,000,000 | $400,000,000 | $? | N/A | $460,427,000 | amount of Developer's Loan will be reduced to extent Developer equity used instead |

**NOTES**

1 max land costs $9,000,000

2 Developer includes SPEs in which Developer is an investor (i.e., Parcel Developers)

3 Amounts for Developer's Loan may include amounts from cash equity investments in Developer

## SCHEDULE 5.1

## ECONOMIC DEVELOPMENT GOALS

Developer, or each Parcel Developer in accordance with Section 3.3, above, as applicable, agrees to use its best efforts to comply with the "Economic Development Goals" as set forth in more detail below.

### Community and Public Benefit

The development of the Master Project will improve the City by (i) revitalizing and redeveloping a blighted and distressed part of the City, (ii) attracting visitors and new residents to the City and (iii) removing a long-standing deterrent to investment in the City. The increased consumer traffic downtown will support existing businesses and attract new ones, and the additional sales tax revenue will support projects that will benefit the entire County. The Developer will work closely with City and County officials in accordance with this Agreement and the Redevelopment Plan.

The proposed construction activity will generate direct job growth and in turn will also create and support revenues in other businesses in the City while creating indirect jobs during the time the Master Project is under development. In total, the Master Project is expected to create as much as $200 million in growth and investment and to create as many as 300 jobs between Developer Project Site I and Developer Project Site II.

### Types of Economic Impact that the Master Project will Provide

The City will receive substantial economic benefits from the development of the Master Project. These benefits include the following:

- New jobs and salaries
- Increased spending downtown from workers at the Master Project
- Increased spending from residents at the Master Project
- Increased spending from visitors to the Master Project
- Real and personal property added to local tax digest

### Projected Economic Impact Due to Master Project Construction

Private Construction Dollars Spent: $200,000,000

Direct on-site jobs: up to 1,500

### Projected Economic Impact Due to Master Project Operation at Full Build Out

Direct Jobs Supported: 300

Local Economic Impact of Resident and Visitor Spending and Sales Tax Revenue: $18,000,000

Notes:

1. The results are based on the Apartment Community Estimator provided by www.weareapartments.org to calculate the local economic contribution of an apartment community in the state of Georgia.

2. Apartment construction is a one-time impact. Resident spending and operations spending recurs annually.

## SCHEDULE 9.4.1-A

### PERMITTED ASSIGNMENT AGREEMENT

[attached]

ASSIGNMENT AND ASSUMPTION OF
DEVELOPMENT AGREEMENT

THIS ASSIGNMENT AND ASSUMPTION OF DEVELOPMENT AGREEMENT (this "**Assignment**") is made and entered into as of the _____ day of _____, 2020 (the "**Effective Date**"), by and between **JACOBY DEVELOPMENT INC.**, a Georgia corporation, hereinafter referred to as "**Assignor**", and **JDI CUMBERLAND INLET, LLC**, a Georgia limited liability company, hereinafter referred to as "**Assignee**".

W I T N E S S E T H:

WHEREAS, Assignor, as the "Developer", the Camden County Joint Development Authority, a joint development authority duly organized and validly existing under the Constitution and laws of the State of Georgia, and the City of St. Marys, Georgia entered into that certain Development Agreement dated as of _____, 2020 (the "**Development Agreement**"), in order to express the definitive terms and conditions for the development of a "Master Project" (as defined in the Development Agreement); and

WHEREAS, Assignor possesses certain rights and has certain duties and obligations under the Development Agreement; and

WHEREAS, Assignor now desires to assign all of its right, title and interest in and under the Development Agreement to Assignee, and Assignee has agreed to assume and perform all of Assignor's duties and obligations under the Development Agreement; and

WHEREAS, Assignee is the "Permitted Assignee", as defined in the Development Agreement.

NOW, THEREFORE, for and in consideration of Ten and No/100 Dollars ($10.00) and the mutual covenants and conditions herein contained, and other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties do hereby agree as follows:

1. Assignor represents and warrants as follows:  (i) Assignor is a corporation, duly organized, validly existing and in good standing under the laws of the State of Georgia; (ii) Assignor has all requisite power and authority to execute and deliver this Assignment; (iii) the execution and delivery of this Assignment has been duly authorized by all necessary action and proceedings by or on behalf of Assignor, and no further approvals or filings of any kind, including any approval of or filing with any governmental authority, are required by or on behalf of Assignor as a condition to the valid execution and delivery by it of this Assignment; (iv) neither the execution and delivery of this Assignment nor the fulfillment of or compliance with the terms and conditions of this Assignment will conflict with or result in a breach of the terms and conditions of any restriction or constitute a default under any agreement or instrument to which Assignor is a party or by which it is bound; and (v) this Assignment, when duly executed and delivered by Assignor, will be the valid, binding and enforceable obligation of Assignor in accordance with its terms, subject to matters and laws

1

affecting creditors' rights generally and to general principles of equity.

2. Assignee represents and warrants as follows: (i) Assignee is a limited liability company, duly organized, validly existing and in good standing under the laws of the State of Georgia; (ii) Assignee has all requisite power and authority to execute and deliver this Assignment and to incur and perform its obligations under this Assignment; (iii) the execution, delivery and performance of this Assignment has been duly authorized by all necessary action and proceedings by or on behalf of Assignee, and no further approvals or filings of any kind, including any approval of or filing with any governmental authority, are required by or on behalf of Assignee as a condition to the valid execution, delivery, and performance by it of this Assignment; (iv) neither the execution and delivery of this Assignment nor the fulfillment of or compliance with the terms and conditions of this Assignment will conflict with or result in a breach of the terms and conditions of any restriction or constitute a default under any agreement or instrument to which Assignee is a party or by which it is bound; and (v) this Assignment, when duly executed and delivered by Assignee, will be the valid, binding and enforceable obligation of Assignee in accordance with its terms, subject to matters and laws affecting creditors' rights generally and to general principles of equity.

3. Assignor hereby assigns to Assignee all of its right, title and interest in, to and under the Development Agreement.

4. Assignee assumes and agrees to perform all of the duties and obligations of Assignor under the Development Agreement and to perform and observe all the covenants and conditions to be performed or observed by Assignor under the Development Agreement. Without limitation, Assignee shall, and does hereby, assume all of the obligations of Assignor incurred theretofore or thereafter that are contained in the Development Agreement or that arise under the Development Agreement.

5. This Assignment shall not release or relieve Assignor from primary liability for the obligations and liabilities of the Developer under the Development Agreement incurred at any time whether prior to or after the Effective Date of this Assignment.

6. Assignee acknowledges that the Development Agreement is not assignable by Assignee without the prior written consent of the other parties to the Development Agreement, pursuant to the Development Agreement.

7. All covenants, agreements, warranties and provisions of this Assignment shall be binding upon and inure to the benefit of the parties and their respective successors and assigns (subject to the limitations on assignment pursuant to the Development Agreement).

8. This Assignment is a contract made under and will be construed in accordance with and governed by the laws of the United States of America and the State of Georgia.

2

Venue shall be in Camden County, Georgia.

9. This written agreement represents the final agreement between the parties and may not be contradicted by evidence of prior, contemporaneous, or subsequent oral agreements of the parties. There are no unwritten oral agreements between the parties.

10. This Assignment may be executed in any number of counterparts, each of which shall be deemed to be an original, but all of which together shall constitute one and the same instrument.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

[SIGNATURES ON FOLLOWING PAGE]

IN WITNESS WHEREOF, the parties have caused this Assignment to be duly executed as of the date and year first above written.

**ASSIGNOR:**

**JACOBY DEVELOPMENT INC.,**
a Georgia corporation

By: _____
      James F. Jacoby, Chairman

      [CORPORATE SEAL]

**ASSIGNEE:**

**JDI CUMBERLAND, LLC,**
a Georgia limited liability company

By: _____[SEAL]
      Name: _____
      Title: _____

**SCHEDULE 9.4.1-B**

**PERMITTED ASSIGNMENT GUARANTY**

[attached]

# GUARANTY

**THIS GUARANTY** (this "**Guaranty**") made and entered into as of _____, 2020, by **JACOBY DEVELOPMENT INC.**, a Georgia corporation ("**Guarantor**"), in favor of the **CAMDEN COUNTY JOINT DEVELOPMENT AUTHORITY**, a joint development authority duly organized and validly existing under the Constitution and laws of the State of Georgia ("**Lender**").

## RECITALS:

1.    Lender, Guarantor and the City of St. Marys (the "**City**") have entered into a Development Agreement dated as of _____, 2020 (the "**Development Agreement**"), in order to express the definitive terms and conditions for the development of a "**Master Project**" (as defined in the Development Agreement). Guarantor has assigned the Development Agreement to JDI Cumberland Inlet, LLC, a Georgia limited liability company, a wholly owned subsidiary of Guarantor ("**Borrower**") by Assignment and Assumption Agreement dated as of _____, 2020 (the "**Assignment and Assumption Agreement**").

2.    Lender has determined to finance certain costs of the Master Project by, inter alia, making a loan to Borrower in the principal sum of SEVEN MILLION TWENTY THOUSAND AND NO/100 DOLLARS ($7,020,000.00) (the "**Loan**") evidenced by that certain Promissory Note dated as of the date hereof (as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time, the "**Note**") and secured by, among other things, (a) that certain Fee and Leasehold Deed to Secure Debt and Security Agreement (First Priority) dated as of the date hereof (as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time, the "**First Priority Instrument**"); (b) that certain Fee and Leasehold Deed to Secure Debt and Security Agreement (Second Priority) dated as of the date hereof (as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time, the "**Second Priority Instrument**"; the First Priority Instrument and the Second Priority Instrument are hereinafter collectively referred to as the "**Instruments**"); (c) that certain Assignment of Leases and Rents (First Priority) dated as of the date hereof (as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time, the "**First Priority Assignment of Leases and Rents**"); and (d) that certain Assignment of Leases and Rents (Second Priority) dated as of the date hereof (as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time, the "**Second Priority Assignment of Leases and Rents**"; the First Priority Assignment of Leases and Rents and the Second Priority Assignment of Leases and Rents are hereinafter collectively referred to as the "**Assignments of Leases and Rents**").

3.    The Loan is governed by that certain Loan Agreement dated as of the date hereof by and between Borrower and Lender (as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time, the "**Loan Agreement**"). "**Loan Documents**" has the meaning provided in the Loan Agreement.

4.    Borrower, as guarantor, has executed that certain Guaranty in favor of Lender, defined as "Developer Guaranty" in the Development Agreement and dated as of the date hereof (as the same may be amended, restated, replaced, supplemented or otherwise modified from time

to time, the "**Developer Guaranty**"), secured by the Collateral Assignment (defined in the Loan Agreement) (the "**Collateral Assignment**") and the Instruments, by which Borrower has guaranteed the timely payment in full of all amounts necessary to ensure that net proceeds of the TAD (defined in the Development Agreement) available under the "First" subparagraph in the Waterfall (defined in the Development Agreement) are sufficient at all times that recourse to contract payments by Camden County (the "**County**") under the Development Agreement is not necessary for the timely repayment of the Series 2020 Bond.

5.      In order to finance the Master Project and to provide for payment of capitalized interest and certain costs of issuance, Lender adopted a bond resolution on _____, 2020 (the "**Bond Resolution**") authorizing Lender to issue its Taxable Industrial Development Revenue Bond, Series 2020, in a maximum principal amount as set forth therein (the "**Series 2020 Bond**"). Such term shall include any refunding bonds issued to refinance the Series 2020 Bond.  Payments by Borrower pursuant to the Note and the other Loan Documents will be applied to repayment of the Series 2020 Bond.

6.      Payment of the Series 2020 Bond will be secured in accordance with the provisions of an Intergovernmental Contract (the "**County IGA**") between Lender and the County pursuant to which Lender will agree, among other things, to issue the Series 2020 Bond and use the proceeds thereof to pay the Costs of the Project, and the County will agree, among other things, to make payments to Lender to the extent necessary (and subject to the one mill limitation in O.C.G.A. Sec. 48-5-220(20)) to pay the debt service on the Series 2020 Bond and that such payments will be pledged by Lender to the holders of the Series 2020 Bond.  Recourse to the payments provided for in the County IGA is not the intended source for repayment of the Series 2020 Bond, which (after a period of capitalized interest) is the other components of the Flow of Funds, including repayments by Borrower of the Loan, other proceeds of the Loan Documents, and net proceeds of the "**TAD Financing**" (defined in the Development Agreement as "amounts from the TAD's special fund, derived solely from Master Project TAD Increments disbursed to pay Redevelopment Costs, such as "pay/go" payments").

7.      Pursuant to the Development Agreement, in order to induce Lender to make the Loan to Borrower and enter into the Loan Agreement, and to proceed with the issuance of the Series 2020 Bond and apply the proceeds thereof for the benefit of Borrower, Guarantor has agreed to enter into this Guaranty for the purpose of assuring the payment and performance of the Guaranteed Obligations (as defined in Section 2.1 hereof) pursuant to the terms and conditions of this Guaranty.

In consideration of the above premises, and other good and valuable consideration, the receipt of which is hereby acknowledged, Guarantor does hereby make the following guaranties to and agreements with Lender.

## ARTICLE I
## REPRESENTATIONS AND WARRANTIES

**Section 1.1.  Representations and Warranties of Guarantor**.  Guarantor represents and warrants as follows:  (a) Guarantor is a corporation, duly organized, validly existing and in good standing under the laws of the State of Georgia; (b) Guarantor has all requisite power and authority

to execute and deliver this Guaranty and to incur and perform its obligations under this Guaranty; (c) the execution, delivery and performance of this Guaranty have been duly authorized by all necessary action and proceedings by or on behalf of Guarantor, and no further approvals or filings of any kind, including any approval of or filing with any governmental authority, are required by or on behalf of Guarantor as a condition to the valid execution, delivery, and performance by it of this Guaranty; (d) neither the execution and delivery of this Guaranty, the consummation of the transactions contemplated hereby nor the fulfillment of or compliance with the terms and conditions of this Guaranty will conflict with or result in a breach of the terms and conditions of any restriction or constitute a default under any agreement or instrument to which Guarantor is a party or by which it is bound; (e) there is no litigation, claim, action or proceeding, pending or threatened against Guarantor which would adversely affect the financial condition of Guarantor or the ability of Guarantor to fulfill all obligations of Guarantor hereunder; (f) no Act of Bankruptcy (defined in the Development Agreement) has occurred with respect to Guarantor; (g) all financial statements heretofore delivered by Guarantor to Lender are true and correct in all respects as of the date thereof, and no material change has occurred in the financial condition of Guarantor since the date thereof; (h) this Guaranty, when duly executed and delivered by Guarantor, will be the valid, binding and enforceable obligation of Guarantor in accordance with its terms, subject to matters and laws affecting creditors' rights generally and to general principles of equity; (i) Guarantor's organizational documents are in full force and effect as of the Effective Date, and no fact or circumstance has occurred that, by itself or with the giving of notice or the passage of time or both, would constitute a default thereunder; and (j) the assumption of the obligations hereunder will result in direct economic benefit to Guarantor.

**Section 1.2. Representations and Warranties of Guarantor as to Borrower**. Guarantor represents and warrants as follows: (a) Borrower is a limited liability company, duly organized, validly existing and in good standing under the laws of the State of Georgia; (b) Borrower has all requisite power and authority to execute and deliver the Assignment and Assumption Agreement, the Loan Agreement and the other Loan Documents, to incur and perform its obligations under the Development Agreement, the Loan Agreement and the other Loan Documents, and to carry out the transactions contemplated by the Development Agreement, the Loan Agreement and the other Loan Documents; (c) the execution, delivery and performance of the Assignment and Assumption Agreement, the Development Agreement, the Loan Agreement and the other Loan Documents have been duly authorized by all necessary action and proceedings by or on behalf of Borrower, and no further approvals or filings of any kind, including any approval of or filing with any governmental authority, are required by or on behalf of Borrower as a condition to the valid execution, delivery, and performance by it of the Assignment and Assumption Agreement, the Development Agreement, the Loan Agreement and the other Loan Documents; (d) neither the execution and delivery of the Assignment and Assumption Agreement, the Development Agreement, the Loan Agreement and the other Loan Documents, the consummation of the transactions contemplated thereby nor the fulfillment of or compliance with the terms and conditions of the Assignment and Assumption Agreement, the Development Agreement, the Loan Agreement and the other Loan Documents will conflict with or result in a breach of the terms and conditions of any restriction or constitute a default under any agreement or instrument to which Borrower is a party or by which it is bound; (e) there is no litigation, claim, action or proceeding, pending or threatened against Borrower which would adversely affect the financial condition of Borrower or the ability of Borrower to fulfill all obligations of Borrower under the Assignment and Assumption Agreement, the Development Agreement, the Loan Agreement and the other

Loan Documents; (f) no Act of Bankruptcy has occurred with respect to Borrower; (g) all financial statements heretofore delivered by Borrower to Lender are true and correct in all respects as of the date thereof, and no material change has occurred in the financial condition of Borrower since the date thereof; (h) the Assignment and Assumption Agreement, the Development Agreement, the Loan Agreement and the other Loan Documents, when duly executed and delivered by each party thereto, will be the valid, binding and enforceable obligation of Borrower in accordance with its terms, subject to matters and laws affecting creditors' rights generally and to general principles of equity; and (i) Borrower's organizational documents are in full force and effect as of the Effective Date, and no fact or circumstance has occurred that, by itself or with the giving of notice or the passage of time or both, would constitute a default thereunder.

Section 1.3.  Further Representations and Warranties.  Guarantor further represents and warrants as follows:  (a) neither Guarantor nor Borrower is in default under or in breach of any contract or agreement, and no event has occurred which, with the passage of time or giving of notice (or both) would constitute such a default, in each case in which such default, breach or event would have a material and adverse impact on Guarantor's ability to perform its obligations under this Guaranty or Borrower's ability to perform its obligations under the Development Agreement, the Loan Agreement and the other Loan Documents; (b) Guarantor and Borrower have disclosed to Lender in writing all defaults and breaches that have asserted against Guarantor and Borrower, respectively, under any contract or agreement as of the Effective Date; (c) the address of Guarantor's and Borrower's principal place of business is 8200 Roberts Drive, Suite 200, Atlanta, Georgia 30350; and (c) Guarantor hereby makes a good faith representation that, based upon its understanding of the obligations incurred by Borrower in the performance of the Development Agreement, the Loan Agreement and the other Loan Documents and the actions contemplated thereby that Borrower is sufficiently capitalized to meet its obligations to Lender and the City in the performance of the Development Agreement, the Loan Agreement and the other Loan Documents and the actions contemplated hereby.

## ARTICLE II
## GUARANTIES

Section 2.1.  Guaranteed Obligations.  Guarantor hereby unconditionally, absolutely and irrevocably guarantees to Lender the full and prompt payment and performance of the following:

(a) all obligations of Borrower under the Development Agreement, all Obligations (as defined in the Loan Agreement) of Borrower under the Loan Documents, and all of Borrower's obligations under the Developer Guaranty, including without limitation, all payments under the Note and the Developer Guaranty when due, whether by acceleration or otherwise, with such interest as may accrue thereon and such other charges as may be due in connection therewith, either before or after maturity thereof; and (b) any and all obligations whatsoever of Borrower under the terms of any and all of the other Loan Documents (as defined in the Loan Agreement). Not in limitation of the above, but in addition thereto, Guarantor hereby unconditionally guarantees to Lender the following:  (i) payment of interest in accordance with the Loan Documents; (ii) repayment of principal in accordance with the Loan Documents; (iii) payment of any and all loss, cost, expense or damage suffered by Lender which is caused by any fraud or material misrepresentation by Borrower in connection with the Development Agreement or the Loan; (iv) payment of all costs and expenses incurred by Lender relating to the Loan, including without

limitation any and all costs, attorneys' fees and expenses incurred or expended by Lender in collecting any of the Guaranteed Obligations or in enforcing any right granted hereunder; (v) payment of all insurance premiums, real estate taxes, personal property taxes, and other assessments levied against the Master Project; and (vi) payment of any and all loss, cost, expense or damage suffered by Lender as a result of Borrower's noncompliance with environmental laws and regulations; and

(b)     the timely payment in full of all amounts necessary to ensure that net proceeds of the TAD Financing, available under the "First" subparagraph in the Waterfall, are sufficient at all times, whether before or after the repayment of the Loan, that recourse to contract payments by the County under Section 3.9.2(c) of the Development Agreement, is not necessary for the timely repayment of the Series 2020 Bond (including any refunding bonds issued to refinance the Series 2020 Bond), all in accordance with the terms and provisions of the Development Agreement.

The obligations set forth in subsections (a) and (b) above are herein collectively referred to as the "**Guaranteed Obligations**".

**Section 2.2.  Nature of Guaranteed Obligations.**  All obligations of Guarantor under this Guaranty shall be absolute, unconditional, continuing and irrevocable and shall remain in full force and effect until all of the Guaranteed Obligations have been fully paid and performed.  Not in limitation of the above, but in addition thereto, all obligations of Guarantor under this Guaranty shall remain in full force and effect until the entire principal of and interest on the Series 2020 Bond (including any refunding bonds issued to refinance the Series 2020 Bond) shall have been paid or shall be deemed to have been paid in accordance with the respective terms thereof.  The provisions of this Guaranty shall extend and be applicable to all renewals, replacements, amendments, extensions, consolidations and modifications of the Development Agreement, the Loan Agreement, and the other Loan Documents, and any and all references herein to the Loan Documents or any of them shall be deemed to include any such renewals, replacements, amendments, extensions, consolidations or modifications thereof.  This Guaranty shall continue to be effective or be revived and reinstated, as the case may be, in the event that any payment received by Lender of any of the indebtedness guaranteed hereby is returned or rescinded by reason of any present or future federal, state or other law or regulation relating to bankruptcy, insolvency or other relief of debtors or for any other reason.

### ARTICLE III
### COVENANTS AND AGREEMENTS

**Section 3.1.  Consents**.  Guarantor hereby consents and agrees that Lender may at any time, and from time to time, without notice to or further consent from Guarantor, either with or without consideration: (a) release and surrender any property or other security of any kind or nature whatsoever now or hereafter held by it or by any person or entity on its behalf or for its account, securing any indebtedness or liability hereby guaranteed, including without limitation the collateral which is the subject of the Instruments, the Assignments of Leases and Rents and the Collateral Assignment (collectively, the "**Collateral**"); (b) substitute for any Collateral held by or on behalf of Lender other collateral of like kind, or of any kind; (c) make other advances or increase the amount of the Loan; (d) agree to modify the terms of any one or more of the Loan Documents; (e) extend or renew the Note for any period; (f) grant releases, compromises and indulgences with

respect to any one or more of the Loan Documents and to any persons or entities now or hereafter liable thereunder or hereunder; (g) release any other guarantor or endorser of or other person or entity liable upon the Note or any other of the Loan Documents; or (h) take or fail to take any action of any type whatsoever. No such action which Lender shall take or fail to take in connection with the Loan Documents or any Collateral, nor any course of dealing with Guarantor, Borrower or any other person, shall limit, impair or release Guarantor's obligations hereunder, affect this Guaranty in any way or afford Guarantor any recourse against Lender. Nothing contained in this section shall be construed to require Lender to take or refrain from taking any action referred to herein.

**Section 3.2.  Waiver and Subordination**.  Guarantor hereby expressly waives any right of contribution from or indemnity against Borrower, whether at law or in equity, arising from any payments made by Guarantor pursuant to the terms of this Guaranty, and Guarantor acknowledges that Guarantor has no right whatsoever to proceed against Borrower for reimbursement of any such payments. In connection with the foregoing, Guarantor expressly waives any and all rights of subrogation to Lender against Borrower, and Guarantor hereby waives any rights to enforce any remedy which Lender may have against Borrower and any rights to participate in any Collateral. In addition to and without in any way limiting the foregoing, Guarantor hereby subordinates any and all indebtedness of Borrower now or hereafter owed to Guarantor to all indebtedness of Borrower to Lender, and agrees with Lender that Guarantor shall not demand or accept any payment of principal or interest from Borrower, shall not claim any offset or other reduction of Guarantor's obligations hereunder because of any such indebtedness and shall not take any action to obtain any of the Collateral.

**Section 3.3.  Waiver of Defenses**.  Guarantor hereby waives and agrees not to assert or take advantage of any defense based upon: (a) any incapacity, lack of authority, death, disability, dissolution or termination of Guarantor, Borrower, Lender, or any other person or entity; (b) any failure of Lender to commence an action against Borrower or any other person or entity (including, without limitation, other guarantors, if any), or to file or enforce a claim against the estate (either in administration, bankruptcy, or any other proceeding) of Borrower or any other person or entity, whether or not demand is made upon Lender to file or enforce such claim; (c) any failure of Lender to give notice of the existence, creation or incurring of any new or additional indebtedness or other obligation or of any action or nonaction on the part of any other person or entity, in connection with the Loan Documents or any obligation hereby guaranteed; (d) any failure on the part of Lender to ascertain the extent or nature of the Collateral or any insurance or other rights with respect thereto, or the liability of any party liable for the Loan Documents or the obligations evidenced or secured thereby, or any failure on the part of Lender to disclose to Guarantor any facts it may now or hereafter know regarding Borrower, the Collateral, or such other parties; (e) any lack of acceptance or notice of acceptance of this Guaranty by Lender; (f) any lack of presentment, demand, protest, or notice of demand, protest or nonpayment with respect to any indebtedness or obligations under any of the Loan Documents; (g) any lack of notice of disposition or of manner of disposition of any Collateral; (h) notice of intention to accelerate the maturity of the Guaranteed Obligations or any part thereof; (i) failure to give notice to Guarantor of the occurrence of an event of default under the terms and provisions of this Guaranty, the Development Agreement, the Loan Agreement or any of the other Loan Documents; (j) any lack of other notices to which Guarantor might otherwise be entitled; (k) any defenses, setoffs or counterclaims which may be available to Guarantor, Borrower or any other person or entity; (l) failure to properly record any document or

any other lack of due diligence by Lender in creating or perfecting a security interest in or collection, protection or realization upon any Collateral or in obtaining reimbursement or performance from any person or entity now or hereafter liable for the Loan Documents or any obligation secured thereby; (m) any invalidity, irregularity or unenforceability, in whole or in part, of any one or more of the Loan Documents; (n) the inaccuracy of any representation or other provision contained in any Loan Document; (o) any sale or assignment of the Loan Documents, in whole or in part; (p) any assignment or mortgaging or the purported assignment or mortgaging of all or any part of the interest of Lender in the Master Project; (q) any sale or assignment by Borrower of the Collateral, or any portion thereof, whether or not consented to by Lender; (r) any lack of commercial reasonableness in dealing with the Collateral; (s) any deficiencies in the Collateral or any deficiency in the ability of Lender to collect or obtain performance from any persons or entities now or hereafter liable for the payment or performance of any obligation hereby guaranteed; (t) an assertion or claim that the automatic stay provided by 11 U.S.C. §362 (arising upon the voluntary or involuntary bankruptcy proceeding of Borrower), or any other stay provided under any other debtor relief law (whether statutory, common law, case law or otherwise) of any jurisdiction whatsoever (collectively, "**Bankruptcy Law**"), now or hereafter in effect, which may be or become applicable, shall operate or be interpreted to stay, interdict, condition, reduce or inhibit the ability of Lender to enforce any of its rights, whether now or hereafter acquired, which Lender may have against Guarantor or the Collateral; (u) any modifications of the Loan Documents or any obligation of Borrower relating to the Loan by operation of law or by action of any court pursuant to any Bankruptcy Law now or hereafter in effect, or otherwise; (v) the waiver of the payment, performance or observance by Lender of any of its obligations or agreements contained in or contemplated by the Development Agreement or the Loan Agreement; (w) the extension of the time for payment of any principal of or redemption premium (if any) or interest on any Bond or any part thereof owing or payable on such Bond or of the time for performance of any other obligation or agreement under, arising out of or contemplated by the Development Agreement, the Loan Agreement or any of the other Loan Documents, or the further extension or the renewal thereof; (x) the modification or amendment (whether material or otherwise) of any obligation or agreement set forth in or contemplated by the Development Agreement, the Loan Agreement, or any of the other Loan Documents; (y) the taking or the omission of any of the actions referred to in or contemplated by the Development Agreement, the Loan Agreement or the other Loan Documents; (z) any failure, omission, delay or lack on the part of Lender to enforce, assert or exercise any right, power or remedy conferred on Lender by this Guaranty, the Development Agreement, the Loan Agreement, or the other Loan Documents, or any other act or acts on the part of Lender or any of the holders at any time or from time to time of the Series 2020 Bond (or any refunding bonds issued to refinance the Series 2020 Bond); (aa) the voluntary or involuntary liquidation, dissolution, sale or other disposition of all or substantially all of the assets, marshaling of assets and liabilities, receivership, insolvency, bankruptcy, assignment for the benefit of creditors, reorganization, arrangement, composition with creditors or readjustment, or other similar proceedings affecting Guarantor or Lender or any of the assets of any of them, or any allegation or contest of the validity of this Guaranty in any proceeding, and any such attempted disposition shall be deemed to have caused the obligations under this Guaranty to be assumed by the person, persons, entity or entities acquiring or otherwise receiving such assets, which shall be deemed to be a Guarantor hereunder, jointly and severally with the initial Guarantor named above; (bb) to the extent permitted by law, any event or action that would, in the absence of this clause, result in the release or discharge of Guarantor by the operation of law from the performance or

observance of any obligation or agreement contained in this Guaranty; and (cc) any other circumstance, occurrence or condition, whether similar or dissimilar to any of the foregoing that might be raised in avoidance of, or in defense against an action to enforce, the obligations of Guarantor under this Guaranty; or (dd) any action, occurrence, event or matter consented to by Guarantor under Section 3.1 hereof, under any other provision hereof, or otherwise. Guarantor specifically waives the right to require Lender to take action against Borrower as provided for in O.C.G.A. Section 10-7-24. Guarantor waives all defenses given to sureties or guarantors at law or in equity other than actual payment and performance of the Guaranteed Obligations and all defenses based upon questions as to the validity, legality or enforceability of the Guaranteed Obligations and agrees that Guarantor shall be primarily liable hereunder.

Section 3.4.   Liability of Guarantor.  This is a guaranty of payment and performance and not of collection. The liability of Guarantor under this Guaranty shall be direct and immediate and not conditional or contingent upon the pursuit of any remedies against Borrower or any other person (including, without limitation, other guarantors, if any), nor against the Collateral. Guarantor waives any right to require that an action be brought against Borrower or any other person or to require that resort be had to any Collateral. In the event that, on account of any Bankruptcy Law now or hereafter in effect, which may be or become applicable, Borrower shall be relieved of or fail to incur any debt, obligation or liability as provided in the Loan Documents, Guarantor shall nevertheless be fully liable therefor. In the event of a default under the Loan Documents, Lender shall have the right to enforce its rights, powers and remedies (including, without limitation, foreclosure of all or any portion of the Collateral) thereunder or hereunder, in any order, and all rights, powers and remedies available to Lender in such event shall be nonexclusive and cumulative of all other rights, powers and remedies provided thereunder or hereunder or by law or in equity. If the indebtedness guaranteed hereby is partially paid by reason of the election of Lender to pursue any of the remedies available to Lender, or is otherwise partially paid, this Guaranty shall nevertheless remain in full force and effect, and Guarantor shall remain liable for the entire remaining unpaid balance of the indebtedness guaranteed hereby, even though any rights which Guarantor may have against Borrower may be destroyed or diminished by the exercise of any such remedy. Guarantor covenants and agrees that, upon the commencement of a voluntary or involuntary bankruptcy proceeding by or against Borrower, Guarantor shall not seek or cause Borrower or any other person or entity to seek a supplemental stay or other relief, whether injunctive or otherwise, pursuant to 11 U.S.C. §105 or any other provision of the Bankruptcy Reform Act of 1978, as amended, or any other Bankruptcy Law now or hereafter in effect, which may be or become applicable, to stay, interdict, condition, reduce or inhibit the ability of Lender to enforce any rights of Lender against Guarantor or the Collateral by virtue of this Guaranty or otherwise. No exculpatory or similar provision of the Loan Documents which limits, or relieves Borrower from, any personal or direct liability of Borrower under the Loan Documents shall limit or relieve Guarantor from any such liability, it being the intention of the parties hereto that Guarantor be liable for all obligations of the Borrower under any provision of the Loan Documents notwithstanding any such exculpatory or similar provision. Lender shall not be required to pursue any other remedies before invoking the benefits of the guaranties contained herein, and specifically it shall not be required to make demand upon or institute suit or otherwise pursue or exhaust its remedies against Borrower or any surety other than Guarantor or to proceed against any security now or hereafter existing for the payment of any of the Guaranteed Obligations. Lender may maintain an action on this Guaranty without joining Borrower therein and without bringing a separate action against Borrower. If for any reason whatsoever (including but not limited to ultra

8

vires, lack of authority, illegality, force majeure, act of God or impossibility) the Guaranteed Obligations cannot be enforced against Borrower, such unenforceability shall in no manner affect the liability of Guarantor hereunder and Guarantor shall be liable hereunder notwithstanding that Borrower may not be liable for such Guaranteed Obligations and to the same extent as Guarantor would have been liable if such Guaranteed Obligations had been enforceable against Borrower.

Section 3.5.  **Preference**.  In the event any payment by Borrower to Lender is held to constitute a preference under any applicable Bankruptcy Law, or if for any other reason Lender is required to refund such payment or pay the amount thereof to any other party, such payment by Borrower to Lender shall not constitute a release of Guarantor from any liability hereunder, but Guarantor agrees to pay such amount to Lender upon demand and this Guaranty shall continue to be effective or shall be reinstated, as the case may be, to the extent of any such payment or payments.

Section 3.6.  **Application of Payments**.  Guarantor hereby authorizes Lender, without notice to Guarantor, to apply all payments and credits received from Borrower or from Guarantor or realized from any security to the indebtedness, obligations and undertakings of Borrower (whether or not the same are the subject of this Guaranty) in such manner and in such priority as Lender in its sole judgment shall determine.

Section 3.7.  **Financial Statements; Financial Condition**.  Guarantor acknowledges that the Loan Documents require that Borrower provide or cause to be provided to Lender certain financial statements of Guarantor, and Guarantor hereby agrees to provide to Lender all such financial statements in such form and at such times as is required under the provisions of the Loan Documents.  Guarantor will deliver to Lender within sixty (60) days after the end of Guarantor's fiscal year, financial statements of Guarantor in scope and detail satisfactory to Lender, which statements shall be sworn and certified as to accuracy by Guarantor.  Guarantor hereby covenants to timely inform Lender of any material adverse change in the financial condition of Guarantor or Borrower occurring after the Effective Date of this Guaranty.

Section 3.8.  **Waiver of Rights**.  Guarantor hereby waives and renounces, to the fullest extent permitted by law, all rights to the benefits of any statute of limitations and any moratorium, reinstatement, marshalling, forbearance, valuation, stay, extension, redemption, appraisement, exemption and homestead now or hereafter provided by the Constitution and laws of the United States of America and of each state thereof, both as to itself and in and to all of its property, real and personal, against the enforcement and collection of the obligations evidenced by this Guaranty.

Section 3.9.  **Condition of Borrower**.  Guarantor is fully aware of the financial condition of Borrower and is executing and delivering this Guaranty based solely upon Guarantor's own independent investigation of all matters pertinent hereto, and Guarantor is not relying in any manner upon any representation or statement of Lender. Guarantor is in a position to obtain, and Guarantor hereby assumes full responsibility for obtaining, any additional information concerning the financial condition of Borrower and any other matter pertinent hereto, and that Guarantor is not relying upon Lender to furnish, and shall have no right to require Lender to obtain or disclose, any information with respect to the indebtedness or obligations guaranteed hereby, the financial condition or character of Borrower or the ability of Borrower to pay the indebtedness or perform the obligations guaranteed hereby, the existence of any collateral or security for any or all of such

indebtedness or obligations, the existence or nonexistence of any other guaranties of all or any part of such indebtedness or obligations, any actions or non-action on the part of Lender, Borrower or any other person or entity, or any other matter, fact or occurrence whatsoever. By executing this Guaranty, Guarantor acknowledges and knowingly accepts the full range of risks encompassed within a contract of guaranty

## ARTICLE IV
## NOTICE AND SERVICE OF PROCESS, PLEADINGS AND OTHER PAPERS

**Section 4.1.  Agent for Service.**  Guarantor designates and appoints, without power of revocation, _____ at _____, as the agent of Guarantor upon whom may be served all process, pleadings, notices or other papers which may or must be served upon Guarantor as a result of any of its obligations under this Guaranty.  Lender shall provide written notice (including a copy of any such process, pleadings, notices or other papers) in accordance with Section 6.5 hereof to Guarantor simultaneously with service to such agent.

**Section 4.2.  Consent to Jurisdiction.**  Guarantor further agrees, without power of revocation:

(a)    that any civil suit or action brought against it as a result of any of its obligations under this Guaranty may be commenced in any court of competent jurisdiction in the State, by service of process upon the above designated agent with a copy thereof forwarded as provided in Section 4.1 hereof;

(b)    that service of process, pleadings, notices and other papers upon the agent, as aforesaid, shall be taken and held in all courts to be as valid and binding upon each Guarantor as if due personal service thereof had been made;

(c)    that service upon the said agent may be effected by delivering copies of said process, pleadings, notices or other papers to the said agent, reciting that a copy of said process pleadings, notices or other papers was forwarded to Guarantor as provided in Section 6.5 hereof;

(d)    that in any civil suit or action brought (after notice as provided herein) against any Guarantor as a result of any of its obligations under this Guaranty, Guarantor will not assert, as a defense, counterclaim or set off (i) any default by Lender, or (ii) any cause of action, claim or counterclaim which it may have against Lender.  Failure to assert such matter shall not be deemed to be a waiver by Guarantor, but the same may be asserted in a separate action; and

(e)    Guarantor has an office in Camden County, Georgia, and transacts business in Camden County, Georgia. Guarantor shall not object to the venue of any proceeding being in Camden County, Georgia.

**Section 4.3.  Service of Notices, etc.**  Any process, pleadings, notices or other papers served upon any of the foregoing agents shall, at the same time, be forwarded to each Guarantor as provided in Section 6.5 hereof.

## ARTICLE V
## EVENTS OF DEFAULT AND REMEDIES

**Section 5.1.  Events of Default.**  If any of the following events occurs and is continuing, it is hereby defined and declared to be and constitute an "**Event of Default**":

(a)     failure by Guarantor to make any payment required to be made under Section 2.1 hereof as and when the same shall become due and payable;

(b)     failure by Guarantor to perform any of the Guaranteed Obligations under Section 2.1 hereof as when performance of the same shall be due;

(c)     any representation by Guarantor contained in this Guaranty proves false or misleading in any material respect as of the date of the making or furnishing thereof;

(d)     Guarantor shall (i) apply for or consent to the appointment of or the taking of possession by, a receiver, custodian, trustee or liquidator of Guarantor or of all or a substantial part of its property, (ii) admit in writing its inability, or be generally unable, to pay its debts as such debts become due, (iii) make a general assignment for the benefit of its creditors, (iv) commence a voluntary case under the United States Bankruptcy Code (Title 11 U.S.C.) (as now or hereafter in effect), (v) file a petition seeking to take advantage of any other law relating to bankruptcy, insolvency, or composition or adjustment of debts, (vi) fail to controvert in a timely or appropriate manner, or acquiesce in writing to, any petition filed against Guarantor in an involuntary case under said Bankruptcy Code, or (vii) take any action for the purpose of effecting any of the foregoing;

(e)     a proceeding or case shall be commenced, without the application or consent of Guarantor, in any court of competent jurisdiction, seeking (i) the liquidation, or composition or readjustment of debts, of Guarantor, as the case may be, (ii) the appointment of a trustee, receiver, custodian, liquidator or the like of Guarantor, as the case may be, or of all or any substantial part of its assets, (iii) similar relief in respect of Guarantor, as the case may be, under any Bankruptcy Law, and such proceeding or case shall continue undismissed, or an order, judgment or decree approving or ordering any of the foregoing shall be entered and continue unstayed and in effect, for a period of sixty (60) days from commencement of such proceeding or case, or an order for relief against Guarantor shall be entered in an involuntary ease under any Bankruptcy Law; or

(f)     an "Event of Default" occurs and is continuing under the Loan Agreement after any applicable notice and cure period.

**Section 5.2.  Remedies.**  Whenever any Event of Default referred to in Section 5.1 hereof shall have occurred and is continuing, Lender, at the discretion of Lender, shall have the right to proceed first and directly against Guarantor under this Guaranty for recovery of the Guaranteed Obligations without proceeding against or exhausting any other remedies which it may have.

**Section 5.3.  No Remedy Exclusive.**  No remedy herein conferred upon or reserved to Lender is intended to be exclusive of any other available remedy or remedies, but each and every such remedy shall be cumulative and shall be in addition to every other remedy given under this

Guaranty or now or hereafter existing at law or in equity. No delay or omission to exercise any right or power accruing upon default, omission or failure of performance hereunder shall impair any such right or power or shall be construed to be a waiver thereof, but any such right and power may be exercised from time to time and as often as may be deemed expedient. Nothing herein contained shall be deemed to authorize any action or proceeding taken by any holder of the Series 2020 Bond (or the holder of any refunding bonds issued to refinance the Series 2020 Bond) against Guarantor in the event of non-payment of the principal of, the redemption premium (if any) or the interest on the Series 2020 Bond (or any refunding bonds issued to refinance the Series 2020 Bond) of such holder.

**Section 5.4. Attorneys' Fees and Expenses.** Guarantor agrees to pay all costs, expenses and fees, including all reasonable attorneys' fees, which may be incurred by Lender in enforcing or attempting to enforce this Guaranty following any Event of Default hereunder whether the same shall be enforced by suit or otherwise.

**Section 5.5. Guaranty for Benefit of Lender.** This Guaranty is entered into by Guarantor for the benefit of Lender and its directors, members, officers, employees and agents.

**Section 5.6. Remedies Cumulative.** The terms of this Guaranty may be enforced as to any one or more breaches, either separately or cumulatively.

## ARTICLE VI
## WAIVERS, AMENDMENTS AND MISCELLANEOUS

**Section 6.1. Waivers, Amendments and Modifications.** If any provision contained in this Guaranty should be breached by Guarantor and thereafter waived by Lender, such waiver shall be limited to the particular breach so waived and shall not be deemed to waive any other breach hereunder. No waiver, amendment, release or modification of this Guaranty shall be established by conduct, custom or course of dealing, but solely by an instrument in writing duly executed by Lender.

**Section 6.2. Governing Law.** This Guaranty and the rights and obligations of the parties hereto shall be governed, construed and interpreted according to the laws of the State of Georgia.

**Section 6.3. Entire Agreement; Counterparts.** This Guaranty constitutes the entire agreement, and supersedes all prior agreements, both written and oral, between the parties with respect to the subject matter hereof and may be executed in any number of counterparts, each of which shall be deemed to be an original, but all of which together shall constitute one and the same instrument.

**Section 6.4. Severability.** If any provision of this Guaranty shall be held or deemed to be or shall, in fact, be invalid, inoperative or unenforceable as applied in any particular case in any jurisdiction or jurisdictions or in all jurisdictions, or in all cases because it conflicts with any other provision or provisions hereof or any constitution or statute or rule of public policy, or for any other reason, such circumstances shall not have the effect of rendering the provision in question invalid, inoperative or unenforceable in any other case or circumstance, or of rendering any other provision or provisions herein contained invalid, inoperative or unenforceable to any extent whatever.

**Section 6.5. Notices.** Any notice or notices which may be or are required to be given respecting any matter pertaining to this Guaranty shall be in writing and shall be deemed to have been given when delivered or mailed by first class registered or certified mail, return receipt requested, postage prepaid, or by recognized overnight delivery service, as follows:

| | |
|---|---|
| To Guarantor: | Jacoby Development Inc.<br>8200 Roberts Drive, Suite 200<br>Atlanta, Georgia 30350<br>Attention: James F. Jacoby, Chairman |
| with copy to: | Troutman Pepper Hamilton Sanders LLP<br>600 Peachtree Street Suite 3000<br>Atlanta, Georgia 30308<br>Attention: Andrea L. Rimer, Esq. |
| To Lender: | Camden County Joint Development Authority<br>531 North Lee Street<br>Kingsland, Georgia 31548<br>Attention: James Coughlin, Executive Director |
| with copy to: | Seyfarth Shaw LLP<br>1075 Peachtree Street, NE, Suite 2500<br>Atlanta, Georgia 30309<br>Attention: Daniel M. McRae, Esq. |

or to such other address with respect to either party as such party shall notify the other in writing.

Any party may, by written notice given hereunder, designate any further or different address to which subsequent notices or other communications shall be sent and to whose attention the same shall be directed.

**Section 6.6. Limit of Validity**. If from any circumstances whatsoever fulfillment of any provisions of this Guaranty, at the time performance of such provision shall be due, shall involve transcending the limit of validity presently prescribed by any applicable usury statute or any other applicable law, with regard to obligations of like character and amount, then ipso facto the obligation to be fulfilled shall be reduced to the limit of such validity, so that in no event shall any exaction be possible under this Guaranty that is in excess of the current limit of such validity, but such obligation shall be fulfilled to the limit of such validity. The provisions of this section shall control every other provision of this Guaranty.

**Section 6.7.   Miscellaneous**. The provisions of this Guaranty shall be binding upon Guarantor and the heirs, executors, legal representatives, successors, successors-in-title and assigns of Guarantor and shall inure to the benefit of and be enforceable by Lender and the heirs, executors, legal representatives, successors, successors-in-title and assigns of Lender. This Guaranty shall in no event be impaired by any change which may arise by reason of the death of Borrower or Guarantor, if individuals, or by reason of the dissolution of Borrower or Guarantor, if Borrower or Guarantor is a corporation or partnership. The Guaranty is assignable by Lender, and any full or partial assignment hereof by Lender shall operate to vest in the assignee all rights

and powers herein conferred upon and granted to Lender and so assigned by Lender. Guarantor expressly waives notice of transfer or assignment of this Guaranty and acknowledges that the failure by Lender to give any such notice shall not affect the liabilities of Guarantor hereunder. All personal pronouns used herein, whether used in the masculine, feminine or neuter gender, shall include all other genders; and the singular shall include the plural and vice versa. Titles of Articles and Sections are for convenience only and in no way define, limit, amplify or describe the scope or intent of any provisions hereof. If Guarantor is a partnership, all of the provisions hereof referring to Guarantor shall be construed to apply to each of the general partners of Guarantor and of any and all further tiers of general partners in the structure of Guarantor. This Guaranty contains the entire agreement between Guarantor and Lender relating to the guarantying of the Loan by Guarantor and supersedes entirely any and all prior written or oral agreements with respect thereto; and Guarantor and Lender acknowledge that there are no contemporaneous oral agreements with respect to the subject matter hereof.

**Section 6.8. Definitions.** Capitalized terms used but not defined in this Guaranty shall have the meanings assigned in the Development Agreement.

[SIGNATURES BEGIN ON FOLLOWING PAGE]

**IN WITNESS WHEREOF,** Guarantor has executed this Guaranty under seal as of the date first above written.

<div style="margin-left:40%">

**JACOBY DEVELOPMENT INC.,**
a Georgia corporation


By: _____
     James F. Jacoby, Chairman

     [CORPORATE SEAL]

</div>

# Georgia Coastal Marshlands Protection Committee

## PERMIT

Issued Pursuant to O.C.G.A. 12-5-280

To: Camden County Joint Development Authority

For: Construction and maintenance of a full-service marina facility known as Wharf St. Marys, Camden County, Georgia. **Standard and Special Conditions apply to this permit.**

Date:                September 14, 2018

Expiration Date:     September 14, 2023

Permit Number:       748

Authorized By:



GEORGIA
DEPARTMENT OF NATURAL RESOURCES
COASTAL RESOURCES DIVISION

For further information, please contact the DNR Coastal Resources Division at (912) 264-7218

# Georgia Coastal Marshlands Protection Committee

## PERMIT

Issued Pursuant to O.C.G.A. 12-5-280

**To:** Camden County Joint Development Authority

**For:** Modification of Coastal Marshlands Protection Act Permit #748. Construction and maintenance of a full-service marina facility known as Wharf St. Marys, Camden County, Georgia. **Standard and Special conditions apply to this permit.**

Date:            February 14, 2023

Expiration Date: February 14, 2028

Permit Number:   748

Authorized By:

For further information, please contact the DNR Coastal Resources Division at (912) 264-7218



GEORGIA
Department of Natural Resources
Coastal Resources Division

EXHIBIT
5
Jacoby   7/24/25





