**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| **In Re:** | **CASE NO. 25-55072-SMS** |
| **JDI CUMBERLAND INLET, LLC,** | **CHAPTER 11** |
| **Debtor.** | |

**DISCLOSURE STATEMENT FOR PLAN OF REORGANIZATION PROPOSED BY DEBTOR JID CUMBERLAND INLET, LLC**

## I. INTRODUCTION

This Disclosure Statement (the "**Disclosure Statement**") has been prepared pursuant to § 1125 of the United States Bankruptcy Code (the "**Bankruptcy Code**") on behalf JDI Cumberland Inlet, LLC ("**Debtor**") in connection with Debtor's solicitation of votes for its Plan of Reorganization dated September 3, 2025 [Doc. No. 47] (the "**Plan**"). It contains important information about Debtor and the Plan.[1]

In providing this Disclosure Statement to parties in interest, Debtor expressly seeks to enable such parties to make an informed judgment on whether to approve or reject the Plan.

This Disclosure Statement contains a summary of the Plan, general information about Debtor and its Chapter 11 case, and important information concerning Debtor's current financial condition and future prospects.

The information contained herein has been prepared by Debtor in good faith, based upon information available to Debtor. The financial information contained herein all was compiled from the records of Debtor but has not been verified by an audit.

The description of the Plan contained in this Disclosure Statement is intended as a summary only and is qualified in its entirety by reference to the Plan itself, which has been filed contemporaneously herewith. Each creditor is encouraged to read, consider, and carefully analyze the terms and provisions of the Plan.

The statements contained in this Disclosure Statement are made as of the date hereof, unless another time is specified herein, and delivery of this Disclosure Statement shall not create an implication that there has been no change in the facts set forth herein since the date of this Disclosure Statement and the date the materials relied upon in preparation of this Disclosure Statement were compiled.

---

[1] Capitalized terms not defined herein shall have the meanings ascribed to them in the Plan.

This Disclosure Statement may not be relied on for any purpose other than to determine how to vote on the Plan, and nothing contained herein shall constitute an admission of any fact or liability by any party, or be admissible in any proceeding involving Debtor or any other party, or be deemed conclusive advice on the tax or other legal effects of the reorganization on holders of claims or equity interests.

## II.  **BRIEF DISCUSSION OF CHAPTER 11 OF THE BANKRUPTCY CODE**

Under Chapter 11 of the Bankruptcy Code, a debtor is afforded its opportunity to rehabilitate and to restructure its financial obligations to its creditors.

In general, a debtor files a "Chapter 11 Plan," which sets forth a proposal for settlement of the debtor's debts.  A debtor's debts are classified as either being secured or unsecured, depending on whether the debtor has pledged any of its property to the creditor as collateral for the debt, or if any creditors hold judgment liens against the debtor's property.

A debtor under Chapter 11 may restructure its secured debt by paying its secured creditors in cash in full or in installment payments up to the value of the debtor's interest in the debtor's property. A debtor may also arrange for a secured creditor's collateral to be sold or surrendered.

The Bankruptcy Code requires that certain unsecured debts receive priority in payment over other debts.  Examples of unsecured debts entitled to priority are expenses and fees incurred during the Chapter 11 case, certain wages and employee benefits, certain consumer obligations, and taxes.

The Bankruptcy Code requires that a plan propose full cash payment to all priority unsecured creditors except taxing authorities.  Taxes under the Bankruptcy Code may be paid over time in installments.  Unsecured creditors may receive payments of anywhere from 0% to 100% of their claims, in a lump sum or over time, and the percentage and timing of payments depends on many factors and varies widely from case to case.

In any event, unless the creditors agree differently, a plan must provide creditors with at least the same treatment that creditors would receive in a liquidation of the debtor's assets under Chapter 7 of the Bankruptcy Code.

The Bankruptcy Code requires that the debtor (or other plan proponent) file a plan with the Court, which will be accompanied by a disclosure statement.  The disclosure statement must contain a summary of the plan and sufficient information about Debtor and its financial affairs to enable a creditor or other party in interest to intelligently determine whether to vote for or against the plan.

After the plan and disclosure statement are filed, the Court may hold a hearing on the adequacy of the disclosure statement or, in a small business case, may conditionally approve the disclosure statement, with final approval to be heard at the same time as confirmation of the plan. If the Court determines that the disclosure statement makes proper disclosures, then it is approved (or conditionally approved as the case may be), and the plan and disclosure statement, along with a ballot, are mailed to creditors and equity security holders for voting.

Typically, a date is set by the Court as the last day votes may be counted. The Court also schedules a confirmation hearing, at which time the Court hears evidence as to whether the plan complies with various standards for confirmation under the Bankruptcy Code, including whether sufficient votes have been cast accepting the plan from classes of creditors whose rights have been "impaired" by the plan (*i.e.*, creditors not receiving precisely the same rights they were entitled under their contracts with the debtor). Only ballots that are properly submitted are counted, so if a creditor does not vote, they are simply not counted in either the acceptance or rejection tallies.

There are two ways that a plan may be confirmed by the Court. First, the plan may be confirmed if all the impaired classes vote to accept the plan, with a simple majority in number of creditors in the impaired class voting to accept, but they must also hold claims totaling at least 2/3 of the value of all the claims in that class that voted.

Alternatively, if a class of impaired creditors does not accept the plan, then the plan may still be confirmed if it is "fair and equitable" respecting such class. The Bankruptcy Code defines "fair and equitable" regarding unsecured creditors as generally meaning payment of the entire amount of each creditor's claim or that no class of creditors or interest holders with a lesser priority will receive any compensation under the plan. Regarding secured creditors, "fair and equitable" generally means that the creditor receives the "indubitable equivalent" of its secured claim or cash or deferred payments with a present value equal to the amount of the secured claim. When a Court confirms a plan notwithstanding the lack of acceptance of all impaired classes, it is said that the debtor has achieved a "cramdown" of the plan.

When a debtor's plan is confirmed, the debtor receives a discharge or release of all indebtedness which it does not pay under the provisions of the plan. The discharge applies whether or not a creditor received notice of the Chapter 11 proceeding and applies even to creditors who voted against the plan.

### III.  BACKGROUND CONCERNING DEBTOR

#### A. Pre-Bankruptcy History of Debtor

Debtor is a Georgia limited liability company formed in 2020 with Jacoby Development, Inc. being the sole member of Debtor. James Jacoby is the sole shareholder of Jacoby Development, Inc. ("Jacoby Development"). Debtor owns approximately 1300 acres of undeveloped land in Camden County, Georgia that extends to the east coast of St. Marys, Georgia (the "**Property**"). The Property includes approximately 560 acres of land that can be developed and approximately 740 acres of undevelopable salt marsh along the North River in Camden County. A recent appraisal of the Property values the undeveloped land at $172,000,000.

The plan for the Property calls for a marina that will draw business and further development to create a multi-use community. The vision includes a town center with single family homes, apartments, hotels, restaurants and a multi-use business district (the "**Development Plan**"). Since purchasing the Property, Debtor has sought investors to fund the Development Plan. Debtor has entertained multiple proposals for funding, but none have these proposals have to come to fruition.

Debtor has incurred significant expense in obtaining the required permitting to build the marina. It also paid for an environmental study for the portion of the Property on which a paper mill operated for many years.

The Camden County Joint Development Authority (the "**JDA**") entered into a Development Agreement dated September 16, 2020 with the City of St. Marys, Georgia and Jacoby Development that allows Jacoby Development to develop the Property into a master project (the "**Development Agreement**"). Jacoby Development assigned the Development Agreement to Debtor pursuant to an Assignment and Assumption of Development Agreement, dated June 1, 2021 (the "**Assignment**").

Under the terms of the Development Agreement, the JDA issued Taxable Industrial Development Revenue Bonds, Series 2020, in the original principal amount of $10,848,500 to finance the loan to Debtor for its acquisition of the Property for development (the "**Bonds**"). The JDA used the proceeds of the Bonds to make a loan to Debtor for its acquisition of the Property (the "**JDA Loan**").

To memorialize the JDA Loan, Debtor and the JDA entered into a Loan Agreement dated June 1, 2021 (the "**JDA Loan Agreement**"). The JDA Loan is evidenced by a Promissory Note executed by Debtor of the same date (the "**Note**"). Debtor also executed a Guaranty in favor of the JDA under which Debtor guaranteed repayment of the Bonds (the "**Debtor Guaranty**"). Jacoby Development also executed a Guaranty in favor of the JDA under which it guaranteed repayment of the Bonds and the JDA Loan (the "**Jacoby Development Guaranty**").

The JDA Loan is secured by a first in priority Fee and Leasehold Deed to Secure Debtor and Security Agreement dated June 1, 2021 and recorded in the records of the Clerk of Court for Camden County, Georgia at Deed Book 2128, Page 796 (the "**First Security Deed**"). The JDA Loan is further secured by a second in priority Fee and Leasehold Deed to Secure Debtor and Security Agreement dated June 1, 2021 and recorded in the records of the Clerk of Court for Camden County, Georgia at Deed Book 2128, Page 837 (the "**Second Security Deed**").

Debtor also executed a first in priority Assignment of Leases and Rents in favor of the JDA dated June 1, 2021 and recorded in the records of the Clerk of Court for Camden County, Georgia at Deed Book 2128, Page 819 (the "**First Lease Assignment**"). On this same date, Debtor executed a second in priority Assignment of Leases and Rents in favor of the JDA dated June 1, 2021 and recorded in the records of the Clerk of Court for Camden County, Georgia at Deed Book 2128, Page 859 (the "**Second Lease Assignment**").

The Note, the Debtor Guaranty, the Jacoby Development Guaranty, the First Security Deed, the Second Security Deed, the First Lease Assignment, and the Second Lease Assignment are referred to collectively as the "**JDA Loan Documents**."

Under the terms of the JDA Loan, payments are due on February 15 and August 15 each year in the amount of $763,648.75, which represents principal and interest.

In October 2024, the JDA released a parcel of the Property to allow Debtor to obtain a loan from Matsco, Inc. in the principal amount of $1,000,000 (the "**Matsco Loan**"). Matsco took a first in priority security interest in and to the parcel of land to secure the Matsco Loan.

Debtor was unable to pay the February 15, 2025 payment due under the JDA Loan. In February 2025, the JDA sent a notice of default to Debtor and accelerated the amounts due under the JDA Loan Documents. In March 2025, the JDA initiated foreclosure proceedings against Debtor with the intention of foreclosing on the Property in May 2025.

Debtor realized that that filing for bankruptcy protection was the best option for Debtor to protect its Property. On May 5, 2025, Debtor filed this Bankruptcy Case.

**B. Post-Bankruptcy Activities of Debtor.**

Debtor has continued speaking with potential investors and possible purchasers of the Property. Debtor currently is negotiating with two different parties. One of these parties will provide funding for this Plan in an amount to pay in full the JDA and Matsco, as well as all priority tax claims and allowed unsecured creditor claims.

On August 29, 2025, Debtor paid the interest payment due under the JDA Note in the amount of $181?.

The JDA filed a motion to dismiss the case or alternatively to obtain relief from the automatic stay to foreclose on the Property [Doc. No. 41], which is set for hearing on October 15, 2025.

Debtor is certain it will obtain the funding necessary to make the Plan payments on or before the Effective Date of the Plan.

Jacoby Development will be the 100% member of Debtor on or before the Confirmation Hearing. Mr. Jacoby's leadership of Jacoby Development and Debtor is necessary to Debtor's successful reorganization. His role as the spokesperson for Debtor will ensure that Debtor obtains the necessary capital to fund the Plan and develop the Property.

**C. Plan Distributions.**

The Plan provides for one class of unsecured creditors: Class 3 consists of the General Unsecured Creditors Allowed Claims that will be paid in a lump sum distribution thirty (30) days after the Effective Date from the Investment Proceeds. If Debtor does not receive the Investment Proceeds, Class 3 shall not receive any Distribution under the Plan.

The Class 1 Allowed Secured Claim of the JDA shall be paid in full on the Effective Date from the Investment Proceeds. If Class 1 is not paid in full on the Effective Date, the JDA shall have relief from the automatic stay under § 362 of the Bankruptcy Code to pursue its rights and remedies against Debtor.

The Class 2 Allowed Secured Claim of Matsco, Inc. shall be paid in full on the Effective Date from the Investment Proceeds. If Class 2 is not paid in full on the Effective Date, Matsco, Inc. shall have relief from the automatic stay under § 362 of the Bankruptcy Code to pursue its rights and remedies against Debtor.

## IV.  SUMMARY OF THE PLAN

The Plan provides for the treatment of all secured, priority, and general unsecured claims, and retention of equity interests of Debtor as set forth below:

### A.  Priority Claims

The Plan provides for the satisfaction of all Allowed Administrative Claims on the Effective Date, unless otherwise agreed by the holder of such claim. As to each Administrative Claim allowed thereafter, payment will be made as soon as practicable.

All tax claims shall be paid in accordance with § 1129 of the Bankruptcy Code. The Camden County Tax Commissioner filed a proof of claim asserting a priority tax claim in the amount of $113,167.40 for tax year 2024. The City of St. Marys filed a proof of claim asserting a priority tax claim in the amount of $25,000.00 for tax year 2024. The Internal Revenue Service filed a proof of claim asserting an estimated priority claim for tax year 2024 in the amount of $2,350.00.

### B.  Secured Claims

**Class 1.  Allowed Secured Claim of Camden County Joint Development Authority** – ("**JDA Allowed Secured Claim**")

Class 1 shall consist of the JDA Allowed Secured Claim. The JDA has first in priority lien on Debtor's Property, pursuant to the JDA Loan Documents, except for the carve out of the parcel of the Property in which Matsco holds a first in priority lien.

Debtor shall continue to pay all interest payments due under the JDA Loan during the Bankruptcy Case prior to the Effective Date.

Debtor shall pay the JDA Allowed Secured Class 1 Claim in full on the Effective Date of the Plan.

If Class 1 is not paid in full on the Effective Date, the JDA shall have relief from the automatic stay under § 362 of the Bankruptcy Code to pursue its rights and remedies against Debtor.

   **Class 2.** **Allowed Secured Claim of Matsco, Inc. ("Matsco Allowed Secured Claim")**

  Class 2 shall consist of the Matsco Allowed Secured Claim. Matsco has first in priority lien on a parcel of Debtor's Property.

  Debtor shall pay the Matsco Allowed Secured Claim in full on the Effective Date of the Plan.

  If Class 2 is not paid in full on the Effective Date, Matsco shall have relief from the automatic stay under § 362 of the Bankruptcy Code to pursue its rights and remedies against Debtor.

  **C.** **Unsecured Claims**

   **Class 3.** **Allowed Claims of General Unsecured Creditors (the "GUCs")**

  Debtor estimates, based on its schedules and filed proofs of claims, that as of the date of the Plan, that undisputed General Unsecured Creditors Allowed Claims total approximately $120,885.00 of nine (9) unsecured creditors. Debtor scheduled as disputed the unsecured claim of Safe and Green Development Corporation. The Allowed Claims of General Unsecured Creditors shall be paid $120,885 in full on the Effective Date of the Plan. The claims shall be paid from the Investment Proceeds.

  **D.** **Equity Interests**

   **Class 4.** On the Effective Date of the Plan, Jacoby Development will be the sole member of Reorganized Debtor. It shall retain its member interest in Reorganized Debtor as of the Effective Date. JDI does not receive any income or distributions from Debtor. Since the Petition Date, JDI has contributed capital to Debtor to pay the JDA interest payment in the amount of at least $181,?. JDI also is the guarantor of the JDA Loan and is obligated to pay any interest payments under the Plan through the Effective Date.

  **E.** **Valuation of Assets and Collateral**

  Debtor owns the Property that is valued at $172,000,000 based upon an appraisal by CBRE. The Property is encumbered by the JDA Loan and the Matsco Loan These loans total $10,428,254.60. There is substantial equity in the Property.

F.  **Funding for the Plan**

Distributions and payments under the Plan shall be paid from the Investment Proceeds. All interest payments due to the JDA through the Effective Date shall be paid by Jacoby Development.

G.  **Absolute Priority Rule and New Value Exception**

Under § 1129 of the Bankruptcy Code, plans must be "fair and equitable" in order to be confirmed. Section 1129(b)(2)(B)(ii) provides guidance as to what constitutes "fair and equitable." It includes a requirement that junior classes of creditors and equity holders cannot receive property of a debtor during a reorganization, unless all senior classes either are paid in full or vote to accept the plan. This requirement is commonly referred to as the absolute priority rule.

The "new value" doctrine is a common law exception to the absolute priority rule. The basic concept behind "new value" is that equity holders may retain their interest in a debtor when they provide contribution, often in the form of capital, to the reorganization. Generally speaking, for the "new value" exception to apply, the value provided must be substantial, necessary, and reasonably equivalent to the value of the interest received in exchange.

H.  **Cramdown**

If not enough classes of creditors vote in favor of the Plan, Debtor will be requesting confirmation pursuant to the "cramdown" provisions of § 1129(b) of the Bankruptcy Code with respect to any impaired Class that votes to reject the Plan. Accordingly, upon confirmation by the Bankruptcy Court, the Plan will be binding on all creditors and Classes, even if they voted to reject the Plan.

I.  **Other Plan Provisions**

Any executory contracts and unexpired leases that have not been previously assumed or rejected shall be deemed rejected on the Effective Date unless the Confirmation Order provides otherwise. Allowed Claims, if any, arising out of the rejection of executory contracts and unexpired leases shall be treated as Class 4 General Unsecured Claims, if not otherwise provided for with the consent of the parties and approval by the Bankruptcy Court.

**THE ABOVE SUMMARY IS A BROAD OUTLINE OF THE PLAN AND IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLAN, WHICH HAS BEEN FILED CONTEMPORANEOUSLY HEREWITH.**

## V.  **VOTING ON THE PLAN**

Below is a summary of the Classes set forth in the plan and identification of which Classes are entitled to accept or reject the Plan:

**Class 1.**  **Allowed Secured Claim of JDA – Unimpaired and not entitled to vote on the Plan.**

      **Class 2.**      **Allowed Secured Claim of Matsco– Unimpaired and entitled to vote on the Plan.**

      **Class 3.**      **Allowed General Unsecured Claims – Impaired and entitled to vote on the Plan.**

## VI. DISCUSSION OF BEST INTEREST OF CREDITORS: TREATMENT IN A CHAPTER 11 VS. CHAPTER 7

Another confirmation requirement is the "Best Interest Test," which requires a liquidation analysis. Under the Best Interest Test, if a claimant or interest holder is an impaired class and that claimant or interest holder does not vote to accept the Plan, then that claimant or interest holder must receive or retain under the Plan property of a value not less than the amount that such holder would receive or retain if Debtor were liquidated under Chapter 7 of the Bankruptcy Code.

In a Chapter 7 case, a debtor's assets are usually sold by a Chapter 7 trustee. Secured creditors are paid first from the sales proceeds of properties on which the secured creditors hold liens. Administrative claims are paid next. Then unsecured creditors are paid from any remaining sales proceeds according to their rights to priority. Unsecured creditors with the same priority share in proportion to the amount of their allowed claims in relationship to the amount of total allowed unsecured claims. Finally, interest holders receive the balance that remains, if any, after all creditors are paid.

For the Court to be able to confirm the Plan, the Court must find that all creditors and interest holders who do not accept the Plan will receive at least as much under the Plan as such holders would receive under a Chapter 7 liquidation. After considering the effect that a Chapter 7 liquidation would have on the value of Debtor's estate, including the costs resulting from a Chapter 7 liquidation, and the adverse effect of a forced sale on the price of Debtor's assets, Debtor has determined that confirmation of the Plan will provide each holder of a claim with a recovery that substantially more than each such holder would receive in a liquidation of Debtor's assets under Chapter 7 of the Bankruptcy Code.

For Plan payments and this liquidation analysis, Debtor values its assets. Debtor's only asset is the Property which is encumbered by Stone Bank and Fenton. Generally, assets disposed of by "liquidation" or "fire" sale generate significantly less proceeds than assets that are marketed and sold as a going concern. Additionally, a Chapter 7 Trustee would incur trustee's fees pursuant to § 326(a) or § 330 of the Bankruptcy Code.[2] After payment of administrative and priority claims, a Chapter 7 liquidation would substantially diminish the funds available for distribution.

---

[2] 11 U.S.C. § 326(a) states that a Chapter 7 trustee would incur trustee's fees equal to 25% of the first $5,000 of Liquidation Value of Assets; 10% of amount in excess of $5,000 but not in excess of $50,000 of Liquidation Value of Assets; 5% of any amount in excess of $50,000 but not in excess of $1,000,000; 3% of any amount in excess of $1,000,000 of the Liquidation Value of Asset, and commissions for auctioneers for personal property generally is equivalent to ten (10%) percent of the gross sales price and commissions for real property brokers is generally six percent (6%) of the gross sales price. In addition, the attorney for the Chapter 7 trustee would incur attorney's fees as would the current Chapter 11 attorneys.

Here, in a chapter 7 case, a Chapter 7 Trustee will not have the opportunity to liquidate Debtor's Property. The JDA and Matsco would obtain relief from the automatic stay and foreclose on the Property. Debtor has no other assets that a Chapter 7 Trustee could liquidate to pay unsecured creditors. Under this Plan, Debtor is paying the undisputed General Unsecured Creditors 100% of their Allowed Claims. In a chapter 7 liquidation, the unsecured creditors would not receive any distribution. These classes of unsecured creditors will receive more under this Plan than they would receive under a Chapter 7 liquidation. Debtor believes that this satisfies the Best Interests Test.

### VII. ADMINISTRATIVE EXPENSE CLAIMS, INCLUDING ATTORNEYS' FEES AND UNITED STATES TRUSTEE FEES

With respect to potential Administrative Expense Claims, Debtor, pursuant to Court order, retained the law firm of Rountree Leitman Klein & Geer, LLC ("**RLKG**") to serve as bankruptcy counsel. As set forth in the employment application and supporting documents, RLKG received a prepetition retainer in the amount of $35,000.00, including the filing fee. As of the date hereof, the fees and expenses incurred by RLKG have exceeded the retainer. Further, RLKG shall file a final application for compensation as soon as practicable after the order confirming the Plan is entered. Debtor shall pay any unpaid Administrative Expense Claim approved by the Court and held by RLKG as agreed upon between Debtor and RLKG. RLKG shall retain its security interests in its pre-petition retainers.

All fees required to be paid by 28 U.S.C. § 1930(a)(6) ("**U.S. Trustee Fees**") will accrue and be timely paid until the Bankruptcy Case is closed. Debtor is current on its obligation to pay U.S. Trustee Fees.

### IX. LITIGATION; BANKRUPTCY CAUSES OF ACTION; AND RECOVERY OF ASSETS

Debtor knows of no litigation which will be instituted and/or continued against any party following confirmation of the Plan, except for routine claim objections which may be instituted against claimants whose claims may be disputed by Debtor.

### X. INFORMATION RELEVANT TO THE RISKS POSED TO CREDITORS UNDER THE PLAN

The primary risk to creditors in this case is that Debtor will not receive funding needed to make the proposed payments under the Plan. However, Debtor believes that this is a minimal risk. Although it is impossible to predict any unforeseen contingencies, Debtor anticipates payment to creditors within the timeframe contemplated in the Plan.

---

11 U.S.C. § 330 provides for reasonable compensation for actual, necessary service rendered by the trustee and reimbursement for actual, necessary expenses.

## XI. FEDERAL AND STATE TAX IMPLICATIONS TO CREDITORS

Debtor is not aware of any adverse federal or state tax implications to creditors by virtue of the treatment of their claims under the Plan, except to the extent that any creditor has written off all or a portion of its claim against Debtor as a bad debt.

**However, Debtor does not warrant that there will be no tax implications to creditors resulting from confirmation of the Plan, and creditors should not rely on Debtor's representations regarding potential tax consequences. Creditors are well-advised to consult their tax advisors as to whether confirmation of the Plan could cause any adverse tax implications.**

The U.S. federal income tax consequences to a holder of a Claim (including the character, timing and amount of income, gain or loss recognized) will depend upon, among other things, (a) the manner in which you acquired a Claim; (b) the length of time that you have held the Claim; (c) whether you acquired the Claim at a discount; (d) whether you have taken a bad debt deduction with respect to the Claim (or any portion thereof) in current or prior years; (e) whether you have previously included in taxable income accrued but unpaid interest with respect to the Claim; and (f) your method of accounting.

## XII. DISCLAIMER

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE HEREOF UNLESS OTHERWISE SPECIFIED, AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER SUCH DATE.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND RULE 3016 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER APPLICABLE LAW. THIS DISCLOSURE STATEMENT HAS BEEN NEITHER APPROVED NOR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION (THE "**SEC**") OR ANY OTHER SECURITIES REGULATORY AUTHORITY NOR HAS THE SEC OR ANY OTHER SECURITIES REGULATORY AUTHORITY PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN. PERSONS OR ENTITIES TRADING IN OR OTHERWISE PURCHASING, SELLING, OR TRANSFERRING CLAIMS OR EQUITY INTERESTS OF THE DEBTORS SHOULD EVALUATE THIS DISCLOSURE STATEMENT AND THE PLAN IN LIGHT OF THE PURPOSES FOR WHICH THEY WERE PREPARED.

THE INFORMATION IN THIS DISCLOSURE STATEMENT IS BEING PROVIDED SOLELY FOR PURPOSES OF VOTING TO ACCEPT OR REJECT THE PLAN. NOTHING IN

THIS DISCLOSURE STATEMENT MAY BE USED BY ANY ENTITY FOR ANY OTHER PURPOSE.

THE TERMS OF THE PLAN GOVERN IN THE EVENT OF ANY INCONSISTENCY WITH THE PLAN SUMMARY IN THIS DISCLOSURE STATEMENT. ALL EXHIBITS TO THIS DISCLOSURE STATEMENT ARE INCORPORATED INTO AND ARE A PART OF THIS DISCLOSURE STATEMENT AS IF SET FORTH IN FULL HEREIN.

AS TO CONTESTED MATTERS, EXISTING LITIGATION INVOLVING, OR POSSIBLE ADDITIONAL LITIGATION TO BE BROUGHT BY, OR AGAINST, THE DEBTOR, ADVERSARY PROCEEDINGS, AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, A STIPULATION, OR A WAIVER, BUT RATHER AS A STATEMENT MADE WITHOUT PREJUDICE SOLELY FOR SETTLEMENT PURPOSES, WITH FULL RESERVATION OF RIGHTS, AND IS NOT TO BE USED FOR ANY LITIGATION PURPOSE WHATSOEVER BY ANY PERSON, PARTY OR ENTITY. AS SUCH, THIS DISCLOSURE STATEMENT SHALL NOT BE ADMISSIBLE IN ANY NONBANKRUPTCY PROCEEDING INVOLVING THE DEBTOR OR ANY OTHER PARTY IN INTEREST, NOR SHALL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES, FINANCIAL OR OTHER EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST THE DEBTOR.

THIS DISCLOSURE STATEMENT CONTAINS FORWARD-LOOKING STATEMENTS BASED PRIMARILY ON THE CURRENT EXPECTATIONS OF THE DEBTOR AND PROJECTIONS ABOUT FUTURE EVENTS AND FINANCIAL TRENDS AFFECTING THE FINANCIAL CONDITION OF THE DEBTOR. IN PARTICULAR, STATEMENTS USING WORDS SUCH AS "BELIEVE," "MAY," "ESTIMATE," "CONTINUE," "ANTICIPATE," "INTEND," "EXPECT" AND SIMILAR EXPRESSIONS IDENTIFY THESE FORWARD-LOOKING STATEMENTS. THESE FORWARD-LOOKING STATEMENTS ARE SUBJECT TO A NUMBER OF RISKS, UNCERTAINTIES AND ASSUMPTIONS. IN THE LIGHT OF THESE RISKS AND UNCERTAINTIES, THE FORWARD-LOOKING EVENTS AND CIRCUMSTANCES DISCUSSED IN THIS DISCLOSURE STATEMENT MAY NOT OCCUR, AND ACTUAL RESULTS COULD DIFFER MATERIALLY FROM THOSE ANTICIPATED IN THE FORWARD-LOOKING STATEMENTS. CONSEQUENTLY, THE PROJECTED FINANCIAL INFORMATION AND OTHER FORWARD-LOOKING STATEMENTS CONTAINED HEREIN SHOULD NOT BE REGARDED AS REPRESENTATIONS BY THE DEBTOR, ITS ADVISORS, OR ANY OTHER PERSON THAT THE PROJECTED FINANCIAL CONDITIONS OR RESULTS OF OPERATIONS CAN OR WILL BE ACHIEVED. EXCEPT AS OTHERWISE REQUIRED BY LAW, THE DEBTOR WILL NOT UNDERTAKE ANY OBLIGATION TO UPDATE OR REVISE PUBLICLY ANY FORWARD-LOOKING STATEMENTS, WHETHER AS A

RESULT OF NEW INFORMATION, FUTURE EVENTS, OR OTHERWISE FOLLOWING APPROVAL OF THIS DISCLOSURE STATEMENT BY THE BANKRUPTCY COURT.

NO STATEMENTS OR INFORMATION CONCERNING THE PLAN AND THE TRANSACTIONS CONTEMPLATED THEREBY HAVE BEEN AUTHORIZED, OTHER THAN THE STATEMENTS AND INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AND THE INFORMATION ACCOMPANYING THIS DISCLOSURE STATEMENT. ALL OTHER STATEMENTS REGARDING THE PLAN AND THE TRANSACTIONS CONTEMPLATED THEREBY, WHETHER WRITTEN OR ORAL, ARE UNAUTHORIZED.

THIS DISCLOSURE STATEMENT HAS NEITHER BEEN APPROVED NOR DISAPPROVED BY THE SEC OR ANY OTHER GOVERNMENTAL AGENCY, NOR HAS THE COMMISSION OR ANY SUCH OTHER GOVERNMENTAL AGENCY PASSED UPON THE ACCURACY OR ADEQUACY OF THE INFORMATION CONTAINED HEREIN.

THIS DISCLOSURE STATEMENT, TOGETHER WITH THE PLAN, SHOULD BE READ IN ITS ENTIRETY.  ADDITIONALLY, IT MAY BE ADVISABLE FOR CREDITORS TO CONSULT THEIR OWN COUNSEL OR OTHER ADVISORS WITH RESPECT TO THE MATTERS CONTAINED HEREIN.

NO REPRESENTATIONS CONCERNING THE DEBTOR, ITS FUTURE BUSINESS OPERATIONS, FINANCIAL CONDITIONS, OR THE VALUE OF ITS PROPERTY ARE AUTHORIZED BY DEBTOR OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.  ANY REPRESENTATIONS OR INDUCEMENTS MADE TO CREDITORS TO SECURE AN ACCEPTANCE OF THE PLAN WHICH ARE OTHER THAN AS CONTAINED IN THIS STATEMENT SHOULD NOT BE RELIED UPON IN ARRIVING AT A DECISION.

### XIII.  CONCLUSION

In the opinion of Debtor, the Plan is the best available option for creditors because it will provide the greatest and quickest distributions to all creditors.

Dated: September 3, 2025                **ROUNTREE LEITMAN KLEIN & GEER, LLC**

*/s/ Ceci Christy*
Ceci Christy
Ga. Bar No. 370092
Century Plaza I
2987 Clairmont Road, Suite 350
Atlanta, Georgia 30329
(404) 584-1238 Telephone
cchristy@rlkglaw.com
*Attorneys for Debtor*

-13-